IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| **RHODE ISLAND AFL-CIO** | |
| **RHODE ISLAND CENTER FOR JUSTICE** | |
| **ANH NGUYEN** | |
| **SOLAR UNITED NEIGHBORS** | |
| **SUNPATH CONSULTING LLC d/b/a SUNPATH SOLAR** | |
| **2KB ENERGY SERVICES, LLC** | Case No. _____ |
| **ENERGY INDEPENDENT SOLUTIONS** | |
| **BLACK SUN LIGHT SUSTAINABILITY** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL** |
| *Plaintiffs,* | |
| v. | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;** | |
| **LEE ZELDIN**, in his official capacity as Administrator of the United States Environmental Protection Agency; | |
| *Defendants.* | |

## INTRODUCTION

1.     This lawsuit challenges the unlawful decision of the Environmental Protection Agency

("EPA" or "the Agency") and its Administrator Lee Zeldin ("Defendant Zeldin") (collectively,

"Defendants") to terminate the Solar for All program, which Congress created and funded to

provide low-income households and disadvantaged communities with savings on their electricity

bills and affordable energy through rooftop and community solar programs.

2.     Before Defendants' abrupt termination of the Solar for All program, EPA obligated $7

billion in grant funding that Congress appropriated to the Agency to provide to states, territories,

Tribal governments, municipalities, and nonprofits across the country to develop long-lasting

solar energy programs. Congress directed EPA to award those grant funds to enable low-income

and disadvantaged communities to deploy and benefit from zero-emission technologies including

distributed residential solar, lowering energy costs for families, and reducing the risk of utility

shut offs, creating good-quality jobs, advancing environmental justice, and tackling climate

change.

3.     According to EPA itself, one hundred percent of Solar for All funding was slated to

support the low-income and disadvantaged communities who need it most, and the average low-

income household benefiting from a grant program would have saved about $400 each year on

their electricity bills.

4.     EPA conducted a competitive review process, selected the grantees, obligated the grant

funds, and entered into agreements and approved workplans for each of the grantees.

5.      Grant recipients developed programs to serve communities facing unique barriers to distributed solar deployment, including rural communities in the Southeast; communities in the industrial heartland; households in affordable housing; households that cannot deploy residential rooftop solar; and communities neighboring minority-serving educational institutions.

6.      Programs funded by Solar for All would have created hundreds of thousands of good-paying, high-quality jobs all across the country, as grantees worked with local, regional, and national labor unions and educational institutions to implement their programs and committed to developing robust workforce development plans.

7.      EPA estimated that the Solar for All program would have cumulatively reduced or avoided greenhouse gas emissions by over 30 million metric tons $CO_2$ equivalent, equal to the emissions of over 7 million typical passenger vehicles.

8.      In July 2025, a subsequent Congress repealed large parts of the Greenhouse Gas Reduction Fund but did not repeal the Solar for All program retroactively.

9.      Congress rescinded only "*unobligated* balances," which preserved all $7 billion of the obligated funding EPA already had awarded through its Solar for All grants.

10.      Instead of distributing the Solar for All funds as Congress directed, Defendants hastily and unlawfully terminated the Solar for All program. Defendants' action to terminate the program violates the law in multiple ways, as set out below.

11.      If Defendants' unlawful termination of the Solar for All program is allowed to stand, nearly one million low-income households will lose access to affordable, resilient solar in communities in all states and territories, and hundreds of thousands of good-paying, high-quality jobs will be lost, especially in the low-income and disadvantaged communities Congress intended these funds to benefit.

12.    Plaintiffs are not direct grantees under the Solar for All program, but rather they are its intended beneficiaries. They are a labor organization, an individual homeowner seeking access to solar energy to reduce costs, nonprofit organizations dedicated to assisting low-income families with affordable energy, and solar consultants and installers. All these Plaintiffs should have benefitted directly from the Solar for All program's provision of new sources of energy throughout the nation and its electricity cost savings.

13.    Defendants' actions violated federal law, including the Administrative Procedure Act and the United States Constitution.

14.    Plaintiffs have been harmed by Defendants' illegal actions and seek an order declaring the termination of the Solar for All program unlawful, setting it aside, and requiring Defendants to restore the program.

## JURISDICTION AND VENUE

15.    Plaintiffs bring this action for declaratory and injunctive relief based on Defendants' violations of the APA and the U.S. Constitution.

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the APA and U.S. Constitution. 5 U.S.C. §§ 551 *et. seq.*

17.    The APA authorizes the Court to grant temporary and permanent relief from unlawful agency action. 5 U.S.C. §§ 705-706. This Court also has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

18.    The Court's jurisdiction over the APA claims here is unaffected by the Tucker Act, 28 U.S.C. § 1491(a)(1). Plaintiffs seek reinstatement of the Solar for All program as a whole, in

order to restore the beneficial opportunities they were deprived of; they are not grantees under the Solar for All program and do not bring claims "based on" any grant. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (Mem.) (citations and internal quotation marks omitted); *see also Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 465 n.5 (1980) (holding that the plain text of 28 U.S.C. § 1491(a)(1) means the Tucker Act does not apply where there is no "actual contract."). Plaintiffs challenge the termination of the entire Solar for All program and seek an order declaring the termination unlawful and vacating it. These APA claims belong in district court. *See Nat'l Insts. of Health*, 145 S. Ct. at 2661 (Barrett, J., concurring) (district court has jurisdiction over APA claims challenging policy-level actions related to grants).

19.    Nor does the Tucker Act affect the Court's jurisdiction over Plaintiffs' freestanding constitutional claims. Where it applies, the Tucker Act affects certain kinds of APA claims not present here because of the interplay between the Tucker Act and the APA's waiver of sovereign immunity. *See id.* at 2659. Because Plaintiffs' freestanding constitutional claims neither involve nor require any waiver of sovereign immunity, *Chamber of Commerce of U.S. v. Reich,* 74 F.3d 1322, 1329 (D.C. Cir. 1996), the Tucker Act has no role to play.

20.    Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and a plaintiff resides in this judicial district.

## PARTIES

### Plaintiffs

21.    Plaintiffs include business owners and non-profit organizations that made business decisions and incurred expenses in reliance on the Solar for All grant awards. Plaintiffs lost

business opportunities as a result of the wrongful termination efforts, and had their missions thwarted by the unlawful agency action. Plaintiffs also include labor unions, who lost Solar for All's support for the creation of apprenticeship programs and well-paying jobs that would have brought in new members, as well as an individual homeowner who lost the ability to receive no-cost access to the reduced energy costs associated with solar energy because of Defendants' decision to terminate the grant program.

22.    **Rhode Island AFL-CIO** is a statewide federation of labor unions, including building trades unions with thousands of members who construct, maintain, and service the state's critical infrastructure and energy systems.

23.    **Rhode Island Center for Justice** is a nonprofit legal advocacy organization that provides legal representation and advocacy for low-income Rhode Islanders, with a focus on utility access, housing, and consumer protection. A central part of their work is representing households in proceedings to prevent eviction and termination of utility service and advocating at the Rhode Island Public Utilities Commission on rate-setting matters and other regulatory proceedings that directly affect affordability for low-income families.

24.    **Anh Nguyen** is a homeowner in Atlanta, Georgia. She applied for no-cost solar installation through the Georgia BRIGHT program, a statewide initiative to provide affordable solar energy that was awarded $156 million through Solar for All to serve all of Georgia.

25.    **Solar United Neighbors** is a 501(c)(3) nonprofit organization with its headquarters in Washington, DC. SUN operates in Florida, Texas, Indiana, and other states across the United States to work with communities to build an energy system with rooftop solar at the cornerstone.

