IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **RHODE ISLAND AFL-CIO** <br><br> **RHODE ISLAND CENTER FOR JUSTICE** <br><br> **ANH NGUYEN** <br><br> **SOLAR UNITED NEIGHBORS** <br><br> **SUNPATH CONSULTING LLC d/b/a SUNPATH SOLAR** <br><br> **2KB ENERGY SERVICES, LLC** <br><br> **ENERGY INDEPENDENT SOLUTIONS** <br><br> **BLACK SUN LIGHT SUSTAINABILITY** <br><br> *Plaintiffs,* <br><br> v. <br><br> **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY** <br><br> **LEE ZELDIN**, in his official capacity as Administrator of the United States Environmental Protection Agency <br><br> *Defendants.* | Case No. 1:25-cv-00510-MSM-PAS |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ........................................................................ 2

1. Congress Appropriates Funding ......................................................................... 2

2. Consistent with the Statute, EPA Crafts the Solar for All Program to
   Benefit Plaintiffs, Among Many Others.............................................................. 3

   a. Solar for All's Commitment to Create Job Opportunities and Market
      Transformation ........................................................................................... 5

   b. Households Facing Unaffordable Electric Bills Were Poised to Benefit
      from Solar for All ....................................................................................... 8

   c. Nonprofits Dedicated Significant Resources to Help Implement
      Solar for All................................................................................................. 9

3. H.R. 1 Repeals the Greenhouse Gas Reduction Fund Going Forward, Leaving
   Solar for All's Funding Obligations in Place ................................................... 11

4. EPA Terminates the Program ........................................................................... 13

5. Legal Challenges ............................................................................................... 16

6. The Administrative Procedure Act ................................................................... 17

7. Legislative Branch Authority Under the United States Constitution.............. 19

   a. Congress Alone Controls Spending ......................................................... 19

   b. Congress Alone Legislates........................................................................ 19

   c. Legislation Is Not Retroactive Absent an Express and Unambiguous
      Congressional Enactment to the Contrary................................................ 20

STANDARD OF REVIEW ................................................................................................ 21

ARGUMENT ...................................................................................................................... 22

I. Defendants Violated the APA............................................................................ 26

   A. Defendants' Decision to Terminate the Solar for All Program Constitutes
      Final Agency Action. ................................................................................ 26

   B. Defendants' Termination of Solar for All Contravened the Plain Language
      of H.R. 1 and Exceeded EPA's Statutory Authority. ............................... 27

      1. Congress preserved all $7 billion in Solar for All grant obligations........................ 28

      2. Congress preserved EPA's authority to administer the Solar for All program. ........ 30

      3. H.R. 1 preserved EPA's funding to administer the Solar for All program. .............. 31

   C. Defendants' Termination of the Solar for All program was
      Arbitrary and Capricious. ......................................................................... 32

      1. Defendants' explanation ran counter to the evidence before the agency. ................. 33

      2. Defendants arbitrarily rejected reasonable alternatives............................................. 34

ii

3.    Defendants failed to consider serious reliance interests in terminating Solar for All...................................................................................................... 36

II.    Defendants Violated the Constitution................................................................. 41

A.    Defendants Violated the Separation of Powers. ............................................. 42

B.    Defendants Violated the Presentment Clause. ............................................... 44

C.    Plaintiffs Have a Cause of Action for Their Constitutional Claims. ............. 46

III.    This Court Has Jurisdiction ................................................................................ 47

A.    Plaintiffs' Claims Belong in this Court.......................................................... 47

B.    Plaintiffs Have Standing. ............................................................................... 52

1.    Injury in Fact ............................................................................................. 53

2.    Causal Connection...................................................................................... 58

3.    Redressability ............................................................................................ 59

CONCLUSION..................................................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967).................................................................22

*In re Aiken County*, 725 F.3d 255 (2013) ...............................................................19, 42, 43, 50

*American Academy of Pediatrics v. Kennedy*,
    No. CV 25-11916-BEM, 2026 WL 33719 (D. Mass. Jan. 6, 2026) ...............................54, 56

*American Association of University Professors v. Rubio*,
    780 F. Supp. 3d 350 (D. Mass. 2025) ..................................................................................54

*American Federation of Government Employees, AFL-CIO v. Trump*,
    318 F. Supp. 3d 370 (D.D.C. 2018)......................................................................................22

*American Hospital Association v. Kennedy*,
    No. 25-2236, 2026 WL 49499 (1st Cir. Jan. 7, 2026) ..........................................................40

*Appalachian Voices v. Environmental Protection Agency*,
    No. CV 25-1982 (RJL), 2025 WL 2494905 (D.D.C. Aug. 29, 2025) ...................................48

*Arizona, et al. v. Environmental Protection Agency*,
    No. 2:25-cv-2015 (W.D. Wash. Oct. 16, 2025).....................................................................16

*Association of American Universities v. National Science Foundation*,
    788 F. Supp. 3d 106 (D. Mass. 2025) .......................................................................37, 38, 39

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................................26, 59

*Boston Redevelopment Authority v. National Park Service*,
    838 F.3d 42 (1st Cir. 2016)...................................................................................................21

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)................................................30

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)...........................................................51, 52, 61

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)....................................48

*Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018)....................................................................43

*Child Trends, Inc. v. U.S. Department of Education*,
    795 F. Supp. 3d 700 (D. Md. 2025).................................................................................49, 61

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Commission*,
    59 F.3d 284 (1st Cir. 1995)...................................................................................................17

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ..................................43

*City of Saint Paul, Minnesota v. Wright*,
  No. 25-CV-03899 (APM), 2026 WL 88193 (D.D.C. Jan. 12, 2026) ....................................50

*Clinton v. New York*, 524 U.S. 417 (1998) ...........................................................................20, 45

*Community Legal Services in East Palo Alto v. United States Department of
  Health & Human Services*, No. 25-2808, 2025 WL 2884805 (9th Cir. Oct. 10,
  2025) ..................................................................................................................................49

*Coalition of MISO Transmission Customers v. FERC*,
  45 F.4th 1004 (D.C. Cir. 2022)..........................................................................................61

*Collins v. Yellen*, 594 U.S. 220 (2021) ........................................................................................46

*Colorado v. U.S. Department of Health & Human Services*,
  783 F. Supp. 3d 641 (D.R.I. 2025).........................................................................31, 33, 37

*Commonwealth of Massachusetts, Deptartment of Public Welfare v. Secretary of
  Agriculture*, 984 F.2d 514 (1st Cir. 1993) .......................................................................21

*Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001) ..........................................46

*Dakota Central Telephone Company v. South Dakota ex rel. Payne*,
  250 U.S. 163 (1919)...........................................................................................................46

*Dalton v. Specter*, 511 U.S. 464 (1994).........................................................................41, 46, 47

*De La Rama Steamship Company v. United States*, 344 U.S. 386 (1953)..............................21, 30

*Department of Homeland Security v. Regents of the University of California*,
  591 U.S. 1 (2020)..................................................................................................... *passim*

*Diamond Alternative Energy, LLC v. Environmental Protection Agency*,
  606 U.S. 100 (2025).............................................................................................59, 60, 61

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................................................18, 37

*FCC v. Fox Television Stations, Incorporated*, 556 U.S. 502 (2009)..........................................36

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)...........................................................................................................53

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477 (2010)...........................................................................................................46

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024)...................................................................17, 26

*Harris County, Texas v. Environmental Protection Agency,*
No. 1:25-cv-3646 (D.D.C. Oct. 13, 2025) ................................................16

*Kendall v. United States*, 37 U.S. 524 (1838) ................................................42

*Louisiana Public Service Commission v. Federal Communications Commission,*
476 U.S. 355 (1986) ................................................18

*Local 2677, American Federation of Government Employees v. Phillips,*
358 F. Supp. 60 (D.D.C. 1973) ................................................27

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ................................................17, 18

*Louis v. Saferent Solutions, LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) ................................................53, 54

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................53, 58, 59

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ................................................58

*Marshall County Health Care Authority v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ................................................22

*Maryland Clean Energy Center v. United States,*
No. 1:25-cv-01738-LAS (Fed. Cl. Oct. 15, 2025) ................................................16

*Massachusetts v. National Institutes of Health,*
No. 25-1343, --- F.4th ---, 2026 WL 26059 (1st Cir. Jan. 5, 2026) ................................................52

*Matthews v. Zane's Lessee*, 9 U.S. 92 (1809) ................................................42

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm
Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) ................................................*passim*

*National Coalition Against Violent Athletes v. Department of Education,*
2020 WL 13876913 (D. Mass. Dec. 3, 2020) ................................................54

*National Education Association v. United States Department of Education,*
779 F. Supp. 3d 149 (D.N.H. 2025) ................................................54

*National Institutes of Health v. American Public Health Association,*
145 S. Ct. 2658 (2025) ................................................48, 50, 51

*New Prime Incorporated v. Oliveira*, 586 U.S. 105 (2019) ................................................18

*New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025) ................................................47

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) ................................................19, 20

*Ohio v. Enivironmental Protection Agency*, 603 U.S. 279 (2024) ................................................17, 36

*Orr v. Trump*, 778 F. Supp. 3d 394 (D. Mass. 2025)....................................................51

*Sustainability Institute v. Trump*,
  No. 25-1575, 2026 WL 157120 (4th Cir. Jan. 21, 2026).........................................50

*U.S. Department of the Navy v. Federal Labor Relations Authority*,
  665 F.3d 1339 (D.C. Cir. 2012).........................................................................19, 43

*United States v. Domenic Lombardi Realty, Inc.*,
  290 F. Supp. 2d 198 (D.R.I. 2003)............................................................................20

*United Steel v. Mine Safety & Health Administration*,
  925 F.3d 1279 (D.C. Cir. 2019)................................................................................51

*Utility Air Regulatory Group v. Environmental Protection Agency*,
  573 U.S. 302 (2014).................................................................................................28

*Vartelas v. Holder*, 566 U.S. 257 (2012) .............................................................20, 30

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
  778 F. Supp. 3d 440 (D.R.I. 2025)............................................................................39

*Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952)..................41, 42

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)......................................22

**Statutes**

1 U.S.C. § 109..........................................................................................20, 30, 36, 44

5 U.S.C. § 702....................................................................................................17, 22

5 U.S.C. § 704................................................................................................................17

5 U.S.C. § 706(2).........................................................................................18, 22, 33, 51

28 U.S.C. § 1491(a)(1)....................................................................................................48

42 U.S.C. § 7434 ...................................................................................................*passim*

42 U.S.C. § 7607(b)(1) .................................................................................................16

42 U.S.C. §7614 ....................................................................................................*passim*

Pub. L. No. 117-169, 136 Stat 1818 (2022)..................................................3, 44, 45, 60

Pub. L. 118-42, 138 Stat. 25 (2024)......................................................................13, 32

Pub. L. No. 119-4, 139 Stat. 9 (2025)................................................................*passim*

Pub. L. No. 119-21, 139 Stat. 72 (2025) .................................................................... *passim*

**Constitutional Provisions**

U.S. Const. art I, § 1 ........................................................................................................19

U.S. Const. art. I, § 7 ............................................................................................... *passim*

U.S. Const. art. I § 9, cl. 7 ........................................................................................19, 42

U.S. Const. art. II, § 3 ......................................................................................................42

U.S. Const. art. III .................................................................................................25, 53, 54

**Other Authorities**

40 C.F.R. § 200.300(a) ....................................................................................................27

Fed. R. Civ. P. 56(a) .....................................................................................................1, 21

D.R.I. Local Civil Rule 56 .................................................................................................1

Joseph Story, *Commentaries on the Constitution of the United States* § 1342
(1833) .........................................................................................................................43

Congressional Budget Office, *Estimated Budgetary Effects of Public Law 119-21,
to Provide for Reconciliation Pursuant to Title II of House Concurrent
Resolution 14, Relative to CBO's January 2025 Baseline* (July 21, 2025) .....................13, 29

Gen. Accounting Office, 1 Principles of Federal Appropriations Law, 3d Ed. (Jan.
2004) ...........................................................................................................................45

U.S. Government Accountability Office, *A Glossary of Terms Used in the Federal
Budget Process*, GAO-05-734SP (Sept. 2005) .........................................................28

EPA, Fiscal Year 2025, *Justification of Appropriation Estimates for the
Committee on Appropriations*, Tab 5: Environmental Programs and
Management ................................................................................................................32

House Committee on Energy and Commerce, Markup of Budget Reconciliation
Text for May 13, 2025 ..............................................................................................12, 29

U.S. Environmental Protection Agency, *About the Greenhouse Gas Reduction
Fund* ..............................................................................................................................4

U.S. Environmental Protection Agency, *Greenhouse Gas Reduction Fund: Solar
for All* ...........................................................................................................................4

U.S. Environmental Protection Agency, *Review and Selection Process* ...........................4

U.S. Environmental Protection Agency, *Solar for All Fast Facts* ................................................4, 8

U.S. Environmental Protection Agency, *Solar for All: Solar for Energy Communities Highlights*.......................................................................................6, 7

U.S. Environmental Protection Agency, *Solar for All: Solar for Household Savings Highlights* ................................................................................................8

U.S. Environmental Protection Agency, *Solar for All: Solar for Labor Highlights* ......................5

Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET) ........................14, 26

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, Plaintiffs move for summary judgment on all counts of their complaint. The undisputed facts in the administrative record make clear that in terminating the Solar for All program in a single day and without authorization, Defendants violated the Administrative Procedure Act and usurped Congress's powers in violation of the U.S. Constitution. Plaintiffs respectfully request that the Court grant the declaratory and injunctive relief they seek in order to undo Defendants' illegal termination of this program and restore Solar for All.

