## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND AFL-CIO, *et al.*,

        *Plaintiffs*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

        *Defendants*.

No. 1:25-cv-00510-MSM-PAS

## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ...............................................................................................................1

LEGAL AND FACTUAL BACKGROUND .........................................................................4

   I.    EPA Implements Congress's Solar Energy Grant Program. ...............................4

   II.   EPA Enters Grant Agreements with SFA Awardees.............................................5

   III.  EPA Evaluates Impact of OBBBA After Congress Repeals Section 134 and Rescinds All Unobligated Funding. ..............................................................7

   IV.  EPA Terminates the SFA Grants............................................................................10

   V.   Plaintiffs Sue Seeking to Vacate and Enjoin EPA's Termination of SFA Grants. ............12

LEGAL STANDARD .........................................................................................................12

ARGUMENT .....................................................................................................................13

   I.    Plaintiffs Lack Standing to Bring Their Claims....................................................13

      A.   Plaintiffs Do Not Have Legally Cognizable Injuries. ..................................14

      B.   Plaintiffs Do Not Establish EPA Caused Their Injuries.............................20

      C.   Any Cognizable Injuries Are Not Redressable by the Court. .....................22

      D.   Plaintiffs Are Not Within the Zone of Interests of OBBBA or the General Savings Statute. .........................................................................26

   II.   This Court Lacks Jurisdiction to Order the Reinstatement of SFA Grants ......27

      A.   *NIH* and *California* Explicitly Forbid the Relief Sought.............................28

      B.   APA's Limited Waiver of Sovereign Immunity Does Not Apply................37

   III.  Plaintiffs' Claims Fail as a Matter of Law. .........................................................43

      A.   EPA's Termination Decision Was Not Contrary to Law.................................43

      B.   EPA's Decision to Terminate SFA Grants Was Not Arbitrary or Capricious. ...............55

   IV.  Any Remedy Should be Limited to Remand. .......................................................61

CONCLUSION..................................................................................................................63

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004) ................................................................................................ 61

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
    No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ..................................... 19

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
    145 F.4th 39 (1st Cir. 2025) ................................................................................... 39

*Am. Sci. & Eng'g, Inc. v. Califano,*
    571 F.2d 58 (1st Cir. 1978) ..................................................................................... 30

*Anderson v. United States,*
    344 F.3d 1343 (Fed. Cir. 2003) ............................................................................... 15

*Assoc. Fisheries of Me., Inc. v. Daley,*
    127 F.3d 104 (1st Cir. 1997) ............................................................................. 13, 56

*Atieh v. Riordan,*
    797 F.3d 135 (1st Cir. 2015) ................................................................................... 13

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021) ............................................................................... 30

*Bos. Redev. Auth. v. Nat'l Park Serv.,*
    838 F.3d 42 (1st Cir. 2016) ............................................................................. 56, 57

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ............................................................................................... 36

*California v. Texas,*
    593 U.S. 659 (2021) .......................................................................................... 14, 23

*Camp v. Pitts,*
    411 U.S. 138 (1973) ............................................................................................... 13

*Carcieri v. Salazar,*
    555 U.S. 379 (2009) ............................................................................................... 45

*Chamber of Commerce of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................... 43

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937)..................................................................................................... 44

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)..................................................................................................... 56

*City of Arlington, Tex. v. FCC*,
    569 U.S. 290 (2013)..................................................................................................... 53

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020) ................................................................................. passim

*City of Saint Paul, Minnesota v. Wright*,
    No. 25-CV-03899 (APM), 2026 WL 88193 (D.D.C. Jan. 12, 2026) ......................... 43

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..................................................................................................... 17

*Clark v. United States*,
    19 App. D.C. 295 (D.C. Cir. 1902) ............................................................................. 44

*Clinton v. City of New York*,
    524 U.S. 417 (1998)..................................................................................................... 54

*Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric.*,
    984 F.2d 514 (1st Cir. 1993) ....................................................................................... 49

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ................................................................................... 30

*Dalton v. Specter*,
    511 U.S. 462 (1994)............................................................................................... 51, 52

*De La Rama S.S. Co. v. United States*,
    344 U.S. 386 (1953)....................................................................................... 49, 50, 51

*Deal v. Fed. Hous. Admin.*,
    260 F.2d 793 (8th Cir. 1958) ....................................................................................... 50

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999)....................................................................................... 29, 34, 35

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025)................................................................................................ passim

*DHS v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020).................................................................... 9, 10, 61

*Diamond Alternative Energy, LLC v. EPA*,
   606 U.S. 100 (2025)................................................................. 24, 25

*Dolan v. USPS*,
   546 U.S. 481 (2006)...................................................................... 29

*Donahue v. City of Boston*,
   304 F.3d 110 (1st Cir.2002)........................................................... 20

*Dorsey v. United States*,
   567 U.S. 260 (2012)...................................................................... 49

*DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*,
   76 F.3d 1212 (D.C. Cir. 1996) ...................................................... 41

*Dubois v. U.S. Dep't of Agric.*,
   102 F.3d 1273 (1st Cir. 1996) ....................................................... 14

*Ducsote v. Cherry*,
   647 F. Supp. 3d 52 (D. Mass. 2022) ............................................. 29

*Efreom v. McKee*,
   46 F.4th 9 (1st Cir. 2022) ............................................................. 23

*Env't Def. Fund v. EPA*,
   922 F.3d 446 (D.C. Cir. 2019) ...................................................... 59

*ExxonMobil Gas Mktg. Co. v. FERC*,
   297 F.3d 1071 (D.C. Cir. 2002) ............................................... 42, 58

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)........................................................... 56, 59, 60

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..................................................................... 56

*FDIC v. Meyer*,
   510 U.S. 471 (1994)...................................................................... 29

*Fernandez-Vargas v. Gonzales*,
   548 U.S. 30 (2006) ....................................................... 47, 48, 52, 53

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................................ 62

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   ("FDA"), 602 U.S. 367 (2024) ................................................................ 18, 19, 20

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ........................................................................................ 14

*Glaskin v. Klass*,
   996 F. Supp. 67 (D. Mass. 1998) ..................................................................... 30

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ..................................................................... passim

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ........................................................................................ 31

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................................ 42

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) ......................................................................... 41

*Ingersoll-Rand Company v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................................... 35, 36, 38

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ......................................................................... 54

*INS v. Chadha*,
   462 U.S. 919 (1983) ........................................................................................ 55

*Int'l Eng'g Co., Div. of A-T-O v. Richardson*,
   512 F.2d 573 (D.C. Cir. 1975) ......................................................................... 31

*Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*,
   802 F.3d 99 (1st Cir. 2015) .............................................................................. 13

*Johansen v. United States*,
   506 F3d 65 (1st Cir. 2007) ............................................................................... 29

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) ................................................................... 15, 16, 20

*Keener v. Wash. Metro. Area Transit Auth.*,
    800 F.2d 1173 (D.C. Cir. 1986) .................................................................... 49

*Kerin v. Titeflex Corp.*,
    770 F.3d 978 (1st Cir. 2014) ....................................................................... 18

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) ....................................................................... 63

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................. 12, 13

*Kolackovsky v. Town of Rockport*,
    165 F.4th 114 (1st Cir. 2026) ..................................................................... 14

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................................................... 44

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ................................................................................... 47

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................. 26, 27

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................. 41, 42

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ................................................................................... 46

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 14, 15

*Lyman v. Baker*,
    954 F.3d 351 (1st Cir. 2020) ....................................................................... 15

*Lyng v. Payne*,
    476 U.S. 926 (1986) ................................................................................... 26

*Mail Ord. Ass'n of Am. v. USPS*,
    2 F.3d 408 (D.C. Cir. 1993) ....................................................................... 61

*Marin Audubon Soc'y v. FAA*,
    121 F.4th 902 (D.C. Cir. 2024) ................................................................... 45

*Martin v. Hadix,*
    527 U.S. 343 (1999) ............................................................................. 48

*Massachusetts v. Dep't Grant Appeals Bd. of U.S. Dep't of Health & Human Servs.,*
    815 F.2d 778 (1st Cir. 1987) ......................................................... 29, 30

*Massachusetts v. Trump,*
    790 F. Supp. 3d 8 (2025) ..................................................................... 42

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
    923 F.3d 209 (1st Cir. 2019) ............................................................... 12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ............................................................. 26, 28, 34

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ................................................. 29, 31, 33

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ..................................................................... 62, 63

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................... 56, 57

*Murphy v. United States,*
    45 F.3d 520 (1st Cir. 1995) ................................................................. 29

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................................................. 55

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n.,*
    145 S. Ct. 2658 (2025) ................................................................. passim

*Nat'l Juv. L. Ctr., Inc. v. Regnery,*
    738 F.2d 455 (D.C. Cir. 1984) ............................................................ 60

*Nat'l Treasury Emps. Union v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) ........................................................... 52

*Newbury v. U.S. Dep't of Hous. & Urb. Dev.,*
    No. CV 24-084, 2024 WL 4785147 (D.R.I. Nov. 14, 2024) ............... 14, 18

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 63

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) ................................................................................ 42

*Olsen v. Town of Westerly,*
    No. C.A. 03-245, 2006 WL 997716 (D.R.I. Apr. 17, 2006) ................... 62

*Palantir USG, Inc. v. United States,*
    129 Fed. Cl. 218 (Fed. Cl. 2016) ......................................................... 58

*Peoples Fed. Sav. Bank v. People's United Bank,*
    672 F.3d 1 (1st Cir. 2012) .................................................................... 62

*Perales-Muñoz v. United States,*
    151 F.4th 1 (1st Cir. 2025) ............................................................. 29, 52

*Rotkiske v. Klemm,*
    589 U.S. 8 (2019)............................................................................ 46, 47

*Royal Canin U.S.A., Inc. v. Wullschleger,*
    604 U.S. 22 (2025).................................................................................. 12

*Sardarian v. Fed. Emergency Mgmt. Agency,*
    No. 3:19-CV-00910, 2022 WL 4080325 (D. Conn. Apr. 1, 2022)........... 15

*Savage v. U.S. Small Bus. Admin.,*
    552 F. Supp. 3d 241 (D.R.I. 2021)........................................................ 14

*Savantage Fin. Servs., Inc. v. United States,*
    595 F.3d 1282 (Fed. Cir. 2010) ............................................................ 58

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior,*
    123 F.4th 1 (1st Cir. 2024) ............................................................. 26, 27

*Serra v. GSA,*
    667 F. Supp. 1042 (S.D.N.Y. 1987) ...................................................... 30

*Sharp v. Weinberger,*
    798 F.2d 1521 (D.C. Cir. 1986) ............................................................ 35

*Shinseki v. Sanders,*
    556 U.S. 396 (2009)............................................................................... 61

*Sibley v. Ball,*
    924 F.2d 25 (1st Cir. 1991) .......................................................... 30, 34, 38

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................ 20, 36

*Sorreda Transp., LLC v. U.S. Dep't of Transp.*,
    980 F.3d 1 (1st Cir. 2020) ..................................................................... 56

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................................................. 34

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .......................................................................... 14

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................ 23

*Sullivan v. United States*,
    625 F.3d 1378 (Fed. Cir. 2010) ........................................................... 15

*Sustainability Inst. v. Trump*,
    165 F.4th 817 (4th Cir. 2026) ........................................... 33, 34, 36, 52

*Syracuse Peace Council v. FCC*,
    867 F.2d 654 (D.C. Cir. 1989) ............................................................. 61

*Tamko Roofing Prods. Inc. v. Ideal Roofing Co.*,
    282 F.3d 23 (1st Cir. 2002) ................................................................. 63

*Taydus v. Cisneros*,
    902 F. Supp. 278 (D. Mass. 1995) ...................................................... 29

*Thakur v. Trump*,
    163 F.4th 1198 (9th Cir. 2025) ........................................... 32, 33, 35, 40

*Thakur v. Trump*,
    787 F. Supp. 3d 955 (N.D. Cal. 2025) ................................................ 32

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) .............................................................................. 13

*TransUnion LLC v. Ramirez.*,
    594 U.S. 413 (2021) .............................................................................. 14

*Trump v. Casa, Inc.*,
    606 U.S. 831 (2025) .............................................................................. 63

*Trump v. Sierra Club*,
    588 U.S. 930 (2019) ................................................................................ 27

*U.S. Lines Co. v. United States*,
    124 F. Supp. 375 (Ct. Cl. 1954) ........................................................... 50

*United States ex rel. Sargent v. Collins*,
    165 F.4th 102 (1st Cir. 2026) ............................................................... 29

*United States v. MacCollom*,
    426 U.S. 317 (1976) ................................................................................ 51

*United States v. Pollard*,
    416 F.3d 48 (2005) .................................................................................. 54

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990) ..................................................................... 62

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................ 54

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ................................................................ 41

*Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*,
    618 F. Supp. 2d 134 (D.R.I. 2009) ........................................ 15, 36, 38

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................ 41

*WildEarth Guardians v. EPA*,
    751 F.3d 649 (D.C. Cir. 2014) ............................................................. 59

*Wilkins v. Genzyme Corp.*,
    93 F.4th 33 (1st Cir. 2024) ........................................................... 13, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 63

*Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*,
    654 F.3d 919 (9th Cir. 2011) ................................................................ 51

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................ 52

## **Statutes**

1 U.S.C. § 109 ........................................................................................ 26, 27, 49, 50

5 U.S.C. § 551(13) ................................................................................................... 40

5 U.S.C. § 702 .................................................................................................... 29, 30

5 U.S.C. § 706 .................................................................................................... 13, 61

28 U.S.C. § 1331 ...................................................................................................... 34

28 U.S.C. § 1491(a)(1) ....................................................................................... 30, 31

31 U.S.C. § 503(a)(2) ............................................................................................... 52

42 U.S.C. § 241(a) .................................................................................................... 39

42 U.S.C. § 4370f .......................................................................................... 25, 26, 48

42 U.S.C. § 7434 ................................................................................................ passim

42 U.S.C. § 7614 ................................................................................................. 26, 27

Pub. L. No. 117-169, § 60103, 136 Stat. 1818 .......................................................... 4

Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025) .................................... passim

## **Constitutional Provisions**

U.S. Const. art. I, § 7, cl. 2 ...................................................................................... 54

## **Rules**

Fed. R. Civ. P. 19 ..................................................................................................... 25

Fed. R. Civ. P. 56(a) .............................................................................................. 1, 63

Local Civil Rule 7 ......................................................................................... 1, 62, 63

Local Civil Rule 56 ..................................................................................................... 1

## **Regulations**

2 C.F.R. Part 200 ............................................................................................. 6, 7, 16

2 C.F.R. § 200.331 ............................................................................................... 7, 16

2 C.F.R. § 200.340 ............................................................................................ passim

2 C.F.R. § 200.344 ............................................................................................ 8, 9, 11

**Other Authorities**

171 Cong. Rec. S4080 ........................................................................................ 45

H.R. Rep. No. 119-106 (2025) ........................................................................... 45

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rules 7 and 56, and the Court's text orders dated December 18, 2025 and February 25, 2026, Defendants respectfully ask the Court to grant summary judgment for Defendants with respect to all of Plaintiffs' claims.

## INTRODUCTION

In 2022, Congress appropriated $27 billion to create a Greenhouse Gas Reduction Fund ("GGRF"), including $7 billion for grants under a program EPA called "Solar for All." *See* 42 U.S.C. § 7434(a)(1) (repealed 2025). Just one year into the multi-year Solar for All ("SFA") grants, Congress reversed course, repealing the statutory authorization for GGRF and rescinding all unobligated funding, including the remaining $19 million appropriated to administer the grant programs. *See* One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025). Then, devoid of any statutory basis or administrative funding to oversee the programs, EPA terminated all existing SFA grants.