26.    **Sunpath Solar.** Plaintiff Sunpath Consulting LLC d/b/a Sunpath Solar is a Georgia-based solar installer. It is dedicated to helping traditionally marginalized communities share in the environmental and economic benefits of solar power.

27.    **2KB Energy Services, LLC** is a Georgia-based small business that supports companies with procuring, financing, and managing energy efficiency and capital infrastructure improvement projects.

28.    **Energy Independent Solutions** is a limited liability company based in Pittsburgh, Pennsylvania that installs solar panels for residential, commercial, and agricultural applications.

29.    **Black Sun Light Sustainability** ("BSLS") is an Indiana fiscally sponsored project of the nonprofit Movement Strategy Center. BSLS is committed to advancing sustainability for impacted communities through community education, policy advocacy, and clean energy projects. BSLS's mission is transformative change, including collaborating, connecting, and changing communities, with a focus on all aspects of energy and climate.

30.    Each Plaintiff stood to benefit from the obligated funds that were awarded by EPA under the Solar for All program and took actions in reliance on the program. Each Plaintiff was significantly harmed by Defendants' termination of the Solar for All program. These harms are directly traceable to Defendants' unlawful decision to terminate the Solar for All program. By eliminating Solar for All in its entirety, Defendants caused direct financial losses to Plaintiffs and deprived them of the opportunities and benefits the program was created to provide: jobs, training programs, and affordable, clean energy, among many others.

### Defendants

31.    Defendant Zeldin is the Administrator of the EPA. He is sued in his official capacity.

32.    Defendant EPA is an agency in the executive branch of the United States government. See 5 U.S.C. § 551(1); Reorganization Plan No. 3 of 1970, Pub. L. No. 98-80, 84 Stat. 2086 (1970).

33.    EPA is responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grant programs related to environmental protection, and for distributing funds Congress specifically appropriated to these grant programs such as the Solar for All program.

34.    By September 2024, EPA had awarded and obligated $7 billion in grants as authorized by 42 U.S.C. § 7434(a)(1) (2022) through its Solar for All program.

35.    EPA then administered the Solar for All program until Defendants terminated it in August 2025.

## FACTUAL BACKGROUND

### The 117th Congress & the Solar for All Grant Program

36.    In 2022, when the 117th Congress enacted the Inflation Reduction Act, it made substantial federal investments in cutting-edge clean energy technology, lowering energy costs, and mitigating the impacts of greenhouse gas emissions and toxic air pollution.

37.    The 117th Congress intended these funds to support communities across the country, prioritizing those that have long borne the brunt of environmental and health harms.

38.    As part of the Inflation Reduction Act, the 117th Congress amended the Clean Air Act to create a new program aimed at extending greenhouse gas-reducing technologies to low-income and disadvantaged communities. Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60103, 136 Stat 1818, 2066-67 (codified at 42 U.S.C. § 7434).

39.    The 117th Congress appropriated a total of $27 billion to the program known as the Greenhouse Gas Reduction Fund. *Id.*

40.    Of that $27 billion, the 117th Congress appropriated $7 billion to fund competitive grants "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities."  42 U.S.C. § 7434(a)(1) (2022).

41.    Section 7434(a)(1) read as follows:

> Zero-emission technologies.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $7,000,000,000 to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after the enactment of this section, to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section.

42 U.S.C. § 7434(a)(1) (2022).

42.    The 117th Congress explicitly required EPA to award this $7 billion in grant funding and technical assistance to benefit low-income and disadvantaged communities through non-profit organizations, States, municipalities, and Tribal government grantees. *Id.*

43.    Congress gave EPA until September 30, 2024, to award this grant funding. *Id.*

44.    In addition to the Solar for All grant program, the 117th Congress appropriated $19.97 billion for two other grant programs through the Greenhouse Gas Reduction Fund.[2] 42 U.S.C. §§ 7434(a)(2)-(a)(3) (2022).

45.    The 117th Congress also appropriated $30 million for EPA's administrative costs necessary to carry out Section 134:

> ADMINISTRATIVE COSTS.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any month in the Treasury not otherwise appropriated, $30,000,000, to remain available until September 30, 2031, for the administrative costs necessary to carry out activities under this section.

42 U.S.C. § 7434(a)(4) (2022).

46.    EPA followed the congressional directive established in 42 U.S.C. § 7434(a)(1), created the Solar for All grant program, and began a competitive grant-awarding process.

47.    EPA released its initial Notice of Funding Opportunity on June 28, 2023, and a revised Notice on August 31, 2023.[1]

48.    The statute directed EPA to use the program funding to enable communities to "deploy or benefit" from zero-emission technologies, including rooftop solar. The Notice of Funding Opportunity defined five "meaningful benefits" that would be used to evaluate program applicants: 1) household savings; 2) equitable access to solar; 3) resilience benefits; 4) community ownership; and 5) workforce development and entrepreneurship.

49.    Award announcements were then made in April 2024, and EPA obligated the entire $7 billion in Solar for All program funds by the statutory deadline of September 30, 2024.[2]

50.    EPA awarded funds to 60 primary grant recipients "to expand the number of low-income and disadvantaged communities primed for distributed solar investment."[3]

51.    EPA issued Solar for All Notices of Award that stated that the obligated funds would be available for five years, consistent with the enabling statute, 42 U.S.C. § 7434 (2022).

---

[1] U.S. Env't Prot. Agency, *Office of the Greenhouse Gas Reduction Fund, Solar for All Notice of Funding Opportunity* (revised August 31, 2023), https://perma.cc/SC5J-7954.

[2] U.S. Env't Prot. Agency, *Review and Selection Process* (last updated Aug. 16, 2024), https://perma.cc/L226-RZXH; U.S. Env't Prot. Agency, *Greenhouse Gas Reduction Fund: Solar for All*, (last visited Aug. 15, 2025), https://perma.cc/Z2TT-97AA; 42 U.S.C.A. § 7434 (2022).

[3] U.S. Env't Prot. Agency, *About the Greenhouse Gas Reduction Fund*, https://perma.cc/43QC-9LR6, (last visited Jun. 26, 2025).

52.    In its press release announcing the awarded funds, EPA highlighted expected benefits, financial savings, and business opportunities.[4] The Solar for All program includes state-specific and regional grants to nonprofits, states, and Tribes covering all 50 states, the District of Columbia, Puerto Rico, territories, and many tribal lands.[5] The program is expected to save an estimated $350 million annually on energy bills during and after the five-year program, providing energy bill relief for more than 900,000 low-income and disadvantaged households.[6] It is expected to secure 4,000 megawatts of new solar energy over five years and generate 200,000 new jobs alongside workforce training programs.[7]

53.    Prior to allowing grantees access to the full amount of their funds, EPA required the submission and its approval of the grantees' "Solar for All Workplan."

54.    EPA approved detailed Solar for All workplans that described each grantee's implementation investments and anticipated benefits to their communities.

55.    Upon information and belief, the workplans set forth, among other things, proposed grant-funded plans for solar design and installation, program administration and technical services, and anticipated increases in staffing by sub-awardees.

---

[4] U.S. Env't Prot. Agency, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://perma.cc/73B7-UEQF.
[5] *Id.*
[6] National Renewable Energy Lab, *Technical Assistance for Solar for All Grant Recipients* (last updated Mar. 19, 2025), https://perma.cc/38JH-W8V6.
[7] *Id.* (including expected job creation); U.S. Env't Prot. Agency, *Solar for All: Solar for Labor Highlights* (last updated Feb. 25, 2025), https://perma.cc/7JG3-DEFR  (including workforce training examples from across the country).