## INTRODUCTION

This case challenges the unlawful action of the Environmental Protection Agency ("EPA" or "the Agency") and its Administrator, Lee Zeldin ("Defendant Zeldin"), to terminate the Solar for All program. Congress funded Solar for All to provide nearly one million low-income households in disadvantaged communities with savings on their electricity bills and access to clean energy through rooftop and community solar programs. Congress directed this funding to the specific purpose of increasing access to affordable solar energy in low-income and disadvantaged communities, while encouraging the growth of the solar industry through job training and job creation to implement much-needed solar projects around the country. The program was designed to have broad beneficial effects, and EPA touted it as such.

Plaintiffs here are intended beneficiaries of the Solar for All program: a labor organization, an individual homeowner seeking access to solar energy to reduce costs, nonprofit organizations dedicated to assisting low-income families with affordable energy, and solar businesses. Plaintiffs made significant investments of time and money as they prepared to participate in and implement the program.

1

On August 7, 2025, Defendants abruptly terminated the Solar for All program, harming thousands of families, workers, and communities around the country, including Plaintiffs. Each Plaintiff's harms would be redressed by setting aside Defendants' termination of the program.

The Court should do so because nothing authorized Defendants to terminate Solar for All. Defendants relied on legislation enacted last summer as the justification for their action, but that legislation was explicit in rescinding only "unobligated" funds, keeping in place EPA's existing grant obligations under the program. Defendants retained the funding, the authority, and the responsibility to continue administering Solar for All, yet they falsely asserted they did not as the basis for terminating the program.

Because Defendants had no justification for their action, it was contrary to law, in excess of statutory authority, and arbitrary and capricious, in violation of the Administrative Procedure Act. Defendants also violated the separation of powers and Presentment Clause of the United States Constitution by refusing to spend awarded grant funds that Congress designated for this purpose, thereby usurping Congress's role in making spending decisions and enacting legislative appropriations.

Defendants' violations of law are straightforward, and this Court has jurisdiction over Plaintiffs' claims and the power to order relief that redresses their injuries. The Court should grant summary judgment to Plaintiffs.

## FACTUAL AND LEGAL BACKGROUND

### 1.    Congress Appropriates Funding

In 2022, Congress made substantial investments in cutting-edge clean energy initiatives, directing EPA to initiate new programs to lower energy costs while reducing harmful air

pollution. D.R.I. EPA 000012;[1] Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60103, 136 Stat 1818, 2066-67 (codified at 42 U.S.C. § 7434). This amendment to the Clean Air Act created a new funding mechanism aimed at extending bill-saving clean energy upgrades to low-income households.

Congress appropriated $27 billion to the newly created Greenhouse Gas Reduction Fund, of which it appropriated $7 billion to fund competitive grants "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.* at § 7434(a)(1); D.R.I. EPA 000012.

This grant funding, which would become known as "Solar for All," was designed to reduce the burden of high utility bills on low-income families, improve energy access, and advance clean energy investment. Congress intended these funds to support communities across the country, prioritizing those that have long borne the brunt of environmental and public health harms. Many of these low-income and disadvantaged communities, as well as non-profits and small businesses that serve those communities—including Plaintiffs—mobilized to maximize the opportunities generated by the new Congressional program.

### 2. Consistent with the Statute, EPA Crafts the Solar for All Program to Benefit Plaintiffs, Among Many Others

In Summer 2023, EPA followed the congressional directive established in 42 U.S.C. § 7434(a)(1) by creating the Solar for All grant program, and began a competitive grant-awarding process. The EPA's Notice of Funding Opportunity was designed to "maximize geographic coverage" and defined five "meaningful benefits" that would be used to evaluate

---

[1] Citations to the administrative record use EPA's Bates-stamp convention "D.R.I. EPA ___." The administrative record is filed at Doc. 30.

program applicants: 1) household savings; 2) equitable access to solar; 3) resilience benefits; 4) community ownership; and 5) workforce development and entrepreneurship. D.R.I. EPA 000331, 000352. Based on these and other detailed criteria, including program objectives to reduce greenhouse gas and other emissions, and stimulating private clean technology investment in undercapitalized markets, EPA announced awards in 2024 and obligated the entire $7 billion in Solar for All program funds before the September 30, 2024 statutory deadline. U.S. Env't Prot. Agency, *Review and Selection Process*, https://perma.cc/L226-RZXH (last updated Aug. 16, 2024); U.S. Env't Prot. Agency, *Greenhouse Gas Reduction Fund: Solar for All*, https://perma.cc/Z2TT-97AA (last visited Aug. 15, 2025); 42 U.S.C.A. § 7434 (2022).

EPA awarded funds to 60 primary grant recipients around the country "to expand the number of low-income and disadvantaged communities primed for distributed solar investment." U.S. Env't Prot. Agency, *About the Greenhouse Gas Reduction Fund*, https://perma.cc/43QC-9LR6 (last updated Feb. 13, 2025). The obligated funds would be available for five years—and as explained below, they remain available today. Meanwhile, the program was designed to have market impacts lasting far longer.

On its website, EPA touted the many benefits of Solar for All, highlighting the broad reach of the program and noting that the 60 Solar for All grant recipients would implement rooftop and community solar programs in all 50 states, the District of Columbia, Puerto Rico, tribal lands, and several territories. U.S. Env't Prot. Agency, *Solar for All Fast Facts*, https://perma.cc/E9LQ-979N (last updated Feb. 25, 2025). EPA ensured Solar for All would serve "rural communities in the southeast; communities in the industrial heartland; households in affordable housing; households that cannot deploy residential rooftop solar; and communities around minority-serving educational institutions." *Id.*

In order to implement these goals, the recipients of EPA's Solar for All grants initiated programs for identifying eligible solar installers, creating and partnering on workforce training and development opportunities, awarding contracts to sub-grantees to help implement their projects, and providing money-saving solar energy to eligible homeowners.

### a. Solar for All's Commitment to Create Job Opportunities and Market Transformation

Because households cannot receive the benefits of Solar for All without installers and contractors to facilitate installation and infrastructure repairs, the program relied on and benefitted groups, contractors, and laborers involved in the buildout of solar power projects. Workforce opportunities were thus an important part of the grant award process. EPA designed Solar for All to create hundreds of thousands of good-paying jobs, with labor unions, including Plaintiff Rhode Island AFL-CIO ("RI AFL-CIO"), as partners to implement the program. This approach was consistent with Congress's clear directive that workers employed on projects like this, mandated by Congress and assisted by the agency, "shall be paid wages" at prevailing rates as determined by the Secretary of Labor. Clean Air Act § 134, 42 U.S.C. § 7614. Accordingly, as EPA began to administer the Solar for All program, it worked to create "high-quality jobs with the free and fair choice to join a union for workers across the United States, while expanding equitable pathways into family-sustaining jobs." U.S. Env't Prot. Agency, *Solar for All: Solar for Labor Highlights*, https://perma.cc/B9U5-23VQ (last updated Apr. 22, 2024). Indeed, EPA explicitly noted that "[s]trong applications will include multi-sectoral partnerships with key stakeholders in the workforce development ecosystem needed to execute on this vision for a robust and inclusive clean energy workforce. . . ." D.R.I. EPA 000352. And EPA reviewed applications for funding awards based on, in part, the ability of applicants to maximize the

benefits of rooftop solar by "supporting prevailing wages, investing in effective workforce training programs . . . and prioritizing equitable economic opportunities." *Id.* at 000319-20.

In reliance on EPA's actions, Rhode Island AFL-CIO entered into a Memorandum of Agreement with the state's Office of Energy Resources, Department of Environmental Management, Infrastructure Bank, and Plaintiff Rhode Island Center for Justice, among others, to expand access to solar and secure new job opportunities for workers in the state and a pathway to bring younger workers into the labor movement. Declaration of Patrick Crowley at ¶¶ 5, 11, attached as Exhibit 1. The average age of workers in the building trades in Rhode Island is about 55, making it important to find opportunities to recruit, train, and retain the next generation of skilled workers. *Id.* at ¶ 3. As a coalition partner for Rhode Island's Solar for All grant, the Rhode Island AFL-CIO was involved in helping to develop the implementation plan, including an initiative to replace old knob and tube wiring, replace roofs, and upgrade electrical panels to make homes solar-ready. *Id.* at ¶ 6. These efforts were slated to create jobs for Rhode Island AFL-CIO members and affiliates and open up new pathways for workers in an emerging trade. *Id.*

Plaintiff EIS Solar likewise took steps to increase its staff in order to participate in Pennsylvania's Solar for All program and was preparing to engage in other workforce development opportunities, including training local talent and hiring workers in western Pennsylvania to help implement the program. Declaration of Ian Smith at ¶ 12, attached as Exhibit 2. EIS Solar was gearing up to help fulfill Solar for All's promise of promoting new job opportunities in the Appalachian region of Pennsylvania, a region that the Department of Energy had identified as including communities susceptible to coal-specific job losses. U.S. Env't Prot. Agency, *Solar for All: Solar for Energy Communities Highlights*, https://perma.cc/BCY4-U9RQ

6

(last updated Apr. 22, 2024). The Pennsylvania Solar for All strategy thus centered workforce training programs with a goal of creating and supporting thousands of new solar and energy efficiency jobs over the five-year grant period. *Id.*

Plaintiff EIS Solar, with its operations based in Pittsburgh area of western Pennsylvania, was well-positioned to make good on EPA's promise to serve customers in the industrial heartland. Smith Decl., Ex. 2 at ¶¶ 3-6. EIS Solar worked closely with the Pennsylvania Building, Renewables, Investing in Green, Healthy, Thriving Communities ("PA BRIGHT") solar leasing pilot program, launched by the Capital Good Fund with philanthropic support, and was taking the steps necessary to be a partner in deploying solar under the $156 million Solar for All program in the Commonwealth of Pennsylvania. *Id.* at ¶¶ 7-8. EIS Solar experienced firsthand how PA BRIGHT could expand access to money-saving rooftop solar to low-income households that otherwise could not afford it. *Id.* at ¶¶ 8-11. The investments that EIS Solar made in 2025 to expand its business were heavily influenced by the Solar for All program and the promise of continued solar installations that it would support, even following the expiration of the investment tax credit for residential solar installations at the end of 2025. *Id.* ¶¶ 6-7.

By the same token, Plaintiff Sunpath Solar in Dallas, Georgia, was poised to make good on EPA's promise to deliver Solar for All's benefits to rural communities in the Southeast. Sunpath was founded to help traditionally marginalized communities share in the benefits of solar power and was an early partner in the development of the Georgia BRIGHT Solar for All program ("Georgia BRIGHT"). Declaration of Seth Gunning at ¶ 2-4, attached as Exhibit 3. Sunpath was selected as an approved installer and repair contractor under the Georgia BRIGHT program and was in the process of negotiating final contract terms when EPA announced the termination of the Solar for All Program. *Id.* at ¶ 5. Sunpath had invested in preparations by

7

hiring new staff, identifying additional candidates to fill additional positions, and expanding its equipment and infrastructure, including investing in a new project management system and vehicles. *Id.* at ¶ 7. Sunpath developed relationships with community organizations like the Latin American Association, Habitat for Humanity, and numerous faith-based organizations to get the word out about the program so that eligible households could apply. *Id.*

Likewise, Plaintiff 2KB, a small energy management company based in Atlanta, Georgia, was responsible for coordinating among various contractors for the Georgia Solar for All Enabling Repairs Program. Declaration of George Buchanan at ¶ 11, attached as Exhibit 4. The Enabling Repairs Program Administrator contract was valued at $1.64 million and required facilitating $19 million in Solar for All Enabling Repairs funding. *Id.* at ¶ 12. As the Program Administrator, 2KB administered, awarded, and facilitated project management services for infrastructure work across Georgia. *Id.* 2KB dedicated four staff members, 40% of its total staff capacity, to its Enabling Repairs work. *Id.* at ¶ 13. The company also invested in a software platform specifically to administer the Solar for All program. *Id.* at ¶ 15.

### b. *Households Facing Unaffordable Electric Bills Were Poised to Benefit from Solar for All*

EPA reported that the average low-income household participating in the Solar for All program would save about $400 per year on its electricity bills, totaling over $350 million in annual savings for all participants (and $8 billion in cumulative savings over 25 years). U.S. Env't Prot. Agency, *Solar for All Fast Facts*, https://perma.cc/E9LQ-979N (last updated Feb. 25, 2025); U.S. Env't Prot. Agency, *Solar for All: Solar for Household Savings Highlights*, https://perma.cc/K6HQ-EVK3 (last updated Apr. 22, 2024). In fact, EPA required that household savings equal at least 20% of the average household electricity bill. D.R.I. EPA 000386. In addition, many Solar for All projects would increase reliability by integrating battery storage and

other grid benefits, creating new capacity to deliver power during grid outages for communities across the country.