Plaintiffs are an assortment of purported subgrantees, contractors, and other alleged beneficiaries of the terminated SFA grants who sue under the Administrative Procedure Act ("APA") and various constitutional doctrines seeking an order to vacate EPA's termination of the SFA "program," by which they mean the SFA grants, so that funds may again flow downstream to their benefit. *See, e.g.*, Compl. ¶¶ 1, 250, ECF No. 1. Plaintiffs' claims fail at the onset from a glaring lack of standing and because the Supreme Court has repeatedly concluded that district courts lack jurisdiction to reinstate terminated grants, the relief plaintiffs seek.

Plaintiffs' failure to establish Article III standing is fatal to their case. With no federal grants under the SFA program, Plaintiffs have no legally protected interest to support standing to sue EPA in an effort to restore those grants. Nor do Plaintiffs provide evidence of concrete, particularized, non-speculative, and imminent injuries, as their purported injuries are either vague (*e.g.*, non-specific losses of time and money from the inability to perform subgrants and

contracts not before the Court) or speculative and non-imminent (*e.g.*, losses of staff and business that "may" happen at some point in the future or could "likely" happen even though EPA terminated the SFA grants nearly seven months ago).  Nor did EPA cause the claimed injuries (*e.g.,* the increasing average age of union workers or the uncompensated work performed under third-party agreements).  Moreover, redressability dooms Plaintiffs' claim to standing under Article III: the only order that could redress any cognizable injuries would require the Court to reinstate six terminated SFA grants, but the Supreme Court has made clear that such relief is not available in district court under the APA, *see Nat'l Insts. of Health v. Am. Pub. Health Ass'n.*, 145 S. Ct. 2658, 2658 (2025) ("*NIH*") and *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) ("*California*"); and to the extent Plaintiffs seek restoration of the SFA program, that too is unavailable—Congress repealed the program over eight months ago when it passed OBBBA.

Plaintiffs also fail to establish subject matter jurisdiction.  The only agency action here is EPA's decision to terminate existing SFA grants after Congress repealed the program.  As twice explained by the Supreme Court, the APA "does not provide" federal district courts "with jurisdiction to adjudicate claims 'based on' . . . grants" or to "order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651).  Breach-of-contract claims against the government must instead be brought by proper parties in the Court of Federal Claims, which can award only monetary damages to those parties alone.

In a plain effort to evade the Supreme Court's recent holdings, Plaintiffs argue their suit has nothing to do with EPA's decision to terminate grants and everything to do with its decision to terminate a supposed "program," as somehow distinct from the underlying grants.  But there is

no program separate from the grants, and there is no agency program decision to review. Congress authorized the award of grants in 2022, and Congress repealed EPA's authority to administer those grants three years later.  Neither this Court nor EPA can reverse that congressional action.

Plaintiffs argue that their lack of privity with EPA might *strengthen* their claim to APA jurisdiction.  Although courts have long recognized that third parties, like Plaintiffs, cannot sue under the Tucker Act to enforce government contracts, that condition on the waiver of sovereign immunity does not aid Plaintiffs' APA claims.  The APA does not provide an avenue to obtain relief the Tucker Act precludes.  Accordingly, Plaintiffs' effort to recast this lawsuit as a challenge under the APA and to constitutional violations should be rejected.  Like the claims asserted in *NIH* and *California*, Plaintiffs' claims all challenge the same type of underlying agency action, grant terminations, and they all seek the same ultimate relief, an order vacating and enjoining the terminations.  As recognized by the Supreme Court, these are quintessential breach-of-contract claims seeking specific performance over which the Court lacks jurisdiction.

Plaintiffs' claims fare no better on the merits.  Plaintiffs' alleged statutory violations fail because EPA did not violate any statute by terminating grants under a program Congress repealed.  Plaintiffs' constitutional claims are not cognizable because they rely on the same alleged statutory violations.  And Plaintiffs' arbitrary and capricious claim fails because OBBBA's repeal of the authorizing statute and rescission of funds to administer the SFA grants provided adequate reason to terminate the SFA grants, and EPA reasonably explained its decision to do so.

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and enter judgment in favor of Defendants on all claims. If the Court nonetheless grants Plaintiffs' motion for summary judgment, any remedy should be limited to remand to the agency.

## LEGAL AND FACTUAL BACKGROUND[1]

In 2022, Congress passed, and former President Biden signed into law, the Inflation Reduction Act ("IRA"). Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065–66. The IRA amended the Clean Air Act to add a new Section 134 ("Section 134"), which appropriated $26.97 billion to the EPA Administrator for a "Greenhouse Gas Reduction Fund" ("GGRF") "to make grants" aimed at reducing greenhouse gas emissions and other forms of air pollution. *See* 42 U.S.C. § 7434(a)–(c) (repealed 2025). Congress appropriated $7 billion of that total to EPA "to make grants, on a competitive basis" to States, municipalities, Tribes, and eligible nonprofits "to enable low-income and disadvantaged communities to deploy or benefit from zero emission technologies . . . and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section." *Id.* § 7434(a)(1). The $7 billion appropriation would "remain available until September 30, 2024." *Id.* Congress also appropriated an additional $30 million to EPA "for administrative costs necessary to carry out activities under this section," which would remain available until September 30, 2031. *Id.* § 7434(a)(4).

### I. EPA Implements Congress's Solar Energy Grant Program.

EPA announced a Notice of Funding Opportunity on June 28, 2023, to implement Section 134(a)(1). *See* ECF No. 30-34 at DRI_EPA_000308–90 ("NOFO"). The NOFO described a competitive grant process to award the $7 billion appropriation through a new grant program,

---

[1] On February 25, 2026, the Court entered a text order granting the parties' joint motion to waive statements of undisputed facts (ECF No. 31).

which EPA called "Solar for All" ("SFA").  *Id.*  The NOFO explained that SFA would "advance the Biden-Harris Administration's equity and environmental justice priorities" as detailed in former President Biden's now-revoked Executive Orders 14091 and 14008.  *Id.* at DRI_EPA_000311.  Through SFA, EPA would "award up to 60 grants" to eligible recipients "to expand the number of low-income and disadvantaged communities primed for distributed solar investment."  *Id.* at DRI_EPA_000312.  Any selected grantee would be "subject to administrative and national policy requirements," *id.* at DRI_EPA_000371, including former President Biden's "Justice40 Initiative," which directed EPA to "track and measure" the former President's goal to provide at least 40 percent of the "overall benefits" from federal investment in clean energy to disadvantaged areas.  *Id.* at DRI_EPA_000372.  The NOFO also made clear that grantees must "expand existing low-income solar programs" or design "new [SFA] programs," and that "EPA [would] not fund individual projects."  *Id.* at DRI_EPA_000312.

## II.    EPA Enters Grant Agreements with SFA Awardees.

EPA awarded SFA funding to 60 grantees, including 34 states (or state instrumentalities), the District of Columbia, Puerto Rico, 19 non-profit organizations, 4 tribal organizations, and one municipality.  EPA Decl. ¶ 3.  Plaintiffs did not receive SFA awards, but all claim to be "intended beneficiaries" of six SFA grants, *see* Pl. Mot. 6–11, namely:

1. The State of Rhode Island ("Rhode Island"), purportedly benefiting:

   - Plaintiffs RI AFL-CIO and RI Center for Justice ("RI Center"), *see* Pl. Mot. 6.

2. The PA Energy Development Authority ("Pennsylvania"), purportedly benefiting:

   - Plaintiff Energy Independent Solutions ("EIS"), *id.* at 6–7.

3. The Capital Good Fund (located in Georgia) ("Georgia"), purportedly benefiting:

   - Plaintiffs Anh Nguyen, Sunpath Solar, and 2KB Energy Services ("2KB"), *id.* at 7–9.

4.  The Indiana Community Action Association ("Indiana"), purportedly benefiting:

- Plaintiffs Solar United Neighbors ("SUN") and Black Sun Light Sustainability ("BSLS"), *id.* at 10–11.

5.  Harris County, Texas ("Harris County"), purportedly benefiting:

- Plaintiff SUN, *id.* at 11, 56.

6.  Solar Energy Loan Fund of St. Lucie County, Florida ("Florida"), purportedly benefitting:

- Plaintiff SUN, *id.* at 11.

Plaintiffs SUN and BSLS are the only subrecipients of SFA grants, *see id.* 10–11; the other six Plaintiffs are neither subrecipients nor SFA grantees, *see id.* 6–9 (describing their general interests in SFA grants issued to Rhode Island, Pennsylvania, Florida, and Indiana).[2]

EPA executed substantially similar agreements with each SFA grantee, including the six grantees listed above, and memorialized the final common terms and conditions in a document titled "SFA Terms and Conditions," dated December 3, 2024.  *See* ECF No. 30-33 at DRI_EPA_000265–307 ("SFA T&C"); *see also* EPA Decl. ¶ 4.  Under these terms, each grantee agreed to, *inter alia*, (1) "comply with the current EPA General Terms and Conditions," SFA T&C at DRI_EPA_000306; (2) "comply with the statutory requirements of Section 134 of the Clean Air Act," *id.* at DRI_EPA_000295; (3) implement "its EPA-approved Solar for All Workplan," *id.* at DRI_EPA_000283; and (4) adhere to numerous applicable regulations within 2 C.F.R. Part 200, *see, e.g.*, *id.* DRI_EPA_000283–84.  The SFA grants also provided EPA with termination authority under 2 CFR § 200.340.  *Id.* at DRI_EPA_000296–97.  Unless terminated, the project period for each of the six state SFA grantees ran from the last quarter in 2024 through

---

[2] Specifically: Plaintiffs EIS, Sunpath Solar, and 2KB are private for-profit solar businesses, Pl. Mot. 7–8; Plaintiffs RI AFL-CIO is a union, and RI Center is a non-profit, and both were involved in preparing Rhode Island's SFA application, *id.* at 6; and Plaintiff Anh Nguyen is an individual who resides in Georgia and hoped to benefit from Georgia's SFA grant, *id.* at 7.

the third quarter of 2029.  *See* ECF No. 30-18 (EPA excel spreadsheet listing all SFA grants, with "Project Periods" through 2029).

Overseeing the SFA grants imposed significant administrative burden on EPA.  The terms of the grants required EPA to "ensure that eligible Recipients effectively carr[ied] out the significant scale, complexity, and novelty of the Solar for All program."  SFA T&C at DRI_EPA_000302.  To fulfill those obligations, EPA designated EPA Project Officers to "oversee and monitor" the SFA Grant by, among other things: (1) "[p]articipating in project activities"; (2) "[r]eviewing the qualifications of key personnel"; (3) "[c]losely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines"; (4) "[c]losely monitoring the Recipient's performance"; and (5) "[v]erifying that the Recipient is expending the award on allowable activities," including "asking for information on draws from ASAP" or reviewing "transactions to verify compliance with regulatory requirements and the terms and conditions of this award."  *Id.* at DRI_EPA_000302–03.

The SFA Grants did not impose any obligations on EPA toward subrecipients or other non-grantee beneficiaries, including Plaintiffs here.  *See* Pl. Mot. 49 (recognizing that "no Plaintiff has a federal grant agreement").  Regulations incorporated into the SFA grants instead made clear that EPA "d[id] not have a direct legal relationship with subrecipients or contractors of any tier." 2 C.F.R. § 200.331; *see* SFA T&C at DRI_EPA_000283–85 (incorporating regulations at 2 C.F.R. Part 200).

## III. EPA Evaluates Impact of OBBBA After Congress Repeals Section 134 and Rescinds All Unobligated Funding.

On July 4, 2025, just ten months into the project period for SFA grants, Congress enacted and President Trump signed the One Big Beautiful Bill Act.  *See* Pub. L. No. 119-21, § 60002,

139 Stat. 72, 154 (2025).  As relevant here, Section 60002 of OBBBA "repealed" Section 134—

the statute that authorized the GGRF, including the SFA grant program—and "rescinded" all

"unobligated balances of amounts made available to carry out that section," including the

remainder of the $30 million for EPA to administer all GGRF programs.  *Id.*

      Following OBBBA's enactment, EPA decided to terminate the SFA grants.  EPA

documented the rationale for its decision in an August 7, 2025 memorandum from its Associate

Deputy Administrator, Travis Voyles, to the Deputy Administrator, David Fotouhi.  *See*

DRI_EPA_000088–96 (Aug. 7, 2025 5:20am email from Voyles with attached memorandum)

("Recommendation").  The Recommendation stated that the repeal of GGRF "eliminate[d] the

Agency's substantive grantmaking authority" under Section 134 and concluded that "the Agency

no longer has the congressionally dedicated funding to carry out its oversight function or

evaluate the effective performance and compliance of recipients with the terms of the SFA

program."  *Id.* at DRI_EPA_000090 (citing 42 U.S.C. § 7434(c)(1), which defines eligible

recipients, and Section III.W. of the SFA Terms and Conditions, which requires EPA Project

Officer to oversee and monitor the SFA grants).

      In reaching this conclusion, EPA considered numerous reliance interests.  First, it

considered the reliance interests of the SFA grantees, including their "initial plans, cost outlays,

and staffing for various projects."  *Id.* at DRI_EPA_000091–92.  EPA determined that such

interests would be limited given "the program's relatively nascent status and the limited funding

distributions which took place prior to enactment of the OBBB[A]," and such interests "could be

lessened further by effective use of the closeout process," which provides "appropriate

distributions for expenses reasonably occurred in reliance on the program."  *Id.* at

DRI_EPA_000092 (citing 2 C.F.R. § 200.344).  Second, EPA considered the reliance interests of

sub-recipients and indirect beneficiaries of the awards, and concluded that many SFA grantees "ha[d] not yet begun to allocate to subs or plan on-the-ground projects in a concrete way" and therefore the program "has not resulted in meaningful reliance interests on the part of potential or speculative individual household beneficiaries." *Id.*

Next, EPA considered the "impacts on the domestic solar energy industry in a more general sense." *Id.* at DRI_EPA_000093–94. In doing so, EPA recognized that industry participants "may have made initial capital outlays based on the expectation of federal assistance to pass-through grant recipients." *Id.* at DRI_EPA_000093. However, EPA concluded the industry's expenses "are currently limited in scope due to the nascent status of program implementation" and therefore "are not comparable to situations . . . [involving] decades of reliance and serious life-ordering decisions as a reason to forestall otherwise justified agency action." *Id.* at DRI_EPA_000093–94 (citing *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 31 (2020), involving "DACA recipients [who] have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program" since 2012). EPA also considered that the prior Administration had largely waived grantees' requirement to comply with the Build America, Buy America Act, meaning that grantees could "purchase solar panels with foreign-manufactured solar components" and limit benefits to domestic industry. *Id.* at DRI_EPA_000094.

Finally, EPA considered "reasonable alternatives" to terminating the SFA grants. *Id.* at DRI_EPA_000095. In doing so, EPA "evaluated a number of general funding appropriations by Congress for grant programs that did not include specifically appropriated funds for program implementation and oversight." *Id.* EPA concluded that, unlike those programs, the GGRF programs had a "specifically earmarked $30 million for the oversight and administration," and

"it would go against congressional intent to use funds dedicated for other purposes and programs." *Id.* EPA likewise declined to "strip[] administration and oversight funding away from programs that Congress intended [EPA] to support through other dedicated funding, including [Environmental Programs and Management] appropriations." *Id.* EPA also considered that the $7 billion scope of the SFA program meant that "the corresponding oversight and administration burden of the SFA program [was] larger than that for virtually all of [EPA's] other grant programs combined"; therefore, "[s]hifting any funding from these other programs would result in a significant shortfall in administration and oversight capabilities elsewhere." *Id.*

For these reasons, EPA leadership agreed with the recommendation to "terminate the SFA program and all existing grants." *See* DRI_EPA_000088 (Aug. 7, 2025 8:21am email from Fotouhi to Voyles agreeing with termination recommendation); *see also* DRI_EPA_000105 (Aug. 7, 2025 1:30pm email from Voyles informing EPA staff of EPA leadership's decision to terminate existing grants).