56.    Upon information and belief, the workplans indicated, among other things, plans to contract with outside business and organizations for workforce training, technical expertise, and other assistance.

57.    In fact, EPA boasted of these significant community benefits on its website.[8]

**Plaintiffs' Actions in Reliance on Grant Awards**

58.    These are precisely the benefits and opportunities anticipated by Plaintiffs. For example:

59.    Plaintiff Rhode Island AFL-CIO, through its Climate Jobs Rhode Island initiative, invested significant time and resources to prepare for Solar for All implementation. Rhode Island's unions relied on the program as a central component of their climate jobs strategy: to expand renewable deployment while ensuring high-quality union careers for a new generation. To facilitate that strategy, RI AFL-CIO joined a coalition to assist with preparing the state's Solar for All application.

60.    RI AFL-CIO staff members spent time and energy to develop a workforce development plan for the state's Solar for All grant application, met with workforce development partners, and worked with state agencies like the Department of Labor and Training to hone and improve the plan. They organized a climate jobs team to coordinate strategy, lobbied for strong labor protections in federal law, and connected local unions to ensure collaboration in solar deployment projects.

61.    RI AFL-CIO and its affiliates have also invested time and money creating and improving training and apprenticeship programs for the workers to increase the implementation

---

[8] U.S. Env't Prot. Agency, *About the Greenhouse Gas Reduction Fund* (last visited Jun. 26, 2025), https://perma.cc/43QC-9LR6; U.S. Env't Prot. Agency, *Solar for All Fast Facts* (last updated Feb. 25, 2025), https://perma.cc/E9LQ-979N.

of solar energy in anticipation of Solar for All funding. Apprenticeship programs were preparing to scale up solar-related training, and unions anticipated new memberships and career pipelines tied to these projects. Some affiliates, for example, developed training curricula to expand into solar installation and clean energy construction, in order to bring in the next generation of skilled tradespeople, including electricians, carpenters, and laborers, and to ensure compliance with federal prevailing-wage and apprenticeship requirements.

62.    Plaintiff Rhode Island Center for Justice entered into a Memorandum of Agreement with the Rhode Island Office of Energy Resources, the Rhode Island Department of Environmental Management, the Rhode Island Infrastructure Bank, the Rhode Island AFL-CIO, and others, promising to help expand access to distributed solar investment incentives for low-income and disadvantaged communities under the Solar for All program. Participating in this program has required the Center to hire additional staff and expand the scope of its work, including participating in more Public Utilities Commission dockets to support the deployment of solar to mitigate rising electricity costs for the Center's low-income clients.

63.    Plaintiff Anh Nguyen applied for the no-cost solar program in Georgia because the electricity bills in her East Atlanta home she recently purchased were as high as $500 per month in the summer and she had received disconnection notices from the utility company, so she hoped to benefit from the reduced electricity costs the program would offer. Without this program, the upfront cost of solar would be unaffordable for Ms. Nguyen.

64.    Plaintiff Solar United Neighbors devoted hundreds of hours to preparing applications and implement programming for Solar for All, and it secured sub-awards that would have provided over $15 million to lead technical assistance, deployment, and implementation of projects in Florida, Texas, and Indiana for their respective state Solar for All programs. SUN has

a sub-award with Solar and Energy Loan Fund for $9.6 million to lead technical assistance, deployment, and implementation of projects for the Florida Solar for All Program. SUN has a sub-award with Houston Advanced Research Center for $4 million to support the Solar for All Program in Texas. SUN has a sub-award of $350,000 from Indiana Community Action Agency to support the Solar for All Program in Indiana.

65.    In each location, SUN hired staff and invested heavily in planning and capacity-building. In Florida, SUN hired seven full-time staff to implement the program, incurring over $14,000 in hiring expenses, and was planning to hire three more in anticipation of providing solar to over 5,000 income-qualified households, and it worked with solar installation contractors to line up qualifying households, putting its reputation on the line. In Texas, SUN hired a full-time Solar for All program manager and began offering training and technical assistance to the City of Waco's effort to provide 150 qualifying households with solar. SUN entered into agreement to develop 30 "Hub Homes" in Harris County, which offer supplies and power to the community during power outages. SUN also entered agreements to create energy resilience at a local community center that serves as a Red Cross Shelter, which would enable the center to keep its doors open for emergency services that coincide with power outages. In Indiana, SUN put in a year of planning work and started a feasibility study for community solar and a brownfield program in partnership with the City of Indianapolis, in addition to other outreach efforts. SUN has engaged in extensive outreach with low-income communities, installers and other contractors, and political leaders, putting its reputation on the line. SUN has met regularly with EPA and complied with all conditions for its Solar for All sub-awards.

66.    Plaintiff Sunpath Solar invested significantly to expand its business in expectation of the significant growth that Solar for All would bring to the residential solar sector in Georgia

after it was selected as a contractor for Solar for All installations and enabling repairs in Georgia. The goals of the Solar for All program also align directly with Sunpath's mission. In reliance on its ability to complete Solar for All projects, Sunpath hired two new staffers, expended resources to identify candidates to fill additional expected positions, and expanded company infrastructure, from project management systems to vehicles. In addition, Sunpath spent months developing relationships with community organizations like the Latin American Association, Habitat for Humanity, and numerous faith-based organizations and congregations, who trusted Sunpath's word about the program and themselves started to develop programmatic and outreach content based on the program's stated benefits and goals.

67.    Plaintiff 2KB was selected in November 2024 as the Program Administrator for the Enabling Repairs portion of the program, supporting the Georgia Solar for All program by conducting federally compliant procurements and providing contractor training in compliance with federal requirements including Build America, Buy America, and the Davis-Bacon Act. In this role, 2KB advertised opportunities for contractors, who 2KB would later manage, to complete work that prepared awarded homes and buildings to receive solar energy. While the request for proposals from contractors was open and before the bidding deadline closed, the program was abruptly terminated. 2KB had no way to inform the general public that the opportunity it advertised was no longer available, so instead it continued to field questions and receive completed applications from hopeful contractors for work opportunities that were no longer available.

68.    Plaintiff Energy Independent Solutions relied on the $156 million slated for income-qualified solar installations in Pennsylvania under the Solar for All program, which would have supported long-term demand for Energy Independent Solutions' services. The company believed

it would be able to sustain a more ambitious expansion as a result, and made hiring and other investment decisions in reliance on the long-term demand supported by the program.

69.    The mission of Plaintiff Black Sun Light Sustainability aligns directly with the goals of the Solar for All program to provide clean energy projects for low-income communities. As a result, BSLS applied for and won a sub-award under Solar for All in the amount of $29,966,500, working with prime grantee Indiana Community Action Association. To prepare for implementing the Solar for All program in Indiana, BSLS worked with five different communities ready to implement community solar projects to reduce energy costs and burdens for low-income residents. BSLS created relationships, trust, and draft contracts with these communities, and began work in all 92 counties of Indiana to build five energy cooperatives, 50 resiliency hubs, and 200 rooftop solar projects. BSLS was about to hire several staff, including developers, to implement these critical projects.

**119th Congress's Continuing Resolution Funding EPA**

70.    On March 15, 2025, the 119th Congress (2025-2026) passed a continuing resolution and appropriated $3,195,028,000 for the "Environmental Protection Agency—Environmental Programs and Management" for the 2025 fiscal year.[9]

71.    These funds are and remain available for the Environmental Protection Agency to carry out its work.

---

[9] Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30, https://perma.cc/62D7-RUDA, (last visited Aug. 10, 2025).