Plaintiff Anh Nguyen in Atlanta, Georgia, turned to the Solar for All Georgia BRIGHT program because of her unaffordable electric utility bills. She has faced unaffordable bills for her modest 1,000 square foot home, and when she has been unable to immediately pay, has received notices of threatened disconnection from the utility. Declaration of Anh Nguyen at ¶ 3, attached as Exhibit 5. In addition to unaffordable utility bills, Ms. Nguyen's roof needs repairs, which would have been covered by the Georgia BRIGHT program; these repairs would not only make solar installation possible but reduce moisture intrusion and mold while improving indoor air quality. *Id*. at ¶¶ 5, 9. The Georgia BRIGHT program's promise to provide solar to eligible households was a source of hope and inspiration to Ms. Nguyen. *See id.* at ¶¶ 15-16. In addition to applying to receive services under the program, Ms. Nguyen spent time voluntarily advocating for the widespread adoption of the Georgia BRIGHT program, informing her community about the program through her children's school and affordable housing groups. *Id.* at ¶ 14.

### c. *Nonprofits Dedicated Significant Resources to Help Implement Solar for All*

Plaintiff Rhode Island Center for Justice ("Center for Justice") works to protect rights and ensure justice for low-income communities in Rhode Island. Declaration of Jennifer L. Wood at ¶ 3, attached as Exhibit 6. The Center for Justice's primary focus is on utility access, housing, and consumer protection, working directly with households who face utility shutoff notices due to unpaid bills. *Id.* at ¶ 4. The clients of the Center for Justice are the very households that Congress intended to benefit with the creation of the Solar for All program. *Id.* at ¶ 11. The loss of essential utility service can lead to severe consequences for the clients the Center for Justice serves—forcing families to choose between energy, food, and rent—and can lead to eviction. *Id.*

at ¶¶ 4, 6. The Center for Justice decided to become a coalition partner in the Rhode Island Solar for All grant application because the new program would help to fulfill its mission to provide affordable, sustainable, and uninterrupted access to life sustaining electric service for low-income residents in Rhode Island. *Id.* ¶ 10. Community solar subscriptions and distributed rooftop projects supported by Solar for All would have reduced utility bills for participating low-income households in a durable manner. *Id.* at ¶ 11. Unlike temporary subsidies, renewable energy under Solar for All would reliably lower household energy costs, giving low-income residents a stable path away from recurring arrearages, shutoff threats, and termination of service. *Id.*

Plaintiff Black Sun Light Sustainability works in Indiana to advance sustainability for impacted communities through community education, policy advocacy, and clean energy projects, a mission that aligns directly with the goals of the Solar for All program to provide clean energy projects for low-income communities. Declaration of Denise Abdul-Rahman at ¶ 3, attached as Exhibit 7. As a result, Black Sun Light Sustainability applied for and won a sub-award of $29,966,500 from Indiana's primary grant recipient, the Indiana Community Action Association, to help implement Solar for All. *Id.* at ¶¶ 9, 13. To prepare for implementing the Solar for All program in Indiana, Black Sun Light Sustainability worked with energy cooperatives in five different communities ready to implement community solar projects to reduce energy costs and burdens for low-income residents. *Id.* at ¶¶ 14-16. The organization created relationships, trust, and draft contracts with these communities, and began work in all 92 counties of Indiana to build five energy cooperatives, 50 resiliency hubs, and 200 rooftop solar projects. *Id.* at ¶¶ 11, 16, 27, 29.

10

Similarly, Plaintiff Solar United Neighbors ("SUN") is a nonprofit organization founded to represent the needs and interests of solar owners and supporters across the United States. Declaration of Anya Schoolman at ¶ 2, attached as Exhibit 8. SUN's mission is to work with communities to build an energy system with rooftop solar as the cornerstone. *Id.* Accordingly, SUN set to work immediately when EPA announced funding opportunities under Solar for All. *Id.* at ¶ 5. SUN employees spent hundreds of hours providing free technical assistance on over 20 prime Solar for All applications. *Id.* at ¶ 5. SUN was ultimately awarded sub-grants of $13,722,744. *Id.* at ¶¶ 12, 28, 42. In administering these funds, SUN worked alongside partners in numerous states including Florida, Indiana, and Texas to prepare workplans and to implement programming, including by securing and managing installation contracts. *Id.* at ¶¶ 19, 31, 50. SUN brought on several staff members to support its wide array of work under the Program and, even with the extra support, forewent opportunities to do other work and secure non-Solar for All grants. *Id.* at ¶¶ 6, 13, 14, 45.

### 3.     H.R. 1 Repeals the Greenhouse Gas Reduction Fund Going Forward, Leaving Solar for All's Funding Obligations in Place

After the primary grantees finalized their EPA-approved workplans and budgets and completed administrative requirements at the end of 2024, many Plaintiffs and others got to work alongside the grant recipients, developing new programs and conducting community outreach to prepare for the projects the primary grantees would fund. Abdul-Rahman Decl., Ex. 7, at ¶ 24 (promoting program to communities, utilities, and municipalities); Wood Decl., Ex. 6, at ¶ 18 (expanding organization's scope of work to participate in the Solar for All program); Smith Decl., Ex. 2, at ¶ 15 (building relationships with partners to prepare to provide installations under the program); Schoolman Decl., Ex. 8, at ¶¶ 12, 20, 29, 31, 44, 45 (implementing programs and conducting community outreach).

11

Approximately two years after Solar for All was launched, the 119th Congress repealed 42 U.S.C. § 7434 going forward as part of H.R. 1, rescinding only those funds that had not yet been obligated to the programs within the Greenhouse Gas Reduction Fund:

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND.
> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

D.R.I. EPA 000014; H.R. 1 – One Big Beautiful Bill, Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025). The President signed H.R. 1 into law on July 4, 2025. Any funds that were *unobligated* as of July 3, 2025 (the day before enactment) were rescinded by H.R. 1.

Congress explicitly recognized that existing grants—that is, *obligated* funds—would continue after the repeal and were not subject to the rescission. *See* H. Comm. on Energy and Com., *Markup of Budget Reconciliation Text* (Part 1) (May 13, 2025), at 13 (Rep. Morgan Griffith explaining that "these provisions . . . only apply, as far as this bill is concerned, to the unobligated balances."), https://perma.cc/PSS2-KE85. Representative Griffith (R–VA), Chair of the Environmental Subcommittee, stated repeatedly in committee that the bill would not impact obligated funds. Mr. Griffith declared that "if a grant was already given, *as far as this bill is concerned, then that would still be going forward,*" and "[i]f the grant has already been granted and the money is obligated, then this -- then *our language does not affect that*." *Id.* at 244:5962-5964, 5968-5970 (emphases added). Similarly, the Chair of the House Energy and Commerce Committee, Representative Brett Guthrie (R–KY), affirmed: "[T]his legislation . . . *does not close the grants on any obligated funds*." *Id.* at 245:5998-6000 (emphasis added).

Consistent with the statutory text, the Congressional Budget Office calculated the amount that H.R. 1 would remove from the budget through 2034 at just $19 million—that is, a rescission of only the remaining unobligated monies set aside for EPA's administrative costs for the entire

Greenhouse Gas Reduction Fund. Congressional Budget Office, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* (July 21, 2025) (select "view document" and select tab "Title VI." View row 21 and column O), https://www.cbo.gov/publication/61570.

Notwithstanding the rescission of these funds, EPA had other administrative funds available to use in administering the Solar for All program. For the 2025 fiscal year, Congress had appropriated well over $3 billion for EPA's Environmental Programs and Management. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025), https://perma.cc/62D7-RUDA. Congress directed EPA to use this funding for "necessary expenses not otherwise provided for," including the "personnel and related costs" necessary to administer grant programs. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 252 (2024), https://perma.cc/8TZX-GYR7. These funds were not rescinded by H.R. 1, and EPA continued to administer Solar for All for over a month after H.R. 1 became law.

### 4.    EPA Terminates the Program

The administrative record includes no consideration of H.R. 1 or any effect of this legislation on Solar for All prior to the day Defendants terminated the program. Instead, EPA Associate Deputy Administrator Travis Voyles recommended the termination in a memo dated August 7, 2025, the same day Defendants terminated the program. D.R.I. EPA 000089–96. The memo stated that "there is no longer a statutory foundation for the EPA to administer and evaluate awards or to ensure and monitor the compliance of award recipients with grant terms, conditions, or applicable laws—or the ability of EPA to enforce grant contracts against programs previously constituted under that section." *Id.* at 000090. The memo went on to state that "the

13

continuation of the SFA program would exceed the Agency's authority, risk flouting congressional intent, and potentially violate the terms and conditions of the grant awards themselves." *Id.* at 000090-91. Mr. Voyles sent the memo to EPA Deputy Administrator David Fotouhi at 5:20 a.m.; just three hours later, at 8:21 a.m., Mr. Fotouhi replied that he agreed with the recommendation to terminate the program and existing grants, and directed Mr. Voyles to "proceed accordingly." *Id.* at 000088. Mr. Voyles replied, "We will work to immediately implement the termination of the SFA program and existing grants." *Id.* At 8:47 a.m., Mr. Voyles confirmed that "Agency leadership has decided to terminate the Solar For All (SFA) program." *Id.* at 000097.

That same day, August 7, 2025, Defendants terminated the Solar for All grant program in its entirety. Before noon, EPA staff sent a spreadsheet of "SFA Grants to Terminate," *Id.* at 000099, which listed every one of the 60 Solar for All grants for termination. *Id.* at 000100-02. EPA staff confirmed later that same day that the Office of Grants and Debarment "has completed and transmitted all 60 SFA Termination Notifications Letters." *Id.* at 000113. Thus, the termination of Solar for All, from the recommendation to notifying all grantees that the program was terminated, occurred on a single day.

Also on August 7, 2025, Defendant Zeldin publicly declared in a social media post that "EPA no longer has the authority to administer the program or the appropriated funds to keep this boondoggle alive. With clear language and intent from Congress in H.R. 1, EPA is taking action to end this program for good." Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET), https://perma.cc/8MWC-6Z42.

EPA's termination notice letter to all grantees stated that EPA had "made the decision to terminate the SFA [Solar for All] program" in its entirety. D.R.I. EPA 000111. In its notice, EPA provided the following reasons for its decision to terminate the Solar for All program:

- "The repeal of the grant appropriations in [42 U.S.C. § 7434(a)(1)-(3)], coupled with the rescission of the administrative appropriation in section [7434(a)(4)], effectively and completely terminated the statutory authority and all appropriations related to Solar for All." *Id.*

- "As both the grant appropriations and the EPA's administrative cost appropriations are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed" to oversee grants or the Solar for All program. *Id.*

- "[A]ny attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible." *Id.*

- "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate." *Id.*

Likewise, in the August 7 memo, EPA's Associate Deputy Administrator recommended terminating the program "because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate." *Id.* at 000089.

EPA did not acknowledge that Congress left in place all obligated funding for the program, though later, in a declaration submitted in litigation, it admitted all grant funding for the program remains in EPA's account. Declaration of Gregg A. Treml at ¶¶ 5-7, attached as Exhibit 9. And it ignored that the statute specifically contemplated the use of "amounts otherwise available" to cover ongoing administrative costs. *See* D.R.I. EPA 000012; 42 U.S.C. §

15

7434(a)(4) (2022). As to "amounts otherwise available," on March 15, 2025, the 119th Congress (2025-2026) passed a continuing resolution and appropriated $3,195,028,000 for the "Environmental Protection Agency—Environmental Programs and Management" for the 2025 fiscal year. Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30, https://perma.cc/62D7-RUDA (last visited Aug. 10, 2025). These funds—well over $3 billion—were available for the Environmental Protection Agency to carry out its work. Yet EPA asserted that "any attempt to continue the SFA program's administration . . . is no longer legally permissible," and that it would be somehow "improper" to use other available funds—as expressly permitted by statute, 42 U.S.C. § 7434(a)(4)—to administer the program to meet the agency's Solar for All grant obligations. D.R.I. EPA 000091, 000111.

### 5.    Legal Challenges

Plaintiffs filed this action on October 6, 2025. Subsequently, multiple recipients of Solar for All Grants—Harris County, Texas, and a coalition of states—filed challenges to the program's termination in other district courts. *Harris County, Texas v. EPA*, No. 1:25-cv-3646 (D.D.C. Oct. 13, 2025); *Arizona, et al. v. EPA*, No. 2:25-cv-2015 (W.D. Wash. Oct. 16, 2025). The states also filed challenges to the termination of their individual Solar for All grants in the Court of Federal Claims. *Maryland Clean Energy Center v. United States*, No. 1:25-cv-01738-LAS (Fed. Cl. Oct. 15, 2025).

Plaintiffs here and in the other district court cases also filed petitions in the D.C. Circuit, solely as a protective measure in the event a court were to hold that the Clean Air Act's channeling provision at 42 U.S.C. § 7607(b)(1) applied; those petitions were consolidated as No. 25-1216 (D.C. Cir. Oct. 20, 2025). EPA has not argued the channeling provision applies, and it

consented to hold those consolidated petitions in abeyance. The D.C. Circuit did so on November 20, 2025.

### 6.     The Administrative Procedure Act

Congress enacted the Administrative Procedure Act (APA) to ensure fairness and stability in agency action by mandating reasoned decision-making, and to guard against agencies' pursuit of a political agenda without adherence to legal process. The APA acts "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). To do so, it provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

Under the APA, federal courts are empowered to review "final agency action." 5 U.S.C. § 704. Agency action is deemed "final" if: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Harper v. Werfel,* 118 F.4th 100, 116-17 (1st Cir. 2024) (internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Agency action must be "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted), especially when the agency changes course, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983); *see also Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995). Courts must set aside final agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's final action is arbitrary and capricious if the agency lacks a rational basis for adopting it, including "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. An agency reversing policy must consider alternative options "within the ambit of the existing policy.." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted). And it must consider the "serious reliance interests" affected by changing its prior position. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (citation omitted).