**IV.    EPA Terminates the SFA Grants.**

On August 7, 2025, EPA terminated all SFA grants. To accomplish this, EPA sent nearly identical, but separate and individualized, notices to all 60 SFA grantees. *See* ECF No. 30-22, DRI_EPA_000108–10 (Aug. 7, 2025 4:33pm Wise email with attached EPA form termination notice, ECF No. 30-23, DRI_EPA_000111–12 ("Termination Notice")).

As provided for in each SFA grant, EPA invoked 2 C.F.R. § 200.340 to terminate the grants. Termination Notice at DRI_EPA_000111. The Termination Notice explained that OBBBA had repealed "the underlying authority for the Solar for All program at Section 134 of the Clean Air Act" and had "rescind[ed] unobligated amounts to carry out Section 134," and EPA no longer had "a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." *Id.* The Termination Notice

also described the grant close-out process. In doing so, EPA "recognize[d] that program participants may have begun to rely on" program funds and may have "made preliminary budgets, projections, outlays, and staffing decisions." *Id.* EPA therefore provided assurance that such expenses would "be remedied and remediable by the close out processes," as "outlined in 2 CFR 200.344." *Id.*

Each of the six SFA grantees, from whom Plaintiffs derive their alleged interests, submitted administrative appeals at the end of August 2025 to dispute EPA's termination of their SFA grants. EPA Decl. ¶ 8. EPA denied the appeals of Rhode Island, Pennsylvania, and Florida; stayed Harris County's appeal; and has not ruled on Indiana's or Georgia's appeal. *Id.* As described in the Termination Notice, the closeout regulations gave the six state grantees 120 days to submit closeout reports supporting reimbursement of any allowable pre-termination and closeout costs. *See* Termination Notice at DRI_EPA_000111–12. Only Georgia and Florida submitted closeout materials before the 120-day period expired. EPA Decl. ¶ 9. The four other SFA grantees have not submitted any closeout materials.

Three of the six SFA grantees filed suit against EPA in various courts. Pennsylvania and Rhode Island (joined by 20 other states and the District of Columbia) filed parallel lawsuits against the EPA in the Western District of Washington, *Arizona v. U.S. Environmental Protection Agency*, No. 2:25-cv-02015 (W.D. Wash.) and the Court of Federal Claims, *Maryland Clean Energy Center v. United States*, No. 25-1738 (Fed. Cl.). Harris County sued EPA in the District for the District of Columbia. *Harris County, Texas v. U.S. EPA*, No. 1:25-cv-03646 (D.D.C.). The plaintiffs in each lawsuit—including Pennsylvania, Rhode Island, Harris County and the Plaintiffs here—filed "protective" petitions under the Clean Air Act in the D.C. Circuit. *Arizona*

*v. U.S. Environmental Protection Agency*, No. 25-1218 (D.C. Cir.).  Georgia, Florida, and Indiana have not sued the government.

**V.    Plaintiffs Sue Seeking to Vacate and Enjoin EPA's Termination of SFA Grants.**

On October 6, 2025, Plaintiffs filed this lawsuit to challenge EPA's termination of the SFA grants, framing it as a decision "to terminate the Solar for All program."  *See* Compl. ¶ 1. Plaintiffs allege that EPA "violated federal law, includ[ing] the Administrative Procedure Act and the United States Constitution" and argue that the APA gives this Court jurisdiction to review their claims and that their "freestanding constitutional claims neither involve nor require any waiver of sovereign immunity."  *Id.* ¶¶ 13–19.  But regardless of how Plaintiffs style their claims, the relief they seek asks this Court to restore the SFA grants.  Plaintiffs demand an order vacating and setting aside EPA's grant terminations, an injunction barring EPA from de-obligating or otherwise interfering with the grant funds, and declaratory relief for each claim.  *Id.* ¶ 250. Plaintiffs further ask this court to direct "EPA to reinstate the Solar for All grant program."  *Id.*

## LEGAL STANDARD

Federal courts "are courts of limited jurisdiction," "[l]imited first by the Constitution, to only the kinds of 'Cases' and 'Controversies' listed in Article III," and "limited as well by statute."  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (quotations omitted). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221 (1st Cir. 2019). Jurisdictional limits therefore are "not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Instead, a court must "presume[] that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.* (citation omitted).  Plaintiffs thus bear the burden of proving

12

both (1) that each of them has standing to bring the claims asserted, *see, e.g.*, *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017), and (2) that the Court has jurisdiction to hear the claims, *see, e.g.*, *Wilkins v. Genzyme Corp.*, 93 F.4th 33, 42 (1st Cir. 2024).

The summary judgment standard "has a special twist in the administrative law context." *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015). Under the APA, the reviewing court may only set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The court's review therefore "is narrow," as "the APA standard affords great deference to agency decisionmaking" and "the [agency's] action is presumed valid." *Assoc. Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). "In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The reviewing court "must uphold" the agency's decision if it "is supported by any rational view of the record," "even if [the court] disagrees with the agency's conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015).

## ARGUMENT

### I. Plaintiffs Lack Standing to Bring Their Claims.

Plaintiffs lack Article III standing. As non-grantees hoping to benefit from SFA funds awarded to five states and one county government, Plaintiffs fail to establish: (A) the invasion of any "legally protected interest," and any "concrete," "particularized," "certain," and "imminent" injury; (B) that EPA caused the alleged injuries; and, most significantly, (C) that the Court could redress any cognizable injuries Plaintiffs may have.

Article III of the U.S. Constitution "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *Savage v. U.S. Small Bus. Admin.*, 552 F. Supp. 3d 241,

247 (D.R.I. 2021) (quoting *California v. Texas*, 593 U.S. 659, 668 (2021)). "That power includes the requirement that litigants have standing." *Id.* (quotations and citation omitted). "The 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," *id.* (citation omitted), each of which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation," *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281–82 (1st Cir. 1996) (quoting *Lujan*, 504 U.S. at 561). Importantly, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Newbury v. U.S. Dep't of Hous. & Urb. Dev.*, No. CV 24-084, 2024 WL 4785147, at *3 (D.R.I. Nov. 14, 2024), *aff'd*, No. 24-2137, 2025 WL 3829304 (1st Cir. Nov. 17, 2025) (quoting *TransUnion LLC v. Ramirez.* 594 U.S. 413, 431 (2021)). "Even plaintiffs seeking only declaratory judgment must meet this standard." *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 119 (1st Cir. 2026) (citing 28 U.S.C. § 2201). Plaintiffs have not done so here.

### A. Plaintiffs Do Not Have Legally Cognizable Injuries.

First, Plaintiffs fail to establish legally cognizable injuries. An injury-in-fact is the "invasion of legally protected interest" which must be "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (quoting *Lujan*, 504 U.S at 560); *Sardarian v. Fed. Emergency Mgmt. Agency*, No.

3:19-CV-00910, 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022).  And injuries that are "too widely shared" may fall into the category of "generalized grievances about the conduct of government" and therefore not support Article III standing.  *Lyman v. Baker*, 954 F.3d 351, 361 (1st Cir. 2020) (quotations and citations omitted).

Plaintiffs' asserted injuries do not meet this standard.  To start, because Plaintiffs are not grantees of any SFA award, they cannot establish the invasion of a "legally protected interest" necessary for Article III standing.  *Katz*, 672 F.3d at 71; *Sardarian*, 2022 WL 4080325, at *1–2.  For example, in *Sardarian*, the plaintiff sued FEMA and local and state agencies, alleging that his home "[was] under threat of constant flooding" because FEMA "unjustifiably terminated" a grant awarded under FEMA's Hazard Mitigation Program.  2022 WL 4080325, at *2.  The court dismissed the suit for lack of standing, holding that the plaintiff did not have a "legally protected interest" under *Lujan,* because FEMA awarded "the grant in question" to the State of Connecticut and to the Town of Westport, and the plaintiff was not a recipient of the federal grant "for purposes of establishing jurisdiction."  *Id.*  So too here.

Like the non-grantee plaintiff in *Sardarian*, Plaintiffs do not have a "legally protected interest" in funding awarded to states under a federal grant program.  Indeed, it is well-settled that "[a] plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim."  *Sullivan v. United States*, 625 F.3d 1378, 1379–80 (Fed. Cir. 2010) (citing *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003)).[3]  Plaintiffs here readily acknowledge they "have no federal grants under the Solar for All program," Pl. Mot. 48, and

---

[3] *See also Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139 (D.R.I. 2009), *judgment entered*, 641 F. Supp. 2d 135 (D.R.I. 2009) (acknowledging that "absent [its] contract [with HUD]," the third-party plaintiff "would have no standing to challenge the 1994 amendments [by Congress] or implementing HUD notice").

describe their injuries as the loss of "beneficial downstream effects" provided by the SFA grant program. *Id.* at 54. But under federal grant regulations and the SFA grants themselves, EPA does not have a "direct legal relationship" with "subrecipients or contractors of any tier." 2 C.F.R. § 200.331; *see* SFA T&C, at DRI_EPA_000283–85 (incorporating regulations at 2 C.F.R. Part 200). Thus, like the harms asserted in *Sardarian*, Plaintiffs' asserted harms are not based on any "legally protected interest," but rather would flow down from EPA's termination of SFA grants awarded to five states and one county. Pl. Mot. at 6–11. It is those six SFA grantees—not Plaintiffs—who may allege legally cognizable injuries, which can be redressed, if proven, through a breach-of-contract suit in the Court of Federal Claims. *See infra* at 27–37. Summary judgment should be entered for Defendants on this ground alone.

Plaintiffs also fail to establish "actual," "concrete," and "particularized" injuries. *Katz*, 672 F.3d at 71 (quotations and citation omitted). For example, RI AFL-CIO claims it "invested significant time and resources" to prepare for SFA but does not quantify the amount of time or otherwise describe the resources spent, and it fails to explain how the time and money spent applying for an award—which Rhode Island was not certain to receive—qualifies as a "concrete" injury that occurred following the termination of Rhode Island's grant. ECF No. 32-1, Crowley Decl. ¶¶ 8, 13. Plaintiffs also assert injuries related to the time and resources spent to meet obligations promised to SFA grantees, subrecipients, or contractors, but fail to provide the details of those relationships or the terms of those contracts, making it difficult to understand how (and if) these Plaintiffs remain uncompensated for that time and work. *See, e.g.,* ECF No. 32-6, Wood Decl. ¶ 9 (no details regarding the "Memorandum of Agreement" that RI Center executed with Rhode Island); ECF No. 32-3, Gunning Decl. ¶¶ 5, 7 (no details regarding Sunpath's loss of a contract with Georgia in which the parties were still "negotiating contract

16

terms" but had purportedly agreed on "pricing and remaining terms").[4]  This lack of specificity is fatal to Plaintiffs' ability to establish Article III standing.

    Nor do Plaintiffs assert "imminent" future injuries.  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending"—"allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up) (citing cases) (emphasis in original).  Here, Plaintiffs do not set forth "certainly impending" injuries.  Rather, they assert various forward-looking *possible* injuries, such as the possibility that they "may" lose business or staff, or that they could suffer from a loss of union membership or a loss of clients, or that they face an increased "risk" of financial harm or higher utility bills, while omitting specific information on the timing of those future losses or any data supporting the increased risk of harm—even though EPA terminated the SFA grants over six months ago.  *See, e.g.,* ECF No. 32-1, Crowley Decl. ¶ 12 (claiming RI AFL-CIO suffers from Rhode Island workers' loss of "*[p]rospects of future employment*—good jobs, paying living wages, providing health care, and retirement security" that "*may* not be recoverable") (emphasis added).[5]  These claims of possible future harms

---

[4] *See also* ECF No. 32-2, Smith Decl. ¶ 9 (no details on terms related to **EIS**'s installation of "twenty projects" and plans to "install roughly fifty additional projects" for Pennsylvania's SFA program); ECF No. 32-4, Buchanan Decl. ¶ 12 (no details on **2KB**'s $1.64 million contract to work in Georgia, and whether it had received payment for any work performed); *id.* ¶ 12 (no details on **2KB**'s loss of "strategic development opportunities"); ECF No. 32-5, Nguyen Decl. ¶ 12 (no details regarding the timing of **Ms. Nguyen's** application or the eligibility requirements to participate in Georgia's SFA program).

[5] *See also* ECF No. 32-7, Abdul-Rahman Decl. ¶ 23 (asserting that "[u]nless project funding is restored, staff [at **BSLS**] *may* be terminated or moved to contracted or part-time positions") (emphasis added); ECF No. 32-2, Smith Decl. ¶ 16 (describing how **EIS** "will *almost* certainly not be able to sustain our current level of operations or investment in trucks and other infrastructure" and how "workforce needs *may* drop by around 25% without SFA") (emphasis

without more do not satisfy Article III's injury-in-fact requirement. *See Kerin v. Titeflex Corp.*, 770 F.3d 978, 983 (1st Cir. 2014) (holding that plaintiff could not satisfy injury-in-fact standard, in part, because he failed "to allege facts sufficient to even calculate or estimate the risk" of the defendant's product causing fires from lightning strikes); *Newbury*, 2024 WL 4785147, at *4–5 (holding that the plaintiffs' harm did not meet the "concrete and imminent" standard, because allegation that HUD-approved housing plan "will likely" cause "increased safety and security issues" and "reduced access to parking spaces" was "simply too speculative").

Nor can Plaintiffs manufacture organizational standing through the diversion of staff and resources in response to EPA's termination of SFA grants. In general, organizations may "sue on their own behalf for injuries they have sustained." *Food & Drug Admin. v. All. for Hippocratic Med. ("FDA")*, 602 U.S. 367, 393 (2024) (quotations and citations omitted). Like all litigants, however, organizations must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id.* at 393–94. In *FDA*, for example, four medical associations claimed they suffered organization-level injuries "based on their incurring costs to oppose FDA's actions" in deregulating an abortion drug. *Id.* They claimed that FDA "'caused' the associations to conduct their own studies on [the drug]" so they could "better inform their members and the public about [the drug's] risks," and to "expend considerable time, energy, and resources drafting citizen petitions to FDA" "to the detriment of other spending priorities." *Id.* The Supreme Court unanimously held that the associations lacked Article III standing. The

---

added); ECF No. 32-3, Gunning Decl. ¶¶ 7-8 (describing how **Sunpath** "hired two new staffers" and "*will likely* be forced to lay off its new hires, as its income flow without Solar for All is insufficient to support these positions") (emphasis added); ECF No. 32-6, Wood Decl. ¶¶ 12–13 (describing how loss of SFA program generally "compound[ed] the *risk* of [utility] shutoff" for **RI Center's** clients, and claiming that its clients "face" the loss of bill savings and "exposure" to disconnection) (emphasis added).

Court reasoned that organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.  To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental action it wishes to challenge. *Id.* at 394–95.  And the Court squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," concluding simply "[t]hat is incorrect." *Id.* at 395.  The Court should reach the same conclusion here.