## 119th Congress and the Solar for All Program

72.    On July 3, 2025, as part of H.R. 1, the 119th Congress repealed 42 U.S.C. § 7434 going forward, and rescinded funds that had not yet been obligated to the programs within the Greenhouse Gas Reduction Fund as of the day before the enactment of the bill:

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND.
> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.[10]

73.    The President signed H.R. 1 into law on July 4, 2025.

74.    Any unobligated funds as of July 3, 2025 (the day before enactment) were rescinded by § 60002.

75.    Congress did *not* rescind any funds obligated as of July 3, 2025, including the $7 billion in Solar for All program grants. *See* § 60002.

76.    Section 60002 did not extinguish the legal liability created by EPA's obligation of $7 billion in Solar for All funds. 1 U.S.C. § 109.

77.    Consistent with the statutory text, the Congressional Budget Office calculated the amount that § 60002 would rescind based on unobligated funds totaling just $19 million—that is, a rescission of only the remaining unobligated monies set aside for EPA's administrative costs.[11]

78.    The 119th Congress recognized that existing grants (that is, obligated funds) would continue after the repeal and would not be subject to the rescission.

---

[10] H.R. 1 – One Big Beautiful Bill, Pub. L. No. 119-21, § 60002 (Jul. 4, 2025), https://perma.cc/SXH6-DUQN, (last visited Aug. 10, 2025).
[11] Congressional Budget Office, *Cost Estimate*, (Section 60002, "Title VI" tab), (last updated June 27, 2025), https://perma.cc/HLD3-2NNJ.

79.    Representative Morgan Griffith (R–VA), Chair of the Environmental Subcommittee, stated repeatedly in committee that the bill would not impact obligated funds.[12]  Specifically, Mr. Griffith declared:

   a.   "Thank you, Mr. Chairman. I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward."[13]

   b.   "If the grant has already been granted and the money is obligated, then this -- then our language does not affect that."[14]

   c.   "[T]his amendment specifically talks about the unobligated amounts, as well, so that whether it be the bill or the amendment, this action that we take does not impact that action that may or may not be going on in the administration."[15]

80.    The Chair of the House Energy and Commerce Committee, Representative Brett Guthrie (R–KY), affirmed: "[T]his legislation does not take -- does not close the grants on any obligated funds."[16]

81.    The Senate Environment and Public Works Committee likewise acknowledged that the scope of § 60002 was limited to unobligated funds.[17]

82.    EPA continued to administer the Solar for All program for weeks after H.R. 1 became law.

---

[12]  H. Comm. on Energy and Com., *Markup of Budget Reconciliation Text* (Part 1), (last updated August 15, 2025), https://perma.cc/PSS2-KE85.
[13] *Id.* at 244:5959-5964.
[14] *Id.* at 244:5968-5970.
[15] *Id.* at 246:6011-6016.
[16] *Id.* at 245:5998-6000.
[17] 171 Cong. Rec. S4080 (Jun. 30, 2025) ("Section 60002 both repeals Section 134 of the Clean Air Act which established the Greenhouse Gas Reduction Fund—GGRF—and rescinds all unobligated funds.").

**Defendants' Termination of the Solar for All Program**

83.  On August 7, 2025, ignoring the congressional directive in the unambiguous text of § 60002 and explicit legislative history, EPA Administrator Lee Zeldin terminated the entire Solar for All grant program.

84.  Defendant Zeldin publicly declared in a social media post that "EPA no longer has the authority to administer the program or the appropriated funds to keep this boondoggle alive. With clear language and intent from Congress in H.R. 1, EPA is taking action to end this program for good."[18]

85.  On or about August 7, 2025, EPA, by and through the EPA Award Official, effectuated Defendant Zeldin's decision by sending grantees a letter notifying them that EPA had "made the decision to terminate the SFA [Solar for All] program" in its entirety. *See* Exhibit A (example of termination letter).

86.  The termination of the Solar for All program was a final agency action.

87.  EPA acknowledged that § 60002 only rescinded *unobligated* funds. Ex. A.

88.  Nevertheless, EPA provided the following reasons in support of its decision to terminate the Solar for All program:

    a.  "The repeal of the grant appropriations in [42 U.S.C. § 7434(a)(1)-(3)], coupled with the rescission of the administrative appropriation in section [7434(a)(4)], effectively and completely terminated the statutory authority and all appropriations related to Solar for All." *Id.*

    b.  "As both the grant appropriations and the EPA's administrative cost appropriations are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed" to oversee grants or the Solar for All program. *Id.*

---

[18] Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET), https://x.com/epaleezeldin/status/1953518426602803684?s=46.

    c.   "[A]ny attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible." *Id.*

    d.   "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate." *Id.*

89.    EPA's entire basis for the termination of the Solar for All grant program was its flawed interpretation of § 60002.

90.    EPA ignored the plain language of the statute.

91.    EPA did not reference Title 1, United States Code, Section 109.

92.    EPA did not reference the legislative history in which the 119th Congress unequivocally recognized that obligated grants would continue to go forward.

93.    EPA justified the program termination, in part, based on the rescission of the small amount of administrative funds Congress had appropriated—but not obligated—for the program previously.

93.    EPA ignored that the statute specifically contemplated the use of "amounts otherwise available" to cover administrative costs. *See* 42 U.S.C. § 7434(a)(4) (2022).

94.    EPA did not explain why other general funding appropriated to EPA could not be used to administer the obligated grants. *Id.*

95.    EPA did not discuss any alternatives beyond cancelling the entire Solar for All program.

96.    EPA did not consider Plaintiffs' significant reliance interests in the Solar for All program.

97.    Since August 7, 2025, EPA has taken steps to close out grants and claw back obligated funds.

98.    Upon information and belief, Defendants are unlawfully attempting to de-obligate the funds that EPA previously obligated pursuant to Congress's directives.

99.    Upon information and belief, Defendants intend to return the funds to the Treasury.[19]

**Defendants' Termination of Solar for All Harmed Each Plaintiff Directly**

100.    Plaintiff RI AFL-CIO was harmed because, without the new pipeline of apprentices and young workers created by the Solar for All program, the RI AFL-CIO faces a retirement cliff in the coming decade that will create significant problems for its union pension funds as those older union members retire. The average age of members in Rhode Island's building trades is approximately 55 years old. The long-term health of the RI AFL-CIO depends on robust apprenticeship programs and on-ramps into union careers for young people, so recruiting, training, and retaining the next generation of skilled workers is a central focus. Solar for All provided precisely these kinds of opportunities.

101.    The termination of Solar for All halted the creation of hundreds of union construction jobs in Rhode Island, undermined RI AFL-CIO's recruitment of young workers into registered apprenticeship programs, including by forcing it to scale back its apprenticeship programs, and jeopardized its long-term ability to renew the workforce as current members retire. In addition, RI AFL-CIO has had to divert staff and organizational resources from other core advocacy and collective bargaining priorities to address the fallout of EPA's termination. The termination also frustrates the RI AFL-CIO's mission of building a strong and sustainable labor movement in Rhode Island.

---

[19] *See Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir.), Letter dated July 3, 2025, from the U.S. Department of Justice to the Clerk of Court, attached as Exhibit B.