Courts must also set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). An agency can only wield power Congress confers. *La. Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 374 (1986) (explaining "an agency literally has no power to act" absent congressional authorization). To determine "whether an agency has acted within its statutory authority," courts use "the traditional tools of statutory construction," *Loper Bright*, 603 U.S. at 401, 412, including that words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up). Moreover, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are not entitled to deference." *Loper Bright*, 603 U.S. at 392.

7.    **Legislative Branch Authority Under the United States Constitution**

*a.  Congress Alone Controls Spending*

The Constitution assigns Congress the power over how taxpayer dollars will be used, "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents . . . ." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Since our Founding, the separation of Congress's power of the purse from the executive branch's powers has been a central tenet of our system that is fundamental to the preservation of liberty.

The Constitution carefully delineates Congress's exclusive appropriation powers. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I § 9, cl. 7. It thus "protects Congress's exclusive power over the federal purse." *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation and quotations omitted).

The executive branch, in turn, must implement Congress's spending decisions. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law" by "declin[ing] to spend appropriated funds" on programs mandated by Congress. *In re Aiken County*, 725 F.3d 255, 266-67 & 261 n.1 (2013) (Kavanaugh, J.) (citation and quotations omitted).

*b.  Congress Alone Legislates*

Article I vests in Congress the power to pass legislation, including appropriations laws. U.S. Const. art I, § 1 ("[a]ll legislative Powers herein shall be vested in a Congress of the United

States"); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (characterizing an appropriations act as a "law").

In *Clinton v. New York*, the Supreme Court struck down the line-item veto as unconstitutional because Article I, section 7 of the Constitution makes clear that the Executive Branch cannot cancel a law, or any part of it, without Congress's express authorization. 524 U.S. 417, 447-49 (1998). As the Supreme Court explained, the text of a bill approved by a majority of both houses of Congress and signed into law by the President must remain identical, otherwise it would be a different document that may not "'become a law' pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution." *Id.* at 448-49. For the same reason, the Court's opinion in *Clinton* specifically rejected the argument that cancelling congressionally appropriated programs "were merely exercises of discretionary authority granted to the President." *Id.* at 442.

### c.   *Legislation Is Not Retroactive Absent an Express and Unambiguous Congressional Enactment to the Contrary*

Courts have long recognized a presumption against retroactivity, under "which courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 265-66 (2012); *see also United States v. Domenic Lombardi Realty, Inc.*, 290 F. Supp. 2d 198, 209 (D.R.I. 2003).

Against this background, Congress enacted the General Savings Statute, which expressly mandates that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability." 1 U.S.C. § 109.

And just as the General Savings Statute preserves existing liabilities absent an expressly retroactive enactment, it likewise preserves the relevant statutory authority that gives rise to that preexisting liability. As recognized by the Supreme Court, "[b]y the General Savings Statute Congress did not merely save from extinction a liability incurred under the repealed statute; *it saved the statute itself: 'and such statute shall be treated as still remaining in force* for the purpose of sustaining any proper action . . . for the enforcement of such . . . liability.'" *De La Rama S. S. Co. v. United States*, 344 U.S. 386, 389 (1953) (citing 1 U.S.C. § 109) (emphasis added); *see also, e.g.*, *Commonwealth of Mass., Dept. of Pub. Welfare v. Secretary of Agric.*, 984 F.2d 514, 518-20 (1st Cir. 1993) (holding that the General Savings Clause permitted sanctions for exceedance of allowable margin of error, despite repeal of applicable quality control program), *cert. denied*, 510 U.S. 822 (1993).

## STANDARD OF REVIEW

The Court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Boston Redevelopment Auth. v. Natl. Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id*. Under this standard of review, a court "shall . . . set aside" an administrative action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise

21

contrary to law." 5 U.S.C. § 706(2)(A), *see also Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

"[I]n the context of . . . constitutional separation of powers claims," there are similarly "no questions of fact, because whether or not a statute or the Constitution grants the [Executive Branch] the power to act in a certain way is a pure question of law." *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 8-10 (2015) (conducting de novo review and requiring courts to consider "the Constitution's text and structure, as well as precedent and history bearing on the question"). "The same can be said of any questions of interpretation that a federal court may have to answer in parsing out the meaning of any relevant statutes[.]" *Am. Fed. of Gov't Emps.,* 318 F. Supp. 3d at 394 (2018).

## ARGUMENT

Plaintiffs are intended beneficiaries of the Solar for All program: a labor organization, an individual homeowner seeking access to solar energy to reduce costs, nonprofit organizations dedicated to assisting low-income families with affordable energy, and solar consultants and installers. Each plaintiff was harmed when the program was terminated, and each Plaintiff's harms would be redressed by setting aside the decision to terminate the program. Vacating the termination of Solar for All would redress Plaintiffs' injuries by restarting the flow of money and opportunities to participate in the program. Accordingly, the Court has jurisdiction to hear Plaintiffs' claims, and Plaintiffs have standing. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–141 (1967) (Section 702 authorizes persons injured by agency action to obtain judicial review by suing the United States or one of its agencies, officers, or employees).

EPA's termination of the Solar for All program constitutes final agency action. And the facts relevant to this action are not in dispute:

1.      In 2022, Congress appropriated $7 billion to fund competitive grants "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities."  42 U.S.C. § 7434(a)(1) (2022); D.R.I. EPA 000012.

2.      EPA announced awards in 2024 and obligated the entire $7 billion in Solar for All program funds before the September 30, 2024 statutory deadline. EPA awarded funds to 60 primary grant recipients around the country "to expand the number of low-income and disadvantaged communities primed for distributed solar investment." D.R.I. EPA 000312. The obligated funds would be available for five years.

3.      Approximately two years after Solar for All was launched, the 119th Congress passed H.R. 1, including a section stating: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded." *Id.* at 000014 (emphasis added). The President signed H.R. 1 into law on July 4, 2025.

4.      EPA continued to administer the Solar for All program between July 4, 2025 and August 7, 2025.

5.      In a memo dated August 7, 2025, EPA Associate Deputy Administrator Travis Voyles recommended the termination of the Solar for All program, stating that "there is no longer a statutory foundation for the EPA to administer and evaluate awards or to ensure and monitor the compliance of award recipients with grant terms, conditions, or applicable laws—or the

ability of EPA to enforce grant contracts against programs previously constituted under that section." *Id.* at 000090. The memo went on to state: "the continuation of the SFA program would exceed the Agency's authority, risk flouting congressional intent, and potentially violate the terms and conditions of the grant awards themselves." *Id.* at 000090-91.

6.    That same day, August 7, 2025, Defendants terminated the Solar for All grant program in its entirety. EPA's termination notices to grantees stated that "repeal of the grant appropriations in [42 U.S.C. § 7434(a)(1)-(3)], coupled with the rescission of the administrative appropriation in section [7434(a)(4)], effectively and completely terminated the statutory authority and all appropriations related to Solar for All." *Id.* at 000111.

On this record, Plaintiffs are entitled to summary judgment on their APA claims. Defendants' actions were contrary to law: EPA is required by law to fulfill the mandates of the original Solar for All appropriation, and the passage of H.R.1 did not change that statutory obligation. (Count I.)  EPA justified its decision to terminate the Solar for All program solely based on H.R. 1. But by its plain language, the statute did not rescind funds already obligated to the Solar for All Program, did not apply retroactively, and did not extinguish prior liabilities of the U.S. government.

Defendants' actions also were arbitrary and capricious, falling well short of the APA's requirement of reasoned and justified agency decisionmaking. (Counts II, III and IV.)

First, EPA's explanation ran counter to the evidence before the Agency. By its plain language and legislative history, H.R. 1 affected only unobligated administrative funds, while all grant funding remained untouched. As to administration of the program, Congress was clear that the 2022 appropriation funding for the Solar for All program was not exclusive, and instead was "[i]n addition to amounts otherwise available" for administering the program. 42 U.S.C. §

24

7434(a)(4) (2022). The evidence before EPA established that Congress intended the Solar for All program to continue to be administered following H.R.1, and that there were administrative funds to do so.

Second, EPA failed to consider relevant factors in terminating the Solar for All Program. The administrative record reflects that EPA's termination decision was accomplished in one day and explained in a single memo. There was no time for a meaningful administrative process. And in fact, the administrative record does not contain any consideration of the relevant factors, including any analysis of the feasibility of continuing the program by administering the program using "amounts otherwise available."

Third, EPA failed to consider the reliance interests on Solar for All funds. EPA's cursory termination memo assumed that the labor groups, nonprofits, and solar businesses that had worked for years on applications and helping prepare to implement Solar for All had no reliance interests in the program. As to reliance interests of other beneficiaries of Solar for All, including other Plaintiffs in this case, EPA conducted no analysis at all. This back-of-the-hand dismissal of reliance interests to justify cutting $7 billion in federal funding does not meet EPA's obligations under the APA.

EPA's elimination of the Solar for All program also violated the Constitution's separation of powers and Presentment Clause (Counts V and VI). Plaintiffs have identified particularized harm from EPA's admitted refusal to spend $7 billion in Solar for All funds and accordingly have Article III standing to assert these claims. As with Plaintiffs' APA claims, the administrative record establishes that Plaintiffs are entitled to summary judgment on these constitutional violations. H.R.1 did not change Defendants' statutory obligations. As a result, Defendants'

actions were entirely their own, and by terminating the program, Defendants unconstitutionally usurped Congress's power of the purse and its legislative authority.

## I.    Defendants Violated the APA

Defendants' decision to *terminate* the Solar for All program based on legislation that *preserves* the program's $7 billion in grant obligations was contrary to law and in excess of statutory authority. Defendants' justifications for the termination ran counter to the legislative, statutory, and other evidence before the agency. And Defendants arbitrarily rejected reasonable alternatives and failed to consider crucial reliance interests before terminating the program.

### A.  Defendants' Decision to Terminate the Solar for All Program Constitutes Final Agency Action.

Defendants' termination of the program marked the "consummation" of their decision-making regarding Solar for All. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). On August 7, 2025, Mr. Voyles confirmed that "Agency leadership has decided to terminate the Solar For All (SFA) program." EPA D.R.I. 000097. Later that same day, EPA staff reported that EPA's Office of Grants and Debarment "has completed and transmitted all 60 SFA Termination Notifications Letters." *Id.* at 000113. In other words, there was no separate decision-making process for any of the grants; instead, they were terminated en masse, effectuating the termination of the program in its entirety. And if there were any doubt about the finality of the agency's decision to terminate the program, Defendant Zeldin publicly announced that "EPA is taking action to *end this program for good*." Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET), https://perma.cc/8MWC-6Z42 (emphasis added).

Terminating the program had legal consequences and determined rights and obligations for all grant recipients. *See Harper*, 118 F.4th at 116. As EPA's notice letters explained, its termination of the program triggered a closeout process and deadlines for the recipients to

request final payments. D.R.I. EPA 000111. EPA halted grantees' access to their SFA award funds; drained grantees' ASAP account balances; and instructed grantees to proceed to close out their awards. *Id.* at 000111-12.

Accordingly, Defendants' termination of the Solar for All grant program is final agency action justiciable under the APA.

### B. Defendants' Termination of Solar for All Contravened the Plain Language of H.R. 1 and Exceeded EPA's Statutory Authority.

Defendants acted contrary to Congress's limited repeal and rescission of Section 134 of the Clean Air Act in H.R. 1. As a result of this error, Defendants' termination of the program exceeded their authority.

Congress charged EPA with implementing and administering the Solar for All grant program. D.R.I. EPA 000012. When Congress authorizes a program, "the Executive must continue to operate" that program "until the funds expire or Congress declares otherwise." *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 76 (D.D.C. 1973).

Here, Defendants eliminated the entire program by declaring that Congress terminated EPA's statutory authority "and all appropriations related to Solar for All." D.R.I. EPA 000111. But Congress did not authorize Defendants to terminate Solar for All. The relevant section of H.R. 1 applies only prospectively and expressly preserves all $7 billion in obligated funding commitments, as explained below. Indeed, EPA still retains all the Solar for All grant funding in its account today. Treml Decl., Ex. 9, at ¶ 7. Accordingly, EPA was required to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution [and] applicable Federal statutes and regulations." 40 C.F.R. § 200.300(a).

It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp v. EPA*, 573 U.S. 302, 328 (2014). Yet that is exactly what Defendants did here. Defendants' rationale disregards the plain language of the H.R. 1 statute and defies the limits of the agency's statutory authority. As a result, Defendants abdicated their continuing obligations to fund and administer Solar for All, while ignoring other appropriations available for them to do so.

### 1. *Congress preserved all $7 billion in Solar for All grant obligations.*

The plain text of H.R. 1 confirms that Congress rescinded only unobligated balances for administering the program, not "all appropriations related to Solar for All," as Defendants claimed, D.R.I. EPA 000111.

Congress provided that:

Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

D.R.I. EPA 000014; H.R. 1, Pub. L. No. 119-21, § 60002 (2025) (emphasis added). With this provision, Congress rescinded funds appropriated to carry out programs including Solar for All that, as of July 3, 2025, remained unobligated. Congress's language left EPA's existing funding commitments under Solar for All in place, and as explained below, preserved EPA's obligation to continue administering the program as well as leaving other funding available to do so.