Like the associations in *FDA*, Plaintiffs assert that EPA's termination of SFA grants caused them to "divert resources" to deal with the subsequent "fallout" from those terminations and that EPA's termination decision compromised their core missions. *See* ECF No. 32-1, Crowley Decl. ¶ 15 (asserting injuries based on RI AFL-CIO's diversion of "staff and organizational resources from other core advocacy and collective bargaining priorities to address the fallout of EPA's termination").[6]  But the Supreme Court made clear that an organization's decision to "divert[] its resources in response to a defendant's actions" does not establish standing. *FDA*, 602 U.S. at 395; *see Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (concluding that unions "[can]not spend their way into standing" by "choosing to divert resources towards responding to . . . [the government's] actions and away from other union priorities") (quotations omitted).  Although the Supreme Court has recognized that an organization may—like any other litigant—have standing

---

[6] *See* ECF No. 32-8, Schoolman Decl. ¶¶ 17, 34, 49 (claiming that the termination of SFA grants in Florida, Indiana, and Harris County caused harm to **SUN**'s "organizational mission, reputation and relationships"); ECF No. 32-6, Wood Decl. ¶ 16 (asserting injuries based on **RI Center**'s diversion of "substantial staff time and resources away from other core priorities-such as eviction defense and affirmative housing unsafe conditions and anti-discrimination litigation" as a "result of the termination" of SFA).

to sue when the defendant's conduct directly interferes with the organization's "core business activities," *see id.* at 395, Plaintiffs here fail to articulate any such direct interference with their missions and reputations: they continue to advocate for and serve their constituents, whether they be union members, homeowner-clients, or solar businesses, just as they did prior to EPA's termination of the SFA grants.

### B.    Plaintiffs Do Not Establish EPA Caused Their Injuries.

Next, Plaintiffs have not satisfied the element of causation. "This element requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Katz*, 672 F.3d at 71 (citations and quotations omitted). Such a connection "cannot be overly attenuated." *Donahue v. City of Boston,* 304 F.3d 110, 115 (1st Cir. 2002). "Because the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party." *Katz*, 672 F.3d. at 71–72 (citing *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)). Here, Plaintiffs claim a host of injuries caused by forces and actors beyond EPA's control. For example, EPA's termination of the SFA grants did not cause aging and declining union membership, a decrease in pension fund contributions, high electricity bills, the shutoff of ratepayers' utility services, or a failing roof. *See, e.g.*, ECF No. 32-1, Crowley ¶ 3 (complaining that the "average age of members in Rhode Island's building trades is approximately 55 years old . . . . and [w]ithout new pipelines of apprentices and young workers, unions face a retirement cliff in the coming decade").[7] Those

_____

[7] Remarkably, for-profit company **EIS** admitted that it received *a surge in business* following OBBBA's future sunset of an investment tax credit ("ITC") for residential solar. *See* ECF No. 32-2 Smith Decl. ¶ 5 ("Ironically, the news that the tax credits were under threat and the later passage of H.R.l on July 4, 2025, which sunsets the ITC for residential solar customers at the end of calendar year 2025, has resulted in a short-term boost to our business as customers rush to take advantage of the credit before it expires."). The company therefore purchased equipment and hired staff to meet this increased demand following OBBBA but then claimed that EPA's

injuries either existed before the prior Congress even authorized the SFA program, or they would have occurred regardless of EPA's termination of the SFA grants.

Moreover, any cognizable harm to Plaintiffs would arise from the conduct of the SFA grantees themselves and must be remedied under the terms of those relationships. Plaintiffs are subrecipients, contractors, or purported beneficiaries of six SFA grants. *See* ECF No. 32, Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support ("Pl. Mot.") at 6–11. Plaintiffs assert injuries for lost time on their applications, lost money in preparing for their respective solar programs, and lost opportunities by supporting these SFA grantees. *See, e.g.*, ECF No. 32-6, Wood Decl. ¶¶ 9, 20 (describing Memorandum of Agreement with Rhode Island and RI Center's "investment of staff, attorney time, and coalition work" undertaken "in reliance on EPA's award of obligated [SFA] funds to Rhode Island").[8] But the SFA grantees, or

---

termination of the SFA grant in Pennsylvania caused it to waste money on two trucks worth $400,000 and the hiring of 12 more staff. *Id.* ¶ 7. At best, it is unclear whether EIS purchased the equipment for the SFA program or to meet this increased demand, or how EPA could be responsible for EIS's decision to hire staff to meet this demand.

[8] *See also* ECF No. 32-1, Crowley Decl. ¶ 10 (describing **RI AFL-CIO**'s work developing programs with "Building Futures Rhode Island and the Community College of Rhode Island"); ECF No. 32-3, Schoolman Decl. ¶¶ 4, 8–9 (describing **Sunpath**'s losses based on purchasing $30,000 vehicles, upgrading software, and paying increased insurance premiums in anticipation of signing a contract with Georgia under the state's BRIGHT program); ECF No. 32-4, Buchanan Decl. ¶ 20 (describing how "**2KB** experienced direct out-of-pocket losses exceeding $12,000 for specialized project management software, attorneys fees, and program compliance tools, purchased specifically for the anticipated four-year performance of the [SFA] contract" under Georgia's SFA program); *id.* ¶ 21 (describing **2KB**'s "loss of nearly $1.5 million in anticipated revenue over the contract period [under its contract with Georgia], forcing 2KB to lay off a dedicated employee and redirect or idle the three remaining employees"); ECF No. 32-7, Abdul-Rahman Decl. ¶ 28 (describing how **BSLS** "has dedicated thousands of hours, as well as space and administrative resources, since the project period started on May 1, 2024, for a total of 16 months on the grant on behalf of the Solar Opportunities Indiana Coalition partners"); ECF No. 32-8, Schoolman ¶¶ 10, 12, 14 (describing **SUN**'s $9.6 million subaward with Florida and losses related to its investment of "significant resources . . . to implement the Florida SFA program" including "7 full-time staff" and costs of "over $14,000 and over 70 hours on the

their subrecipients, are responsible for compensating Plaintiffs for the time, money, equipment, and services spent on their respective solar programs, and their failure to provide such compensation caused Plaintiffs' injuries.  Indeed, if such pre-termination costs are allowable under the SFA grants, the six grantees could have submitted claims to EPA for reimbursement through the grant closeout process, as explained in the Termination Notices.  *See* Termination Notice at DRI_EPA_000111 (describing submission of allowable costs under 2 C.F.R. § 200.344).  If the grantees failed to seek all allowable costs during closeout, or failed to then reimburse Plaintiffs for those costs, the grantees are responsible for any alleged harm caused by those failures, not EPA.  For these reasons too, Plaintiffs have not met their burden to establish Article III standing.

### C.    Any Cognizable Injuries Are Not Redressable by the Court.

Plaintiffs have not (and cannot) satisfy the element of redressability.  Plaintiffs strain to frame their claims as a challenge to EPA's termination of the SFA program, rather than the termination of SFA grants.  *See, e.g.*, Pl. Mot. 48 (trying to distinguish between a challenge to federal grant terminations and a challenge to "high-level agency actions related to grant programs").  This framing is an artifice in a failed attempt to avoid the jurisdictional bar on Plaintiffs' claims, as described in the following section.  *See infra* at 27–37.  But however Plaintiffs frame their claims, the relief they seek will not remedy their only purported harms:

_____

hiring process"); *id.* ¶¶ 28–29 (describing **SUN**'s $350,000 subaward with Indiana and losses related to its "significant organizational resources to implementing [SFA] in Indiana in reliance on this award"); *id.* ¶¶ 41–42 (describing **SUN**'s $3.7 million sub-subaward with the Houston Advanced Research Center under Harris County's SFA grant and losses related to work performed for, or anticipated revenue from, that sub-subaward); ECF No. 32-5, Nguyen Decl. ¶¶ 3–6 (describing how **Ms. Nguyen**'s "electricity bills in [her] . . . East Atlanta home . . . were more than [she] could afford" and that her "home was built in the 1960's and currently has significant roof leaks" and has "received disconnection notices from the utility company").

Congress repealed the SFA program that Plaintiffs seek to "restore"; and the Court lacks jurisdiction to reinstate the SFA grants and require EPA's specific performance under them. *See id*. Plaintiffs' alleged harms therefore cannot be remedied by their requested relief.

"Redressability concerns the 'likelihood that the requested relief will redress the alleged injury.'" *Efreom v. McKee*, 46 F.4th 9, 21 (1st Cir. 2022) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). A plaintiff therefore has standing only if he can "allege personal injury . . . likely to be redressed by the requested relief." *Id.* (quoting *Texas*, 593 U.S. at 668–69). "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *Id*. at 671 (citation omitted). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. Under this standard, Plaintiffs' injuries—even if cognizable—cannot be redressed by the relief they seek, however Plaintiffs choose to frame their claims.

First, an order requiring EPA to resurrect the SFA program is relief that this Court cannot give. On July 4, 2025, Congress enacted OBBBA. This law did two things. It "repealed" Section 134, eliminating the statutory subsections governing EPA's administration of the GGRF, including SFA. *See* OBBBA § 60002. Those sections authorized and appropriated funding to the GGRF programs, including the $30 million to EPA for necessary administrative costs, and they set forth how grant recipients could use the funds. 42 U.S.C. § 7434(a)–(c). Next, OBBBA "rescinded" all "unobligated balances" that Congress made available to EPA to carry out the version of Section 134 "in effect" as of July 3, 2025. OBBBA § 60002. Thus, the unobligated "administrative costs" provided to EPA could no longer be used to carry out any GGRF program, including the SFA program, as it existed on July 3, 2025. Plaintiffs now ask this Court to undo

23

this law and restore the now-repealed SFA program.  Neither EPA nor the Court can restore this program: Congress has repealed it.  *See infra* at 44–45.

Second, Plaintiffs face an even more stark redressability problem.  The purported legally cognizable injury here is Plaintiffs' loss of their interests (arising from their status as subrecipients, solar contractors, or purported third-party beneficiaries) under six SFA grants.  *See* Pl. Mot. 54 (describing injuries as the loss of "beneficial downstream effects" provided by the SFA grant program).  Plaintiffs claim their requested relief would "fully restore [SFA] and its funding," enabling Plaintiffs to "resume their participation" in the SFA grant program.  Pl. Mot. 60.  But the Court cannot provide that relief.  As the Supreme Court has twice explained, district courts cannot remedy grant termination.  *See NIH*, 145 S. Ct. at 2659 and *California*, 604 U.S. at 651, discussed further *infra* 31–32.  The six grants at issue here thus will remain terminated, and Plaintiffs will remain former subrecipients, contractors, or beneficiaries of a still-repealed grant program.  Without any ability to reverse grant termination, Plaintiffs could ask for no more than an "advisory opinion" about the meaning and effect of OBBBA for EPA's consideration in deciding the pending administrative appeals of the six prime grantees—"without the possibility of any judicial relief" for Plaintiffs.  *Id*. at 673 (quotations and citations omitted).  That is the "very kind of relief that cannot alone supply jurisdiction otherwise absent."  *Id.*

Plaintiffs' arguments to the contrary should be rejected.  First, their reliance on *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025), *see* Pl. Mot. 59–61, is misplaced.  In that case, oil producers challenged EPA's approval of California regulations requiring automakers to manufacture more electric cars and less gasoline-powered cars.  *Id.* at 104–07.  The Supreme Court held that setting aside those regulations would likely redress the oil producers' monetary injuries, because the oil producers provided sufficient evidence showing that automakers would

predictably sell more gasoline-powered cars if California did not require them to sell more electric cars. *Id.* at 118–20. But that case did not involve the legal backdrop here—*i.e.*, the Court's lack of jurisdiction to reinstate terminated federal grants, *see infra* at 27–37, and Congress' repeal of a program that Plaintiffs seek to restore. In other words, unlike the relief requested in *Diamond Alternative Energy*, the relief requested here is not available to Plaintiffs— even if they could establish that it is "likely" and "predicable," *see id.* at 114, that (a) the six state SFA grantees would resume performance under their SFA grants, and (b) all other relevant non-parties would reinstate the subawards and contracts under those individual SFA state programs.[9]

Next, Plaintiffs argue that SFA funding remains at Treasury under 42 U.S.C. § 4370f, and therefore the Court can order EPA to use that money to restore funding to the SFA program. Pl. Mot. 60–61. Not so. As stated already, the Court lacks jurisdiction to order EPA to pay money under the SFA grants, *see NIH*, 145 S. Ct. at 2659; *California*, 604 U.S. at 651, regardless of the availability of the funds to do so. The statute does not change that. It provides:

> [T]he obligated balances of sums available in multiple-year appropriations accounts shall remain available through the seventh fiscal year after their period of availability has expired for liquidating obligations made during the period of availability.

---

[9] To be sure, Plaintiffs have submitted no declaration showing the likelihood that the six state grantees would resume performance under their SFA grants or that other non-parties would resume their subawards and contracts. Although three of these SFA grantees (Rhode Island, Pennsylvania, and Harris County) have sued EPA to reinstate their SFA grants, the other three grantees (Georgia, Indiana, and Florida) have not done so, and no other subrecipient in any of the six states has done so. Without more information regarding the status of these non-parties, the Court should require their joinder under Fed. R. Civ. P. 19 or otherwise dismiss the case Plaintiffs' failure to do so. *See* Fed. R. Civ. P. 19(a)(1) ("(a)(1), which provides that "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties . . . .").

42 U.S.C. § 4370f.  Accordingly, under this statute, SFA funds are available through September 30, 2031—the seventh year after their expiration on September 30, 2024—"for liquidating obligations made during the period of availability." Section 4370f does not in any way give the Court authority to reinstate terminated grants.  And EPA has no authority (and Plaintiffs cite to no authority) outside those SFA grants allowing EPA to use this Treasury money to reimburse the six prime grantees.  Nor does EPA have authority to issue new grants to redress Plaintiffs' injuries, as Congress has repealed the authority for EPA to "make grants" under the program and rescinded all administrative funding necessary to do so.  *Infra* at 44–45; *Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."). Without establishing the Court's ability to redress their injuries, Plaintiffs lack Article III standing, and judgment should be entered for Defendants.

### D.    Plaintiffs Are Not Within the Zone of Interests of OBBBA or the General Savings Statute.

Plaintiffs cannot establish standing to bring APA claims under OBBBA or the general savings statute, 1 U.S.C. § 109, because Plaintiffs are not within the "zone of interests" of those laws.  The Supreme Court "has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014))

26

("An APA claimant must establish that the claim arguably falls within the zone of interests to be protected or regulated by the underlying statute."). Plaintiffs do not meet this test. [10]

Plaintiffs argue they have standing to bring their APA statutory claims because they are in the "zone of interests" of Section 134 and 42 U.S.C. § 7614. Pl. Mot. 58. But Plaintiffs do not claim that EPA violated Section 134 or 42 U.S.C. § 7614. Indeed, Plaintiffs acknowledge that EPA complied with Section 134 by "obligat[ing] the entire $7 billion in Solar for All program funds before the September 30, 2024 statutory deadline." Pl. Mot. 4. Instead, Plaintiffs claim in Count I, *see* Compl. ¶ 170, that "EPA acted contrary to" OBBBA § 60002 and the general savings statute, 1 U.S.C. § 109. Nowhere in their brief, however, do Plaintiffs argue they are within the zone of interests of these statutes. Nor could they. There is no indication that Congress intended to give non-grantees any private cause of action under either OBBBA, which repealed Section 134, or the general savings statute. *See Trump v. Sierra Club*, 588 U.S. 930, 930 (2019) (staying injunction against border wall construction because environmental plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with" the DoD appropriations transfer statute). This too is a reason to grant judgment in favor of Defendants on Plaintiffs' APA statutory claims.