102.   The loss of the Solar for All program frustrates Plaintiff Rhode Island Center for Justice's organizational mission of lowering the high cost of electricity for low-income consumers and providing sustainable, uninterrupted access to vital electricity in their homes by preventing their utilities from being shut off. The Center for Justice was prepared to build on the Solar for All program, which Congress designed to provide a long-term solution to energy insecurity and unaffordability for the low-income households the Center serves. Instead, as a result of the termination, the Center for Justice has had to take time and resources away from other core aspects of its mission and expend additional resources on temporary harm reduction strategies that do not provide sustainable solutions, like alternative shutoff protections and payment plans, and contesting rate increases.

103.   Plaintiff Anh Nguyen has been harmed because Ms. Nguyen's efforts to secure lower-cost electricity for her home have been thwarted by Defendants' termination of the Solar for All program. She cannot afford the upfront cost of solar on her own.

104.   The loss of the Solar for All program means that Plaintiff SUN has been ordered to stop work on its projects around the country, including installing solar at a Red Cross Resilience Center and providing solar and battery storage in Harris County, Texas. In Indiana, SUN had spent over $6,600 on Solar for All work for which it has not been reimbursed, and its relationships with contractors and low-income communities have been damaged by the abrupt termination. And because SUN's access to its sub-award grant funds has been cut off, SUN will likely be forced to lay off its dedicated Solar for All employees, losing their expertise and community relationships, and will lose access to contractors if Solar for All funding is not restored. It is already suffering reputational damage among the homeowners, tribal and community groups with whom it works, and contractors in all these states.

105.   Without Solar for All, Plaintiff Sunpath will likely be forced to lay off its new hires, as its income flow without Solar for All is insufficient to support these positions. The termination of Solar for All has left a sizeable vacuum in the residential solar market that cannot be filled quickly enough to avoid serious harm. As a result of the termination of the grant program, Sunpath suffered direct out-of-pocket expenses of $30,000 for vehicles, $18,000/annually in software upgrades, and $10,000 for increased insurance premiums to meet program requirements. Sunpath will also lose over 120 work-hours spent developing program bid responses, contract negotiations, and assisting in the development of Standard Operating Procedure documents, a commitment of over $100,000 in salaries/compensation to new employees, and trust from the communities Sunpath sought to serve.

106.   As a result of losing the Solar for All program, Plaintiff 2KB incurred significant harm, including direct out-of-pocket losses exceeding $12,000 for specialized project management software, attorney's fees, and program compliance tools, purchased specifically for the anticipated four-year performance of the Solar for All contract. 2KB also lost nearly $2 million in anticipated revenue over the contract period. This has forced 2KB to lay off a dedicated employee and redirect or idle four more, all of whom had been assigned to Solar for All program design and implementation.

107.   2KB has also had to divert core staff away from other work and strategic business development opportunities, causing further lost income and operational momentum. It has suffered reputational harm from being unable to honor ongoing commitments to enabling repairs subcontractors and partner businesses, with whom 2KB was in active negotiations when the program was canceled, damaging business relationships and the likelihood of future collaboration; as well as the inability to notify bidders about the sudden cancellation due to

uncertainty around the government's action, resulting in harm to 2KB's standing as a responsible procuring entity.

108.   2KB has also lost opportunities for business expansion, as 2KB had planned to replicate its Solar for All–compliant enabling repairs model in neighboring states (TN, SC, NC, FL), all of which lost their own Solar for All programs, resulting in the loss of more than $5 million in potential future revenue and organizational growth. And 2KB's mission to promote scalable, federally certified clean energy and workforce opportunities in the Southeast has been frustrated. These harms are a direct consequence of the government's abrupt termination of the Georgia Solar for All program, with immediate and ongoing adverse impacts on 2KB's finances, personnel, reputation, and future business prospects.

109.   Plaintiff Energy Independent Solutions lost the opportunity to become an approved installer for Solar for All projects in western Pennsylvania when the program was terminated. Without the program and the steady demand it would support, Energy Independent Solutions likely will not be able to sustain its expansion, will be forced to lay off approximately one quarter of its workforce, and anticipates suffering significant financial losses due to the termination.

110.   Plaintiff Black Sun Light Sustainability was about to hire at least four new staff to implement its critical projects in Indiana, including a project developer who was at the final interview stage. BSLS was unable to make any of those hires and all of the critical projects that were in the planning stages in to bring low-cost solar to homes in Indiana have been halted. Losing this funding has severely impacted BSLS's ability to carry out its mission of working to advance clean energy projects in impacted areas, eviscerating its ability to hire staff and to create

community solar projects, residential rooftop solar, and resilience hubs in Indiana, as well as energy storage and other enabling upgrades.

111.   In summary, each Plaintiff was significantly harmed by Defendants' termination of the Solar for All program. These harms are directly traceable to Defendants' unlawful decision to terminate the Solar for All program. By eliminating Solar for All in its entirety, Defendants caused direct financial losses to Plaintiffs and deprived them of the opportunities and benefits the program was created to provide: jobs, training programs, and affordable, clean energy, among many others.

112.   Each Plaintiffs' injuries are redressable through a favorable court decision. The requested relief need only be "likely" to "redress at least some" of a plaintiff's injury, such as just one dollar of a monetary injury. *Diamond Alternative Energy, LLC v. E.P.A.*, 145 S. Ct. 2121, 2135 (2025). Granting Plaintiffs the relief sought here—an order declaring the termination unlawful, vacating it, and enjoining Defendants to restore the program—will restart the grant program. This relief will allow Plaintiffs who are nonprofit organizations and businesses, for example, the opportunity to continue their work and compete for projects, including training workers, creating jobs, promoting energy security and independence, helping low-income households save money on their utility bills, and improving the health of communities across the country. And it will reopen opportunities for Plaintiffs who are the intended beneficiaries of the program to receive the affordable solar energy they seek.

## LEGAL FRAMEWORK

### Federal Grants and Obligations

113.   Words and definitions matter in the federal budget process. *See* U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP,

at Preface (Sept. 2005) ("The budget's importance makes it essential that it be comprehensive and clear.").

114.    "Appropriations do not represent cash actually set aside in the Treasury for purposes specified in the appropriation act; they represent amounts that agencies may obligate during the period of time specified in the respective appropriation acts." *Id.* at 21.

115.    An "obligated balance" is "[t]he amount of obligations already incurred for which payment has not yet been made. Technically, the obligated balance is the unliquidated obligations." *Id*. at 71.

116.    An "agency incurs an obligation . . . when it . . . awards a grant . . . or takes other actions that require the government to make payments to the public or from one government account to another." *Id.* at 70

117.    An "obligation" is a "definite commitment that creates a *legal liability* of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability. *Id.* (emphasis added).

118.    An "unobligated balance" is "the portion of the obligation authority that has not yet been obligated." *Id*. at 72.

**The General Savings Clause**

119.    Title 1, United States Code, Section 109, titled "Repeal of statutes as affecting existing liabilities," provides, in relevant part, that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

## The Administrative Procedure Act

120.    Congress enacted the Administrative Procedure Act to ensure fairness and stability in agency action by mandating reasoned decision-making, and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices"); *see also N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting that the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process").

121.    To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 469 (D.R.I. 2025) *(*citing *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017)); *Cent. Tex. Tel. Coop., Inc. v. Fed. Commc'ns*, 402 F.3d 205, 209 (D.C. Cir. 2005).

122.    A final agency action is a decision that both (1) marks the "consummation" of an agency's decision-making process, and (2) determines the "rights or obligations" of a party, or is a decision "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations and internal quotation marks omitted)

123.    As to the substantive constraints on final agency action, the APA requires courts to set aside agency action that is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A),(C).