 "An agency incurs an obligation . . . when it . . . awards a grant, or takes other actions that require the government to make payments to the public," while an "unobligated balance" is "the portion of the obligation authority that has not yet been obligated." U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 70-72 (Sept. 2005). The only funds H.R. 1 addresses are "unobligated balances."

Legislators who enacted H.R. 1 confirmed the repeal and rescission did not impact the $7 billion in obligated Solar for All grants. Representative Morgan Griffith (R–VA), Chair of the Environmental Subcommittee, explained several times in committee that the bill would not impact obligated funds. H. Comm. on Energy and Com., Markup of Budget Reconciliation Text for May 13, 2025 at 246:6011-16 (last updated August 15, 2025), https://perma.cc/PSS2-KE85. The Chair of the House Energy and Commerce Committee, Representative Brett Guthrie (R–KY), likewise affirmed: "[T]his legislation . . . does not close the grants on any obligated funds." *Id*. at 245:5998-6000.

 Consistent with the statutory text and legislative history, the Congressional Budget Office calculated that H.R. 1 rescinded just $19 million—that is, H.R.1 rescinded only the then-remaining unobligated monies set aside for EPA's administrative costs for the Greenhouse Gas Reduction Fund. Congressional Budget Office, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* (July 21, 2025) (select "view document" and select tab "Title VI." View row 21 and column O), https://www.cbo.gov/publication/61570. Thus, the Congressional Budget Office confirmed that the entire $7 billion of obligated grant funding under the Solar for All program was unaffected by H.R. 1.

Defendants themselves subsequently had to acknowledge in a declaration that Congress did not rescind "all appropriations related to Solar for All"—as they claimed in their termination notice—when they confirmed that all grant funding for the program remains in EPA's account and will remain untouched for the entire appropriations period, until 2031. Treml Decl., Ex. 9, at ¶¶ 5-7.

### 2. Congress preserved EPA's authority to administer the Solar for All program.

Defendants erroneously claimed Congress "terminated the statutory authority" for Solar for All and "the Agency no longer possesses . . . the substantive legal authority" to administer the Solar for All program and its existing $7 billion in awarded grants. But Congress did no such thing. H.R. 1 preserved all existing financial obligations and—by eschewing any retroactive language—maintained EPA's authority to meet those obligations going forward.

Courts consistently have confirmed that repeals do not apply retroactively unless dictated by the plain language of the statute. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012); s*ee also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result."). Given the absence of unambiguous language that the repeal applied retroactively, this section of H.R. 1 must be read as only prospective in application. *Vartelas*, 566 U.S. at 266.

Moreover, Congress enacted H.R. 1 against the backdrop of 1 U.S.C. § 109, the General Savings Statute, which addresses the impacts of repeals on existing liabilities and provides that:

> [t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. §109. As the Supreme Court recognized, "[b]y the General Savings Statute Congress did not merely save from extinction a liability incurred under the repealed statute, *it saved the statute itself.*" *De La Rama S.S. Co.*, 344 U.S. at 389 (emphases added). By choosing to avoid any retroactive language and rescind only unobligated balances, Congress preserved EPA's existing Solar for All grant obligations and its authority to continue administering them.

Thus, Congress did not direct EPA to shut down the program as to existing liabilities and did not, either expressly or by necessary implication, remove EPA's statutory authority under Clean Air Act § 134 to administer existing grants. Rather, Congress left in place EPA's authority—and obligation—to administer the grant program. *See, e.g.*, *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 783 F. Supp. 3d 641, 648 (D.R.I. 2025)("It is well-established that in the interpretation of statutes, the express mention of one thing is the exclusion of others. So Congress's decision to eliminate some COVID-era public health measures but leave alone the funding at issue here presumably signals its intent to continue that funding" (citing *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017))).

### 3.  *H.R. 1 preserved EPA's funding to administer the Solar for All program.*

Defendants erroneously claimed that "the Agency no longer possesses . . . the financial appropriations needed" to oversee grants or the Solar for All program, and that "any attempt to continue the SFA program's administration, in the absence of any authorizing legislation or congressionally dedicated funding for that purpose, is no longer legally permissible." D.R.I. EPA 000090. In reality, Congress did not remove available funding for EPA to fulfill its continuing obligation to administer Solar for All.

EPA's administrative costs were never exclusively funded by Section 134 of the Clean Air Act. Rather, Section 134 expressly contemplated other funding sources supplementing the administration of the Greenhouse Gas Reduction Fund:

> ADMINISTRATIVE COSTS.—*In addition to amounts otherwise available*, there is appropriated to the Administrator for fiscal year 2022, out of any month in the Treasury not otherwise appropriated, $30,000,000, to remain available until September 30, 2031, for the administrative costs necessary to carry out activities under this section.

D.R.I. EPA 000012; 42 U.S.C. § 7434(a)(4) (2022) (emphasis added).

31

At the time of the termination decision, EPA had "amounts otherwise available." In seeking FY 2025 appropriations, EPA specifically had requested additional funds "to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act." EPA, Fiscal Year 2025, *Justification of Appropriation Estimates for the Committee on Appropriations*, Tab 5: Environmental Programs and Management at 40, https://perma.cc/95WY-ASDY. For the 2025 fiscal year, Congress appropriated well over $3 billion for EPA's Environmental Programs and Management. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025). Congress directed EPA to use this funding for "necessary expenses not otherwise provided for," including the "personnel and related costs" necessary to administer grant programs. Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25, 252 (2024), https://perma.cc/8TZX-GYR7.

In enacting H.R. 1, Congress did not rescind those general appropriations. Its limited rescission of $19 million in unobligated administrative funds did not remove EPA's financial ability to carry out its work and administer Solar for All, and in fact EPA continued to do so until August 7, 2025.

### C.  Defendants' Termination of the Solar for All Program Was Arbitrary and Capricious.

Defendants' actions here were arbitrary and capricious for at least three independent reasons, each of which warrants summary judgment in favor of Plaintiffs.

Defendants' assertion that they terminated the program and rescinded obligated funds because they lacked the statutory authority and funding to administer the Solar for All grant program (1) ran counter to all the evidence before the agency and failed to consider both (2) reasonable alternatives and (3) the serious reliance interests of those affected by Defendants' decision nationwide. As a result, their termination of the Solar for All program was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### 1. *Defendants' explanation ran counter to the evidence before the agency.*

An agency's final action is arbitrary and capricious if the agency lacks a rational basis for adopting it, including by offering "an explanation for its decision that runs counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. As discussed above, *supra* at 27, the plain language of H.R. 1 did nothing to alter Defendants' ongoing obligation to continue administering the Solar for All program, nor did it deprive Defendants of the authority and funding available to continue doing so. Their flouting of their ongoing obligation was unreasonable: as this Court noted at the preliminary relief stage in another case where Congress rescinded certain funding but "chose not to rescind the funding for the grants and cooperatives agreements" at issue, an agency's decision to carry out "the mass termination of [that] funding was likely not substantively reasonable." *Colorado*, 783 F. Supp. 3d at 648. Moreover, the

legislative history further confirms what the statutory text already made plain: H.R. 1 left EPA's Solar for All grant obligations in place.

Accordingly, Defendants' decision to terminate the program based on H.R. 1 was unsupported by—and indeed directly contrary to—all the evidence before them.

### 2. *Defendants arbitrarily rejected reasonable alternatives.*

The APA requires that agencies "must consider the alternatives that are within the ambit of existing policy" *Regents*, 591 U.S. at 30 (internal citation and quotations omitted). Here, Defendants failed to engage in any "reasoned analysis," as required by the APA, before terminating Solar for All. *State Farm Mut. Ins. Co.*, 463 U.S. at 43. As discussed above, *supra* at 31, Section 134 of the Clean Air Act provided for the use of "amounts otherwise available" to administer Solar for All, and EPA had ample general appropriations funding—over $3 billion for fiscal year 2025—available for this purpose. This funding was not rescinded by H.R. 1 or otherwise, so it was an available alternative to continue administering Solar for All.

Regarding the alternative of using other available funds to continue administering Solar for All, EPA stated in its memo recommending termination of the program:

> In enacting [Clean Air Act] section 134(a)(4), Congress specifically earmarked $30 million for the oversight and administration of all section 134 grant programs. In repealing section 134 and all administrative funding, Congress spoke definitively, and . . . it would go against congressional intent to use funds dedicated for other purposes and programs that lack a specific administrative funding appropriation to maintain a program that no longer has a statutory or appropriations basis.

D.R.I. EPA 000095.

This is not reasoned consideration of using alternative funds to administer Solar for All. Congress did not "speak definitively" that Solar for All had to be terminated because of the rescission of earmarked administrative funds. Congress preserved EPA's grant funding

obligations, and nowhere in either Section 134 of the Clean Air Act or in H.R.1 is there support for the argument that Solar for All was ever meant to be administered only using specifically appropriated funding. Quite the opposite: Congress unambiguously appropriated limited funds "*[i]n addition to amounts otherwise available*" for administering the program. 42 U.S.C. § 7434(a)(4) (2022) (emphasis added). As a result, it would in no way "go against congressional intent" to use other available funds, as the memo claimed, because Congress expressly provided EPA the authority to do so.

The memo also stated that "it would be improper to reallocate funds dedicated for programs that do not have specifically appropriated administrative funding for any program established under [Clean Air Act] section 134." D.R.I. EPA 000091. EPA likewise asserted that administering Solar for All using other available funds "would likely require stripping administration and oversight funding away from programs that Congress intended the Agency to support through other dedicated funding." *Id.* at 000095. But these conclusory statements do not justify EPA's decision to terminate the program. EPA was appropriated well over $3 billion to run its programs for fiscal year 2025 alone, which was done without limiting those funds to particular programs. Pub. L. No. 119-4, § 1802 (3), 139 Stat. 30 (2025). Moreover, the administrative record contains no analysis of whether making up the rescinded administrative costs for Solar for All—which would be a small fraction of the rescinded $19 million appropriated for administering the entire Greenhouse Gas Reduction Fund through 2031—would have any impact on EPA's other programs. And EPA made no attempt to reconcile its purported concern with the fact that Congress expressly authorized the Agency to administer Solar for All using "amounts otherwise available," and that Congress preserved existing financial obligations, including all Solar for All grants, when it enacted H.R. 1.

Rather than acknowledging EPA's continued obligation to administer Solar for All, Mr. Voyles stated—wrongly—that EPA was under "no enforceable obligation" to do so. D.R.I. EPA 000091. This entirely fails to acknowledge that Congress left in place EPA's existing $7 billion in grant obligations. Because the repeal effected by H.R. 1 was prospective only, and expressly preserved EPA's existing obligations, including its Solar for All grants, EPA was indeed under the obligation to continue administering those grants. Moreover, Congress set out in the General Savings Statute that legislation lacking express retroactivity language does not "release or extinguish any . . . liability incurred under such statute," and such liabilities remain enforceable. 1 U.S.C. §109. In other words, the General Savings Statute and the plain text of H.R. 1 make clear that EPA was under a continuing, enforceable obligation to follow through in administering the program and its existing grant agreements. EPA could not evaluate the termination decision without acknowledging this obligation and evaluating how to meet it, but it failed to do so.

### 3. *Defendants failed to consider serious reliance interests in terminating Solar for All.*

In terminating Solar for All, Defendants "entirely failed to consider an important aspect" of the problem, *State Farm*, 463 U.S. at 43—namely, serious reliance interests—and as a result, their decision was "not 'reasonable'" or "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). When changing positions, an agency "of course . . . must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and must consider any "serious reliance interests" engendered by the status quo. *Regents*, 591 U.S. at 30. Defendants failed to do so here.

In deciding to terminate a program that Congress specifically directed to help struggling communities around the nation, Defendants did not consider those communities' reliance

36

interests, including those who would benefit from and help implement Solar for All. Congress funded this program to the tune of $7 billion "to enable low-income and disadvantaged communities" to deploy or benefit from zero-emission technologies, and to provide "financial assistance and technical assistance in low-income and disadvantaged communities." 42 U.S.C. § 7434(a)(1)-(2). The impact of an agency's "sudden termination of billions of dollars in congressionally appropriated funds is substantial." *Colorado*, 783 F. Supp. 3d at 649. Yet Defendants made clear they did not consider how these communities had relied on the program and how they would be affected by its sudden termination.

Instead, in a two-sentence paragraph of its notice letter to grantees, EPA cursorily mentioned only the economic interests of grant recipients. D.R.I. EPA 000111-12. This was inadequate for multiple reasons. EPA stated that "[d]ue to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes," but grantees' work and investments to apply and prepare for Solar for All were not "early"—they had been ongoing for years—and their affected interests extend far beyond monetary outlays that could be compensated by the close-out process. *Id.*

But in addition, EPA ignored the myriad other beneficiaries of Solar for All, including the Plaintiffs in this case—homeowners seeking low-cost clean energy and the businesses and nonprofit organizations participating in the program to help bring it to disadvantaged communities—who were affected by Defendants' decision to terminate the program without warning. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-23 (2016) (finding that the Department of Labor "needed a more reasoned explanation for its decision to depart from its existing enforcement policy" where industry had "negotiated and structured their compensation plans" against the prior policy's "background understanding"); *Ass'n of Am. Universities v. Nat'l*

*Sci. Found.*, 788 F. Supp. 3d 106, 138, 141 (D. Mass. 2025) (finding a cognizable reliance interest where "[p]laintiffs and member universities have relied on [an agency's] longstanding approach to indirect cost rates in making long-term financial commitments, hiring and compensating staff, building and maintaining facilities, and generally advancing their scientific agendas").