## II.    This Court Lacks Jurisdiction to Order the Reinstatement of SFA Grants

In addition to their lack of standing, Plaintiffs also fail to establish jurisdiction in this Court. Despite nominally bringing claims under the APA and the Constitution, Plaintiffs expressly demand restoration of terminated grant agreements. *See, e.g.*, Pl. Mot. 51 (explaining that the vacatur sought would "revive the grants that comprised the [SFA] program"). But claims

---

[10] The Supreme Court has "clarified that the [zone of interests] test is not jurisdictional but rather goes to whether the claimant has stated a viable claim." *Seafreeze*, 123 F.4th at 20 (citing *Lexmark*, 572 U.S. at 128 n.4 (2014)). Because Plaintiffs raised their "zone of interests" argument in support of standing, Pl. Mot. 58, Defendants respond to that argument here.

seeking to remedy grant termination can only be brought in the Court of Federal Claims under the Tucker Act, which is the only applicable waiver of the United States' sovereign immunity.[11] Although the APA provides a limited waiver of the United States' sovereign immunity, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Patchak*, 567 U.S. at 215 (quoting 5 U.S.C. § 702). The Supreme Court has made clear that claims regarding grant terminations belong in the Court of Federal Claims, and Plaintiffs cannot overcome this hurdle through creative pleading. *NIH*, 145 S. Ct. at 2659; *California*, 604 U.S. at 651. Even if the Court entertained the notion that there is a "policy" decision relating to EPA's termination of the SFA grants, that "decision" would not be reviewable under the APA. Accordingly, Plaintiffs fail to establish jurisdiction in this Court.

**A. *NIH* and *California* Explicitly Forbid the Relief Sought.**

This Court lacks subject matter jurisdiction over challenges to EPA's termination of SFA grants. The Supreme Court has made it clear that only the Court of Federal Claims has jurisdiction to adjudicate grant termination claims. *NIH*, 145 S. Ct. at 2659; *California*, 604 U.S. at 651. Plaintiffs allege that their "APA claims challenging the high-level agency action to terminate the Solar for All program fall within the APA's waiver of sovereign immunity." Pl. Mot. 48. But Plaintiffs cannot dress up their challenge to grant terminations as a challenge to the termination of a program that Congress, rather than EPA, repealed. Despite Plaintiffs' artful pleading, Plaintiffs' lawsuit boils down to a demand that this Court "revive the [SFA] grants." Pl. Mot. 51. This is beyond the Court's power. Plaintiffs' interests derive entirely from the SFA grants, and no one has any right to those grants except as provided by the grantees' agreements

---

[11] Any inability to sue in the Court of Federal Claims due to lack of contractual privity does not expand this Court's jurisdiction over Plaintiffs' claims. It merely illuminates the fact that Plaintiffs are not the appropriate parties to bring suit relating to EPA's termination of SFA grants.

with EPA.  This is a contract action against the government, which cannot proceed in this Court. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).  This reason alone is sufficient to grant summary judgment in favor of Defendants.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *United States ex rel. Sargent v. Collins*, 165 F.4th 102, 110 (1st Cir. 2026) (quoting *Dolan v. USPS*, 546 U.S. 481, 484 (2006)).  Waiver of the United States' sovereign immunity "must be unequivocally expressed in statutory text" and "cannot be implied." *Id.* (quotations and citations omitted).  Any such waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  "Sovereign immunity is jurisdictional in nature," *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), and "the burden of demonstrating the existence of federal jurisdiction ultimately lies with [] the party seeking to invoke federal jurisdiction." *Perales-Muñoz v. United States*, 151 F.4th 1, 6 (1st Cir. 2025) (citing *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)); *see also Ducsote v. Cherry*, 647 F. Supp. 3d 52, 55 (D. Mass. 2022) (stating that the party seeking to overcome sovereign immunity "bears the burden of proving Congress' consent" to be sued) (citing *Johansen v. United States*, 506 F3d 65, 68 (1st Cir. 2007) and *Murphy*, 45 F.3d at 522). Plaintiffs cannot meet this burden.

"The APA contains a limited waiver of sovereign immunity for suits challenging agency actions seeking 'relief other than money damages.'" *Taydus v. Cisneros*, 902 F. Supp. 278, 284 (D. Mass. 1995) (quoting 5 U.S.C. § 702).  That waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Massachusetts v. Dep't of Grant Appeals Bd. of U.S. Dep't of Health & Hum. Servs.*, 815 F.2d 778, 782 (1st Cir. 1987) (quoting 5 U.S.C. § 702); *Glaskin v. Klass*, 996 F. Supp. 67, 72 (D. Mass. 1998) (quoting 5

U.S.C. § 702) ("Nothing herein … confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.").  Further, the APA "is at pains to exclude suits seeking money judgments." *Sibley v. Ball*, 924 F.2d 25, 28 (1st Cir. 1991); *see also Dep't of Grant Appeals Bd.*, 815 F.2d at 783 (reading "'money damages' to mean any monetary relief, whether it is in the nature of damages or in the nature of specific relief.").

Congress long ago made clear that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  Thus, for actions based in contract, a claim "under the Tucker Act is an 'adequate remedy in court,' precluding APA review." *Glaskin*, 996 F. Supp. at 71–72 (citing *inter alia*, *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978)) (stating that the Court of Claims "provide[s] an adequate remedy for an alleged breach of contract by a federal agency"); *Serra v. GSA*, 667 F. Supp. 1042, 1051 (S.D.N.Y. 1987), *aff'd*, 847 F.2d 1045 (2d. Cir. 1988) (stating  "Congress … has deemed the Court of Claims, despite whatever limitations exist as to the relief it may grant, to be the 'adequate remedy' for plaintiffs suing the United States over a federal contract."); *see also Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  This prohibition on APA review extends to claims founded on grants, like the SFA grants, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

To determine whether claims fall within the Tucker Act's scope, courts must look "beyond the pleadings" and beyond a plaintiff's preferred characterization of its claims, *Megapulse*, 672 F.2d at 967, lest they "upset the carefully modulated waiver of sovereign immunity and grant of remedies for breach of contract embodied in the Tucker Act." *Int'l Eng'g*

*Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975). Thus, regardless of how a claim is styled—*i.e.,* as a "violation of the Administrative Procedure Act [and] the United States Constitution," Pl. Mot. 2—this Court lacks jurisdiction if the claim is "at its essence" contractual. *Megapulse*, 672 F.2d at 968. To determine whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Id.* (quotations omitted).

In 2025, the Supreme Court twice emphasized that claims challenging federal grant terminations belong in the Court of Federal Claims under the Tucker Act. *See NIH*, 145 S. Ct. at 2660; *California*, 604 U.S. at 650. In *California*, certain states obtained a temporary restraining order "enjoining the Government from terminating various education-related grants" and requiring the government to pay grant obligations. 604 U.S. at 650. The Supreme Court stayed the district court order, holding that "the Government is likely to succeed in showing the District Court lacked jurisdiction" because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The Supreme Court reiterated this conclusion in *NIH*. There, the district court purported to "vacat[e] the Government's termination of various research-related grants." 145 S. Ct. at 2659. Relying on its reasoning in *California*, the Supreme Court stayed the judgment vacating grant terminations. The Court explained that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce

31

any obligation to pay money pursuant to those grants." *Id.* (quotations omitted); *see also id.* at 2662 (Barrett, J., concurring) ("[M]y preliminary judgment is that the plaintiffs' challenges to the grant terminations belong in the CFC."). The only judgment the Supreme Court did not stay was the district court's decision vacating NIH's "[g]oing forward" policy guidance—a decision which did not (and could not) reinstate the terminated grants. *Id.* at 2661 (Barrett, J., concurring).

Two federal appellate courts have followed *California* and *NIH*, and the two-pronged analysis under *Megapulse*, to conclude that grantees' claims against the government were essentially contractual. In December 2025, the Ninth Circuit concluded, "We are bound by *NIH*," and thus stayed a district court order enjoining two agencies from terminating federal awards. *Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025). In that case, the plaintiffs sued two federal agencies following the April 2025 termination of their federal grants. *Id.* at 1202.[12] Like Plaintiffs here, the *Thakur* plaintiffs asserted APA and constitutional claims and sought an order vacating and enjoining the agencies' termination decisions. *Id. Thakur* has particular applicability here; the lower court in *Thakur* found that the Tucker Act did not preclude district court jurisdiction because plaintiffs were not parties or intended third-party beneficiaries to the terminated grants. *See Thakur v. Trump*, 787 F. Supp. 3d 955, 990 (N.D. Cal. 2025). After the district court preliminarily enjoined the grant terminations, the United States appealed and moved for a partial stay, arguing that the court lacked jurisdiction to adjudicate the plaintiffs'

---

[12] The agencies terminated other grants relating to DEI programs. *Thakur*, 163 F.4th at 1201. Referring to these grantees as the "DEI Termination Class," the Ninth Circuit did not stay the order enjoining the termination of their awards, concluding that the district court did not abuse its discretion in holding that these grantees were likely to prevail on First Amendment claims. *Id.* at 1206. Plaintiffs do not assert any First Amendment or DEI-related claim here. Any purported constitutional claims against Defendants in this case are disguised contract claims that belong in the Court of Federal Claims, or disguised statutory claims that fail as a matter of law. *See infra* at 50–54.

APA claims. *Thakur*, 163 F.4th at 1203. The Ninth Circuit agreed with the United States. *Id.* at 1204. Applying the two-pronged analysis of *Megapulse*, 672 F.2d at 967–68, the Ninth Circuit held (1) the plaintiffs' "source of rights" was their "research-related grants"—just like those at issue in *NIH*; and (2) "the type of relief sought" was the vacatur of the termination notices—just like the relief sought in *NIH*. *Id.* (citing *NIH*, 145 S. Ct. at 2658). The Ninth Circuit recognized that under *NIH*, such relief was "designed to enforce an obligation to pay money pursuant to the grants" at issue. *Id.* (cleaned up). It therefore concluded the government made a "strong showing" that the district court likely lacks jurisdiction to review the plaintiffs' APA claim. *Id.*

The Fourth Circuit reached the same conclusion. In January 2026, the Fourth Circuit held that "the district court lacked jurisdiction to adjudicate Plaintiffs' APA claims challenging the freezing or termination of their [federal] grants and to order enforcement of those grants." *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 (4th Cir. 2026). Following *NIH* and *California*, the Fourth Circuit concluded that plaintiffs' claims were "essentially contractual"—rejecting the plaintiffs' argument that their "source of [] rights" arose from regulations, statutes, and the Constitution, and rejecting the contention that the "relief sought" was merely "forward-looking injunctive and declaratory relief." *Id.* at 828. The Fourth Circuit concluded that the plaintiffs could "identify no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payments on those grants," and that any such relief amounted to the "classic *contractual* remedy of specific performance." *Id.* at 827–28 (citations omitted) (emphasis in original). So too here.

Starting with "the source of rights," like the plaintiffs in *California*, *NIH*, *Thakur*, and *Sustainability Institute*, the SFA grants are the only channel between Plaintiffs and SFA funding. As subgrantees and non-grantees, Plaintiffs lack privity with the United States and are only

33

entitled to payment of money based on their separate agreements with prime grantees such as Georgia or Indiana.  But because entitlement to SFA funding does not "exist independently of that contract," the prime grant agreements are themselves Plaintiffs' "source of rights." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).  In *Blue Fox*, a prime contractor failed to pay a subcontractor (Blue Fox) for a construction project completed for the Department of the Army.  525 U.S. at 256–57.  Predicating jurisdiction on 28 U.S.C. § 1331 and the APA—as Plaintiffs do here—Blue Fox sought an "equitable lien" on any Army funds not yet paid under the prime contract, or any funds available or appropriated for completion of the construction project, and an order directing the Army to pay those funds.  *Id.* at 258.  The Supreme Court rejected Blue Fox's arguments for APA jurisdiction and emphasized that "unless waived by Congress, sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses."  *Id.* at 263–65. *Blue Fox* thus demonstrates that subrecipients such as Plaintiffs are bound by the limitations that the Tucker Act imposes upon the APA's waiver of sovereign immunity.  Like Blue Fox, Plaintiffs have no privity with EPA, as they themselves acknowledge.  *See, e.g.*, Pl. Mot. 48 (stating that Plaintiffs in this case have no federal grants under the SFA program).[13]  And yet, Plaintiffs seek to receive funds from terminated grants—opportunistic labels aside, that is a demand for money damages, which "falls outside of § 702's waiver of sovereign immunity."  *Id.* at 263.

---

[13] Plaintiffs argue that their lack of any contractual relationship with EPA is a jurisdictional strength.  Pl. Mot. 48–49.  The Supreme Court has already rejected that absurd argument.  *See Blue Fox*, 525 U.S. at 263 (finding that APA does not waive sovereign immunity for claims whose goal is to "seize or attach money in the hands of the Government," even when raised by subcontractors).  Instead, because the Tucker Act bars third parties from enforcing government agreements, Plaintiffs cannot invoke the APA to provide that forbidden relief.  *See supra* at 26 (citing *Patchak*, 567 U.S. at 215).

As to the "relief sought," Plaintiffs' claims are "designed to enforce an obligation to pay money pursuant to the grant[]." *NIH*, 145 S. Ct. at 2659.  Plaintiffs expressly ask this Court to set aside EPA's termination decision and to enjoin its implementation.  In their own words, Plaintiffs seek a vacatur that would "redress [their alleged injuries] by restarting the flow of money."  Pl. Mot. 22.  This relief unabashedly demands EPA to continue paying under the SFA grants and is indistinguishable from the contractual remedy of specific performance.  *See NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring) ("An order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants."); *Sharp v. Weinberger*, 798 F.2d 1521, 1523–24 (D.C. Cir. 1986) (holding that an order declaring that the plaintiff was entitled to "payments illegally withheld [under a contract]" was "the classic contractual remedy of specific performance").  The Court lacks jurisdiction to order this relief.

This Court should reject Plaintiffs' arguments to the contrary.  Plaintiffs attempt to manufacture jurisdiction in this Court by fashioning their claims as APA and constitutional claims.  *See, e.g.*, Pl. Mot. 48.  But the *Megapulse* analysis requires the Court to look "beyond the pleadings" to determine whether Plaintiffs' claims are disguised contract claims, notwithstanding Plaintiffs' pleading otherwise.  In *Ingersoll-Rand Company v. United States*, 780 F.2d 74 (D.C. Cir. 1985), for example, the plaintiff sought injunctive relief under the APA in district court, alleging that the government's decision to terminate a supply contract "for convenience" violated the APA and two federal regulations.  The D.C. Circuit looked beyond plaintiff's artful pleading and determined that its "source of rights" was the contract because, *inter alia*, the contract had a "termination-for-convenience" clause; the government invoked that clause to terminate; and therefore the dispute was "entirely contained within the terms of the

contract." *Id.* at 78.  Same here: the SFA grants contain a section outlining EPA's termination rights, including the right to terminate under 2 C.F.R. § 200.340, SFA T&C at DRI_EPA_000296–97, and EPA invoked that regulation to terminate the grant, *see* Termination Notice at DRI_EPA_000111.  Whether EPA unlawfully terminated any SFA grant is thus "entirely contained within the terms of the contract."  *Ingersoll-Rand*, 780 F.2d at 78.