124.    "Agencies are creatures of statute," *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 1836009, at *17 (D.D.C. July 3, 2025) (citing *Nat'l Fed'n of Indep. Bus. v.*

*Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

125.    It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.

126.    As such, agencies "have no power to act except to the extent authorized by Congress." *Id.* (internal quotation marks and citations omitted). *See also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it.").

127.    "[I]f an agency acts without statutory authority, then a court must set that action aside." *Drs. for Am.*, 2025 WL 1836009, at *17 (citing 5 U.S.C. § 706(2)(C)).

128.    Conversely, an agency charged with implementing a statute ordinarily lacks authority to deviate from or abdicate its statutory responsibilities. *See Massachusetts v. EPA*, 549 U.S. 497, 532-33 (2007).

129.    "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning ... of the terms of an agency action").

130.    To determine "whether an agency has acted within its statutory authority," courts use "the traditional tools of statutory construction," *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 403), including that words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New*

*Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up); *see also Loper Bright*, 603 U.S. at 400 (explaining that "the whole point of having written statutes" is that "every statute's meaning is fixed at the time of enactment" (internal quotations and citations omitted)).

131.    As to process, the APA requires a reviewing court to "hold unlawful and set aside agency action" found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A).

132.    "[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests*." Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (citations and internal quotation marks omitted).

133.    Accordingly, in taking final agency action, an agency must "examine the relevant data and articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43, "including a rational connection between the facts found and the choice made," *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43). *See also Housatonic River Initiative v. U.S. Env't Prot. Agency*, *New England Region*, 75 F.4th 248, 269-70 (1st Cir. 2023).

134.    An agency must provide a reasoned explanation for a change in an existing position. *Id.* at 270 (internal quotation marks and citation omitted).

135.    An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," *State Farm,* 463 U.S. at 43, 52, or failed to consider relevant reliance interests, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32-33 (2020). *See also Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024).

136.    Specifically, "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Regents of the*

*Univ. of Cal.*, 591 U.S. at 30  (citing *State Farm*, 463 U.S. at 51) (failure to consider less extreme alternative to program shutdown was arbitrary and capricious). *See also Housatonic River Initiative*, 75 F.4th at 270.

137.    Likewise, the APA requires agencies changing course "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.

138.    Agencies are required to provide "genuine justifications for important decisions" so that their reasons "can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. at 785. Accordingly, an agency may not rely on pretextual justifications for its actions because "[a]ccepting contrived reasons would defeat the purpose [of APA review]." *Id.*

139.    Section 702 of the APA waives sovereign immunity and vests jurisdiction over APA claims for injunctive or declaratory relief in the federal district courts. 5 U.S.C. § 702.

140.    That waiver does not apply where another statute grants consent to suit explicitly or expressly or impliedly forbids the relief which is sought. *Id.*

### Congress's Legislative Power

141.    The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. CONST. art. I, § 1.

142.    Congress' lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416, 438 (2024); *see also*

Mem. from John G. Roberts, Jr. to Fred F. Fielding at 1 (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("no area seems more clearly the province of Congress than the power of the purse.").

143.    This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. Env't Prot. Agency*, 960 F. 2d 180, 185 (D.C. Cir. 1992) (citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

144.    Congress' power over the purse is rooted in two constitutional provisions: the Appropriations Clause and the Spending Clause.

145.    The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

146.    The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

147.    Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

148.    When Congress passes a law appropriating money for a particular purpose, the President must spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S.

CONST. art. II, § 3; *see Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them."); *City and Cnty. of San Franscisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations. Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role.").

149.    "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

150.    A President who disagrees with Congress's spending decision can veto the legislation, but once a spending law has been enacted, the executive branch must spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

151.    The executive branch has no constitutional power to amend or repeal statutes, *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with the executive branch's own policy or preference.

152.    When the executive branch intrudes on Congress's power over the purse, it violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Representatives v. Burwell*, 130 F.Supp.3d 53, 76 (D.D.C. 2015), and acts as a "bulwark of the Constitution's separation of powers," *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Allowing the Executive to usurp this power "would be clothing the President with a power entirely to control

the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

153.    "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when an executive branch agency attempts to unilaterally seize the Nation's purse strings, nullify a congressional enactment, and claw back lawfully obligated funds based on an erroneous interpretation of a statute.

154.    The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

155.    These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. CONST. art. I, § 7, cl. 2–3.

156.    The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–39 (quoting *Chadha*, 462 U.S. at 951).

157.    The Presentment Clauses also limit the President's role in lawmaking to vetoing an "entire bill . . . before the bill becomes law." *Clinton*, 524 U.S. at 439.

158.    "Presidential action that either repeals or amends parts of duly enacted statutes" violates the Presentment Clauses. *Id.*

159.    "[R]epeal of statutes, no less than enactment, must conform with Art. I." *Id.* at 438 (quoting *Chadha*, 462 U.S. at 954).

160.    Repeals of statutes do not apply retroactively unless dictated by the plain language of the statute. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012*); Landgraf v. USI Film Products*, 511 U.S. 244, 263 (1994) *See, e.g., Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.... By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.") (internal citations and quotations omitted). *See also* 1 U.S.C. § 109.

161.    The Constitution's careful limitations on the executive branch's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

162.    No constitutional provision or other law provides EPA with the authority to apply statutes retroactively in the absence of clear congressional intent.

163.    No constitutional provision or other law provides EPA with the authority to extinguish liabilities established under 42 U.S.C. § 7434(a)(1) (2022) prior to its repeal in July 2025.

164.    No constitutional provision or other law provides EPA with the authority to refuse to spend congressionally appropriated and obligated funds.

165.    Under the *Larson-Dugan* doctrine, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich,* 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larsen v. Domestic & Foreign Com. Corp*, 337 U.S. 682, 690-91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963)). "[T]here is no sovereign immunity to waive—it never attached in the first place." *Reich*, 74 F.3d at 1329.

166.    As such, Plaintiffs' constitutional challenges against the Defendants are not barred by sovereign immunity.

## CLAIMS FOR RELIEF

## ADMINISTRATIVE PROCEDURE ACT CLAIMS

167.    EPA's termination of the Solar for All program is a final agency action subject to review under the APA.

### COUNT I

*Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)*
*Termination of Solar for All Program - Contrary to Law and In Excess of Statutory Authority*

168.    The allegations of the preceding paragraphs are incorporated herein by reference.

169.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

170.    Defendants acted contrary to the plain language of Section 60002 and 1 U.S.C. § 109 when they terminated the Solar for All program.

171.   EPA justified its decision to terminate the Solar for All program solely based on Section 60002.

172.   By its plain language, Section 60002 does not apply retroactively.

173.   By its plain language, Section 60002 did not extinguish prior liabilities. 1 U.S.C. § 109.

174.   The vast majority of funding for the Solar for All program—including all funding relied on by Plaintiffs—was fully obligated to grant recipients as of September 30, 2024, and was therefore unaffected by Section 60002.

175.   As the Supreme Court recognized, "By the General Savings Statute Congress did not merely save from extinction a liability incurred under the repealed statute; it saved the statute itself" and "and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action . . . for the enforcement of such . . . liability." *De La Rama S.S, Co. v. United States*, 344 U.S. 386, 389 (1953) (internal citations and quotations omitted).

176.   Consistent with H.R.1, Defendant EPA continued to administer the Solar for All grant program without interruption from July 4 until August 7, 2025.

177.   Upon information and belief, Defendant EPA used funds from other appropriations to administer the Solar for All program.