Many of the Plaintiffs in this case made major decisions—including hiring, training, and investing significant resources—in reliance on this program, all in service of work to implement Solar for All that now can no longer move forward. As discussed in detail below, *infra* at 51, the termination of this program has caused Plaintiffs significant harm, including by upending their projects, frustrating their organizational missions, harming their businesses and ability to retain staff, and significantly impacting their budgets. Individual homeowners lost the chance to receive low-cost, reliable solar energy, and the Rhode Island AFL-CIO lost the training and job opportunities that were one of the program's purposes.

Mr. Voyles's August 7 memo included a brief section on reliance interests, but like the termination notice, the memo ignores or brushes aside the interests of Plaintiffs and many others. It expressly assumes that the labor groups, nonprofits, and solar businesses that had worked for years assisting with grant applications and helping prepare to implement Solar for All had no reliance interests in the program: "Because of the program's pass-through structure and implementation delays attributable in many cases to direct recipients, entities and individual households have not and are not likely to in the near future have significant reliance interests in the program's continuation that could not be mitigated through the closeout process." D.R.I. EPA 000093.

This conclusion was based on no actual analysis and was wrong. As for individual households, many like Ms. Nguyen relied on Solar for All because it was the only way they could obtain the affordable, reliable solar energy they sought. They put in work researching the program, preparing applications, drawing up plans, and spreading the word in their communities. *See Regents*, 591 U.S. at 31 (concluding that the agency unlawfully failed to consider the reliance interests individuals had in enrolling in degree programs, embarking on careers, starting businesses, purchasing homes, and getting married and having children).

As for the organizations and businesses, like Plaintiffs, who participated in helping to implement Solar for All, the memo wrongly implies that reliance interests do not exist unless an organization has already received funding in the form of a pass-through grant. But there is no basis for that assumption. *See, e.g.*, *Ass'n of Am. Universities*, 788 F. Supp. 3d at 138 ("An agency must consider such reliance interests even where the policy at issue 'confer[s] no substantive rights.'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. at 223)). And the types of reliance that are significant are far more than just sub-grant funding itself. *E.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) (relevant consequences of agency action include "projects halted, staff laid off, goodwill tarnished"), *appeal filed*, *Woonasquatucket River Watershed Council, et al v. USDA, et al*, 1st Cir., May 1, 2025. Here, Plaintiffs' declarations confirm their significant reliance interests: organizations and businesses who are not direct federal grant recipients undertook tremendous amounts of work and expenditures of time and money in reliance on the program in order to help prepare to implement it, starting well before the application process, and had specific projects under development.

EPA did concede that "in limited circumstances . . . potential domestic solar industry participants may have taken steps to develop plans, hire staff, enter into agreements, and perhaps some may have made initial capital outlays based on the expectation of federal assistance to pass-through grant recipients," but it brushed these interests aside as "limited in scope." D.R.I. EPA 000093. This dismissal was arbitrary and capricious for several reasons. First, a cursory dismissal of these interests is insufficient. *See American Hospital Association v. Kennedy*, No. 25-2236, 2026 WL 49499 at *3 (1st Cir. Jan. 7, 2026) ("At best, the federal government identifies a sentence in the record acknowledging that rebate models could fundamentally shift how the 340B Program has operated . . . . Though unquestionably true, that statement does not demonstrate that the federal government considered whether and to what extent such a 'shift' would impact the hospitals, whose financial survival relies on the upfront discounts that they have long received.")

Second, EPA knew better than to cast these efforts as so "limited in scope" as to be negligible. With Solar for All, EPA itself promised to support job training and workforce development in the solar market, encouraging organizations and businesses to invest in preparing to implement the program. And EPA promised to bring financial and market transformation benefits to underserved communities, encouraging homeowners and community organizations to rely on the program as well. Plaintiffs and many others responded by making significant investments, working for multiple years to prepare applications and plans, and much more, based on the promise of a transformative major federal program designed to benefit them. But without considering the effects of cutting off these intended benefits, EPA's termination of the program led to workforce instability and job losses, and left organizations and individuals less equipped to

contribute to and benefit from the clean energy economy. These are not interests that are "limited in scope," nor did EPA grapple with how to mitigate the harm.

EPA had no basis for negating these concerns. If it had met with affected organizations and businesses or otherwise made any effort to understand their reliance interests, it would have realized how significant and longstanding they are. But as the record reflects, the agency did not do so. Instead, Defendants decided in a single day to terminate this massive, much-needed program nationwide without any consideration of these broad and serious consequences.

In sum, Defendants entirely failed to acknowledge significant reliance interests, let alone weigh "such interests against competing policy concerns." *Regents*, 591 U.S. at 33. This was "the agency's job, but the agency failed to do it." *Id.* at 32.

## II.    Defendants Violated the Constitution

EPA's elimination of the Solar for All program violated the Constitution's separation of powers and Presentment Clause. The executive branch violated the separation of powers by negating Congress's spending decisions and thereby usurping powers the Constitution expressly reserves for Congress. And it violated the Presentment Clause by rewriting legislative mandates, thereby producing the equivalent of an unconstitutional line-item veto.

The executive's authority to act "must stem either from an act of Congress or from the Constitution itself," but Defendants had no authority to eliminate the Solar for All program. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,585 (1952). Accordingly, this case does not challenge EPA's "exercise [of] discretion Congress ha[d] granted" it by statute. *Dalton v. Specter*, 511 U.S. 464, 476 (1994). Instead, Plaintiffs challenge the complete lack of authority for the executive's action, and thus bring constitutional, rather than statutory, claims.

### A. Defendants Violated the Separation of Powers.

EPA was required to continue administering the grant program it put in place to comply with Congress's funding directives. As the Supreme Court explained in *Youngstown Sheet & Tube Co. v. Sawyer*, all executive power must come either "from an act of Congress or the Constitution itself." 343 U.S. at 587. And when "the President takes measures incompatible with the express or implied will of Congress," then the executive's "power is at its lowest ebb." *Id.* at 637 (Jackson, J. concurring). Here, no statute authorizes the elimination of the Solar for All program. On the contrary, Congress funded the program in 2022, and in 2025, it preserved EPA's existing obligation and authority to continue this fully awarded grant program via the unambiguous text of H.R. 1.

The Constitution does not authorize Defendants' actions either—it forbids them. Once a law is enacted, Article II requires that the executive branch "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The executive branch does not have dispensing power—that is, the ability to disobey duly enacted laws for policy reasons. *See Matthews v. Zane's Lessee*, 9 U.S. 92, 98 (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (explaining that dispensing power "has no . . . support in any part of the constitution").

The executive branch's inability to disobey duly enacted laws is particularly important when it comes to appropriated funds, because Congress's power of the purse is absolute. As then-Judge Kavanaugh put it, the executive "does not have unilateral authority to refuse to spend [congressionally appropriated] funds." *Aiken County*, 725 F.3d at 261 n.1. A contrary rule of open disregard for congressional control over spending decisions would drastically alter the balance of power between Congress and the executive. "If not for the Appropriations Clause, 'the

42

executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)).

Numerous court decisions confirm that withholding the funding appropriated by Congress, as Defendants have done here, is a textbook separation of powers violation. *E.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018) ("Because the Executive Order directs Executive Branch administrative agencies to withhold funding . . . there is no reasonable argument that the President has not . . . . violate[d] the constitutional principle of the Separation of Powers."); *Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) (noting that "the power of the purse rests with Congress, which authorized the federal funds at issue," and explaining that where the executive branch attempted to impose its own conditions on the receipt of these grant funds, "[i]t falls to us, the judiciary . . . to act as a check on such usurpation of power."), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *In re Aiken Cnty.*, 725 F.3d at 261 n.1 ("'With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.'") (quoting Memorandum from William H. Rehnquist, Assistant Attorney General, Off. of Legal Couns., to Edward L. Morgan, Deputy Couns. to the President (Dec. 1, 1969)).

Defendants' termination of Solar for All violated the separation of powers because they were required to continue administering the program Congress funded. In 2022, Congress appropriated $7 billion to EPA to make grants by a date certain for a specific purpose: "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission

technologies." D.R.I. EPA 000012; 42 U.S.C. § 7434(a)(1) (2022). EPA timely obligated those funds through the Solar for All program's competitive grant-making process. Once EPA awarded the funds in accordance with this legislation, EPA was obligated to continue administering the program, absent Congressional instruction to the contrary.

Defendants' refusal to do so violated the separation of powers by defying Congress's command in 42 U.S.C. § 7434 to spend its duly appropriated funds, as well as Congress's declaration in 1 U.S.C. § 109 that "[t]he repeal of any statute shall not have the effect to release or extinguish any . . . liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force . . . ." Defendants tried to justify their actions to terminate Congressionally appropriated and obligated funding by pointing to H.R. 1, but as discussed above, *supra* at 27, that is simply wrong. H.R.1 was not retroactive, did not cancel awards made under the Solar for All program prior to July 3, 2025, and did not rescind funds that already were obligated as of that date. As a result, Defendants' actions were entirely unauthorized, and by terminating the program, Defendants unconstitutionally usurped Congress's power of the purse.

**B.  Defendants Violated the Presentment Clause.**

Defendants' termination of the Solar for All program also amounts to an unlawful attempt to amend and repeal a duly enacted statute without following the constitutionally mandated legislative process.

As discussed above, Defendants' refusal to spend appropriated and obligated Solar for All funds was a unilateral decision, not one authorized by Congress. Accordingly, EPA's termination of Solar for All is indistinguishable from the agency having the power to strike the provisions that funded Solar for All out of the Inflation Reduction Act of 2022 in a retroactive

line-item veto. That legislation, including the exact language that became Section 134 of the Clean Air Act, was presented to both houses of Congress and signed into law by the President. The program, its obligated grants, and the authority to continue administering it were all left in place by Congress. Yet, if allowed to stand, EPA's action would create a version of the Inflation Reduction Act that did not ever contain Section 134.

By the same token, Defendants' actions could be viewed as akin to amending H.R. 1 so as to add express retroactivity language to its repeal and somehow rescind all obligated funds. *But see, e.g.*, Gen. Accounting Office, 1 Principles of Fed. Appropriations Law, 3d Ed., at p. 5-7 (Jan. 2004), https://www.gao.gov/assets/2019-11/202437.pdf ("Congress may pass a law to rescind the *unobligated* balance of a[n] . . . appropriation at any time prior to the accounts closing" (emphasis added)).

Regardless of whether Defendants' action to interfere with the legislative process is viewed in terms of altering the 2022 or 2025 legislation, or both, it was equally impermissible. Defendants' action is exactly what the Supreme Court has explained that Article I, § 7 forbids: "the power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439-40 (quoting *Chadha,* 462 U.S., at 951). Defendants' action here contravened that procedure.

Moreover, the power Defendants assert by canceling the Solar for All program—the power to refuse to spend statutorily mandated appropriations—is far broader than that conferred by the line-item veto addressed in *Clinton*. The power EPA claims here would allow any President to sign a bill into law and then refuse to spend those appropriations due to a policy disagreement, a desire to impose extra conditions on the use of funds, or any other reason. The Court should reject this unprecedented power-grab.

### C.  Plaintiffs Have a Cause of Action for Their Constitutional Claims.

Plaintiffs have a cause of action for their constitutional claims. "[I]njunctive relief has long been recognized as the proper means for preventing [government] entities from acting unconstitutionally." *Corr'l. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *accord Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

More generally, Plaintiffs may bring constitutional claims against the exercise of a power not delegated to the President, including when the executive branch usurps a power expressly delegated to another branch. *See Dalton*, 511 U.S. at 473. When the President does the latter, there is "'a want of Presidential power'"—not "'a mere excess or abuse of discretion in exerting a power given.'" *Id.* at 474 (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne,* 250 U.S. 163, 184 (1919)).

Here, EPA has refused Congress's instruction to fund the Solar for All program entirely. As explained above, that makes this a constitutional issue: EPA usurped Congress's power over funding decisions and rewrote the legislation Congress enacted. By contrast, if Plaintiffs' claim were that EPA awarded the funding that Congress appropriated in a manner that failed to correctly apply the criteria of 42 U.S.C. § 7434, the claim would be a statutory one. But here, EPA has made clear that it has fully terminated the entire program and confirmed that it will not spend the appropriated funds at all, declaring that the money appropriated by Congress for this purpose will sit in its bank account until the appropriation expires in 2031. Treml Decl., Ex. 9, at ¶ 7.

As a result, Plaintiffs' challenges to this nullification of Congress's spending decision are cognizable constitutional claims. While Congress may choose to grant the executive branch discretion about how to comply with the terms of a statute, it is axiomatic that a statute that requires a certain action does not give the executive authority to refuse to perform that action. *See New York v. McMahon*, 784 F. Supp. 3d 311, 350 (D. Mass. 2025) ("[Plaintiffs] do not allege a violation of the DEOA – rather, the Act simply evidences that the Department was created pursuant to Congress's authority and cannot be dismantled without it."). Because Plaintiffs challenge the "want of [executive] power," *Dalton*, 511 U.S. at 474 (citation omitted), rather than EPA's "exercise [of] discretion Congress ha[d] granted" it by statute, *id.* at 476, Plaintiffs state constitutional claims.

### III.    This Court Has Jurisdiction

This case belongs in this Court because it challenges Defendants' high-level decision to terminate the Solar for All program, which falls squarely within the Court's jurisdiction.