Notably, the plaintiffs in *California*, *NIH*, *Thakur*, and *Sustainability Institute* all framed their claims as constitutional, statutory, and/or APA claims instead of contract claims, as Plaintiffs do here.  *See* Compl. ¶¶ 168–249.  But each court rejected that framing in holding that the district courts lacked jurisdiction to hear them.  *See supra* at 29–32; *see also Vill. W. Assocs.*, 618 F. Supp. 2d at 139 (explaining that "simply calling something an APA claim does not make it so" and that "the Court cannot ignore that, at bottom, [plaintiff] aims to receive an order compelling [agency] to specifically perform [a contract] or provide monetary relief").  The same reasoning should lead to the same result here.

Plaintiffs' invocation of *Bowen v. Massachusetts,* 487 U.S. 879 (1988), does not aid their jurisdictional argument.  Pl. Mot. 51.  In *Bowen,* the Supreme Court recognized that setting aside agency action could permit a party to receive money authorized by statute and would therefore be in the nature of specific relief, not money damages.  *Id.* at 910.  That rationale is drastically different from this case.  In *Bowen*, the state's claims concerned the United States' withholding of statutorily-mandated Medicaid payments that HHS "shall pay" the state based on "the State's estimate of its anticipated future expenditures."  *Id.* at 883–84, n. 2 (citing provisions under 42 U.S.C. § 1396).  In this case, however, no statute requires EPA to pay money to any specific grantee, let alone subgrantees.  The monetary relief at issue in this case is not merely some downstream consequence of vacating agency action like a regulation or order—the action that

Plaintiffs challenge is itself *contractual* in nature (the termination of the grants). Plaintiffs openly demand an order "restarting the flow of money." Pl. Mot. 22, 61. No fair or plausible reading of *Bowen* provides authority to specifically enforce a *contractual* promise, and Plaintiffs' claims cannot proceed in this Court. For this same reason, Justice Barrett considered *Bowen* in her concurrence in *NIH* and observed that "[v]acating the guidance does not reinstate terminated grants" and that "vacating the guidance does not necessarily void decisions made under it." *NIH*, 145 S. Ct. 2661. This is fatal to Plaintiffs' assertion that "[v]acating the decision to terminate the program would therefore restore the status quo ante and revive the grants that comprise the program." Pl. Mot. 51.[14]

**B.    APA's Limited Waiver of Sovereign Immunity Does Not Apply.**

To circumvent this Court's lack of subject matter jurisdiction over challenges to grant terminations, Plaintiffs re-characterize the grant terminations as termination of the entire SFA program at a "high-level" or a "policy-level," but such characterization cannot manufacture APA jurisdiction. Plaintiffs challenge EPA's terminations of SFA grants, which do not belong in this Court (or to Plaintiffs, for that matter); any alternative "agency action" is not subject to challenge under the APA because either it lacks finality or it is committed to EPA's discretion.

*1.    The Only "Final Agency Actions" are Grant Terminations.*

Plaintiffs assert blanketly that EPA's "termination of the Solar for All grant program is final agency action justiciable under the APA." Pl. Mot. 27. Plaintiffs argue that "there was no separate decision-making process for any of the grants; instead, they were terminated en masse, effectuating the termination of the program in its entirety." *Id.* at 26. But what Plaintiffs

---

[14] Plaintiffs' notion that the "status quo ante" necessitates the revival of terminated grants further ignores that as of August 6, 2025, Congress had repealed Section 134 and the SFA grants served no statutory purpose and Congress also stripped EPA of all dedicated administrative funding.

describe as "termination of the Solar for All grant program" is indistinguishable from EPA's terminations of SFA grants after OBBBA's repeal.  To conclude otherwise would transform every grant or contract termination notice into an agency "policy" that could be challenged in district court under the APA.  That result would be contrary to Congress's intent to channel all contract claims against the government to the Court of Federal Claims.  *See Ingersoll-Rand*, 780 F.2d at 78 (recognizing that Congress "inten[ded] to provide a single, uniquely qualified forum for the resolution of contractual disputes"); *see also Vill. W. Assocs.*, 618 F. Supp. 2d at 140 ("[B]iting at the APA bait here would undermine the purpose of the Tucker Act.").

Moreover, treating grant terminations as a policy decision challengeable under the APA would be contrary to *NIH* and *California*.  In each case, plaintiffs challenged an alleged policy resulting in the mass termination of grants.  But the Supreme Court refused to consider the agencies' *reasons* for the grant terminations, or hold that those *reasons* should be treated as "policies" reviewable in district court.  *NIH*, 145 S. Ct. at 2659 (holding that APA does not provide district court with jurisdiction to adjudicate claims "based on" research grants or to order relief designed to enforce any "obligation to pay money" pursuant to those grants) (quoting *California*, 604 U.S. at 651; *see also NIH*, 145 S. Ct. at 2661–62 (Barrett, J. concurring) (noting that if Court of Federal Claims has exclusive jurisdiction over the grant terminations, "the plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance.").  For example, plaintiffs in *NIH* asserted that certain agency policies were unlawful "because they violate[d] various federal statutes and the Constitution . . . and that the [grant] terminations flowed directly from those unlawful policies."  *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 51 (1st Cir. 2025).  But the Supreme Court looked beyond those characterizations and stayed "judgments vacating the Government's termination of various

research-related grants" because the APA does "not provide the District Court with jurisdiction" to order such relief. *NIH*, 145 S. Ct. at 2659. Admittedly, the Supreme Court in *NIH* did not stay the district court's vacatur of agency "guidance documents"; however, that guidance applied only to grants "[g]oing forward," and the vacatur of that guidance "d[id] not reinstate [the] terminated grants." *Id*. at 2661 (Barrett, J., concurring). Vacatur of "guidance documents" may have had appreciable effects distinct from restoration of terminated grants in *NIH* because NIH has ongoing statutory authority to make research grants. *See Am. Pub. Health Ass'n*, 145 F.4th at 44–45 (discussing statutory authority for NIH's grantmaking); *see also* 42 U.S.C. § 241(a) (authorizing NIH to, among other things, "make grants-in-aid" to fund research projects). No such separate "guidance documents" exist in this case to any grants going forward—indeed, OBBBA precluded any similar forward-looking guidance by repealing the GGRF. *See infra* at 44–45. Rather, this case involves only a challenge to EPA's one-time decision to terminate a group of existing grants issued under the same repealed statute. This Court lacks jurisdiction to hear that challenge under *NIH* and *California*.

Finally, Plaintiffs suggest that they "are asking the Court to vacate the high-level termination of the program, from which the termination of all SFA grants 'simply flowed.'" Pl. Mot. 51 (quoting *NIH*, 145 S. Ct. at 2661 (Barrett, J. concurring)). But recasting their challenge as a "policy-level decision" to terminate the SFA program, *see, e.g. id.*, is a fiction perpetuated to help Plaintiffs skirt *NIH* and *California*. There was no separate "SFA program" termination. OBBBA terminated any program. The only agency action here was EPA's decision to terminate existing SFA grants, as reflected in termination notices sent to each SFA grantee. Indeed, Section 134 itself precludes the possibility of any "program" severed from EPA's grant termination. The "program" Congress authorized EPA to administer only ever consisted of grants awarded to

eligible recipients. *See* 42 U.S.C. § 7434(a)–(c). Plaintiffs fail to address how the Court can "restart[] the flow of money" without requiring the Court to order the reinstatement of terminated SFA grants. Pl. Mot. 22. But reinstating the terminated grants exceeds this Court's jurisdiction. *See NIH*, 145 S. Ct. at 2659; *California*, 604 U.S. at 650; *see also Thakur*, 163 F.4th at 1204 (holding that *NIH* barred "vacatur of the termination notices and reinstatement of the terminated grants" because it was "'designed to enforce an obligation to pay money pursuant to the grants'") (quoting *NIH*, 145 S. Ct. at 2658).

Plaintiffs describe the grant terminations as a "high-level agency action" in an attempt to avoid the Supreme Court's clear imperative that the District Court does not have jurisdiction to hear challenges to the government's termination of grants. *See, e.g.*, Pl. Mot. 48. But even if the Court accepted that there was some "high-level agency action" separate from the grant terminations, it would not be a reviewable "agency action." The only agency action here was to terminate the grants; and there is no reviewable decision that can conceivably be separated from grant termination.

Under the APA, "agency action" "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This is a "term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract. Rather, the APA's definition of agency action focuses on an agency's *determination* of rights and obligations." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis in original). Courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (citation omitted). Courts "lacked

authority to review claims where 'an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" *Id.* (citation omitted). EPA needs to "have rendered its last word on the matter" for its action to be "'final' and thus reviewable." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The "final agency action" requirement is jurisdictional. "If the agency action is not final, the court therefore cannot reach the merits of the dispute." *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212 (D.C. Cir. 1996) (citation omitted).

Neither the IRA nor OBBBA created any specific rights for Plaintiffs. Plaintiffs have no claim to SFA funding beyond their arrangements with SFA grantees. In other words, EPA's interpretation of OBBBA "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp.*, 76 F.3d at 1214. Here, the grant terminations are the only "future administrative action(s)" that have any bearing on any grantee's rights, which the Court lacks jurisdiction to review. If Plaintiffs' premise that there was a separate "high-level" policy decision to review, apart from the grant terminations, that alleged decision cannot be a reviewable "final" agency action.

### 2. *Administration of SFA Grants Was Committed to EPA's Discretion.*

Following OBBBA, EPA's decision to terminate the SFA grants was "committed to agency discretion," and thus Section 701(a)(2) of the APA precludes judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 183 (1993). "It is a fundamental principle of appropriations law where Congress merely appropriates lump-sum amounts without statutory restriction, a clear inference may be drawn that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should, or are expected to, be spent, do not establish any legal requirements on the agency." *Id.* After OBBBA repealed

41

Section 134, no "legally binding restrictions" could possibly exist with respect to how EPA chose to administer the orphaned SFA grants. *See infra* at 45–51. Thus, EPA's decision to terminate the SFA grants, in addition to being reasonable, is not subject to APA review. OBBBA provides "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). OBBBA also repealed all appropriations to administer all GGRF grants, leaving it to EPA to determine whether and how to expend funds to oversee the grants. When it comes to EPA's decision as to how "its resources are best spent," or how any SFA grant "best fits the agency's overall policies," EPA "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831–32). In any event, EPA's decision not to reassign funding to continue administering SFA grants after Congress "spoke definitively" to repeal Section 134, Recommendation at DRI_EPA_000095, is reasonable. *See ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002) (no fault by agency "taking a conservative view of its own authority" where Congress expressly limited agency jurisdiction).[15]

---

[15] Plaintiffs do not invoke *ultra vires* jurisdiction in their Motion, but group their constitutional counts under the heading of "*ultra vires* claims" in their Complaint. *See* Compl. 42 (cover Counts V and VI). To the extent Plaintiffs seek to establish *ultra vires* jurisdiction in this Court, such attempts must fail; *ultra vires* claims are "essentially a Hail Mary pass." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted). Here, Plaintiffs' constitutional and statutory claims are indistinguishable from their APA claims and do not form a separate bases for *ultra vires* jurisdiction. *See Massachusetts v. Trump*, 790 F. Supp. 3d 8, 31 (2025). *City of Saint Paul, Minnesota v. Wright*, No. 25-CV-03899 (APM), 2026 WL 88193 (D.D.C. Jan. 12, 2026) does not suggest a different conclusion. In that case, the district court "emphasize[d] the narrowness of its ruling" and found that the case was "unique" because defendants "freely admit that they made grant-termination decisions primarily—if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump in 2024." *Id.* at *7. No such unique circumstances apply here to EPA's administrative decision regarding SFA grants after Congress repealed Section 134. Likewise, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) is inapplicable here because it addressed a challenge to an executive order instead of a contract termination. 74 F.3d at 1324.

III.    **Plaintiffs' Claims Fail as a Matter of Law.**

Even if the Court has jurisdiction, Plaintiffs' assortment of claims fails on the merits as a matter of law.  As discussed above, Plaintiffs cannot challenge EPA's termination of the SFA grants in this Court because they lack standing and any jurisdiction to reinstate the grants. Trying to avoid those jurisdictional deficiencies, Plaintiffs dissemble, challenging EPA's termination of the "SFA program" as somehow distinct from termination of the SFA grants.  *See, e.g.*, Compl. ¶ 1.  But there is no separate SFA program to restore.  OBBBA repealed the statutory authority for the program and rescinded the remaining designated funds to administer it. If there were a "program" apart from the existing grants, Congress ended it through OBBBA. EPA could not have violated OBBBA by ending the "SFA program" that OBBBA itself repealed.

As to the existing grants, OBBBA did not purport to alter EPA's preexisting authority to terminate the SFA grants.  Plaintiffs' constitutional claims fail because they merely repackage the alleged statutory violation, and Plaintiffs' *ultra vires* claims fail because EPA exceeded neither its statutory nor constitutional authority.  Finally, devoid of any underlying statutory authority for the grant program and all designated funds to it administer it, EPA's decision to terminate existing grants was both reasonable and reasonably explained.

A. **EPA's Termination Decision Was Not Contrary to Law.**

1.  *The Termination Decision Did Not Violate OBBBA.*

a)  *Congress, and Not EPA, Repealed the SFA Program.*

The fundamental flaw in Plaintiffs' challenge to the termination of a supposed SFA program, as distinct from the grants, is straightforward.  As Plaintiffs recognize, Pl. Mot. 18, it is bedrock law that a federal agency cannot run a program without statutory authority.  *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'")

(quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  EPA launched the GGRF

programs, including SFA, under Section 134.  *See* NOFO at DRI_EPA_000313;

Recommendation at DRI_EPA_000090.  On July 4, 2025, OBBBA "repealed" Section 134 in its

entirety, without any savings language.  OBBBA § 60002.  At that point, Section 134, and with it

EPA's authority to maintain any SFA program apart from the existing grants, "ceased to exist."

*Clark v. United States*, 19 App. D.C. 295, 297 (D.C. Cir. 1902); *see also, e.g.*, REPEAL, Black's

Law Dictionary (12th ed. 2024) (defining "repeal" as the abrogation, revocation, rescission, or

annulment of an existing law).

In addition to repealing the program's organic statute, OBBBA also "rescinded" the

"unobligated balances of amounts made available to carry out" that statute, OBBBA § 60002,

thereby taking away EPA's remaining appropriation for administering SFA and other GGRF

programs, *see* Recommendation at DRI_EPA_000095.  Thus, OBBBA not only repealed EPA's

statutory authority to run the SFA program but also took away its dedicated funding to do so.

*See, e.g.*, *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ("[N]o money can be

paid out of the Treasury unless it has been appropriated by an act of Congress.").  Without

statutory authority, EPA could not (and cannot) lawfully continue to run an alleged SFA program

divorced from the pre-OBBBA SFA grants.[16]  *See, e.g.*, *Marin Audubon Soc'y v. FAA*, 121 F.4th

902, 912 (D.C. Cir. 2024) (federal agencies "are creatures of statute" that "literally have no

power to act except to the extent Congress authorized them") (quotations omitted).

---

[16] Again, to be clear, the notion that there is any "SFA program" apart from the terminated grants
is a fiction advanced by Plaintiffs to avoid controlling Supreme Court precedent, which this court
should reject.  *See supra* at 27–37.