178.   On August 7, 2025, Defendant Zeldin summarily terminated the Solar for All program.

179.   Defendants acted unlawfully and beyond the powers statutorily granted to them by Congress by terminating the Solar for All program based on Section 60002.

180.   Accordingly, Defendants' termination of the entire Solar for All grant program must be declared unlawful and set aside as contrary to law and/or in excess of statutory jurisdiction, authority, or limitation. 5 U.S.C. § 706(2)(A), (C).

## COUNT II

*Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)*
*Termination of Solar for All Program - Arbitrary and Capricious*
*Explanation Runs Counter to the Evidence before Agency*

181.  The allegations of the preceding paragraphs are incorporated herein by reference.

182.  The APA requires courts to "hold unlawful and set aside agency action" that is arbitrary or capricious. 5 U.S.C. § 706(2)(A).

183.  Agencies are required to provide "genuine justifications for important decisions" so that their reasons "can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. at 785.  Accordingly, an agency may not rely on pretextual justifications for its actions because "[a]ccepting contrived reasons would defeat the purpose [of APA review]." *Id.*

184.  Defendant Zeldin erroneously claimed that "EPA no longer has the authority to administer the program or the appropriated funds."[20]

185.  Similarly, EPA justified its termination of the Solar for All program solely based on Section 60002. *See e.g.,* Ex. A.

186.  However, and as reflected both in H.R. 1 and the legislative history, the 119th Congress reaffirmed that the Solar for All program grants underway would be unaffected by Section 60002.

187.  Therefore, EPA was required to continue to administer obligated grants.

188.  Upon information and belief, EPA continued to administer obligated grants after July 4, 2025.

---

[20] Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET), https://x.com/epaleezeldin/status/1953518426602803684?s=46.

189.   Upon information and belief, EPA had funds available to continue to administer the Solar for All program.

190.   Accordingly, Defendants' first justification for the program termination—that "[t]he repeal of the grant appropriations in [42 U.S.C. § 7434(a)(1)-(3)], coupled with the rescission of the administrative appropriation in section [7434(a)(4)], effectively and completely terminated the statutory authority and all appropriations related to Solar for All"—runs counter to the legislative and statutory evidence before agency.

191.   Likewise, Defendants' second explanation for the termination—that "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed" to oversee grants or the Solar for All program—runs counter to the legislative, statutory, and other appropriation evidence before the agency.

192.   Defendants' third explanation for the termination—"any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible"—runs counter to the legislative and statutory evidence before the agency.

193.   Defendants' final justification—that "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate"—also runs counter to the legislative and statutory evidence before the agency.

194.   Defendants reached a conclusion unsupported by the evidence before them.

195.   As such, EPA's termination of the entire Solar for All grant program must be declared unlawful and set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## COUNT III

*Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)*
*Termination of Solar for All Program - Arbitrary and Capricious*
*Failure to Consider Relevant Factors*

196.    The allegations of the preceding paragraphs are incorporated herein by reference.

197.    The APA requires courts to "hold unlawful and set aside agency action" that is arbitrary or capricious. 5 U.S.C. § 706(2)(A).

198.    An agency fails to engage in "reasoned decision-making," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 52.

199.    Here, Defendants terminated a grant program for which Congress had appropriated $7 billion under the Inflation Reduction Act, without engaging in a "reasoned analysis" as required by the APA. *Id.* at 57.

200.    Specifically, Defendants terminated the Solar for All grant program without consideration of "important aspect[s] of the problem," including alternative ways to administer the program. *Id.* at 43.

201.    EPA justified its termination of the Solar for All program on three bases: (1) its erroneous statement that the 119th Congress terminated all appropriations for Solar for All; (2) its erroneous statement that the Agency did not have legal authority to continue the program; and (3) its erroneous statement that the Agency had no funds to administer the program. *See e.g.*, Ex. A.

202.    First, Congress did not repeal "all appropriated funding" for Solar for All:  Congress did not rescind or repeal the $7 billion in obligated program funding. *See* 1 U.S.C. § 109.

203.    Second, Congress did not extinguish the legal liability created by the original enabling statute and EPA's obligation of the $7 billion for the Solar for All program. *See id*. Therefore, EPA had the authority and the obligation to continue the program.

204.    Third, EPA receives general budget appropriations from Congress, in recent years through continuing resolutions—so Congress has appropriated funds for the EPA to carry out any required duties, including administering obligated grants.

205.    Just six months ago, on March 15, 2025, the 119th Congress (2025-2026) passed a continuing resolution and appropriated $3,195,028,000 for the "Environmental Protection Agency—Environmental Programs and Management" for the 2025 fiscal year.[21] These funds have been available for the Environmental Protection Agency to carry out its work.

206.    Section 134 contemplated the use of "amounts otherwise available" for administrative costs.

207.    Upon information and belief, EPA has been using other appropriated funds to carry out its required duties under Section 134, including administering the Solar for All program.

208.    In addition, upon information and belief, the choice to find and use other resources is wholly within the discretion of EPA.

209.    In terminating the program, Defendants failed to consider whether they could continue to administer the Solar for All program with respect to obligated grants by using other appropriated funds or other resources for program administration.

210.    By failing to do so, Defendants failed to consider a reasonable alternative before making a decision. Specifically, Defendants failed to consider the availability of the

---

[21] Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30, https://perma.cc/62D7-RUDA, (last visited Aug. 10, 2025).

"Environmental Protection Agency—Environmental Programs and Management" funds to administer the Solar for All program.

211.    Accordingly, EPA's termination of the Solar for All grant program was arbitrary and capricious. 5 U.S.C. § 706(2)(A).

COUNT IV

<em>Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)<br>Termination of the Solar for All Program - Arbitrary and Capricious<br>Failure to Consider Reliance Interests</em>

212.    The allegations of the preceding paragraphs are incorporated herein by reference.

213.    The APA requires courts to "hold unlawful and set aside agency action" that is arbitrary or capricious. 5 U.S.C. § 706(2)(A).

214.    An agency fails to engage in "reasoned decision-making," and its actions are arbitrary and capricious when the agency failed to consider relevant reliance interests. *Regents of the Univ. of Cal.*, 591 U.S. at 33.

215.    Defendants' termination of the Solar for All program is arbitrary and capricious because it failed to consider Plaintiffs' "serious reliance interests" on those funds. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

216.    Plaintiffs had reasonable and legitimate expectations built around the Solar for All program.

217.    Among other things, Plaintiffs made investments based on the Solar for All program, built operations structured to implement and manage the program for their communities, and made decisions in expectation that the Solar for All program would be implemented as obligated.

218.    Defendants knew third parties had these reasonable and legitimate expectations, given that EPA approved the Solar for All workplans, which provided detailed information on how the

program would be implemented, for every grant award prior to Defendants' decision to terminate the program.

219.   Defendants must acknowledge and weigh the consequences of their policy change on those individuals and entities, such as Plaintiffs, who reasonably relied on the Solar for All program funding. *Regents of the Univ. of Cal.*, 591 U.S. at 33.

220.   In failing to do so, Defendants did not provide a reasoned explanation for the termination of the Solar for All program funding.