Plaintiffs have standing because their injuries—to their opportunities to obtain low-cost solar power, to their reputations and relationships, to their organizations, and to their businesses—have been caused by Defendants' abrupt termination of the program, which shut off the funding and the opportunities that Congress expressly designated to help individuals and organizations like Plaintiffs.

Accordingly, this Court has jurisdiction to vacate Defendants' unlawful termination of the program and restore Solar for All.

### A.  Plaintiffs' Claims Belong in this Court.

Defendants have made clear they will argue this Court lacks jurisdiction over Plaintiffs' claims. They stated in their motion to transfer that "Plaintiffs cannot bring claims challenging

[Solar for All] grant terminations . . . to district court." Doc. 27 at 9. And in other cases challenging grant program terminations, EPA and other executive branch agencies have attempted to evade judgment by arguing the challenges fall within the much more limited jurisdiction of the Court of Federal Claims. *E.g.*, *Appalachian Voices v. U.S. Env't Prot. Agency*, No. CV 25-1982 (RJL), 2025 WL 2494905, at *1 (D.D.C. Aug. 29, 2025), *appeal docketed*, No. 25-5333 (4th Cir. Sep 19, 2025). Rather than defend the legality of its actions, the government has argued that where plaintiffs are recipients of federal grants that were terminated, their claims should be considered breach of contract actions that belong in the Court of Federal Claims pursuant to the Tucker Act.

But challenges to high-level agency actions related to grant programs, like this one, belong in federal district court. Plaintiffs' APA claims challenging the high-level agency action to terminate the Solar for All program fall within the APA's waiver of sovereign immunity. *See National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("*NIH*"). And Plaintiffs' constitutional claims challenge action for which "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). The government's argument that the Tucker Act's waiver of sovereign immunity governs challenges to grant terminations does not apply to these constitutional claims.

In addition, Plaintiffs in this case have no federal grants under the Solar for All program, meaning that Plaintiffs have no "express or implied contract with the United States" that could be subject to the Tucker Act. 28 U.S.C. § 1491(a)(1). This makes Plaintiffs' APA and constitutional claims—and this Court's jurisdiction over them—even clearer. Indeed, Defendants explained in another case that where certain plaintiffs "had not been awarded grants [by the

48

federal government] . . . *the plaintiffs' claims could not have been essentially contractual, because there was no contract to speak of.*" Appellants' Reply Brief, *Sustainability Inst. v. Trump*, No. 25-1575 (4th Cir. July 14, 2025), Doc. 63 at 9 n.1 (emphasis added). Defendants have no credible argument to this Court that Plaintiffs' claims could be "essentially contractual," when Plaintiffs have "no contract to speak of" with the federal government.

As one Court of Appeals recently explained in a case where the plaintiffs challenging a grant program termination were not recipients of a federal grant, and instead had a sub-grant from the federal grant recipient,

> The bottom line is that Plaintiffs have no contract with the Government. They do not invoke any contractual terms as the basis for their action. Nor do they seek a contractual remedy from the Government. Rather, Plaintiffs seek declaratory and injunctive relief requiring compliance with the statutory obligations set out by Congress and the regulatory obligations set forth by Defendants themselves. Thus, as the district court put it, "Plaintiffs' claims have no business before the [Court of Federal] Claims."

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-2808, 2025 WL 2884805, at *2 (9th Cir. Oct. 10, 2025) (denying rehearing en banc).

The same reasoning applies here. Lead plaintiff Rhode Island AFL-CIO and many of the other Plaintiffs have no grants or sub-grants connected to Solar for All whatsoever. Other Plaintiffs have sub-grants awarded by Solar for All grant recipients. But no Plaintiff has a federal grant agreement or any breach of contract claim against the federal government.

Instead, Plaintiffs challenge the termination of the program as a whole, which cut off funding to all their communities at one stroke, damaging their reputations, interfering with their businesses, and causing many other harms, as discussed below. This Court has jurisdiction to rule on the legality of this agency action to terminate the program. *See, e.g.*, *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 719 (D. Md. 2025) (finding the court had jurisdiction

49

over APA and constitutional claims where "Plaintiffs' Program Claims challenge not the termination of their particular grant awards but instead dispute the legality of the wholesale cancellation of the REL program"); *accord NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (district courts have jurisdiction over APA challenges to agency policy actions "related to grants"); *see also City of Saint Paul, Minnesota v. Wright*, No. 25-CV-03899 (APM), 2026 WL 88193, at *4 (D.D.C. Jan. 12, 2026) (explaining that *NIH* addressed only APA claims and that "federal district courts have jurisdiction over constitutional claims like the ones at issue here"). Indeed, even though in another grant termination case the Fourth Circuit recently reversed injunctions restoring individual grant awards, it remanded to the district court for further proceedings challenging the termination of grant programs, and cited *Aiken County* for the proposition that "'where previously appropriated money is available for an agency to perform a statutorily mandated activity, [there is] no basis for a court to excuse the agency from that statutory mandate.'" *Sustainability Inst. v. Trump*, No. 25-1575, 2026 WL 157120, at *12 (4th Cir. Jan. 21, 2026) (quoting *In re Aiken Cnty.*, 725 F.3d at 260). Here, Plaintiffs are exactly the types of organizations, businesses, and individuals whom Congress mandated that EPA use these funds to benefit; Defendants' decision to terminate Solar for All deprived them of these opportunities, in violation of the APA and Constitution; and this Court has jurisdiction to rule on those claims.

Moreover, while Plaintiffs' standing does not depend on the particular grants awarded by EPA being restored, *infra* at 61-62, the fact remains that vacating the termination decision would have the effect of restoring this grant funding. Defendants' termination of the program was the action that ended all Solar for All grants at one stroke—there was only one decision, at the program level, which was given effect through the mass termination of every grant in a single

day. Vacating the decision to terminate the program would therefore restore the status quo ante, and revive the grants that comprise the program. *See, e.g.*, *Orr v. Trump*, 778 F. Supp. 3d 394, 431 (D. Mass. 2025) (discussing "vacatur of a rule or policy" and explaining that "when a court vacates an agency's rules under 5 U.S.C. § 706(2), the vacatur restores the status quo before the invalid rule took effect" (cleaned up)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (effect of vacatur was to "automatically resurrec[t]" the prior standard).

Recently, Justice Barrett's controlling concurrence in *NIH* noted that, as in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), a policy-level decision involving grant funding may be the only relevant action to challenge. That is the case here. Regarding the relationship between a high-level agency decision and individual grant terminations, Justice Barrett stated, "If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself." *NIH*, 145 S. Ct. at 2661 Barrett, J., concurring) (citing *Bowen* and distinguishing it from the situation in *NIH* where the challenged agency action—guidance setting out policies related to grants—may have had a more indirect relationship to individual grant terminations). Here, Plaintiffs are asking that the Court vacate the high-level termination of the program, from which the terminations of all Solar for All grants "simply flowed." *Id.*

That makes this case like *Bowen*, where the Supreme Court upheld an order that "simply reversed the decision of the Department Grant Appeals Board of the United States Department of Health and Human Services" that "disallowed reimbursement of $6,414,964 to the State." 487 U.S. at 909 (internal quotations omitted). The Supreme Court explained this order was not a money judgment because "it did not order [an] amount to be paid" but rather told the United States:

> [I]t may not disallow the reimbursement on the grounds given, and thus it is likely that the Government will abide by this declaration and reimburse Massachusetts the requested sum. But to the extent that the District Court's judgment engenders this result, this outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law.

*Id.* at 909-10.

Here, the Court has jurisdiction to review Defendants' decision to terminate Solar for All, and to restore the program by vacating that decision. *See also Massachusetts v. Nat'l Insts. of Health*, No. 25-1343, --- F.4th ---, 2026 WL 26059, at *5 (1st Cir. Jan. 5, 2026) (federal district court has jurisdiction to provide relief from policy-level decision affecting grant program).

### B. Plaintiffs Have Standing.

Congress and EPA recognized that individuals and organizations like Plaintiffs would be essential to implementing the Solar for All program, and would benefit from it. Plaintiffs are among those Congress specifically intended to benefit through the program: workers and labor organizations protected by prevailing wage requirements, low-income individuals in disadvantaged communities, and businesses and nonprofits essential to implementing solar projects. Plaintiffs took concrete steps in reliance on the obligated funding appropriated by Congress "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies," 42 U.S.C. § 7434(a)(1), and in reliance on the Solar for All program EPA established to do so. As set forth below, each Plaintiff was harmed by Defendants' termination of the Solar for All program. By abruptly eliminating Solar for All in its entirety, Defendants harmed Plaintiffs in a wide range of ways, including by causing direct financial losses, frustrating their organizational missions, damaging their reputations with their communities and partners, and depriving them of the opportunities and benefits the program was created to provide: jobs, training programs, and affordable, clean energy, among many others. Restoring the Solar for All program will redress each of those injuries.

Plaintiffs' declarations satisfy the injury, causation, and redressability requirements of Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have standing to seek restoration of Solar for All to redress the injuries caused by Defendants' unlawful termination of the program.

### 1. Injury in Fact.

Plaintiffs have suffered injury in fact because Defendants' abrupt termination of the program has harmed them in numerous concrete and particularized ways. *Defs. of Wildlife*, 504 U.S. at 560. An organization has standing where "the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests,' which is 'not a demanding standard,' as 'only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact.'" *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) (quoting *Nat'l Ass'n of Consumer Advocates v. Uejio*, 521 F. Supp. 3d 130, 142 (D. Mass. 2021)).

Plaintiffs, including Rhode Island's principal labor union as well as nonprofit organizations and solar businesses, invested time and money preparing for and participating in the implementation of Solar for All, in addition to building relationships with their communities and partner organizations to help implement the program—all of which was wiped out by Defendants' termination of the program. Moreover, Plaintiff organizations and businesses who had subcontracts and other official roles in the program lost income under the program and the investments to participate that they had made already. Thus, for both the solar companies and nonprofit organization Plaintiffs, Defendants' actions "directly affected and interfered with [Plaintiffs'] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). In addition, an individual homeowner, Ms. Nguyen, invested time in

applying for the program and championed it to her community, and due to the termination, she now has no other way to afford solar that would help manage her unaffordable electricity bills.

By terminating the Solar for All program, Defendants shut off all its beneficial downstream effects at one stroke. As a result, Plaintiffs' injuries are actual, not speculative, and unfortunately, more injuries—such as additional layoffs—are imminent if the funding is not restored.

These injuries, discussed in more detail below, satisfy Article III because Defendants "cause[d] a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Louis*, 685 F. Supp. 3d at 32 (quoting *Nat'l Ass'n of Consumer Advocs*, 521 F. Supp. 3d at 142). Courts in this Circuit regularly recognize such injuries demonstrate standing. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, No. CV 25-11916-BEM, 2026 WL 33719 at *5 (D. Mass. Jan. 6, 2026) (defendants' alteration of vaccine recommendations "directly affected and interfered with [professional organization's] core business activities" of counseling member medical providers) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (plaintiff association had organizational standing where challenged agency letter addressing diversity, equity, and inclusion "directly affect[ed] plaintiffs' core activities" such as providing trainings and legal education); *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 380 (D. Mass. 2025) (defendants' foreign policy actions deterred participation in advocacy organizations' "core organizational activities"); *Nat'l Coal. Against Violent Athletes v. Dep't of Educ.*, 2020 WL 13876913, at *3-4 (D. Mass. Dec. 3, 2020) (challenged guidance documents disfavored organizational plaintiff's clients, frustrating its advocacy mission and diverting its resources).

*Labor Unions*

Rhode Island AFL-CIO assisted with the state's Solar for All application because the program would create jobs that would benefit its members and help train and provide good-paying jobs for new members who would help support the long-term health of the organization. Crowley Decl., Ex. 1, at ¶¶ 4, 7, 12. As a partner in Rhode Island's program, RI AFL-CIO invested significant time in developing training programs and curricula to bring electricians, carpenters, and others into solar work via Solar for All, including apprenticeships and skills training, which were designed ensure high-quality union careers for a new generation of workers who would help revitalize its aging membership and help support its pension funds as union members retire. *Id.* ¶¶ 5-10. The loss of the program threatens the organization's goals of providing good-paying union jobs, recruiting members, and supporting its pension funds. *Id.* ¶¶ 15-16.

*Individual Homeowner*

Plaintiff Anh Nguyen cannot afford to pay the high electricity bills for her modest East Atlanta home, and while solar would reduce those costs, she cannot afford the upfront cost of installation on her own. Nguyen Decl., Ex. 5, ¶¶ 3, 8. Ms. Nguyen therefore falls squarely within the class of beneficiaries Congress identified. She applied for Georgia's Solar for All program, which would have provided roof repairs and no-cost solar for her home. *Id.* ¶¶ 3, 8–9. But her efforts to secure lower-cost electricity for her home have been thwarted by Defendants' termination of the Solar for All program. *Id.* ¶ 15.

*Nonprofit Organizations*

The termination has also impaired nonprofit Plaintiff organizations' ability to assist their constituents and carry out their missions, in addition to damaging their relationships with their

communities and partners. The Rhode Island Center for Justice was a coalition partner in the Rhode Island Solar for All grant application in fulfillment of its mission to provide affordable, sustainable, and uninterrupted access to electricity for low-income Rhode Islanders; with the loss of Solar for All, the Center's clients have suffered and the Center itself has had to shift its time and resources to temporary harm reduction strategies. Wood Decl., Ex. 6, at ¶¶ 9, 13, 15-16. "[T]here is no question that, but for the [challenged action, the organization] would not have expended the resources that it did.'" *Am. Acad. of Pediatrics*, 2026 WL 33719, at *6 (citing *Louis*, 685 F. Supp. 3d at 32).