Though irrelevant because OBBBA § 60002 is clear on its face, *see, e.g., Carcieri v. Salazar*, 555 U.S. 379, 387, 392 (2009), the legislative history comports with this plain meaning that OBBBA terminated the GGRF programs, including SFA.  The House Report of the Committee on the Budget accompanying OBBBA made clear that OBBBA "repeals" both "the authorizations" and the "unobligated balances of funds" of "programs . . . which were authorized for the first time" through the IRA, including the Section 134 GGRF programs.  H.R Rep. No. 119-106, at 557 (2025).  Similarly, Senator Capito, chair of the Senate Environment and Public Works Committee, explained on the Senate floor that Section 60002 would "terminate the [GGRF] program by repealing its organic statute and rescinding all unobligated funds."  171 Cong. Rec. S4080 (daily ed. June 30, 2025) (statement of Sen. Shelley Capito).[17]  Thus, even accepting Plaintiffs' theory that they can challenge a freestanding program decision apart from grant termination, EPA did not violate OBBBA.  To the extent any SFA program existed independently of the SFA grants, OBBBA eliminated it, and this Court cannot restore it.

    *b)*  *OBBBA Did Not Limit EPA's Discretion to Terminate SFA Grants.*

In an effort to sidestep both OBBBA's repeal of the program and the obvious fatal impediments to challenging the grant terminations directly, Plaintiffs' case rests on referring to the SFA "program" and SFA grants interchangeably, using whichever terminology best suits their purpose in the moment.  That commingling of distinct concepts is simply incorrect.  As discussed above, even assuming there was some SFA program distinct from the grants, OBBBA repealed

---

[17] The legislative history cited by Plaintiffs is irrelevant as it concerns the impact of the rescission of unobligated funds only on outstanding grants, not on agency programs.  *See* Pl. Mot. 29.  Moreover, the two cited House members were sharing their views only on the rescission of unobligated funds.  House Committee on Energy & Commerce, *Full Committee Markup of Budget Reconciliation Text Part 1*, at 5:40:13–5:42:34 (YouTube, May 13, 2025), https://www.youtube.com/live/J4fGR1CiNGg?si=ap8mBiadz0tlY2iB&t=20412.  They were not considering the Section 134 repeal and rescission, specifically, or a rescission of unobligated funds coupled with repeal of the authorizing statute, as is the case here.

that program, and it cannot be restored.  Moreover, neither this Court nor these plaintiffs can adjudicate EPA's termination of the grants.  *See supra* at 27–37.  The Court therefore should grant summary judgment for Defendants.

Regardless, even if the Court could adjudicate a challenge to grant terminations—and it cannot—EPA's termination of the grants was consistent with OBBBA.  Having repealed the SFA program and having rescinded the designated funding to administer the program, including the grants, OBBBA then says nothing about the grants at all.  *See* OBBBA § 60002.  At minimum, then, OBBBA left EPA discretion regarding extant grants.  "It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts.  To do so is not a construction of a statute, but, in effect, an enlargement of it by the court."  *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quotations and citations omitted).  "This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).  Here, the plain language of OBBBA repealed the statutory authority for the SFA program, rescinded the designated funds to continue administering the program, and imposed no guidance or limits on EPA's ability to terminate the orphaned grants.  EPA therefore did not violate OBBBA by terminating the grants.

> c) *EPA's Termination Decision Did Not "Retroactively" Eliminate Vested Rights, and Repealed Section 134 No Longer Governs.*

Plaintiffs' contentions that EPA's termination decision improperly (1) applies OBBBA retroactively, (2) contravenes Section 134 as preserved by the general savings statute, and (3) fails to use general lump-sum appropriations as authorized by Section 134, *see* Pl. Mot. 30–32, are all incorrect.

*First*, EPA's termination decision was not based on a "retroactive" application of OBBBA in any sense.  "A statute does not operate 'retrospectively' merely because it . . . upsets expectations based in prior law."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (citation omitted).  Rather, to be retroactive, "the new provision" must "attach[] new legal consequences to events completed before its enactment," *id.* at 270, thereby "affecting substantive rights, liabilities, or duties" incurred "on the basis of conduct arising before its enactment," *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (alterations and quotations omitted).  As a preliminary matter, the only "rights" or "liabilities" that were incurred under Section 134 prior to OBBBA that are even capable of being retroactively impacted are "rights" or "liabilities" under the SFA grants.  Plaintiffs in this action are not grantees and therefore cannot bring any cognizable claim on the grants.  *See supra* at 14–16.  And the grants were not impacted by any freestanding decision toward any SFA program; they were instead affected only by EPA's decision to terminate the SFA grants, which this Court cannot review.  Thus, Plaintiffs' claim that the termination decision applied OBBBA retroactively is not justiciable.

Regardless, the termination decision did not apply OBBBA retroactively because it did not attach any new consequences to any pre-OBBBA conduct.  As Plaintiffs admit, EPA complied with Section 134 while it was in effect.  Pl. Mot. 3–4.  EPA terminated the SFA program and grants as of August 7, 2025, after OBBBA had already repealed Section 134.  *See* Recommendation at DRI_EPA_000088.  That termination did not undo any work that the agency had done under SFA prior to that time.  *See id.* at DRI_EPA_000088–89 (recommending course for "the future of the [SFA] program").  Termination did not rescind the grant funds, which continue to be maintained in the account in which they were maintained prior to OBBBA's enactment.  *See* ECF No. 32-9; Treml Decl. ¶ 7; 42 U.S.C. § 4370f.  Thus, even assuming at that

point there was some standalone agency "program" subject to adjudication in this Court, termination of the SFA program was not in any sense "retroactive."

Even if this Court could hear a challenge to EPA's decision to terminate grants, the termination of those grants was not impermissibly retroactive. Retaining the option to terminate grants is part and parcel of the authority to make grants, *see* 2 C.F.R. § 200.340, and even before Section 134 was repealed, EPA had incorporated that authority into the SFA grant agreements, *see, e.g.*, SFA T&C at DRI_EPA_000296–97. Thus, while OBBBA's repeal of Section 134 and rescission of administrative funding provided reason for EPA's decision to terminate the grants, the grant terminations are governed by the grant agreements themselves. *See supra* at 34–35. And EPA's termination of the grants was not retroactive, as it did not negate any existing obligations for work already performed under the grants and EPA specifically provided that grantees could receive pre-termination costs. Termination Notice at DRI_EPA_000112; *see also Martin v. Hadix*, 527 U.S. 343, 360–61 (1999) (new statutory cap on attorney fees was not impermissibly retroactive when applied to work performed after the effective date of the law, even though the attorneys expected to receive higher rates when they assumed ongoing representation). EPA's termination decision therefore did not have any retroactive effect. *See, e.g.*, *Fernandez-Vargas*, 548 U.S. at 37.

*Second*, Plaintiffs' contention that, despite having been repealed by Congress, Section 134 requires EPA to continue carrying out the SFA program due to the general savings statute, 1 U.S.C. § 109, *see* Pl. Mot. 30–31, loads significantly more weight on that statute than it can bear. By its plain terms, the savings statute does not require agencies to continue carrying out repealed programs. That very notion is contrary to the bedrock principle that "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt

the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified."  *Dorsey v. United States*, 567 U.S. 260, 274 (2012).

Instead, the general savings statute has a singular focus on preserving liabilities and actions to enforce liabilities.  It provides that, unless otherwise specified, the repeal of a statute "shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute," and the repealed statute "shall be treated as still remaining in force *for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability*."  1 U.S.C. § 109 (emphasis added).  By its terms, then, although the general savings statute "keep[s] a repealed statute alive," it does so only "for a precise purpose": to pursue a pre-repeal liability in an enforcement action.  *De La Rama S.S. Co. v. United States*, 344 U.S. 386, 389 (1953); *see also Keener v. Wash. Metro. Area Transit Auth.*, 800 F.2d 1173, 1177 (D.C. Cir. 1986) (general savings statute kept repealed law in "a state of suspended animation . . . for the sole purpose" of enforcing liabilities incurred before repeal).  Thus, contrary to Plaintiffs' assertion, repealed Section 134's purported ongoing "obligation" to EPA "to administer the grant program" has no continued life through the general savings statute.  Pl. Mot. 31; *see* 1 U.S.C. § 109; *Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric.*, 984 F.2d 514, 518–19 (1st Cir. 1993) (legislation repealed agency's quality control program though general savings statute preserved penalty already owed).

Moreover, even if the Court could consider EPA's termination of the SFA grants (and it cannot), the general savings statute would not revive repealed Section 134 for two reasons.  First, this is not an action to prosecute or enforce any pre-OBBBA liability under any SFA grant.  Any such action against Defendants would have to be brought in the Court of Federal Claims by a grantee and would be governed by the terms of the relevant grant.  *See supra* at 27–37.  Instead,

this is an action by non-grantees seeking to reestablish the perceived public benefits of a repealed grant program. *See, e.g.*, Compl. ¶ 1. The general savings statute does not resuscitate repealed public benefits in non-liability-enforcement litigation. *See* 1 U.S.C. § 109; *Deal v. Fed. Hous. Admin.*, 260 F.2d 793, 799–800 (8th Cir. 1958) (general savings statute did not save repealed statutory right to excess project funds where real estate developer had no "contractual or vested right to" the funds prior to the statute's repeal). Section 134 therefore does not apply here through the general savings statute.

Second, even if Plaintiffs could enforce the grants by bringing suit in district court (and they cannot), the general savings statute would not aid the effort. Because an action to enforce a grant is a contract action, the general savings statute would only resuscitate any "enforcing provisions" set out in the repealed statute "that have special relation to" actions on the contract. *De La Rama*, 344 U.S. at 390; *see also U.S. Lines Co. v. United States*, 124 F. Supp. 375, 377 (Ct. Cl. 1954). For example, in *De La Rama*, the general savings statute saved a jurisdictional provision of the then-repealed War Risk Insurance Act. *See* 344 U.S. at 388. The Supreme Court held that the general savings statute preserved the repealed statutory provision providing the district court jurisdiction over coverage disputes because disregarding the provision would "diminish substantially the recoverable amount" of the claim. *Id.* at 389–90. Here, Section 134 does not have any such "enforcing provisions." Section 134 simply authorized the EPA to "make grants" without any direction as to how those grants would be enforced. *See generally* 42 U.S.C. § 7434 (repealed 2025). Section 134 thus offers no enforcement mechanism that Plaintiffs could seek to revive through the general savings statute. For that reason, too, the general savings statute does not save any aspect of repealed Section 134 for purposes of this litigation.

Finally, Plaintiffs cite no authority for the proposition that an agency must use lump-sum appropriations to continue running a program whose statutory authority and designated appropriations have been eliminated by Congress. *See* Pl. Mot. 31–32. That proposition is contrary to the "established rule" that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976). Instead, Plaintiffs simply cite language in repealed Section 134 contemplating EPA's use of other appropriations for the SFA program. *See* Pl. Mot. 31. In doing so, Plaintiffs again wrongly ask this Court to rely on a repealed statute; the request should be denied. *See Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 934 (9th Cir. 2011) ("A statute that Congress snuffed out of existence by repeal leaves no residual clear statement of authorization.").

### 2. *Plaintiffs Fail to Bring Cognizable Constitutional Claims.*

Grasping at anything that might provide jurisdiction for this Court, Plaintiffs further cloak their grant dispute in the garb of constitutional claims. But dressing up defective statutory and contract claims as standalone constitutional claims cannot help Plaintiffs prevail. However Plaintiffs may label them, their claims "simply alleg[e] that [EPA] has exceeded [its] statutory authority." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). Plaintiffs' alleged constitutional claims are therefore not cognizable. *Id.*; *see also Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 792 (D.C. Cir. 2025) (discussing *Dalton* and finding that "statutory claims do not become constitutional ones by operation of the separation-of-powers principles that prevent the States and the Executive Branch from disregarding federal statutes").

Plaintiffs argue that *Dalton* is inapplicable because there is a "complete lack of [statutory] authority" for EPA's conduct. Pl. Mot. 41. That is incorrect. As discussed above, to the extent,

if any, this litigation can challenge termination of a standalone SFA program apart from the grants, EPA administered the SFA program under Section 134, and OBBBA repealed that statute, thereby terminating the program.  *See supra* at 44–45.  EPA therefore complied with the statutory authority.  Moreover, EPA did not terminate the grants until after OBBBA was enacted.  *See supra* at 7–12.  Plaintiffs cannot argue on the one hand that EPA's action violated OBBBA and yet maintain a constitutional claim based on the "*absence* of *any* statutory authority."  *Dalton*, 511 U.S. at 473 (emphasis in original) (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–87 (1952)).  Because Plaintiffs' constitutional claims simply repackage their statutory claims, *Dalton* squarely applies, and the constitutional claims cannot be maintained. *See Glob. Health Council v. Trump*, 153 F.4th 1, 13–17 (D.C. Cir. 2025) (separation of powers claim in case challenging grant terminations was not cognizable under *Dalton*); *Sustainability Inst.*, 165 F.4th at 829–32 (rejecting separation of powers and Presentment Clause claims brought by plaintiffs whose federal grants were terminated).  Finally, although this Court lacks jurisdiction to review the grant terminations, EPA possesses ample authority to terminate the grants.  *See, e.g.*, 31 U.S.C. § 503(a)(2); 2 C.F.R. § 200.340.

> 3.  *Dalton Aside, EPA's Termination Decision Violates No Constitutional Provisions.*

Even if they are not barred by *Dalton*, Plaintiffs' constitutional claims lack merit. Plaintiffs assert violations of separation of powers and the Presentment Clause.  These constitutional claims rely on inapposite constitutional principles and fail for the same reasons the statutory claims fail.[18]

---

[18] Moreover, as discussed below, Plaintiffs have failed to present any legal or factual support for their request for injunctive relief, and have thus waived any remedy for any non-APA constitutional violations.  *See infra* at 62–63; *see also* Pl. Mot. 46 (arguing injunctive relief is the remedy for constitutional violations).

Though Plaintiffs argue that EPA's termination of the SFA program violated the separation of powers doctrine, as discussed above, Plaintiffs admit that EPA complied with Section 134 while it was in effect, and OBBBA repealed any congressional mandate regarding the SFA program. *See supra* at 44–45. Plaintiffs' assertion that "no statute authorizes the elimination of the Solar for All program," Pl. Mot. 42, has it backwards: because an agency needs congressional authorization to run a program, it is the repeal of that authority, and thus the absence of authority, that eliminates the program. *See City of Providence*, 954 F.3d at 31 ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'") (quoting *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013)). And Plaintiffs' abridged quotation of the general savings statute and invocation of retroactivity, *see* Pl. Mot. 44, are of no help for the reasons explained above, *see supra* at 49–51.

Moreover, though grant termination may not be reviewed by this Court, *see supra* at 27–37, OBBBA is silent on what EPA should do with existing SFA grants. Plaintiffs cherry-pick lawmakers' statements focused on unobligated appropriations, but OBBBA repealed Section 134, rescinded designated program funding, and did not impose any requirements with respect to the existing grants. *See supra* at 44–47. If Congress intended to require EPA to continue administering the SFA grants, it would have said so, especially since Congress's programmatic repeal and rescission of administrative funding would have naturally undermined EPA's ability to continue the grants' administration. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration.").

Because there is no "policy disagreement" between EPA and Congress, cases such as *In re Aiken County* are inapplicable. *See* Pl. Mot. 43. In that case, the D.C. Circuit found a

violation of the separation of powers doctrine because the Government ignored a statutory mandate.  725 F.3d 255, 260 (D.C. Cir. 2013) (finding where "money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate").  Here, after OBBBA, no statutorily mandated activity remained, and the designated funding for administering the grants had been rescinded.  The termination of the SFA grants cannot run afoul of a repealed statute.  Indeed, Plaintiffs' request that the Court vacate the termination decision and require EPA to reinstate the SFA program (under a statute repealed by Congress, for which Congress rescinded designated administrative funding) runs far greater risk of "impair[ing] [the executive branch] in the performance of its constitutional duties."  *United States v. Pollard*, 416 F.3d 48, 57 (2005).  But even if OBBBA could be read to require EPA to continue the program (and it cannot), the separation of powers claim still fails because it is nothing more than a claim to enforce a statute.  *Glob. Health Council,* 153 F.4th at 14–15, 17.