221.   As such, EPA's termination of the grant program without consideration of the reasonable reliance interests of Plaintiffs was arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## ULTRA VIRES CLAIMS

### COUNT V

*Constitutional Violation - Separation of Powers*

222.   The allegations in the preceding paragraphs are incorporated herein by reference.

223.   This Court has inherent equitable power to enjoin Executive branch conduct that violates the Constitution, including the separation of powers. *E.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

224.   The Constitution grants Congress, not the Executive, exclusive power over the nation's purse and the power to legislate. U.S. CONST. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

225.   The Constitution requires the Executive branch to implement the law. U.S. Const. art. I, § 3. *See Util. Air Reg. Grp.*, 573 U.S. at 327 ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

226.    Defendants' decision to terminate the Solar for All program constitutes an unconstitutional exercise of power in violation of the separation of powers established by Articles I, II, and III of the U.S. Constitution.

227.    In the Inflation Reduction Act, Congress appropriated $7 billion to EPA for the agency to make competitive grants "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities," 42 U.S.C. § 7434(a)(1) (2022) , which EPA implements through the Solar for All program.

228.    Consistent with its constitutional and statutory duties, EPA obligated $7 billion under its Solar for All program to specific entities following a rigorous, regulated, and competitive grantmaking process.

229.    Section 60002 repealed 42 U.S.C. § 7434 going forward and rescinded only "the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment . . . .)."

230.    When the 119th Congress passed § 60002, it left all obligated funding for the Solar for All program intact.

231.    Defendants' termination of the Solar for All program was not based on any lawful criteria established by Congress and reflected an assertion of authority that circumvents the checks and balances fundamental to our government.

232.    Defendants have no constitutional authority to apply statutes retroactively without explicit direction from Congress.

233.    Defendants have no constitutional authority to rescind funds appropriated by Congress.

234.    All the relevant constitutional powers here—the powers to appropriate and legislate—belong solely to Congress.

235.    As such, Defendants' termination of the Solar for All program and its obligated funding pursuant to 42 U.S.C. § 7434(a)(1) (2022), and excluded from the repeal and rescission, violates Congress's spending power, *see* U.S. CONST. ART. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violates the separation of powers.

236.    To prevent Defendants' violations of the separation of powers, Defendants must be enjoined from terminating the Solar for All program.

<u>COUNT VI</u>

*Constitutional Violation - Presentment Clauses*

237.    The allegations in the preceding paragraphs are incorporated herein by reference.

238.    The Constitution provides a direct cause of action for parties challenging unconstitutional government action. *E.g.*, *Free Enter. Fund*, 561 U.S. at 491 n.2.

239.    Defendants' decision to terminate the Solar for All grant program without authorization from Congress constitutes an unlawful attempt to amend and repeal a duly enacted statute without following the constitutionally mandated legislative process.

240.    The Solar for All program was authorized and funded pursuant to 42 U.S.C. § 7434 (2022)—legislation duly enacted by the 117th Congress and signed into law by the President, in accordance with the Presentment Clauses of the U.S. Constitution.

241.    Likewise, H.R. 1, which includes Section 60002, was legislation duly enacted by the 119th Congress and signed into law by the President, in accordance with the Presentment Clauses of the U.S. Constitution.

242.    EPA's retroactive termination of Solar for All, including the attempt to rescind funds that had been duly obligated under 42 U.S.C. § 7434(a)(1), violates the Presentment Clauses because it seeks to eliminate parts of the Inflation Reduction Act after they were passed by Congress and signed by the President, and which have not been rescinded or repealed retroactively by Congress in Section 60002 or otherwise.

243.    Defendants have no authority to cancel duly enacted statutes.

244.    By so doing, Defendants effectively ignored the plain language of Section 60002, which retained existing liabilities including the obligated Solar for All funds appropriated under by 42 U.S.C. § 7434(a)(1) (2022).

245.    By terminating the entire Solar for All program, Defendants created a repeal that Congress did not enact and, in so doing, Defendants unilaterally altered Section 60002, in violation of the Presentment Clauses. *See* U.S. CONST. ART. I, § 7, cl. 2–3.

246.    By unilaterally altering Section 60002, Defendants exercised legislative authority in violation of the Presentment Clauses. *See* U.S. CONST. Art. I, § 7, cl. 2–3.

247.    By unilaterally attempting to rescind *obligated* funds contrary to Section 60002, Defendants in essence exercised the equivalent of a "line item veto" by extinguishing liabilities that Congress chose not to extinguish.

248.    For these reasons, Defendants' retroactive termination of the Solar for All grant program authorized by 42 U.S.C. § 7434(a)(1) (2022) (and not impacted by Section 60002), and Defendants' attempted de-obligation of obligated funds, violate the Presentment Clauses.

249.    To prevent Defendants' violations of the Presentment Clauses, Defendants must be enjoined from terminating the Solar for All program.

## PRAYER FOR RELIEF

250.   For the reasons set forth above, Plaintiffs seek equitable relief to ensure the continuation of the Solar for All grant program and its promise of the delivery of energy resources and their benefits, and ask the Court to:

A.   Issue a declaratory judgment that Defendants' termination of the Solar for All program violates the APA, 5 U.S.C. § 706, and the United States Constitution;

B.   Pursuant to 5 U.S.C. § 706 of the Administrative Procedure Act, hold unlawful and set aside EPA's termination of the Solar for All grant program;

C.   Issue injunctive relief directing EPA to reinstate the Solar for All grant program;

D.   Enjoin EPA from de-obligating or otherwise interfering with the availability of the funds.

E.   Retain jurisdiction over this matter to ensure compliance with the above relief;

F.   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, in accordance with law pursuant to 28 U.S.C. § 2412; and

G.   Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 (b), Plaintiffs demand a jury trial on all issues triable of right by a jury.

Respectfully submitted, this 6th day of October, 2025,

/s/ James Crowley_____          /s/  Nicholas S. Torrey_____
James Crowley (R.I. Bar No. 9405)          Nicholas S. Torrey (N.C. Bar No. 43382)
Alexandra St. Pierre (MA Bar No. 706739)   (Pro Hac Vice forthcoming)
(Pro Hac Vice forthcoming)                 Banumathi Rangarajan (N.C. Bar No. 27311)
Conservation Law Foundation                (Pro Hac Vice forthcoming)

235 Promenade St.
Suite 560, Mailbox 28
Providence, RI 02908
Telephone: (401) 228-1905
Facsimile: (401) 351-1130
jcrowley@clf.org
aestpierre@clf.org

*/s/ Gary DiBianco*

Gary DiBianco (D.C. Bar No. 458669)
(Pro Hac Vice forthcoming)
Jillian Blanchard (CA Bar No. 203593)
(Pro Hac Vice forthcoming)
Amy Powell (N.C. Bar No. 50300)
(Pro Hac Vice forthcoming)
Larissa Koehler (CA Bar No. 289581)
(Pro Hac Vice forthcoming)
Lawyers for Good Government
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
Telephone: (202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
amy@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

David Neal (N.C. Bar No. 27992)
(Pro Hac Vice forthcoming)
Kimberley Hunter (N.C. Bar No. 41333)
(Pro Hac Vice forthcoming)
Jennifer Whitfield (D.C. Bar No. 983212)
(Pro Hac Vice forthcoming)
Ben Grillot (D.C. Bar No. 982114)
(Pro Hac Vice forthcoming)
Southern Environmental Law Center
136 E. Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 347-929-9421
ntorrey@selc.org
brangarajan@selc.org
dneal@selc.org
kmeyer@selc.org
jwhitfield@selc.org
bgrillot@selc.org

*/s/ Amy R. Romero*

Amy R. Romero (RI Bar # 8262)
Kevin Love Hubbard (MA Bar #704772)
(Pro Hac Vice forthcoming)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
Telephone: (401) 453-1500
Amy@dwbrlaw.com
Kevin@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*Counsel for Plaintiffs*