Solar United Neighbors has been ordered to stop work on its projects as a Solar for All subcontractor in multiple states, including installing solar at a Red Cross Resilience Center and providing solar and battery storage in Harris County, Texas. Schoolman Decl., Ex. 8, at ¶¶ 43, 47. SUN will likely be forced to lay off its dedicated Solar for All employees, will lose access to contractors with Solar for All funding, and is already suffering reputational damage among the homeowners, tribal and community groups with whom it works, and contractors. *Id.* ¶¶ 18-19, 35, 49-52.

Similarly, Black Sun Light's core mission, which involves ensuring the creation of green jobs in Black communities and transitioning away from fossil fuels, was directly harmed by the termination. Abdul-Rahman Decl., Ex. 7, at ¶ 3. The termination negated thousands of hours of work, *id.* ¶ 28, and has led to massive disruptions in the organization's day-to-day operations, causing slowdowns and budgetary challenges. As a result, the organization has had to divert staff and other resources towards responding to and managing the fallout. *Id.* ¶¶ 18-20, 23, 30. And the abrupt termination has damaged the community's faith in the organization's ability to deliver on its promises, with an attendant drop in participation by partners. *Id.* ¶ 24.

*Solar Businesses*

Energy Independent Solutions lost the opportunity to become an approved installer for Solar for All projects in western Pennsylvania; without the program and the steady demand it would support, Energy Independent Solutions likely will not be able to sustain a recent expansion, will be forced to lay off approximately one quarter of its workforce, and anticipates suffering significant financial losses due to the termination. Smith Decl., Ex. 2, at ¶ 16.

Sunpath was founded to connect traditionally marginalized communities with access to solar power; it invested hundreds of hours in helping prepare for Georgia's Solar for All program, and was selected as an installation contractor. Gunning Decl., Ex. 3, at ¶ 5. As a result of the termination, Sunpath has suffered direct out-of-pocket expenses of $30,000 for vehicles, $18,000 annually in software upgrades, and $10,000 for increased insurance premiums to meet program requirements. *Id.* ¶ 8.

2KB was selected as the Program Administrator for the Enabling Repairs portion of Georgia's Solar for All program to help make homes solar-ready and train contractors; the company devoted 40% of its staff time to creating the infrastructure to fulfill its Solar for All obligations and invested in a dedicated software platform to manage the work. Buchanan Decl., Ex. 4, at ¶¶ 12, 15. 2KB suffered direct out-of-pocket losses exceeding $12,000 for specialized project management software, attorneys fees, and program compliance tools, as well as the loss of nearly $1.5 million in anticipated revenue over the contract period, forcing 2KB to lay off a dedicated employee and redirect or idle the three remaining employees who had been assigned to Solar for All program design and implementation. *Id.* ¶¶ 20-22.

*Zone of Interests*

In addition to being actual and imminent, the injuries to Plaintiffs fall within zone of interests represented by Congress's funding of Solar for All. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). Congress explicitly directed its appropriation of $7 billion in funding for this program "to enable low-income and disadvantaged communities" to deploy or benefit from zero-emission technologies, and to provide "financial assistance and technical assistance in low-income and disadvantaged communities." 42 U.S.C. § 7434(a)(1)–(2). Moreover, Congress explicitly conditioned the program on providing prevailing wages to benefit labor organizations and businesses tasked with implementing the program and installing solar projects across the country. 42 U.S.C. § 7614. Accordingly, the Plaintiffs here—labor unions and businesses that would have benefitted from the job opportunities and training provided by the program, Crowley Decl., Ex. 1, at ¶¶ 5-6, Buchanan Decl. Ex. 4, at ¶¶ 11-12, Smith Decl., Ex. 2, at ¶¶ 7-8, Gunning Decl., Ex. 3, at ¶ 4; an individual homeowner seeking lower electricity bills, Nguyen Decl., Ex. 5, at ¶ 3; and nonprofit organizations dedicated to bringing low-cost, clean energy to disadvantaged communities, Wood Decl., Ex. 6, at ¶ 11, Schoolman Decl., Ex. 8, at ¶ 5, Abdul-Rahman Decl., Ex. 7, at ¶ 3—fall squarely within the zone of interests Congress targeted when funding the program.

## 2. *Causal Connection.*

Defendants' termination of Solar for All caused the harms set out in Plaintiffs' declarations. The requisite "causal connection between the injury and the conduct complained of," *Defs. of Wildlife*, 504 U.S. at 560, could not be more straightforward here: Plaintiffs applied to participate in the program as a customer, made investments necessary to participate as installers and consultants, developed training programs, and hired staff in order to fulfill the

program's requirements and implement the projects it would fund. *See* Smith Decl., Ex. 2, at ¶¶ 7-8, 12, Gunning Decl., Ex. 3, at ¶ 7, Buchanan Decl., Ex. 4, at ¶¶ 12-15, Nguyen Decl., Ex. 5, at ¶¶ 12-13, Wood Decl., Ex. 6, at ¶ 10, Crowley Decl., Ex. 1, at ¶ 6, Schoolman Decl., Ex. 8, at ¶¶ 5, 19, 31, 50.

Defendants' decision to terminate the program ground all this work to a halt. Having terminated the program, Defendants left primary grant recipients no choice but to cease work and cut off sub-grants. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). When an agency action has a "determinative or coercive effect upon the action of someone else," causation is satisfied even if the injury flows through an intermediary. *Id.* Accordingly, it is Defendants' termination of the program that frustrated the nonprofit Plaintiffs' missions and harmed Plaintiffs' solar businesses, as well as eliminating the opportunities for which all Plaintiffs had invested their time, energy, and capital. *See* Schoolman Decl., Ex 8, at ¶ 49, Buchanan Decl., Ex. 4, at ¶¶ 26, 28.

And while Defendants blamed Congress's July 2025 legislation for their decision to eliminate the program and its funding, their assertions are baseless, as explained in Plaintiffs' argument above. Defendants are responsible for terminating the program and for the resulting harms to Plaintiffs.

### 3. *Redressability.*

"[I]t must be likely, as opposed to merely speculative" that a favorable decision will redress the plaintiff's injury. *Defs. of Wildlife*, 504 U.S. at 561. The requested relief need only be likely to redress "at least some" of the plaintiff's injury—such as just "one dollar" of a monetary injury. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 114 (2025) (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)). Here, the requested relief would

fully restore Solar for All and its funding, enabling Plaintiffs to resume their participation in this vitally important program.

Recently, in *Diamond Alternative Energy*, the Supreme Court reaffirmed that "[c]ourts should not 'make standing law more complicated than it needs to be,'" *id.* at 125 (quoting *Thole v. U. S. Bank N. A.*, 590 U.S. 538, 547 (2020)). Certainty is not required: redressability is satisfied where a plaintiff simply "show[s] a predictable chain of events" that would likely result from judicial relief and redress the plaintiff's injury. *Id.* at 121 (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 383). As a result, the Supreme Court held that fuel producers had standing to challenge California's electric vehicle requirements where—notwithstanding consumer demand for electric vehicles—invalidating the requirements "would likely" lead to some increased amount of increased gasoline-powered vehicle sales and thus "redress at least some" of the plaintiffs' economic injuries. *Id.* at 114.

Here, the requested relief would vacate Defendants' termination of Solar for All and thereby restore the program to which Congress appropriated $7 billion expressly to provide grant funding and technical assistance to benefit low-income and disadvantaged communities. This funding was not rescinded by H.R. 1, and it remains sitting in EPA's accounts, where it will remain until the end of the appropriations period in 2031, Treml Decl., Ex. 9, at ¶ 7—absent an order from this Court restoring it to the program for which Congress appropriated it to be used. EPA has stated it has no intention of spending this money for any other purpose, *id.*, nor could it lawfully do so. So there is no impediment to these funds once again being used for their Congressionally mandated purpose.

And while H.R. 1 rescinded administrative funds for the program, the Inflation Reduction Act specifically contemplated the use of "amounts otherwise available" to cover administrative

costs. D.R.I. EPA 000012; 42 U.S.C. § 7434(a)(4) (2022). Over $3 billion has been appropriated

for EPA to manage environmental programs for the 2025 fiscal year. Full-Year Continuing

Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30,

https://perma.cc/62D7-RUDA. EPA is fully capable of administering Solar for All going

forward.

Accordingly, vacating the termination of Solar for All would redress Plaintiffs' injuries

by restarting the flow of money and opportunities to participate in the program. *See Bowen*, 487

U.S. at 909. Just as a plaintiff suffers harm for standing purposes where "it has been walled off

from an entire category of projects for which it is qualified, prepared, and eager to compete,"

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022),

removing such a barrier and restoring the opportunity to compete for projects or contracts

provides sufficient redressability where "invalidating" the challenged agency action "would

remove a[n] . . . impediment to [plaintiffs'] ability to fully compete in the market." *Diamond*

*Alternative Energy*, 606 U.S. at 104-05. *See also Child Trends*, 795 F. Supp. 3d at 718

("Plaintiffs ask for . . . only the opportunity to compete for grants and subcontracts . . . a well-

established form of redressable injury." (cleaned up)).

Some Plaintiffs had formalized roles in the Solar for All program that make redressability

particularly clear. 2KB Energy Services was designated as the Program Administrator for

Georgia's Enabling Repairs component, with a contract for the five-year grant period. Buchanan

Decl., Ex. 4, at ¶ 12. Sunpath Solar was selected as an approved installer and was negotiating

final contract terms when EPA terminated the program. Gunning Decl., Ex. 3, at ¶ 5. Solar

United Neighbors had active subcontracts for projects in multiple states. Schoolman Decl., Ex. 8,

at ¶¶ 43, 47. For these plaintiffs, restoring the program could allow their existing contractual relationships and designated roles to resume.

But regardless, for these and the other Plaintiffs who were coalition partners or who were positioning themselves to participate in Solar for All, restoring the program would remove the primary impediment to their ability to participate going forward. For example, restarting Solar for All would alleviate Rhode Island AFL-CIO's injuries by supporting well-paying solar projects that employ its members and allow it to continue recruiting and training the next generation of skilled union members. Crowley Decl., Ex. 1, at ¶¶ 16-18. Restarting Solar for All would restore Plaintiff Anh Nguyen's opportunity to obtain no-cost solar for her home. Nguyen Decl., Ex. 5, at ¶¶ 17-18. And it would allow Plaintiffs who are nonprofit organizations and businesses the opportunity to continue their interrupted work under the program—including training workers, creating jobs, promoting energy security and independence, helping low-income households save money on their utility bills, and improving the health of communities across the country—as well as continuing to compete for new projects under the program and rebuild their reputations. Buchanan Decl., Ex. 4, at ¶ 36, Wood Decl., Ex. 6, at ¶ 22, Smith Decl., Ex. 2, at ¶ 17, Schoolman Decl., Ex. 8, at ¶ 53, Gunning Decl., Ex. 3, at ¶ 9. These benefits would be available and alleviate Plaintiffs' injuries through restoration of the program, irrespective of the particular primary grant recipients. Nguyen Decl., Ex. 5, at ¶ 18, Buchanan Decl., Ex. 4, at ¶ 37, Schoolman Decl., Ex. 8 at ¶ 54, Crowley Decl., Ex. 1, at ¶ 18, Abdul-Rahman Decl., Ex. 7, at ¶ 31.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Plaintiffs and

vacate Defendants' unlawful termination in order to restore the Solar for All program.

Respectfully submitted, this 6th day of February, 2026,


/s/ James Crowley
James Crowley (R.I. Bar No. 9405)
Alexandra St. Pierre* (MA Bar No. 706739)
Conservation Law Foundation
235 Promenade St.
Suite 560, Mailbox 28
Providence, RI 02908
Telephone: (401) 228-1905
Facsimile: (401) 351-1130
jcrowley@clf.org
aestpierre@clf.org


/s/ Gary DiBianco
Gary DiBianco* (D.C. Bar No. 458669)
Jillian Blanchard* (CA Bar No. 203593)
Amy Powell* (N.C. Bar No. 50300)
Larissa Koehler* (CA Bar No. 289581)
Lawyers for Good Government
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
Telephone: (202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
amy@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org


/s/ Nicholas S. Torrey
Nicholas S. Torrey* (N.C. Bar No. 43382)
Banumathi Rangarajan* (N.C. Bar No. 27311)
David Neal* (N.C. Bar No. 27992)
Kimberley Hunter* (N.C. Bar No. 41333)
Jennifer Whitfield* (D.C. Bar No. 983212)
Ben Grillot* (D.C. Bar No. 982114)
Southern Environmental Law Center
136 E. Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
ntorrey@selc.org
brangarajan@selc.org
dneal@selc.org
kmeyer@selc.org
jwhitfield@selc.org
bgrillot@selc.org


/s/ Amy R. Romero
Amy R. Romero (RI Bar # 8262)
Kevin Love Hubbard* (MA Bar #704772)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
Telephone: (401) 453-1500
Amy@dwbrlaw.com
Kevin@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI


*Counsel for Plaintiffs*


*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, the foregoing Motion for Summary Judgment and Memorandum of Law in Support was filed through the Court's electronic filing system ("ECF"), by which means the document is available for viewing and downloading from the ECF system, and that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Nicholas S. Torrey*
Nicholas S. Torrey (N.C. Bar No. 43382)
Southern Environmental Law Center
136 E. Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