Likewise, the Presentment Clause is inapplicable here.  That clause provides that after a bill passes Congress, it shall "be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it . . . ."  U.S. Const. art. I, § 7, cl. 2.  This means that, on the one hand, the President cannot enact a different law than what Congress passed.  *Clinton v. City of New York*, 524 U.S. 417, 448–49 (1998).  On the other hand, and just as significantly, the Presentment Clause serves to "provide the President with a limited and qualified power to nullify proposed legislation by veto" and to ensure that lawmaking is "a power to be shared by both Houses and the President."  *INS v. Chadha*, 462 U.S. 919, 947 (1983).  "[T]he Presentment Clauses serve the important purpose of assuring that a 'national' perspective is grafted on the legislative process."  *Id.* at 948 (citing *Myers v. United States*, 272 U.S. 52, 123 (1926)).

Here, the Presentment Clause is not implicated because EPA neither enacted a different law than what Congress passed nor vetoed the law. As discussed, OBBBA repealed the SFA program, and EPA's termination of the SFA grants after Congress repealed Section 134 and rescinded administrative funding is not contrary to OBBBA. *See supra* at 44–47. For the reasons already stated, Plaintiffs' assertion that the SFA "program, its obligated grants, and the authority to continue administering it were all left in place by Congress," Pl. Mot. 45, improperly conflates distinct legal issues and is simply incorrect. *See supra* at 44–51. By arguing that OBBBA preserved the SFA "program" and prohibited the termination of the SFA grants, it is Plaintiffs, and not EPA, that seek to enact a different law than the one Congress passed.

### B. EPA's Decision to Terminate SFA Grants Was Not Arbitrary or Capricious.

Even if Plaintiffs' challenge to EPA's termination decision can be reviewed under the APA (and as described above, it cannot), EPA rationally explained its decision to terminate the SFA program and grants. As already discussed, following OBBBA's repeal of Section 134, any SFA "program" could not exist apart from the SFA grants; and OBBBA does not restrain EPA from terminating the SFA grants. *See supra* at 44–47. To the contrary, Congress repealed Section 134, rescinded the designated funding for EPA's continuing administration of the SFA grants, and said nothing about the grants themselves, leaving EPA in a position to decide whether to terminate existing SFA grants. *See supra* at 44–47. EPA reasonably terminated the SFA grants under these circumstances and reasonably explained its decision to do so.

The "scope of review under the 'arbitrary and capricious' standard is narrow." *Sorreda Transp., LLC v. U.S. Dep't of Transp.*, 980 F.3d 1, 3 (1st Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). At bottom, the APA requires only that agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court applying the arbitrary-and-capricious standard should

55

only set aside an agency decision if "there has been a clear error of judgement." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quotations omitted). In its review of agency action, the court "cannot substitute its judgment for that of the agency." *Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc. Fisheries of Me.*, 127 F.3d at 109) (noting "policy choices are for the agency, not the court, to make"). Instead, the court must "simply ensure[] that the agency has acted within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423.

EPA's termination of the SFA grants falls within this "zone of reasonableness." *Id.* As EPA observed, OBBBA both repealed Section 134 and stripped EPA of the designated funding to administer SFA. Recommendation at DRI_EPA_000089. EPA thus reasonably concluded that the congressional intent was that "the SFA program is no longer to operate." *Id.* Accordingly, EPA decided to "terminate the SFA program and the existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." *Id.* EPA explained this decision to the SFA grantees. *See* Termination Notice at DRI_EPA_000111. In light of OBBBA's repeal of statutory authority and rescission of designated administrative funding, EPA's decision to terminate the SFA grants was reasonable.

Plaintiffs' attacks on the termination decision fall short. First, as discussed above, *supra at* 44–47, Plaintiffs are simply incorrect that "the plain language of [OBBBA] did nothing to alter Defendants' ongoing obligation to continue administering the Solar for All program, nor did it deprive Defendants of the authority and funding available to continue doing so." Pl. Mot. 33.

56

Instead, in deciding to terminate the SFA grants, EPA reasonably concluded that, by repealing Section 134 and rescinding the remaining designated administrative funds to carry out that section, Congress expressed its intent that "the SFA program is no longer to operate." Recommendation at DRI_EPA_000089. *Colorado v. U.S. Department of Health and Human Services* is of no help to Plaintiffs. *See* Pl. Mot. 31, 33. In that case, Congress had rescinded some COVID-era public health appropriations but not others, and the grants at issue were not affected by the rescissions. *See* 783 F. Supp. 3d 641, 648 (D.R.I. 2025). Here, in contrast, the SFA grants were directly affected by Congress's repeal of the SFA program statute and rescission of designated administrative funding. EPA was then forced to make a decision about whether to continue a significant grant program without any dedicated funds to oversee the grants or any remaining statute giving rise to them. *See* Recommendation at DRI_EPA_000090–91, 95. Under these circumstances, EPA's decision to terminate the SFA grants was reasonable.

Second, despite Plaintiffs' contrary assertion, EPA considered reasonable alternatives and explained its decision not to use other sources of funding to continue administering the SFA grants. *Id*. That decision is not subject to APA review because the allocation of lump sum appropriations is committed to agency discretion by law. *See supra* at 42. In any event, as EPA explained, "using administrative funding dedicated for other purposes would mean that resources expended on the SFA program going forward would come at the expense of funding for other programs and purposes." Recommendation at DRI_EPA_000091. EPA also noted that "the $7 billion scope of the SFA program far exceeds funding awarded through other typical grant programs and that the corresponding oversight and administration burden of the SFA program is larger than that for virtually all of the Agency's other grant programs combined." *Id.* at DRI_EPA_000095.

EPA determined that because the funding specifically appropriated for GGRF administration "has now been completely rescinded, it would be improper to reallocate funds dedicated for programs that do not have specifically appropriated administrative funding for any program established under CAA [S]ection 134." *Id.* at DRI_EPA_000091. EPA concluded that it was "well within the Agency's discretion as a matter of appropriations law for the Agency to wind down and halt further implementation of the SFA program." *Id.* EPA's decision not to reassign general funding to administer SFA grants after Congress repealed Section 134 and rescinded all remaining designated administrative funding is reasonable. *See ExxonMobil*, 297 F.3d at 1088 (the court "cannot fault the [agency] for taking a conservative view of its own authority" where Congress expressly limited agency jurisdiction).[19] Plaintiffs have not shown otherwise. Plaintiffs simply ask the Court to substitute their judgment (and preferences) with respect to agency funding priorities for that of the agency. But "[i]t is not for [the court] to 'second-guess'" what the agency chooses to prioritize. *Env't Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019) (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 656 (D.C. Cir. 2014)). Moreover, Plaintiffs have identified no authority for their proposition that an agency must use general appropriations to replace funds specifically rescinded by Congress on the strength of a statute that has been repealed and no longer has effect. *See* Pl. Mot. 34–36.

---

[19] Further, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. "Effective contracting demands broad discretion." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260 (Fed. Cl. 2016) (citations omitted). As such, contracting decisions are subject to a "highly deferential rational basis review," *id.* at 261 (quotations omitted), because, at bottom, "competitors do not dictate an agency's minimum needs, the agency does," *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted). "Determining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for the court to second guess." *Id.* (alterations and quotations omitted).

Third, EPA reasonably considered reliance interests.  Where an agency decision will impact reliance interests, the agency needs only to acknowledge and address those interests and explain its new course of action.  *Fox Television Stations*, 556 U.S. at 515.  An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *Id.* (emphasis in original).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.* (emphasis in original).

EPA addressed reliance interests here by considering "whether grantees, indirect beneficiaries, and the domestic solar market generally may have reasonabl[y] relied on SFA program funds."  Recommendation at DRI_EPA_000095.  Specifically, EPA acknowledged that "some program participants in the broader market for solar energy infrastructure and equipment may have begun to rely on the funding made available through the SFA program."  *Id.* at DRI_EPA_000091.  However, EPA observed "the program remains in a nascent stage, and many recipients have not yet begun to plan projects or have made only minimal progress toward planning such projects."  *Id.* at DRI_EPA_000092.  Because of that, "[t]he program has not resulted in meaningful reliance interests on the part of potential or speculative individual household beneficiaries because . . . potential on-the-ground benefits have not been realized and are not likely to be realized in the near future."  *Id.*  EPA also considered that "[a]ny disruptive impacts" due to termination "could be lessened further by effective use of the closeout process set out in the grant agreements."  *Id.*  EPA communicated to grantees that they could receive allowable pre-termination costs in the closeout process.  Termination Notice at DRI_EPA_000112.

EPA also considered the "impacts on the domestic solar energy industry in a more general sense."  Recommendation at DRI_EPA_000093.  EPA determined any "initial capital outlays based on the expectation of federal assistance to pass-through grant recipients" were "limited in scope due to the nascent status of program implementation."  *Id.*  And EPA concluded that the impact of terminating the SFA grants on the domestic solar industry was "significantly lessened" due to waivers issued by the prior administration that allowed "grant recipients to purchase solar panels with foreign-manufactured solar components, equipment, and infrastructure," which meant "that a significant percentage of funding would have gone to growing foreign solar industries rather than any domestic producers and suppliers."  *Id.* at DRI_EPA_000094. Moreover, EPA noted that "[t]he early termination of this source of funding will allow the market to operate without plans being made based upon, or significant initiatives undertaken in reliance on, a source of funding whose authorization has been completely repealed."  *Id.*

EPA thus reasonably acknowledged and addressed reliance interests.  Cases relied on by Plaintiffs do not compel a contrary result.  For example, *Encino Motorcars, LLC v. Navarro* recognizes that an agency may change its position on an issue "as long as [it] provide[s] a reasoned explanation for the change."  579 U.S. 211, 221 (2016).  As discussed, EPA provided such explanation.  That Plaintiffs would prefer a different outcome does not lock EPA into the SFA grant agreements.  *See Nat'l Juv. L. Ctr., Inc. v. Regnery*, 738 F.2d 455, 464–65 (D.C. Cir. 1984) (noting that the prospects of changes in circumstances, changes in agency's perceptions, and electoral changes weigh against treating funding decisions as long-term commitments). Likewise, *DHS v. Regents of the University of California* supports the adequacy of EPA's consideration of reliance interest.  591 U.S. at 30.  In *Regents*, the Supreme Court found that the government failed to consider an "important aspect of the problem" by failing to discuss

"forbearance or the option of retaining forbearance without benefits" when it rescinded DACA. *Id.* The facts underlying *Regents* stand in stark contrast to the facts here: the government is the only entity that could provide the legal protection DACA afforded to immigrants. Here, in contrast, because the SFA program consisted only of grants, Plaintiffs' interests are solely monetary. EPA thus adequately considered any reliance interest. *See also supra* at 8–10.

For each of these reasons, the termination decision was reasonable and reasonably explained. However, even if the Court finds that EPA's judgment presents any shortcomings, the Court should refrain from invalidating EPA's termination of the SFA program. The APA only requires that the path to EPA's decision may "reasonably be discerned." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citation omitted). "[D]ue account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see also Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (describing § 706 of the APA as a "harmless error" rule). "When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" *Mail Ord. Ass'n of Am. v. USPS*, 2 F.3d 408, 434 (D.C. Cir. 1993) (quoting *Syracuse Peace Council v. FCC,* 867 F.2d 654, 657 (D.C. Cir. 1989). Here, Congress's repeal of the SFA program and rescission of designated administrative funding to oversee the SFA grants constitutes sufficient cause for EPA to have terminated the SFA program and grants, and the termination decision should be upheld on that basis.

## IV.    Any Remedy Should be Limited to Remand.

For the reasons already discussed, Plaintiffs' claims fail on the merits, precluding any relief in their favor. However, even if the Court concludes that Plaintiffs' claims have merit, the Court should limit any remedy to remand. Upon determination that an agency has violated the APA, "the proper course, except in rare circumstances, is to remand to the agency." *Fla. Power*

*& Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012) (same).

Although Plaintiffs request permanent injunctive relief, Pl. Mot. 1, they fail to provide any argument or factual or legal support for that request in their motion, in contravention to the local rules.  *See generally* Pl. Mot.; *see also* LR Cv 7(a)(2)(A) (requiring motions to "state with particularity the grounds for seeking an order, the relief sought, and the legal argument necessary to support it").  Plaintiffs therefore have waived their request for injunctive relief.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citations omitted); *Olsen v. Town of Westerly*, No. C.A. 03-245, 2006 WL 997716, at *4 (D.R.I. Apr. 17, 2006) (claim supported by single sentence on summary judgment was waived).

Even if the request is not waived, it must be denied.  Plaintiffs fail to argue or show that a permanent injunction would "have any meaningful practical effect independent of [the termination decision's] vacatur," as is needed to support a permanent injunction in APA cases.  *Monsanto*, 561 U.S. at 165.  Plaintiffs additionally fail to argue or show that they will suffer irreparable harm in the absence of a permanent injunction, and that the balance of the equities and public interest favor such relief.  *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914–15 (1st Cir. 1989) (providing standard for permanent injunctive relief); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of equities and public interest merge when relief is

sought from the government).  Plaintiffs therefore fail to meet every aspect of their burden for

permanent injunctive relief in the APA context, and their request for injunctive relief must be

denied.[20]  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (a movant may be

awarded injunctive relief only "upon a clear showing" that it is "entitled to such relief").[21]

## CONCLUSION

For these reasons, Defendants respectfully request that Plaintiffs' Motion for Summary

Judgment be Denied, and that judgment be entered in favor of Defendants.


Dated: March 6, 2026                              BRETT A. SHUMATE
                                                  Assistant Attorney General
                                                  Civil Division

                                                  KIRK T. MANHARDT
                                                  Director

                                                  KEVIN P. VANLANDINGHAM
                                                  Assistant Director

                                                  */s/ Tiffiney F. Carney*
                                                  TIFFINEY F. CARNEY
                                                  I-HENG HSU
                                                  BETHANY R. THERIOT
                                                  Trial Attorneys
                                                  U.S. Department of Justice, Civil Division
                                                  Commercial Litigation Branch
                                                  1100 L Street NW
                                                  Washington, DC 20005

---

[20] Moreover, any attempt to raise arguments supporting Plaintiffs' request for a permanent injunction for the first time on reply would be improper and should be disregarded.  *See* Fed. R. Civ. P. 56(a); LR Cv 7(a)(4).

[21] If the Court nonetheless issues a permanent injunction, it should be properly tailored to the SFA grants with a demonstrated nexus to Plaintiffs.  *See, e.g.*, *Tamko Roofing Prods. Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002).  A district court does not have equitable powers to issue a "universal injunction," barring the defendant from enforcing "a law or policy against *anyone*." *Trump v. Casa, Inc.*, 606 U.S. 831, 837 (2025) (emphasis in original).  While courts in equity may provide the aggrieved party with "complete relief," the concept of "'[c]omplete relief' is not synonymous with 'universal relief.'"  *Id.* at 851.

(202) 598-7521
tiffiney.carney@usdoj.gov
i-heng.hsu@usdoj.gov
bethany.theriot@usdoj.gov

*Attorneys for Defendants*