IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **RHODE ISLAND AFL-CIO**<br><br>**RHODE ISLAND CENTER FOR JUSTICE**<br><br>**ANH NGUYEN**<br><br>**SOLAR UNITED NEIGHBORS**<br><br>**SUNPATH CONSULTING LLC d/b/a SUNPATH SOLAR**<br><br>**2KB ENERGY SERVICES, LLC**<br><br>**ENERGY INDEPENDENT SOLUTIONS**<br><br>**BLACK SUN LIGHT SUSTAINABILITY**<br><br>*Plaintiffs,*<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br><br>**LEE ZELDIN**, in his official capacity as Administrator of the United States Environmental Protection Agency<br><br>*Defendants.* | Case No. 1:25-cv-00510-MSM-PAS |

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

   I.     Plaintiffs Have Standing ..................................................................................... 2

      A.   Plaintiffs Have Suffered Legally Cognizable Injuries. ........................................... 2

         1.    Plaintiffs need not be grantees to have legally protected interests. .......................... 2

         2.    Plaintiffs' injuries are concrete and particularized. ..................................................... 5

      B.   Defendants Caused Plaintiffs' Injuries. ................................................................. 8

      C.   Plaintiffs' Injuries Are Redressable. .................................................................... 10

      D.   Plaintiffs Are Within Congress's Zone of Interests. ............................................ 11

   II.    This Court Has Jurisdiction ............................................................................. 13

      A.   Broad Jurisdictional Issues. ................................................................................. 14

         1.    Defendants terminated the program. ....................................................................... 14

         2.    Plaintiffs seek restoration of the program. ................................................................ 15

      B.   This Court's Jurisdiction Is Consistent with *NIH* and *California*. ........................... 17

         1.    *California* and *NIH* do not foreclose APA jurisdiction here. .................................... 18

         2.    The *Megapulse* factors likewise confirm this Court's jurisdiction. ......................... 19

      C.   The APA's Waiver of Sovereign Immunity Applies. ............................................ 24

         1.    The challenged final agency action is Defendants' decision to end the Solar for All program. ................................................................................................... 24

         2.    Defendants did not have discretion to cancel the program because H.R. 1 left EPA's existing program obligations in place. ........................................................... 27

   III.   Defendants Violated the APA and Constitution ................................................. 31

      A.   Defendants Violated the APA. ............................................................................. 31

         1.    EPA's decision to terminate Solar for All was contrary to law. .............................. 31

         2.    Defendants' decision to terminate Solar for All was arbitrary and capricious. ........ 39

         3.    Defendants failed to consider serious reliance interests. .......................................... 44

      B.   Defendants Violated the Constitution. ................................................................. 48

         1.    Because H.R. 1 is silent on the obligated Solar for All funding, *Dalton v. Specter* does not apply. ................................................................................................. 48

         2.    Defendants violated the Separation of Powers. ...................................................... 50

         3.    Defendants violated the Presentment Clause. ......................................................... 52

   IV.   Restoring the Program Is the Proper Remedy .................................................... 53

      A.   Vacatur Is Appropriate. ....................................................................................... 53

      B.   An Injunction Is Also Appropriate. ..................................................................... 54

CONCLUSION ............................................................................................................... 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramowitz v. Lake*,
No. 1:25-cv-887-RCL, 2026 WL 746989 (D.D.C. Mar. 17, 2026) ...................................41, 53

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ...............................................................................28, 33, 42, 50

*Allied-Signal, Inc. v. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) .......................................................................................................53

*Allstate Insurance Co. v. Fougere*,
581 F. Supp. 3d 307 (D. Mass. 2022), *aff'd*, 79 F.4th 172 (1st Cir. 2023)..............................56

*American Federation of Government Employees v. Trump*,
784 F. Supp. 3d 1316 (N.D. Cal. 2025) ..................................................................................49

*American Hospital Association v. Kennedy*,
164 F.4th 28 (1st Cir. 2026)......................................................................................................41, 44

*American Academy of Pediatrics v. Kennedy*,
No. 25-11916-BEM, 2026 WL 33719 (D. Mass. Jan. 6, 2026)..................................................7

*American Federation of Government Employees, AFL-CIO v. Ezell*,
No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ...........................................8

*Association of American Universities v. National Science Foundation*,
788 F. Supp. 3d 106 (D. Mass. 2025) ...................................................................................47, 53

*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................................................................8

*Bowen v. Georgetown University Hospital*,
488 U.S. 204 (1988)................................................................................................................32

*Bowen v. Massachusetts*,
487 U.S. 879 (1988).......................................................................................... *passim*

*California v. U.S. Department of Education*,
132 F.4th 92 (1st Cir. 2025)....................................................................................................19

*Campaign Clean Water, Inc. v. Ruckelshaus*,
361 F. Supp. 689 (E.D. Va. 1973) .........................................................................................51

iv

*Chamber of Commerce of U.S. v. Reich*,
 74 F.3d 1322 (D.C. Cir. 1996) .........................................................................17, 30, 31

*Chicago Women in Trades v. Trump*,
 No. 25-cv-2005, 2025 WL 1331743 (N.D. Ill. May 7, 2025)......................................49

*Child Trends, Inc. v. U.S. Department of Education*,
 795 F. Supp. 3d 700 (D. Md. 2025)...........................................................................30

*City of Providence v. Barr*,
 954 F.3d 23 (1st Cir. 2020)........................................................................................34

*City of Saint Paul, Minnesota v. Wright*,
 No. 25-CV-03899 (APM), 2026 WL 88193 (D.D.C. Jan. 12, 2026) ..........................30

*Climate United Fund v. Citibank N.A.*,
 No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) .....................................50

*Climate United Fund v. Citibank, N.A.*,
 No. 25-5122 (D.C. Cir.) (en banc), argued Feb. 24, 2026 ....................................16, 32, 50, 56

*Community Legal Services in East Palo Alto v. U.S. Department of Health and
 Human Services*,
 155 F.4th 1099 (9th Cir. 2025) ...............................................................................3, 21

*County of Santa Clara v. Noem*,
 No. 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ...................4

*Collins v. Yellen*,
 594 U.S. 220 (2021)......................................................................................................4

*Colorado v. U.S. Department of Health and Human Services*
 783 F. Supp. 3d 641 (D.R.I 2025)..............................................................................40

*Dalton v. Specter*,
 511 U.S. 462 (1994)........................................................................................48, 49, 50

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
 958 F.3d 38 (1st Cir. 2020)...........................................................................................5

*De La Rama S. S. Co. v. United States*,
 344 U.S. 386 (1953)...............................................................................................37, 38

*Deal v. Federal Housing Administration*,
 260 F.2d 793 (8th Cir. 1958) .....................................................................................37

*Department of Homeland Security v. Regents of the University of California*,
 591 U.S. 1 (2020)...........................................................................................41, 44, 46

v

*Department of the Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999)......................................................................................................22

*Department of Education v. California*,
  604 U.S. 650 (2025)..................................................................................................10, 18

*Diamond Alternative Energy, LLC v. EPA*,
  606 U.S. 100 (2025)..................................................................................................10, 11

*Does 1-26 v. Musk*,
  771 F. Supp. 3d 637 (D. Md. 2025)..............................................................................49

*Dorsey v. United State*s,
  567 U.S. 260 (2012)......................................................................................................37

*DRG Funding Corporation v. Secretary of Housing and Urban Development*,
  76 F.3d 1212 (D.C. Cir. 1996)......................................................................................27

*Environmental Defense Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019)......................................................................................43

*ExxonMobil Gas Marketing Co. v. Federal Energy Regulatory Commission*,
  297 F. 3d 1071 (D.C. Cir. 2022)...................................................................................43

*Federal Communications Commission v. NextWave Personal Communications
  Inc.*,
  537 U.S. 293 (2003)......................................................................................................53

*Food and Drug Administration v. R. J. Reynolds Vapor Co.*,
  606 U.S. 226 (2025)......................................................................................................12

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)....................................................................................................6, 7

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477 (2010).......................................................................................................4

*Global Health Council v. Trump*,
  No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025)........................................50

*Global Health Council v. Trump*,
  153 F. 4th 1 (D.C. Cir. 2025)........................................................................................50

*Griffith v. Federal Labor Relations Authority*,
  842 F.2d 487 (D.C. Cir. 1988)......................................................................................30

*Heckler v. Chaney*,
  470 U.S. 821 (1985)......................................................................................................29

*Hertz v. Woodman*,
    218 U.S. 205 (1910)..................................................................................................36

*Illinois v. Noem*,
    No. 1:25-CV-00495-MSM-PAS, 2025 WL 3707011 (D.R.I. Dec. 22, 2025)........................44

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985).............................................................................23, 24

*Kendall v. United States* ex rel. *Stokes*,
    37 U.S. 524 (1838)..................................................................................................51

*Louisiana Public Service Commission v. Federal Communications Commission*,
    476 U.S. 355 (1986)................................................................................................34

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994)..........................................................................................32, 39

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..........................................................................................29, 42

*Local 2677, American Federation of Government Employees v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973)...............................................................................51

*Louis v. Saferent Solutions, LLC*,
    685 F. Supp. 3d 19 (D. Mass. 2023) .........................................................................5

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................3

*Massachusetts v. Departmental Grant Appeals Board of U.S. Department of
    Health and Human Services*,
    815 F.2d 778 (1st Cir. 1987)..................................................................................19

*Massachusetts v. National Institutes of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ..............................................................19, 56

*Massachusetts v. Secretary of Health and Human Services*,
    816 F.2d 796 (1st Cir. 1987)..................................................................................19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)................................................................................................11

*Matthews v. Zane's Lessee*,
    9 U.S. 92 (1809) (Marshall, C.J.)..........................................................................51

*Motor Vehicle Manufacturers Association of the U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)....................................................................................41, 44

*National Council of Community Mental Health Centers., Inc. v. Mathews*,
    546 F. 2d 1003 (D.C. Cir. 1976).................................................................51

*National Council of Community Mental Health Centers, Inc. v. Weinberger*,
    361 F. Supp. 897 (D.D.C. 1973).................................................................51

*National Education Association v. U.S. Department of Education*,
    779 F. Supp. 3d 149 (D.N.H. 2025)...............................................................7

*National Institutes of Health v. American Public Health Association*,
    145 S. Ct. 2658 (2025) (Barrett, J., concurring) ............................................... *passim*

*National Treasury Employees Union v. Vought*,
    No. 25-5091 (D.C. Cir.), argued Feb. 24, 2026 ....................................................50

*New York v. Trump*,
    No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ....................................13

*New York v. Trump*,
    Nos. 25-1236, 25-1413, 2026 WL 734941 (1st Cir. Mar. 16, 2026) ..........................16, 25, 29

*President and Fellows of Harvard College v. U.S. Department of Health and Human Services*,
    798 F. Supp. 3d 77 (D. Mass. 2025) ...............................................................9

*Refugee and Immigrant Center for Education and Legal Services v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025)..................................................................7

*Responsible Offshore Development Alliance v. Department of the Interior*,
    145 S. Ct. 2680 (2025)............................................................................12

*Rhode Island v. Trump*,
    155 F.4th 35 (1st Cir. 2025).....................................................................4, 55

*Rhode Island v. Trump*,
    No. 1:25-cv-128-JJM-AEM, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) ................................54

*Richardson v. Morris*,
    409 U.S. 464 (1973)...............................................................................30

*Ross-Simons of Warwick, Inc. v. Baccarat*,
    102 F.3d 12 (1st Cir. 1996).......................................................................55

viii

*Ross-Simons of Warwick, Inc. v. Baccarat*,
  217 F.3d 8 (1st Cir. 2000)..................................................................................55

*Sardarian v. Federal Emergency Management Agency*,
  No. 3:19-cv-00910, 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ........................................4, 5

*Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*,
  123 F.4th 1 (1st Cir. 2024)..............................................................................12, 13

*Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*,
  145 S. Ct. 2681 (2025)..................................................................................12

*Sibley v. Ball*,
  924 F.2d 25 (1st Cir. 1991)...............................................................................19

*Spectrum Leasing Corp. v. United States*,
  764 U.S. 891 (D.C. Cir. 1985) .......................................................................21, 22

*State v. U.S. Department of Transportation*,
  No. 2:25-cv-00848-TL, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026)............................3, 39

*Sullivan v. United States*,
  625 F.3d 1378 (Fed. Cir. 2010)............................................................................5

*Sustainability Institute v. Trump*,
  165 F.4th 817 (4th Cir. 2026) ...........................................................................21

*Thakur v. Trump*,
  163 F.4th 1198 (9th Cir. 2025) ..........................................................................20

*Thakur v. Trump*,
  787 F. Supp. 3d 955 (N.D. Cal. 2025) ...................................................................20

*Tootle v. Secretary of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ...........................................................................30

*Train v. City of New York*,
  420 U.S. 35 (1975)........................................................................................34

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)...................................................................................53, 55

*U.S. Lines Company v. United States*,
  124 F. Supp. 375 (Ct. Cl. 1954)..........................................................................38

*United Aeronautical Corp. v. U.S. Air Force*,
  80 F.4th 1017 (9th Cir. 2023) ...........................................................................23

*United States v. Langston*,
    118 U.S. 389 (1886)....................................................................................................33

*Vartelas v. Holder*,
    566 U.S. 257 (2012)....................................................................................................32

*Victim Rights Law Center v. U.S. Department of Education*,
    788 F. Supp. 3d 70 (D. Mass. 2025) ...........................................................................5

*Washington v. Federal Emergency Management Agency*,
    No. CV 25-12006-RGS, 2025 WL 3551751 (D. Mass. Dec. 11, 2025) ......................26, 27, 35

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
    778 F. Supp. 3d 440 (D.R.I. 2025)............................................................................. *passim*

*Yakima Valley Memorial Hospital v. Washington State Department of Health*,
    654 F.3d 919 (9th Cir. 2011) ......................................................................................38, 39

**Statutes**

1 U.S.C. § 109.................................................................................................................36, 37

5 U.S.C. § 702...................................................................................................................3

5 U.S.C. § 703...................................................................................................................54

5 U.S.C. § 706...................................................................................................................15

5 U.S.C. § 706(2) ..............................................................................................................53

28 U.S.C. § 1491(a)(1).......................................................................................................17

42 U.S.C. § 7434(a)(1).......................................................................................................12

42 U.S.C. § 7434(a)(2).......................................................................................................12

42 U.S.C. § 7614................................................................................................................11, 12

Pub. L. No. 118-42, 138 Stat. 25 (2024)...........................................................................35

Pub. L. No. 119-4, 139 Stat. 9 (2025)...............................................................................35

Pub. L. No. 119-21, 139 Stat. 72 (2025)........................................................................... *passim*

Pub. L. No. 119-74, 140 Stat. 5 (2026)...........................................................................35

**Constitutional Provisions**

U.S. Const. art. II, § 3 .......................................................................................................50

x

U.S. Const. art. III.................................................................................................2, 3

**Other Authorities**

2 C.F.R. § 200.300.................................................................................................42

2 C.F.R. § 200.344.................................................................................................45

171 Cong. Rec. S4080 (2025)................................................................................34

171 Cong. Rec. S4282 (2025)................................................................................32

Congressional Research Service, *Authorizations and the Appropriations Process*
(May 2023).....................................................................................................33

EPA, *Fiscal Year 2025: Justifications of Appropriation Estimates for the
Committee on Appropriations*, Tab 05: Environmental Programs and
Management....................................................................................................35

H.R. Rep. No. 119-106 (2025)...............................................................................34

House Committee on Energy and Commerce, Markup of Budget Reconciliation
Text (May 13, 2025) ......................................................................................34

U.S. Government Accountability Office, *A Glossary of Terms Used in the Federal
Budget Process,* GAO-05-734SP (2005) ......................................................31

U.S. Government Accountability Office, *Principles of Federal Appropriations
Law* (3d ed. 2004), GAO-04-261SP .............................................................33

U.S. Government Accountability Office, *Principles of Federal Appropriations
Law* (3d ed. 2006), GAO-06-382SP .......................................................17, 28

U.S. Government Accountability Office*, Principles of Federal Appropriations
Law* (4th ed. 2016), GAO-16-464SP .............................................................33

**INTRODUCTION**

Defendants try to avoid accountability for their termination of Solar for All with shifting, contradictory arguments, but they cannot get around three essential facts. First, Congress appropriated $7 billion to be used to provide clean energy to low-income and disadvantaged communities via this grant program. Second, subsequent legislation did not affect this appropriation because it was already obligated. And third, Defendants nevertheless abruptly shut down Solar for All in its entirety.

This unauthorized decision by the Environmental Protection Agency ("EPA") not to spend congressionally appropriated funding is clearly documented in the administrative record. It injured Plaintiffs (and many others), it falls within this Court's jurisdiction, and it violated the Administrative Procedure Act ("APA") and the U.S. Constitution.

Defendants, for their part, cannot seem to settle on a story. They claim in their brief that "there is no agency program decision to review," Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Doc. 35 ("EPA Br."),[1] at 3—yet they also admit that "EPA terminated the SFA [Solar for All] program." *Id.* at 47. At the same time, they try to blame Congress, asserting that it "repealed the statutory authority for the program." *Id.* at 43.

The record resolves any confusion Defendants have created. Congress in 2022 specified the purposes for which it appropriated Solar for All's $7 billion in grant funding, all of which

---

[1] Citations to pleadings in the record refer to the pagination in the footer of each pleading.

EPA timely obligated. D.R.I. EPA 000011-13.[2]  H.R.1[3] rescinded only unobligated balances, and it repealed Section 134 without any retroactivity language. *Id.* at 000014. As a result, the repeal was prospective only—and thus would prevent new appropriations or re-obligating any unobligated funds—while leaving EPA's existing Solar for All grant funding obligations untouched. Yet Defendants "decided to terminate the Solar For All (SFA) program." *Id.* at 000097. Their decision was based on their own policy choice that it would be "improper" to continue the program and their preference not to use available funds to administer it. *Id.* at 000091. Their ongoing refusal to do so contravenes Congress's original appropriation and the H.R. 1 legislation that left this obligated funding in place to be used for its intended purpose.

## ARGUMENT

### I.   Plaintiffs Have Standing

By abruptly eliminating the Solar for All program in its entirety, Defendants harmed Plaintiffs, including by causing direct financial losses and layoffs, frustrating their organizational missions, damaging their reputations with their communities and partners, and depriving them of the opportunities and benefits the program was created to provide. Each standing argument Defendants raise in response fails.

### A.  Plaintiffs Have Suffered Legally Cognizable Injuries.

#### 1.  *Plaintiffs need not be grantees to have legally protected interests.*

Defendants contend that because Plaintiffs are not parties to the Solar for All grant agreements, they have no "legally protected interest" sufficient for Article III standing. EPA Br.

---

[2] Citations to the administrative record use EPA's Bates-stamp convention "D.R.I. EPA ___." The administrative record is filed at Doc. 30.

[3] H.R. 1 is referenced in Defendants' brief as the "One Big Beautiful Bill Act" or "OBBBA." The full citation is H.R. 1 – One Big Beautiful Bill, Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025). *See* D.R.I. EPA 000014.

at 14-16. This argument wrongly conflates standing with contractual privity. Article III does not require that a plaintiff be a party to a government contract to challenge the legality of agency action that causes the plaintiff concrete harm. The question is whether Defendants' termination of the Solar for All program caused Plaintiffs to suffer "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). For example, non-grantees who "expected to enjoy economic, quality-of-life, and environmental benefits" from an electric vehicle charging program rescinded by the government and "have now seen those expectations significantly dampened" had standing to challenge cessation of the program. *State v. U.S. Dep't of Transportation*, No. 2:25-cv-00848-TL, 2026 WL 183584, at *1 (W.D. Wash. Jan. 23, 2026).

The APA grants a right to judicial review to any "person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute" when "seeking relief other than money damages." 5 U.S.C. § 702. Here, Plaintiffs are such persons because they are among those Congress specifically intended to benefit through the program. The Government's termination of the Solar for All program "has injured Plaintiffs' attempts to serve their mission. Thus, Plaintiffs may challenge the Government's actions under the APA." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 1099, 1103 (9th Cir. 2025). As in *Community Legal Services*, Plaintiffs here challenge the Government's total refusal to fund the Solar for All program, despite the availability of congressionally appropriated funds that Congress mandated be spent for that program, as violating statutory and constitutional obligations. And of course, Plaintiffs also have legally protected, enforceable interests under the Constitution: "[W]henever a separation-of-powers violation occurs, any aggrieved party with

3

standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *accord Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

Here, Plaintiffs' claims turn on the appropriation of funding for the Solar for All program in the Greenhouse Gas Reduction Fund, the APA, and the Constitution—not individual grant agreements. Defendants' arguments to the contrary rest on their fundamental mischaracterization of Plaintiffs' claims as challenging the termination of individual grants. But as Plaintiffs have explained, this case challenges Defendants' high-level decision to terminate the entire Solar for All program, a single, program-wide agency action from which all grant terminations "simply flowed." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* ("*NIH*"), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring). The Complaint sets out harms that are well recognized within this Circuit: "with respect to the across-the-board policy to terminate grants, the [P]laintiffs . . . have been and will continue to be injured by the [D]efendants' failure to provide services on which the [P]laintiffs rely*." Rhode Island v. Trump*, 155 F.4th 35, 44 (1st Cir. 2025); s*ee also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 457 (D.R.I. 2025) (rejecting the government's argument that subrecipients who were not direct grantees lacked standing because "the Nonprofits' interests . . . are not 'so marginally related to or inconsistent with the purposes implicit' in all the statutory schemes implicated here as to defeat standing.") (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177-78, (2011)), *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025); *see also Cnty. of Santa Clara v. Noem*, No. 25-cv-08330-WHO, 2025 WL 3251660, at *25 (N.D. Cal. Nov. 21, 2025) (subgrantees lacking a contract relationship with government had standing to challenge program-wide policy).

Defendants' reliance on *Sardarian v. Fed. Emergency Mmgt. Agency*, No. 3:19-cv-00910, 2022 WL 4080325 (D. Conn. Apr. 1, 2022) is misplaced. In *Sardarian*, a single homeowner

4

alleged that the Federal Emergency Management Agency's termination of a hazard mitigation grant left his home vulnerable to flooding. *Sardarian*, 2022 WL 4080325, at *2. The court found that the plaintiff was a non-citizen and therefore did not have a legally protected interest in the grant. *Id.*

Defendants' reliance on Tucker Act privity cases like *Sullivan v. United States*, 625 F.3d 1378 (Fed. Cir. 2010), meanwhile, is simply inapposite. Those cases address whether a non-party to a government contract has standing to bring a breach-of-contract claim in the Court of Federal Claims. Plaintiffs do not bring breach-of-contract claims; they challenge unlawful agency action under the APA and the Constitution.

### 2. *Plaintiffs' injuries are concrete and particularized.*

An organization has standing to sue when it can "show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) (cleaned up). This is "not a demanding standard, as only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Id.* (cleaned up). In the First Circuit, it "is a bedrock proposition that a relatively small economic loss – even an identifiable trifle – is enough to confer standing." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 48 (1st Cir. 2020) (citations omitted). When a government action "interferes with a core business activity" of an organization, that is also sufficient to demonstrate "concrete injury in fact." *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 788 F. Supp. 3d 70, 84 (D. Mass. 2025).

5

Defendants argue that Plaintiffs' injuries are too "vague" and "speculative" to support standing. EPA Br. at 1, 16-18. The declarations tell a very different story: Defendants' termination of the Solar for All program had immediate, concrete effects on Plaintiffs.

Defendants' termination of the Solar for All program has impaired nonprofits' ability to carry out their missions and prevented solar businesses' work from moving forward. Plaintiffs' Motion for Summary Judgment and Memorandum of Law in Support, Doc. 32 ("Pltfs. Br."), at 53-57. The termination eliminated the opportunities that EPA had touted and Plaintiffs relied upon while making major decisions and investing significant resources. *Id.* at 38. After months, and often years, of preparation to implement the Solar for All program, the nonprofit and solar business Plaintiffs are left with lost income, stranded investments, and time they will not be able to recoup. *Id.* at 53-57. Several nonprofit and solar business Plaintiffs had to lay off staff or divert staff's time to other projects due to the loss of income and work opportunities stemming from the program termination. *Id.* at 55-57. The sudden termination has also damaged Plaintiffs' reputations with partners and the communities they serve by hampering their ability to deliver on their promises and planned work. *Id.* at 49, 52, 55-57. These are not "vague" or "speculative" injuries. They are quantified financial losses, actual layoffs and staffing reductions, lost contracts, damaged organizational relationships, and frustrated missions, all of which have already occurred.

Defendants invoke *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), to argue that Plaintiffs cannot "manufacture organizational standing through the diversion of staff and resources," EPA Br. at 18-20, but *Alliance for Hippocratic Medicine* is not at all like this case. There, the organizational plaintiffs had no direct connection to the challenged agency action; instead, they chose to spend money opposing a regulatory

6

decision with which they disagreed. *All. for Hippocratic Med.*, 602 U.S. at 394-96. The Court held that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

Plaintiffs' injuries go far beyond that here. The organizational Plaintiffs here are participants in the Solar for All program whose core activities were disrupted by its termination. The Rhode Island Center for Justice was a coalition partner on Rhode Island's grant, and Rhode Island AFL-CIO ("RI AFL-CIO") was developing training and workforce programs integral to the program's implementation. Wood Decl. ¶ 9 (Doc. 32-6); Crowley Decl. ¶¶ 5-10 (Doc. 32-1). SUN and Black Sun Light Sustainability held subgrants and were actively implementing program work. Schoolman Decl. ¶¶ 5, 12, 28-31, 42-44 (Doc. 32-8); Abdul-Rahman Decl. ¶¶ 9, 17 (Doc. 32-7). 2KB was designated as a Program Administrator. Buchanan Decl. ¶ 12 (Doc. 32-4). Sunpath was selected as an approved installer. Gunning Decl. ¶ 5 (Doc. 32-3). Energy Independent Solutions ("EIS") was preparing for installations under the program, incurring actual costs. Smith Decl. ¶ 7 (Doc. 32-2).

Plaintiffs are not organizations that voluntarily diverted resources to gather information and advocate against a regulatory action. These are organizations whose ongoing programmatic work as part of Solar for All was thwarted by Defendants' action. Courts in this Circuit have consistently recognized standing in analogous circumstances. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, No. 25-11916-BEM, 2026 WL 33719, at *5 (D. Mass. Jan. 6, 2026) (standing where challenged action "directly affected and interfered with [organization's] core business activities"); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (organizational standing where challenged action "directly affect[ed] plaintiffs' core activities"); *see also Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 67

7

(D.D.C. 2025) (holding organizational plaintiffs have standing where they "have each identified various ways [the challenged government actions] have interfered with their core business activity.").

Accordingly, Defendants' reliance on *American Federation of Government Employees, AFL-CIO v. Ezell*, No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025), is unavailing. EPA Br. at 19. In *Ezell*, unions challenged the government's workforce reduction actions and claimed standing based on having chosen to spend resources responding to those actions. 2025 WL 470459, at *1-2. Here, by contrast, Plaintiffs' injuries stem from the direct elimination of their programmatic work, contracts, and revenue streams. The distinction is between organizations that "spend their way into standing" by opposing government action and organizations whose existing activities are directly disrupted by government action. Plaintiffs fall squarely in the latter category.

### B. Defendants Caused Plaintiffs' Injuries.

Defendants' argument that Plaintiffs' injuries were caused by forces beyond EPA's control, EPA Br. at 20-22, defies common sense and controlling precedent. Defendants terminated the Solar for All program. That termination forced the grantees to cease work, which in turn caused subgrantees, contractors, and beneficiaries, including Plaintiffs, to lose their programmatic work, revenue, and opportunities.

This chain of causation is not attenuated at all: it is direct and inevitable. When an agency action has a "determinative or coercive effect upon the action of someone else," causation is satisfied even where the injury flows through an intermediary. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). EPA's termination of the program was the "determinative" event, which was given effect that same day by the mass termination of all grants. As a result of Defendants'

termination of the program, the grantees had no choice but to halt all downstream work. Plaintiffs' standing, "more so than in the typical third-party standing case, hinges on a 'predictable chain of events leading from the government action to the asserted injury.'" *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 111 (D. Mass. 2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 385). "It was entirely predictable that Defendants' sudden revocation of funding would immediately and directly harm the Organizational Plaintiffs[]." *Id.*

Defendants' suggestion that some Plaintiffs' injuries pre-date the termination, pointing to the aging of RI AFL-CIO's membership or Ms. Nguyen's pre-existing electricity costs, EPA Br. at 20, misses the point. The injury is not that these conditions exist; it is that EPA's termination of the program eliminated the specific remedy Congress created to address them. The RI AFL-CIO's injury is not that its members are aging, but that the training and recruitment pipeline that Solar for All was creating to bring in younger members was destroyed. Ms. Nguyen's injury is not that her electricity bills are high, but that her opportunity to receive no-cost solar through the Georgia BRIGHT program was eliminated.[4]

Defendants' argument that Plaintiffs' injuries were caused by the grantees' failure to compensate them fares no better. EPA Br. at 21-22. Plaintiffs do not seek compensation from EPA for work performed under third-party agreements. Plaintiffs seek vacatur of EPA's

---

[4] Defendants' invocation of EIS's short-term business boost following H.R. 1's passage, EPA Br. at 20 n.7, is a red herring. EIS explained that the rush in demand was driven by the sunsetting of the residential solar investment tax credit, which is a separate provision of H.R. 1 entirely. The company's investments in trucks and staff to meet this temporary surge do not negate the separate, ongoing harm caused by the elimination of the Solar for All program, which EIS was relying on to sustain its operations beyond 2025.

unlawful termination of the program so that the program, and the downstream work it funds, may resume. The causal chain runs directly from EPA's termination decision to Plaintiffs' injuries.

### C.  Plaintiffs' Injuries Are Redressable.

Defendants' redressability argument, EPA Br. at 22-26, rests on two faulty propositions: (1) that the Court cannot restore the Solar for All program because Congress repealed it, and (2) that the Court lacks jurisdiction to reinstate Solar for All grant funding. Both are wrong.

First, as Plaintiffs explained in their opening brief, Pltfs. Br. at 27-32, H.R. 1 repealed Section 134 prospectively and rescinded only unobligated balances. All the obligated grant funds remain in EPA's account. Treml Decl. ¶ 7 (Doc. 32-9). Vacating EPA's termination decision would therefore restore a program with $7 billion in appropriated funding with statutory obligations that were left in place by H.R. 1, as discussed further below, *infra* at 53. Contrary to Defendants' assertion that "neither EPA nor the Court can restore this program," EPA Br. at 23-24, vacatur of the termination decision would do precisely that, because no act of Congress terminated this fully obligated program charged with carrying out Congress's $7 billion appropriations mandate.

Second, Defendants conflate the redressability inquiry with their jurisdictional arguments about *NIH* and *Department of Education v. California* ("*California*"), 604 U.S. 650 (2025). EPA Br. at 24. But standing and subject-matter jurisdiction are distinct inquiries. The redressability question is whether a favorable decision would likely remedy at least a portion of Plaintiffs' injuries, as the Supreme Court recently reiterated in *Diamond Alternative Energy, LLC v. EPA*. 606 U.S. 100, 114 (2025). A favorable decision would do so here. Vacating the program-level termination decision would remove the "impediment to [Plaintiffs'] ability to fully compete in the market" and participate in the program. *Id.* at 104-05.

Defendants argue that Plaintiffs must demonstrate the "likelihood" that six particular grantees would resume performance and that other non-parties would reinstate subawards and contracts. EPA Br. at 25 n.9. But the Supreme Court has held that redressability does not require such certainty; it requires only a "predictable chain of events." *Diamond Alternative Energy*, 606 U.S. at 121 (citations omitted). Here, the chain is straightforward: if the Court vacates the termination decision, EPA's obligated grant funding would be revived, grantees—regardless of their identity—would be authorized to resume projects, and downstream participants, including Plaintiffs, would be able to resume their work and continue competing for the opportunities the program provides. *See, e.g.*, Buchanan Decl. ¶¶ 36-37 (Doc. 32-4); Schoolman Decl. ¶¶ 23-24, 37-38, 53-54 (Doc. 32-8); Crowley Decl. ¶ 18 (Doc 32-1). And contrary to Defendants' footnote regarding joinder, EPA Br. at 25 n.9, the relief Plaintiffs seek is to undo the invalid termination of Solar for All as a whole, so redressability does not depend on how individual grant recipients later responded.

### D. Plaintiffs Are Within Congress's Zone of Interests.

Finally, Defendants argue that Plaintiffs cannot satisfy the zone-of-interests test because they do not claim EPA violated Section 134 or 42 U.S.C. § 7614, and that they are not within the zone of interests of H.R. 1 or the General Savings Statute. EPA Br. at 26-27. This argument misunderstands the zone-of-interests analysis. The zone-of-interests test asks whether the plaintiff's interests fall "within the zone of interests to be protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citations omitted). And it is not limited to the specific statutory provision a plaintiff claims was

11

violated; rather, courts look to the relevant statutory scheme under which the APA claim is brought as a whole.

"Congress enacted the APA to make agency action presumptively reviewable, and [courts] do not require any indication of congressional purpose to benefit the would-be plaintiff." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024), *cert. denied sub nom. Responsible Offshore Dev. All. v. Dep't of the Interior*, 145 S. Ct. 2680 (2025) *and Seafreeze Shoreside, Inc. v. Dep't of the Interior*, 145 S. Ct. 2681 (2025) (cleaned up). The APA cause of action belongs to "anyone even *arguably* within the zone of interests to be protected or regulated by the statute in question." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 233 (2025) (cleaned up). "A plaintiff may sue under the APA unless her interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The inquiry is not especially demanding." *Id.* (cleaned up).

Plaintiffs are plainly within the zone of interests of Section 134 and the Solar for All program, which H.R. 1 left in place as to all obligated grant funding. Congress designed the Solar for All program to benefit "low-income and disadvantaged communities," 42 U.S.C. § 7434(a)(1), and to support "financial assistance and technical assistance" for those communities. *Id.* § 7434(a)(2); D.R.I. EPA 000012. Congress also conditioned the program on prevailing wage requirements to benefit workers and labor organizations. 42 U.S.C. § 7614. Plaintiffs include a labor union (RI AFL-CIO), a low-income homeowner (Ms. Nguyen), nonprofit organizations serving disadvantaged communities (Rhode Island Center for Justice, SUN, Black Sun Light Sustainability), and solar businesses participating in program implementation (EIS, Sunpath, 2KB). These are precisely the kinds of interests Congress sought to protect.

12

Defendants' suggestion that Plaintiffs must be within the zone of interests of H.R. 1 specifically, rather than the broader statutory scheme governing the Solar for All program, finds no support in the case law. The zone-of-interests test examines the "relevant statute" in the context of the statutory framework as a whole, not each provision in isolation. *See New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301, at *6-7 (D. Mass. Dec. 8, 2025) (quoting 5 U.S.C. § 702); *Seafreeze Shoreside*, 123 F.4th at 20. The relevant statutory framework here—Section 134, the Clean Air Act's prevailing wage provisions, and the General Savings Statute's preservation of existing liabilities—all contemplate the interests of program participants and beneficiaries like Plaintiffs. Because H.R. 1 left all obligated grant funding in place, this framework continues to govern.

In sum, Plaintiffs have standing to challenge Defendants' unlawful termination of the Solar for All program. Each Plaintiff has suffered concrete, particularized, and actual injuries that are fairly traceable to Defendants' termination decision and redressable by the relief Plaintiffs seek.

## II.    This Court Has Jurisdiction

On August 7, 2025, Defendants made one decision: to end the Solar for All program. The administrative record confirms that Defendants' action was a program-level, policy decision. Accordingly, this Court has both jurisdiction over this challenge to that action and the ability to remedy it.

Plaintiffs first address two underlying premises that Defendants try to use to frame their jurisdictional defense, then respond to their specific arguments.

### A. Broad Jurisdictional Issues.

Defendants try to rewrite the administrative record, claiming they did not terminate the program, and they try to recharacterize the relief sought, claiming Plaintiffs ask the Court to reinstate particular grants. Both attempts to recast the jurisdictional issues fail.

### 1. Defendants terminated the program.

Defendants terminated the Solar for All program. Indeed, Defendants made their program-level decision clear at every opportunity, including:

- In their internal communications: "Agency leadership **has decided to terminate the Solar For All (SFA) program**," D.R.I. EPA 000097 (emphasis added).

- In their notice to all grant recipients, which stated that EPA had "**made the decision to terminate the SFA program**," D.R.I. EPA 000111 (emphasis added).

- And in announcing the termination of Solar for All to the public: "EPA is taking action to **end this program for good**." Video posted by Lee Zeldin (@epaleezeldin), X (Aug 7, 2025 at 14:07 ET), https://perma.cc/8MWC-6Z42 (emphasis added).[5]

And yet, to try to thwart this Court's jurisdiction, Defendants claim "there is no agency program decision to review," EPA Br. at 3, and "the only agency action here was to terminate the grants." *Id.* at 40.

The record belies these assertions. First, Defendants' numerous statements expressly deciding upon and announcing their program-wide termination are crystal clear, as set out above. And Defendants continue to admit they terminated the program in their briefing here. *E.g.*, *id.* at 47 ("EPA terminated the SFA program and grants").

Second, their action itself makes clear this was a program-level decision: Defendants decided to eliminate the entire $7 billion in grant funding that Congress appropriated for this program and had left in place with H.R. 1. Defendants did not make 60 grant termination

---

[5] This video is also available on EPA's website: https://www.epa.gov/aboutepa/greenhouse-gas-reduction-fund.

decisions; they made one program-wide decision. D.R.I. EPA 000097. It is self-evident that an agency cannot decide to eliminate an entire grant program and separately decide whether to maintain the individual grants under that program. Nor did Defendants terminate grants in order to reissue them to other recipients, which they could have done via replacement grants, thereby keeping the program alive; instead, Defendants decided to shut down the program itself. *Id*. ("Agency leadership has decided to terminate the Solar For All (SFA) program and existing grants."). And as a result, their decision affected every aspect of this program: their memo, for example, confirms their decision included refusing to continue overseeing and administering the program, not just refusing to pay out the grant funds. D.R.I. EPA 000089-96.

Finally, the reasoning they used to justify their decision (both at the time and now in their brief) makes clear that this was a program-level decision: they asserted that H.R. 1 affected the program as a whole, that it would be "improper" to allocate funds "dedicated for other programs" to administer this program, and that it was "well within the Agency's discretion . . . to wind down and halt further implementation of the SFA program." EPA Br. at 58. These justifications, while thoroughly erroneous, are all unmistakable statements of agency policy: Defendants chose not to use other available funds to continue administering this program and instead decided to eliminate it.

### 2. *Plaintiffs seek restoration of the program.*

This challenge to the termination of the program naturally requests the corresponding remedy: that the Court declare Defendants' termination of Solar for All unlawful and reverse it. Plaintiffs' Complaint requests that the Court issue a declaratory judgment that Defendants' termination of the Solar for All program violates the APA, 5 U.S.C. § 706, and the United States Constitution; that the Court hold unlawful and set aside EPA's termination of the Solar for All

grant program; and that the Court issue injunctive relief directing EPA to reinstate the Solar for All grant program and not interfere with the availability of funds. Complaint, Prayer for Relief ¶¶ 250 (A)-(D) (Doc. 1). Nowhere do Plaintiffs demand reinstatement of particular grants. *See New York v. Trump*, Nos. 25-1236, 25-1413, 2026 WL 734941, at \*19 (1st Cir. Mar. 16, 2026) (an order that "bars the Agency Defendants from 'implementing' or 'giving effect to' the proscribed funding freezes . . . . is not itself an order 'to enforce a contractual obligation to pay money'") (citations omitted).

In the D.C. Circuit last month, EPA's counsel confirmed that, for a claim alleging EPA unlawfully terminated a statutorily mandated program, "the remedy would be [to] restore the program." *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir.) (en banc), argued Feb. 24, 2026, Transcript at 63:2-3 (transcript excerpt[6] attached as Exhibit 1).

However, Defendants seek to evade review of their program termination by characterizing this case as a contract dispute, so they insist that Plaintiffs "expressly demand restoration of terminated grant agreements." EPA Br. at 27. As set out above, that is not the relief Plaintiffs seek. Plaintiffs did explain in their opening brief that under the caselaw on APA vacatur, a court order vacating Defendants' decision to terminate the program should restore the status quo before that action took place. Pltfs. Br. at 51. But Plaintiffs are not asking the Court to take any action with respect to any particular grants. Any effect on individual Solar for All grants that flows from vacatur of the program termination would be a natural consequence of the program-level action Defendants chose to take, and it does not transform this action into a

---

[6] A full recording of this oral argument is available at https://media.cadc.uscourts.gov/recordings/docs/2026/02/25-5122-02.24.2026.mp3. An excerpt is provided pursuant to LR Cv 56(b). A declaration regarding preparation of the transcript is attached as Exhibit 2.

contract damages case. Justice Barrett recognized that when she explained that some monetary relief, as was the case in *Bowen*, "simply flow[s]" from vacatur of a high-level agency decision. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).

Moreover, because the relief Plaintiffs ask this Court to order is restoration of the program, Defendants would determine how to carry out the program, so long as they implemented it in a lawful manner. For example, Defendants could decide how much of their general appropriations to use for administering the program. An agency also may issue a replacement grant that has the same purpose, scope, and material features as the original grant. *See* 2 U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law*, 10-108–10-110 (3d ed. 2006), GAO-06-382SP, https://www.gao.gov/assets/gao-06-382sp.pdf.

**B. This Court's Jurisdiction Is Consistent with *NIH* and *California*.**

First, Defendants' jurisdictional arguments are based on sovereign immunity and do not apply to Plaintiffs' freestanding constitutional claims, which challenge action for which "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

As to Plaintiffs' APA claims, this is a challenge to a program-level agency action, not a contract suit for money damages. Plaintiffs have no Solar for All contracts with EPA and therefore this action does not fall within the plain language of the Tucker Act because it is not "founded . . . upon . . . any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

17

### 1. California *and* NIH *do not foreclose APA jurisdiction here.*

Defendants argue that the Supreme Court's interlocutory orders in *California* and *NIH* deprive this Court of jurisdiction over this case, EPA Br. at 28-37, but those decisions did not address constitutional claims, and as to Plaintiffs' APA claims, *NIH* actually confirms this Court has jurisdiction.

The Supreme Court's decision in *California* reviewed a district court order enjoining the Government from terminating particular education-related grants and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *California*, 604 U.S. at 650. *NIH*, like *California*, did not involve the termination of an entire grant program. In *NIH*, the district court had vacated the termination of particular research grants. 145 S. Ct. at 2659. This case does not seek that relief, as explained above, *supra* at 15.

What Plaintiffs do seek is standard fare for federal district courts: review of a high-level agency action. This is exactly the type of challenge that Justice Barrett's controlling concurrence in *NIH* recognized is subject to the APA's waiver of sovereign immunity and not to the Tucker Act. A challenge to "policies related to grants does not transform [that] challenge . . . into a claim 'founded ... upon' contract," and accordingly such a challenge belongs in federal district court. *Id.* at 2661 (Barrett, J., concurring) (citing 28 U.S.C. § 1491(a)(1)). The particular high-level action in *NIH* was policy guidance, which the agency separately applied to terminate specific grants; as a result, Justice Barrett noted that vacating the challenged guidance "does not reinstate [the] terminated grants," as shown by the lower court's separate order addressing the grants. *Id*. But Defendants try to turn that contingent fact into a broad legal principle, asserting that Justice Barrett's observation is somehow "fatal" to Plaintiffs' requested relief of vacating the program termination here. EPA Br. at 37. Not so. Justice Barrett explained that in a different case, a

18

district court could validly vacate a high-level agency action "related to grants" where restoration of grant funding "simply flowed" from the high-level vacatur, as was the case in *Bowen*. *Id.* That scenario is also the case here.

### 2. *The* **Megapulse** *factors likewise confirm this Court's jurisdiction.*

The *Megapulse* test Defendants invoke has not been formally adopted by the First Circuit, *see Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293 (D. Mass. 2025), but several recent decisions in this Circuit have cited it. *E.g.*, *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). In any event, the source of Plaintiffs' rights here—the APA and the U.S. Constitution—and the relief sought—restoration of a congressionally mandated program—make clear that this action belongs in this Court. Plaintiffs have no EPA grants, so there can be no confusion about whether such grants are the source of their rights, nor do Plaintiffs seek to vacate particular termination notices.

Here, Defendants' single decision to do away with the entire program is the only action Plaintiffs challenge. Defendants strain to get around this plain fact by implying that this action must be excluded from this Court's jurisdiction simply because money is involved. EPA Br. at 30. That is obviously incorrect. The case Defendants cite for the proposition that "any monetary relief" should be treated as "money damages," *Massachusetts v. Dep't Grant Appeals Bd. of U.S. Dep't of Health & Hum. Servs.*, 815 F.2d 778, 783 (1st Cir. 1987), "concerned the unusual situation in which [a] disallowance decision had no significant prospective effect; [and] the challenge *only* concerned [] money allegedly past due." *Massachusetts v. Sec'y of Health & Hum. Servs.*, 816 F.2d 796, 799 (1st Cir. 1987), *aff'd in part, rev'd in part sub nom. Bowen*, 487 U.S. 879 (1988). Likewise, *Sibley v. Ball* was a case "seeking, *inter alia*, back pay from the United States." 924 F.2d 25, 29 (1st Cir. 1991). Here, by contrast, Plaintiffs seek not monetary

19

relief but rather restoration of Solar for All on an ongoing, forward-looking basis. And of course, the *Grant Appeals Board* language Defendants rely on pre-dates the Supreme Court's decision in *Bowen*, which concluded that the APA's "exception for an action seeking 'money damages' should not be broadened beyond the meaning of its plain language." *Bowen*, 487 U.S. at 900.

Reversal of a program-level agency decision here is not akin to a grant of money damages, and the post-*NIH* cases Defendants rely on do not support their argument against jurisdiction. The source of Plaintiffs' rights and the relief sought makes the Ninth Circuit's decision in *Thakur v. Trump*, 163 F.4th 1198 (9th Cir. 2025), inapplicable. EPA Br. at 32-33. In that case, the plaintiffs challenged, and the district court enjoined, termination notices for their particular grants, *Thakur*, 163 F.4th at 1202-03, while Plaintiffs here do not have any EPA grants, nor do they challenge or seek an injunction against any termination notices. Defendants portray the *Thakur* decision as having some bearing on Plaintiffs' lack of Solar for All grants with EPA, EPA Br. at 32-33, but that is far from accurate. In *Thakur*, the plaintiffs were University of California researchers who may not have been the named grant recipients—the district court noted that the termination notices went to the University of California, *Thakur v. Trump*, 787 F. Supp. 3d 955, 973 (N.D. Cal. 2025),—but in every other respect the plaintiffs sought to restore their own grants:

> Named Plaintiffs are six [University of California] System researchers. Between 2021 and 2023, Plaintiffs submitted grant applications to the EPA, NSF, and NEH. The grants were awarded, allowing Plaintiffs to launch or continue multi-year projects . . . . As principal researchers, Plaintiffs are responsible for overseeing the grant-funded project, and must notify the funding agency, and receive approval, if they plan to transfer schools or need to reduce the time devoted to the project.

*Id.* at 972. Plaintiffs here have no such relationship with EPA.

By contrast, the Ninth Circuit decision that did address a situation like this one—where the plaintiffs have no grant agreement relationship with the government whatsoever—is

20

*Community Legal Services in East Palo Alto v. United States Department of Health and Human Services*, 155 F.4th 1099 (9th Cir. 2025) (denying rehearing en banc). Defendants do not discuss or even cite this case, making clear they have no response to the Ninth Circuit's correct analysis that where "Plaintiffs have no contract with the Government . . . Plaintiffs' claims have no business before the [Court of Federal] Claims." *Id.* at 1100.

Nor does the Fourth Circuit's decision in *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), help Defendants. EPA Br. at 33. The Fourth Circuit reversed an injunction reinstating the plaintiffs' grants because "the district court focused on the freeze and termination of Plaintiffs' particular grants—not the termination of entire programs," and remanded for further proceedings in the district court on the program termination issue. *Sustainability Inst.*, 165 F.4th at 834; *see also id.* at 829 n.8 (citations omitted) ("We recognize that Plaintiffs challenged not only their individual grant terminations but also . . . various directives issued by the agencies funding their grants" that the district court could consider for review as "high-level actions under the APA[.]"). *Sustainability Institute* does not counsel against this Court's jurisdiction over Plaintiffs' challenge to EPA's termination of the Solar for All program—rather, it allowed such claims to proceed.

Defendants assert that this action seeks "payment of money," and thus claim Plaintiffs' rights are somehow tied to the particular grants EPA previously awarded. EPA Br. at 33-34. They cite *Spectrum Leasing Corp. v. United States*, 764 U.S. 891 (D.C. Cir. 1985), to try to argue Plaintiffs' claims are based on primary grant agreements. EPA Br. at 34. But in *Spectrum*, the government collected contractual liquidated damages from a firm by stopping lease payments for other products it had provided, and the company claimed the stoppage violated procedures in the Debt Collection Act and sought an order under the APA "compelling the government to pay

21

money owed in exchange for goods procured under an executory contract." 764 U.S. at 894. That suit fundamentally sought to enforce the contract, as confirmed by the backward-looking, past-due payment sought.

Here, as Plaintiffs have made clear, they seek the opportunity to compete for work made possible by the grant program and to participate in the program in other ways. Crowley Decl. ¶ 18 (Doc. 32-1); Smith Decl. ¶ 17 (Doc. 32-2); Gunning Decl. ¶ 9 (Doc. 32-3); Buchanan Decl. ¶¶ 36-37 (Doc. 32-4); Wood Decl. ¶¶ 22-23 (Doc. 32-6); Abdul-Rahman Decl. ¶¶ 30-31 (Doc. 32-7); Schoolman Decl. ¶¶ 23-24, 37-38, 53-54 (Doc. 32-8); Nguyen Decl. ¶¶ 17, 18 (Doc. 32-5). They are not seeking to enforce primary grant recipients' grant agreements and do not challenge individual grant terminations. Rather, they seek to redress injuries caused by Defendants' disregard of the APA's requirements for reasoned, lawful agency action, and their flouting of the Constitution's separation of powers and Presentment Clause, by restoring a congressionally mandated program so they can continue participating in that program and competing for the opportunities Congress funded it to provide.

Likewise, *Department of the Army v. Blue Fox, Incorporated*, 525 U.S. 255 (1999), EPA Br. at 34, is inapposite: it held that the APA's sovereign immunity waiver turns on the statutory definition of "money damages" and the distinction between "specific relief and substitute relief," concluding that equitable liens like the one sought in that case "by their nature constitute substitute or compensatory relief rather than specific relief." *Id.* at 262-63. Here, Plaintiffs are not seeking compensation but rather to participate in and compete for work under Solar for All going forward. As the Supreme Court explained in *Bowen*, that is the type of relief that falls under the APA's waiver of sovereign immunity, not damages subject to the Tucker Act: "Damages are given to the plaintiff to *substitute* for their suffered loss, whereas specific

22

remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" 487 U.S. at 894-95 (quoting Dan B. Dobbs, *Handbook on the Law of Remedies* 135 (1973)).

Restoration of the Solar for All program, in whatever form that may take, is what Plaintiffs here seek—contrary to Defendants' claim that they "unabashedly demand[] EPA to continue paying under the SFA grants." EPA Br. at 35. The relief sought here is to restore the program as a whole, so Plaintiffs have a chance to access the benefits and opportunities Congress intended by appropriating the funding.

Defendants try to distort the *Megapulse* analysis by suggesting that their own arguments justifying their actions should dictate the nature of the case: they state that this case should be treated like *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), simply because EPA cited a termination regulation in its notices to all grant recipients. EPA Br. at 35-36. But as one court has explained, "[t]he Tucker Act does not bar an APA action if the plaintiff's rights and remedies, as alleged, are noncontractual—even if it is inevitable that the government will raise a contract provision as a defense." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). Instead, the nature of Defendants' challenged action here (eliminating the entire program), the nature of Plaintiffs' claims (challenging executive branch agency action in violation of the APA and Constitution) and the relief sought (restoration of the program) dictate the analysis. Moreover, the record makes clear that Defendants' rationale for terminating the program was a policy decision to discontinue administering the entire program and must be evaluated as such.

In *Ingersoll-Rand v. United States*, by contrast, the government terminated the plaintiffs' contract based on a specific provision of the contract. 780 F.2d at 75. The plaintiffs argued the

23

termination of the contract was arbitrary and capricious under the APA and sought reinstatement of the contract itself. *Id.* at 77-80. Therefore, the case turned on whether the text of the contract "forbids termination under these conditions." *Id.* at 78. The claim thus belonged in the Court of Federal Claims because "it [was] possible to conceive of this dispute as entirely contained within the terms of the contract." *Id.* By contrast, Plaintiffs' claims here—that EPA unlawfully dismantled an entire grant program—do not implicate the terms of the grant agreements and cannot be resolved via reference to them. Instead, the Court must review the 2022 legislation that funded the program and required EPA to administer Solar for All, as well as the July 2025 legislation that left those obligations in place, in order to evaluate whether Defendants' actions were lawful and reasonable under the APA, and whether they were consistent with the Constitution's separation of powers and Presentment Clause.

### C. The APA's Waiver of Sovereign Immunity Applies.

#### 1. *The challenged final agency action is Defendants' decision to end the Solar for All program.*

Defendants try to rewrite the administrative record by denying they terminated the program. As discussed above, *supra* at 13, that is a non-starter. But Defendants go further.

First, they assert that review by this Court of the action they actually took—eliminating the Solar for All program—"would transform every grant or contract termination into an agency 'policy' that could be challenged in district court under the APA." EPA Br. at 38. They do not say why that supposedly would be, and there is no basis for their claim. Program-level policy decisions are different in kind from individual grant terminations, as Justice Barrett explained in *NIH*. The district court in *NIH* enjoined the grant terminations, separate from the challenged policy guidance; Justice Barrett's analysis turned on the fact that these were two separate decisions, unlike here.

Consistent with this approach, the First Circuit recently held that an agency policy action that applies broadly can be challenged, noting that the Supreme Court had stated as much: where a final agency action "'appl[ies] some particular measure across the board to all individual classification terminations and withdrawal revocations . . . it can of course be challenged under the APA.'" *New York v. Trump*, 2026 WL 734941, at *9 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990)).

Here, the decision to end the entire Solar for All program due to Defendants' misreading of H.R. 1 and their decision not to use other available funds to continue administering the program is a program-level policy decision, and the only one at issue in this litigation. The record shows Defendants made only one decision, something they do not meaningfully dispute.

This decision was a policy choice by the agency—Defendants have largely abandoned their contemporaneous justification that H.R. 1 required it. And Defendants' policy decision continues to this day, consistent with their decision memo addressing "the future of the Solar for All (SFA) program." D.R.I. EPA 000089. Defendants could decide to restart the program at any time, since the grant funding appropriations remain in their account, Treml Decl. ¶ 7 (Doc. 32-9); and they could choose to use their ample other available funds to administer it, but they prefer not to. Contrary to Defendants' assertions, EPA Br. at 39, that makes this termination decision exactly the type of agency policy action "related to grants" that *NIH* recognized has effects "going forward" and is reviewable in this Court under the APA. 145 S. Ct. at 2661 (Barrett, J., concurring).

Plaintiffs explained in their opening brief why termination of the program is final agency action reviewable under the APA. Pltfs. Br. at 26-27. The simple fact that Defendants prepared an administrative record is consistent with its status as a final action, and so does the content of

25

that record: Defendants prepared a decision memo laying out the program-level reasoning for ending Solar for All, which even purported to address reliance interests, albeit inadequately. D.R.I. EPA 000089-96. These are all hallmarks of final agency action.

But most fundamentally, Defendants made a single, program-level decision, and they cannot evade review by reimagining their single decision to eliminate $7 billion in congressionally mandated appropriations for this grant program as 60 separate decisions to terminate individual grants—especially since there are no such individual decisions in the record. As one court in this Circuit recently held, "[t]he Tucker Act is . . . inapplicable" where a challenge does not allege a breach of "any specific contract, nor . . . seek . . . to compel performance under or enjoin the termination of any contract," and instead is "focused solely on whether the agency has the authority to shutter the entire . . . program." *Washington v. Fed. Emergency Mgmt. Agency*, No. CV 25-12006-RGS, 2025 WL 3551751, at *4 (D. Mass. Dec. 11, 2025). Here, the administrative record documents that Defendants made one decision to end the program in one fell swoop. That is the agency action at issue here. The bulk termination of all grants that same day simply flowed from this decision and does not insulate it from this Court's review.

The requested relief in this case appropriately asks the Court to undo the challenged action. Declaring Defendants' termination of the program unlawful—under the APA and/or Constitution—and reversing it would require them to resume administering the $7 billion Solar for All program. While Defendants assert that the Court would be ordering particular grants reinstated, EPA Br. at 40, that is not the requested relief. One way or another, Defendants would have to continue satisfying their existing liabilities—which were left untouched by H.R. 1—to spend the $7 billion for its congressionally mandated purposes. "[A]n injunction enjoining the

26

allegedly unlawful termination of the program . . . do[es] not ask the court to compel the agency to exercise its discretion in a particular way . . . ." *Washington*, 2025 WL 3551751, at *4.

In the end, Defendants' attempt to cast this case as a challenge to individual grant terminations fails because Defendants themselves made a program-level decision, which they documented in the administrative record. For this reason, Defendants' discussion of *DRG Funding Corp. v. Secretary of Housing and Urban Development*, 76 F.3d 1212 (D.C. Cir. 1996), is inapplicable. EPA Br. at 41. Unlike the guidance in *NIH* or the "intermediate decision" that the D.C. Circuit in *DRG* found was "'tentative, provisional, or contingent' . . . and therefore nonfinal," 76 F.3d at 1214 (quoting *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 712 F.2d 669, 671 (D.C. Cir. 1983)), Defendants' decision here to end Solar for All wiped out Congress's intended $7 billion in appropriated funding and constitutes final agency action.

### 2. Defendants did not have discretion to cancel the program because H.R. 1 left EPA's existing program obligations in place.

As Plaintiffs explained in their opening brief, H.R. 1 only repealed the relevant portions of the Inflation Reduction Act prospectively, and it left in place all $7 billion of EPA's awarded grant funding. Pltfs. Br. at 27-32. As a result, H.R. 1 did not touch EPA's authority and obligation to continue administering the program.

Congress's 2022 appropriation imposed a mandate to spend $7 billion for clean energy grants to low-income and disadvantaged communities. "In addition to amounts otherwise available," it appropriated

> $7,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after the date of enactment of this section, to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse

27

gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section.

D.R.I. EPA 000012. This language is mandatory. Absent an express indication to the contrary, an appropriation is a mandate that the executive branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither the President nor an agency has "unilateral authority to refuse to spend the funds." *Id.* Here, Congress specified the amount to be awarded via grants (unlike some appropriations that include more flexible "not to exceed" language[7]), it imposed a deadline to begin that grantmaking process, it imposed a deadline by which that process must be completed, and it specified the purposes for the grant program. It provided discretion to EPA about how to fulfill those purposes via grant awards, but not about whether to do so at all.

Defendants argue that H.R. 1 somehow turned this $7 billion appropriation for specific, congressionally mandated purposes into a "lump-sum amount[] without statutory restriction," giving EPA unlimited discretion over it. EPA Br. at 41-42 (quoting the case syllabus from *Lincoln*, 508 U.S. at 183). This argument would turn H.R. 1 into a *retroactive* repeal that somehow reached back and erased the legislative purpose for the $7 billion appropriation of awarded grant funds that Congress left in place by rescinding only unobligated balances. As Plaintiffs explained in their opening brief, that is simply not what H.R. 1 did, as confirmed by the caselaw on retroactivity and the General Savings Statute. Pltfs. Br. at 30. By rescinding only unobligated balances and repealing the statutory language only prospectively, H.R. 1 left in place

---

[7] *See* 2 U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law*, 6-28 (3d ed. 2006), GAO-06-382SP, https://www.gao.gov/assets/gao-06-382sp.pdf (explaining that with a "not to exceed" appropriation, "the agency is not required to spend the entire amount").

28

the "meaningful standard against which to judge" the agency's action that Congress set out in its appropriation. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

By the same token, EPA was not free to simply disregard its obligation to implement Congress's appropriations mandate. Defendants argue that H.R. 1 gave them free rein to simply discard this program because they preferred not to use any of their billions in general appropriations to make up for the small amount of dedicated administrative funding rescinded by H.R. 1. EPA Br. at 42. But Defendants' existing grant obligations—to spend the appropriated $7 billion for the purposes Congress set out—were left in place, and Defendants were not free to simply refuse to meet those obligations. Nothing in H.R. 1 relieved them of that responsibility. That makes this situation fundamentally different from *Lincoln*, which lacked any "statutor[y] restrict[ions] [on] what can be done with those funds." 508 U.S. at 192.

The First Circuit recently confirmed as much: "*Lincoln* did not address an agency's discretion to withhold obligated funds. It thus did not hold that agencies have unreviewable discretion to categorically stop disbursing obligated funds . . . ." *New York v. Trump*, 2026 WL 734941, at *10. While Defendants now make the *post hoc* assertion that they had sole authority to decide whether to cancel the program, EPA Br. at 41-42, they ignore the fact that Congress mandated this funding be used for its intended purpose and left that obligation in place with H.R. 1. Congress simply did not give Defendants the discretion they claim.

Finally, Defendants include a footnote "[t]o the extent Plaintiffs seek to establish ultra vires jurisdiction" for their Constitutional claims. EPA Br. at 42 n.15. But in addition to challenging action contrary to law under the APA, Plaintiffs bring freestanding Constitutional claims, as set out in their opening brief. Pltfs. Br. at 41-47. Regardless, to the extent the Court were to deem the prerequisites for ultra vires review applicable, they exist here: 1) judicial

29

review is not foreclosed; 2) the agency has made a drastic legal error; and 3) the government contests all other avenues of judicial review. *See Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). The only other statutory scheme that could potentially provide restoration of the grant program is the APA, as discussed above. The Court of Federal Claims is not an alternative venue for restoration of the program—it is powerless to order Defendant EPA to restore an entire grant program, because that is quintessential equitable relief over which "the Court of Federal Claims has no power." *Richardson v. Morris*, 409 U.S. 464, 465 (1973); *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 715-19, 725 (D. Md. 2025) (holding "Program Claims" for restoration of cancelled grant programs sought "equitable" relief that is "not subject to the Tucker Act" or Court of Federal Claims jurisdiction). As the D.C. Circuit has explained, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006).

Meanwhile, Defendants' footnote tries to distinguish *City of Saint Paul, Minnesota v. Wright* by appeal to the "narrowness" of the ruling, but the court stated clearly that it meant "the mere presence of political considerations" did not violate the Equal Protection clause. No. 25-CV-03899 (APM), 2026 WL 88193, at *7 (D.D.C. Jan. 12, 2026). The court was not placing any limitation on the broad general principle that "district courts have jurisdiction over constitutional claims, even if they arise from a contractual relationship with the government." *Id.* at *4 (citing *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017)). Likewise, Defendants' attempt to distinguish *Reich* as dealing with an

30

executive order is unavailing, since that has nothing to do with the general principle articulated by the court that there is no sovereign immunity for unconstitutional acts. 74 F.3d at 1329.

**III.  Defendants Violated the APA and Constitution**

On the merits, Defendants' termination of the program effectively erased the fully obligated appropriation Congress left in place with H.R. 1. They flouted the relevant acts of Congress without any justification, and in the process violated the APA and the Constitution.

**A.  Defendants Violated the APA.**

**1.  *EPA's decision to terminate Solar for All was contrary to law.***

H.R. 1 left in place EPA's obligation to spend the $7 billion that Congress appropriated to Solar for All. As such, EPA's refusal to do so by ending the Solar for All program was contrary to law.

*a.  Congress did not repeal the Solar for All program.*

Plaintiffs have explained that because H.R. 1 rescinded only unobligated balances, it did not touch the $7 billion in obligated Solar for All grant funding EPA awarded to carry out Congress's appropriations mandate. Pltfs. Br. at 28-29. Defendants concede H.R. 1 did not rescind this obligated funding. EPA Br. at 46 ("OBBBA . . . says nothing about the [existing] grants at all."). *See also* U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process* 70-72 (2005), GAO-05-734SP, https://www.gao.gov/assets/gao-05-734sp.pdf (explaining that obligated funds are legally committed and cannot be rescinded absent explicit congressional direction). Thus, H.R. 1 left EPA's $7 billion grant funding obligation in place.

Nor did Congress "repeal[] EPA's statutory authority to run the SFA program," as Defendants claim. *See* EPA Br. at 44. Defendants try to suggest that the absence of "savings

language" in H.R. 1 somehow meant the legislation reached back and wiped out EPA's statutory authority to administer this obligated funding program, *see id.*, but in reality, statutes such as H.R. 1 do not apply retroactively unless dictated by the plain language of the statute. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012). *See also Landgraf v. USI Film Prods.*, 511 U.S. 244, 264-65 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As the Supreme Court explained:

> [P]rospectivity remains the appropriate default rule. . . . Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

*Landgraf*, 511 U.S. at 272-73. The absence of express retroactivity language in H.R. 1 makes clear it was prospective in application. *See Vartelas*, 566 U.S. at 266.

The prospective repeal did two things, neither of which is relevant here. First, it prevented a later Congress from appropriating more funding to the program in the future, absent further legislative action. And second, it prevented EPA from re-obligating any Greenhouse Gas Reduction Fund funding that may have been properly deobligated prior to the enactment of H.R. 1. *See* 171 Cong. Rec. S4282 (July 9, 2025) (statement of Sen. Sheldon Whitehouse) (explaining the repeal's potential relevance to certain Greenhouse Gas Reduction Fund funding terminated prior to H.R. 1: "The majority did express concern about EPA prevailing in litigation and suddenly having nearly $20 billion back and, for this reason, pushed to repeal the language."), *available at* https://www.congress.gov/119/crec/2025/07/09/171/118/CREC-2025-07-09.pdf. For the Court's context, the obligation status of funding under other Greenhouse Gas Reduction Fund programs that were terminated prior to H.R. 1 has been a subject of dispute, *see Climate United Fund v.*

32

*Citibank, N.A.*, No. 25-5122 (D.C. Cir.) (en banc), argued Feb. 24, 2026, but it is not at issue here, since all Solar for All grant funding was undisputedly obligated at the time H.R. 1 became law.

To the extent Defendants suggest Congress's rescission of unobligated administrative funds was an implicit repeal of its responsibility to continue administering Solar for All, *see* EPA Br. at 44, they are mistaken. "[T]he mere failure to appropriate sufficient funds is not enough to consider an agency's statutory duties or obligations to be repealed by implication." Cong. Rsch. Serv., *Authorizations and the Appropriations Process* 10 (May 2023) (citing U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* 2-63 (4th ed. 2016), GAO-16-464SP, https://www.gao.gov/assets/2019-11/675709.pdf), https://www.congress.gov/crs-product/R46497; 1 U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* 2-49 (3d ed. 2004), GAO-04-261SP, https://www.gao.gov/assets/2019-11/202437.pdf ("[A] mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation."); *In re Aiken Cnty.*, 725 F.3d at 260 ("[C]ourts generally should not infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated."). By preserving obligated funds, Congress preserved the Solar for All Program and EPA's statutory authority and duty to administer it, which included Congress's authorization to use "amounts otherwise available" to do so. D.R.I. EPA 000012. And, as discussed below, *infra* at 34-35, EPA had plenty of administrative funds available to comply with its statutory obligations.

The legislative history, discussed in Plaintiffs' opening brief, comports with the limited, prospective-only repeal effected by H.R. 1, which Congress understood did not touch the obligated Solar for All grant funding. Pltfs. Br. at 28-29; *see also* H. Comm. on Energy & Com., Markup of Budget Reconciliation Text at 244:5959-70 (May 13, 2025), https://perma.cc/PSS2-

33

KE85; H.R. Rep. No. 119-106, pt.1, at 626 (2025) ("What's striking is that most, if not all, of the IRA funds have already been invested in communities across the country. The savings achieved by repealing and rescinding the IRA environmental programs is comically small . . . .").

By contrast, EPA's preferred history adds nothing. The House Report of the Committee on the Budget to accompany H.R. 1 simply states: "This Subtitle repeals the authorizations and unobligated balances of funds made available to EPA under the IRA." H.R. Rep. No. 119-106, pt. 1, at 557 (2025). It does not state that Congress intended the repeal to apply retroactively. And Senator Capito's statement cited by EPA, *see* EPA Br. at 45, did not concern the Solar for All program. *See* 171 Cong. Rec. S4080 (daily ed. June 30, 2025).

b. *EPA had no discretion to eliminate the Solar for All Program.*

Defendants appear to claim—in a *post hoc* justification that was not part of their decision—that H.R. 1 repealed Congress's appropriations mandate governing the $7 billion in obligated Solar for All funding, leaving the obligated grant funding supposedly "orphaned" and EPA free to end the program in its entirety. *See* EPA Br. at 46. They assert that their action to end the program was lawful because H.R. 1 "imposed no guidance or limits on EPA's ability to terminate the orphaned grants." *Id.*

But as explained above, H.R. 1 left in place all $7 billion in obligated funding, and thus did not retroactively repeal the statutory requirements governing its use. Indeed, Defendants admit the legislation "says nothing about the grants at all." *See id.* Courts do not read implied discretionary powers regarding appropriations into Congress's mandates. *Cf. Train v. City of New York*, 420 U.S. 35, 44-46 (1975). Instead, an agency can only wield power Congress confers. *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 357 (1986); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Congress would have needed to confer some

34

new authority upon Defendants to terminate the existing Solar for All program, and its silence here did not do so, meaning Defendants had no authority to eliminate the program.

Defendants also suggest that the rescission of "designated funds to continue administer the program" created a lack of guidance on how the agency should proceed with existing grants. EPA Br. at 46. Defendants are wrong. Section 134 specifically contemplated EPA's use of other available appropriations to administer the Solar for All program. Although Congress sometimes appropriates money for administration of a particular grant program, Congress separately appropriates money to each agency for its general operations, including for salaries and expenses in managing the agency's programs. EPA is no exception. In FY 2025, EPA requested additional money "to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act." EPA, *Fiscal Year 2025: Justifications of Appropriation Estimates for the Committee on Appropriations*, Tab 05: Environmental Programs and Management, https://perma.cc/95WY-ASDY. In response, Congress appropriated well over $3 billion for EPA's Environmental Programs and Management. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025), https://perma.cc/62D7-RUDA. Congress directed EPA to use this funding for "necessary expenses not otherwise provided for," including the "personnel and related costs" necessary to administer grant programs. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 252 (2024), https://perma.cc/8TZX-GYR7. In the appropriations bill for Fiscal Year 2026, Congress appropriated another $3,114,671,000 to EPA for "Environmental Programs and Management." Pub. L. No. 119-74, 140 Stat. 5, 126 (2026), https://perma.cc/HR8F-96QS.

In sum, EPA had no discretion to decide to end the program and sit on the obligated grant funding until the appropriation expires. *See Washington*, 2025 WL 3551751, at *5-6 (holding de

facto termination of grant program was contrary to law, among other APA and constitutional violations). It must fulfill the mandate Congress set out in appropriating funding for the program.

        c.   *Section 134 continues to govern the program, as confirmed by the General Savings Statute.*

Defendants' confusing discussion of retroactivity and recission of grant funds, *see* EPA Br. at 46-48, is not responsive to Plaintiffs' arguments and not relevant to any issue before the Court. Defendants contend that "[t]ermination did not rescind the grant funds, which continue to be maintained in the account in which they were maintained prior to OBBBA's enactment" and therefore claim the Solar for All program termination was not retroactive. *Id.* at 47-48. The Court should dismiss this argument as simply nonsensical. There is no getting around the fact that Defendants—contrary to what Congress actually did—applied H.R. 1 retroactively in order to justify their decision to terminate the program, stating: "Congress repealed CAA Section 134 in its entirety," "[t]his repeal of grant funding in CAA section 134(a)(1)-(3) . . . effectively and completely terminated . . . all funding related to the SFA program," and "the grant funding . . . [is] rescinded." D.R.I. EPA 000090. Defendants' actions and justifications wrongly applied H.R. 1 retroactively, in contravention of the statute.

Defendants next try to narrow the scope of the General Savings Statute, 1 U.S.C. § 109, beyond recognition. *See* EPA Br. at 48-50. But the General Savings Statute is the statutory embodiment of the longstanding principle prohibiting retroactive application of federal statutes unless Congress expressly provides otherwise. It establishes "a rule of construction . . . to be read and construed as a part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress." *Hertz v. Woodman*, 218 U.S. 205, 217 (1910). Its text, purpose, and judicial interpretation all point to the same conclusion: only Congress can authorize retroactivity, and

only if it does so clearly and explicitly. *See Dorsey v. United State*s, 567 U.S. 260, 273 (2012) (stating that courts require "clear congressional intent" to find retroactivity).

Defendants try to confine the statute to "a singular focus on preserving liabilities and actions to enforce liabilities." *See* EPA Br. at 49. But the Supreme Court rejected such a narrow reading, declaring that

> [b]y the General Savings Statute Congress *did not* merely save from extinction a liability incurred under the repealed statute; *it saved the statute itself*: "and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action . . . for the enforcement of such . . . liability."

*De La Rama S. S. Co. v. United States*, 344 U.S. 386, 389 (1953) (quoting 1 U.S.C. § 109) (emphases added).

The case cited by Defendants, *Deal v. Federal Housing Administration*, 260 F.2d 793, 800 (8th Cir. 1958), EPA Br. at 50, actually undermines their argument for a narrow reading of the General Savings Statute. The court noted that the term "liability" in the General Savings Statute "has been *broadly construed* by the courts to comprehend all obligations arising out of *any* breach of a statutory duty." *Deal*, 260 F.2d at 800 (emphases added) (quoting *N.L.R.B. v. Nat'l Garment Co.*, 166 F.2d 233, 237 (8th Cir. 1948)). And while Defendants try to suggest this case is relevant to Plaintiffs' status as non-grantees, it is not: the *Deal* court concluded that a liability under a housing statute was incurred after a repeal statute, and thus was not saved by the General Savings Statute. *Id.* at 800. The court focused on timing, not on whether a third-party beneficiary such as Plaintiffs could bring suit to enforce a statutory obligation. *See id.* Here, EPA's actions flouted its statutory duty to fulfill its grant funding obligations under the program. Accordingly, this is a "proper action"—authorized under the APA to address agency action contrary to law—to enforce EPA's compliance with its continuing obligation to implement that congressionally mandated program. *See* 1 U.S.C. § 109.

37

Defendants' reliance on *De La Rama* and *U.S. Lines Company v. United States*, 124 F. Supp. 375 (Ct. Cl. 1954), as a bar to Plaintiffs' APA claims is equally puzzling. *See* EPA Br. at 50. In *De La Rama*, the government admitted its liability survived the repeal of the War Risk Insurance Act but argued the district court's jurisdiction to hear the case did not. 344 U.S. at 388-89. The Supreme Court disagreed. *Id.* at 389. In reaching its decision, the Court applied the General Savings Statute and declared, "[w]e see no reason why a careful provision of Congress, keeping a repealed statute alive for a precise purpose, should not be respected when doing so will attain exactly that purpose." *Id.* The *De La Rama* Court did not, as Defendants suggest, find jurisdiction "because disregarding the provision would 'diminish substantially the recoverable amount' of the claim." EPA Br. at 50. The *De La Rama* Court rested its decision on the General Savings Statute and simply reflected that the case "demonstrate[d] the concrete, dollars-and-cents importance of saving the statute and not merely the liability." 344 U.S. at 389. In *U.S. Lines Co.*, the Court of Claims applied the General Savings Statute and held the district courts, rather than the Court of Claims, had exclusive jurisdiction to hear plaintiff's policy claim under the War Risk Insurance Act. 124 F. Supp. at 377.

Here, H.R. 1's prospective effect means Congress's appropriations mandate continues to govern, as does its authorization of "amounts otherwise available" to fulfill that mandate by administering the program. D.R.I. EPA 000012.

Plaintiffs do not, as Defendants argue, "ask this Court to rely on a repealed statute." EPA Br. at 51 (citing *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 934 (9th Cir. 2011)). The statutory appropriation remains in effect. In *Yakima*, by contrast, Congress had repealed the 1974 National Health Planning and Resources Development Act in 1986, but in 2008, the state health department promulgated certificate of need regulations under it. 654 F.3d

38

at 923-24. The Ninth Circuit found that the state health department had failed to show that the statute, "repealed without a savings clause, provides the requisite clear statement of authorization for the 2008 [] regulations." *Id*. at 933. Because *Yakima* dealt with the lack of authorization for an agency action decades after repeal, it has no bearing on EPA's obligations in this case, which are entirely based on Congress's appropriation prior to the prospective repeal in H.R. 1.

In any event, even if the Court were not to apply the General Savings Statute to this situation, the longstanding presumption against retroactive legislation in the caselaw, *see, e.g.*, *Landgraf*, 511 U.S. at 265, remains, and yields the same outcome: Defendants acted contrary to law.

### 2. Defendants' decision to terminate Solar for All was arbitrary and capricious.

In a single day, Defendants terminated the Solar for All program based on a single 8-page memo that ran counter to the evidence before it, failed to consider alternatives, and disregarded years of reliance interests spanning the entire country. This is the exact kind of arbitrary and capricious decisionmaking the APA is designed to prevent. As one court recently held regarding the government's "instantaneous and sudden cessation" of an electric vehicle charging program, "[s]uch capriciousness runs counter to the Administrative Procedure Act; it is simply not how things are lawfully done." *State v. U.S. Dep't of Transp.*, No. 2:25-CV-00848-TL, 2026 WL 183584, at *1 (W.D. Wash. Jan. 23, 2026).

### a. Defendants' termination decision ran counter to the evidence before the agency.

Defendants' decision to terminate the program was unreasonable because it flew in the face of what Congress actually did. Pltfs. Br. at 28-34. At the time, Defendants stated their reasons plainly: "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program . . . that the SFA program is no longer to operate,"

and "any attempt to continue the program's administration . . . is no longer legally permissible." D.R.I. EPA 000111. But these justifications ran directly counter to the evidence before Defendants: both the plain language and legislative history make clear that H.R. 1 left in place all Solar for All grant funding and with it, EPA's obligation to use the money for its congressionally mandated purpose.

This is directly analogous to grants and cooperative agreements at issue in *Colorado v. United States Department of Health and Human Services*, where Congress "had already rescinded plenty of COVID-era public health spending in 2023," but "chose not to rescind the funding for the grants and cooperatives agreements at issue in this case." 783 F. Supp. 3d 641, 648 (D.R.I. 2025) (citation omitted), *appeal dismissed*, No. 25-1671, 2025 WL 4057116 (1st Cir. July 29, 2025); *cf.* EPA Br. at 57. Just like the grants and cooperative agreements at issue in *Colorado*, here Congress rescinded limited unobligated administrative funding but left in place the Solar for All program grants. *See Colorado*, 783 F. Supp. 3d at 648. As a result, Defendants' "sudden, blanket termination" of a $7 billion program "based on misinterpretations of federal law" is "neither reasonable nor reasonably explained." *See id.*

Defendants still try to defend their erroneous rationale that with H.R. 1 Congress "expressed its intent that 'the SFA program is no longer to operate,'" EPA BR. at 57, but otherwise they appear largely to have abandoned their contemporaneous justifications for their action. They now argue that "Congress said *nothing* about the grants themselves, leaving EPA in a position to *decide* whether to terminate existing SFA grants" and "OBBBA does not *restrain* EPA from terminating the SFA grants." EPA Br. at 55 (emphases added). In other words, Defendants now claim Congress gave them the discretion to decide for themselves to terminate the program.

40

First, this is an impermissible *post hoc* rationale, which the Court should summarily reject. *See Am. Hosp. Ass'n v. Kennedy,* 164 F.4th 28, 34 (1st Cir. 2026) (citation omitted) ("[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations[.]" (first alteration in original) (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022))); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Second, Congress gave Defendants no such discretion to end the program, as set out above and in Plaintiffs' opening brief: in the absence of legislative authorization to end the program, their obligation remained in place to fulfill the mandate set out by Congress when it appropriated the $7 billion in grant funding for this purpose. *Supra* at 27-30, 34-35; Pltfs. Br. at 28-29. No matter the discretion granted an agency, it "still must exercise that discretion to fulfill Congress's command, and '[a] grant of discretion to an agency does not . . . authorize it to make an unprincipled decision.'" *Abramowitz v. Lake*, No. 1:25-cv-887-RCL, 2026 WL 746989, at *13 (D.D.C. Mar. 17, 2026) (emphasis removed) (quoting *Ky. Mun. Energy Agency v. Fed. Energy Regul. Comm'n*, 45 F.4th 162, 186 (D.C. Cir. 2022) (further quotations omitted)).

> b.   *Defendants arbitrarily rejected reasonable alternatives.*

The APA requires a "reasoned analysis," *State Farm*, 463 U.S. at 42, and that agencies consider "'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (alterations in original) (quoting *State Farm*, 463 U.S. at 51). Defendants did not do so.

As a threshold matter, Defendants argue their refusal to use available funds to administer Solar for All is an exercise of unreviewable agency discretion. EPA Br. at 57. But because

41

Congress left undisturbed Defendants' continuing obligation to administer Solar for All, EPA may have discretion in how it does so (for example by deciding how much funding to dedicate to administration and oversight), but it has no authority to unilaterally terminate the entire Solar for All program. "[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity, [there is] no basis for a court to excuse the agency from that statutory mandate." *In re Aiken Cnty.*, 725 F.3d at 260. This requirement is also set out in federal regulations: an agency "must manage and administer the Federal award in a manner *so as to ensure that Federal funding is expended and associated programs are implemented* in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." 2 C.F.R. § 200.300 (emphasis added).

As for their consideration of alternative means of administering the program, it cannot be adequate because Defendants made no attempt to square the legislative mandate that H.R. 1 left in place with their proposal to shut down the program. Moreover, while Defendants try to liken their decision not to administer the program to *Lincoln v. Vigil*, 508 U.S. 182 (1993), EPA Br. at 41-42, 57, here the agency was given specific directives from Congress in creating the program and obligating the grants. The program in *Lincoln* did not involve "legally binding obligations," unlike in this case. 508 U.S. at 194. As the Supreme Court noted in *Lincoln*, "an agency is not free simply to disregard statutory responsibilities," such as those Defendants had here. *Id.* at 193.

In addition to their failure to acknowledge their post-H.R. 1 grant funding obligations, Defendants' rejection of using alternative administrative funds cannot satisfy the APA's alternatives requirement because it rested on an empty assertion: the record contains no analysis of the supposed tradeoff Defendants claimed to be worried about. *See* D.R.I. EPA 000095 (stating concern without support or analysis). They requested additional funds to administer

42

Solar for All in 2025 and received over $3 billion in "Environmental Programs and Management" funding for necessary "personnel and related costs" "not otherwise provided for." Pltfs. Br. at 13, 31-32. The record is devoid of any analysis of the effect of making up Solar for All's fraction of the $19 million in administrative funding that was rescinded for the entire Greenhouse Gas Reduction Fund. There is nothing in the record to support Defendants' claim in their memo, EPA Br. at 57, so for this additional reason, it cannot justify their decision to end Solar for All, in addition to their lack of legislative authorization to do so. Pltfs. Br. at 34-36.

Defendants' cited cases do not help them either. EPA Br. at 58. *ExxonMobil Gas Marketing Co. v. Federal Energy Regulatory Commission* made the uncontroversial point that "it is *statutory authorization* alone" that gives an agency its authority, so an agency violates the APA when it acts "in the absence of such authority." 297 F.3d 1071, 1088 (D.C. Cir. 2002) (emphasis in original). Here, Defendants canceled an entire grant program mandated by congressional appropriation, which Congress left in place by rescinding only unobligated balances. EPA had no authority to do so; its action was an unauthorized overreach, not a "conservative view of its own authority." *See id.*

Likewise, in *Environmental Defense Fund v. EPA*, Defendants' quoted language cautions against second-guessing how an agency prioritizes its compliance with a statutory mandate—it does not allow an agency to flout one entirely. 922 F.3d 446 (D.C. Cir. 2019). There, the court held that while EPA had a statutory duty to assign and apply "a unique public identifier for each chemical identity it decides to keep confidential," it did not have to do so in the challenged rulemaking, so long as it did so eventually. *Id*. at 457. Here, by contrast, Defendants made a final decision to "terminate the SFA [Solar for All] program" for good, and do not dispute that they

43

intend to never comply with the appropriation of those obligated funds for their intended purpose. Nothing in the APA or H.R. 1 authorizes that decision.

### 3. *Defendants failed to consider serious reliance interests.*

As Plaintiffs explained in their opening memo, Defendants failed entirely to consider significant reliance interests when they decided to terminate the Solar for All program, including the interests of the very communities Congress intended the program to benefit. Pltfs. Br. at 36-41. In response, Defendants do not contend they considered those interests; instead, they argue that such interests were not meaningful and that they acknowledged other interests. *See* EPA Br. at 59-60. But acknowledging that reliance interests exist and then dismissing them without analysis is not the "reasoned analysis" the APA requires. *See State Farm*, 463 U.S. at 42.

When an agency changes course, it must do more than gesture at reliance interests. It must actually grapple with them: "As the Supreme Court has explained, '[w]hen an agency changes course,' it is 'required to *assess* whether there were reliance interests, *determine* whether they were significant, and *weigh* any such interests against competing policy concerns.'" *Illinois v. Noem*, No. 1:25-CV-00495-MSM-PAS, 2025 WL 3707011, at *11 (D.R.I. Dec. 22, 2025) (first alteration in original) (emphases added) (quoting *Regents*, 591 U.S. at 30, 33). In *Regents*, the agency's failure was not that it ignored reliance interests altogether, but that it said nothing about whether and how those interests could be accommodated. 591 U.S. at 30-33. *Cf. Am. Hosp. Ass'n v. Kennedy*, 164 F.4th at 33-35 (merely identifying "a sentence in the record" that acknowledged potential impact does not demonstrate that the agency "considered whether and to what extent" the action would harm affected parties).

The same is true here. The best the government can do is point to an EPA memo that acknowledged in passing that "some program participants" may have relied on Solar for All

44

funding but then waved these interests away as "limited in scope" due to the program's supposedly "nascent" status, without conducting any actual analysis of the nature or extent of those reliance interests. D.R.I. EPA 000091, 000093. This characterization was wrong on the facts and reflects a fundamental misunderstanding of how reliance interests work under the law.

First, the program was not "nascent" in any meaningful sense. By the time Defendants terminated the program, Congress had appropriated $7 billion two years earlier; EPA had conducted a competitive grant process; all 60 grants had been awarded; grantees had finalized EPA-approved workplans and budgets; and subgrantees, contractors, and community partners, including Plaintiffs, had spent years preparing applications, hiring staff, purchasing equipment, building community relationships, and developing specific projects. *See* Pltfs. Br. at 3-11. EPA's conclusory assertion that the program was "nascent" ignored the extensive implementation work that had occurred downstream from the prime grantees—the very work EPA's own Notice of Funding Opportunity, D.R.I. EPA 000308-90, and associated materials were designed to encourage.

*Second*, Defendants' conclusion that the closeout process would "lessen[]" the impact of termination, EPA Br. at 59, was unreasonable. The closeout process reimburses only certain "allowable pre-termination costs", EPA Br. at 59, to grantees. *See* 2 C.F.R. § 200.344 (describing the closeout process). But many other types of harms from Defendants' decision are not compensable through closeout, as Plaintiffs' own experiences make clear: lost business opportunities, damaged community relationships, frustrated organizational missions, workforce instability, and the inability to deliver promised services to low-income households are not allowable pre-termination costs. Pltfs. Br. at 55-58. The closeout process was never designed to

45

make whole the downstream participants and communities that the entire program was created to serve.

*Third*, Defendants' treatment of the reliance interests of non-grantee beneficiaries, including Plaintiffs, was particularly deficient, especially given the broad community benefits the program was created to impart. EPA conducted no analysis to support its conclusion that these interests were "limited in scope." *See* D.R.I. EPA 000093. It did not survey subgrantees, contractors, or community organizations. It did not assess the scope of downstream hiring, contracting, or community outreach. It did not consider that organizations like Plaintiffs forewent other opportunities—other grants, other business development, other revenue-generating work—in reliance on the program. *See* Schoolman Decl. ¶¶ 6, 13, 29, 45 (Doc. 32-8) (describing foregone opportunities due to Solar for All prioritization); Buchanan Decl. ¶¶ 16-17, 22 (Doc. 32-4) (same). An agency cannot satisfy its obligation to consider reliance interests by simply assuming they do not exist, without bothering to look. *See Regents*, 591 U.S. at 30-33.

*Fourth*, Defendants' attempt to distinguish *Regents* fails. *See* EPA Br. at 60-61. Defendants argue that *Regents* is inapposite because the immigration program at issue involved unique "legal protection" the government alone could provide, whereas here they claim Plaintiffs' interests are "solely monetary" simply because Solar for All is a grant program. *Id.* at 61. This argument misreads *Regents* and mischaracterizes the interests of Plaintiffs and the many others the program was created to help. Plaintiffs' reliance interests are far from "solely monetary." *See id.* They are precisely the kinds of serious decisions that *Regents* held an agency must consider. *See* 591 U.S. at 30-33. The *Regents* Court considered the full range of life decisions Deferred Action for Childhood Arrivals recipients had made, including financial ones. *Id.* at 31; *see also*

46

*Woonasquatucket*, 778 F. Supp. 3d at 471 (finding the government "ignored significant reliance interests" when it failed to consider "projects halted, staff laid off, goodwill tarnished").

*Fifth*, Defendants' invocation of the foreign-manufacturing waivers as a basis for minimizing reliance interests, EPA Br. at 60, is a non sequitur. Whether some solar components might have been manufactured abroad has nothing to do with the reliance interests of the American workers, businesses, nonprofits, and households who invested in preparing to implement the program domestically. Plaintiffs' reliance interests arise from their own investments of time, money, and organizational capacity, not from the country of origin of solar panels. Defendants' suggestion that the domestic impact was "significantly lessened," *see id.*, because some equipment might have been foreign-made reflects a fundamental failure to understand the reliance interests the APA requires an agency to consider.

Finally, perhaps aware that EPA's failure to seriously consider reliance interests would otherwise be fatal, Defendants argue that their decision to terminate the Solar for All program despite that failure should be sustained under the harmless error doctrine. *See* EPA Br. at 61. But as Plaintiffs have demonstrated, the forward-looking repeal of the Greenhouse Gas Reduction Fund and recission of *unobligated* funds did not require or authorize EPA to terminate this program. Pltfs. Br. at 27-32. All $7 billion in grant funding for the Solar for All program was obligated, and thus unaffected by the repeal and recission, and the funds remain in EPA's account. *See Colorado*, 788 F. Supp. 3d at 307-08 (refusing to ignore reliance interests in part because, "[b]ased on Congress's direction that the funds remain available, the Government's argument that it met some of the statutory requirements in the appropriation acts is irrelevant; it is certainly not dispositive of any questions about its refusal to spend the remaining funds because it believes the money is no longer necessary"). Because the statutory premise of EPA's

47

decision here was also fundamentally wrong, the inadequacy of its reliance-interest analysis cannot be dismissed as harmless. An agency cannot claim harmless error when its primary rationale for action is itself unlawful.

### B. Defendants Violated the Constitution.

Defendants admit the key administrative and legislative actions that form the basis for Plaintiffs' constitutional claims: Defendants agree that $7 billion in Solar for All program funds were appropriated and obligated to Solar for All awardees prior to the passage of H.R. 1, EPA Br. at 4-5, 7-8, and that these $7 billion in funds were not addressed by H.R. 1: "OBBBA is silent on what EPA should do with existing SFA grants." *Id.* at 53.

On this undisputed record, and notwithstanding Administrator Zeldin's unambiguous statement that "EPA is taking action to end *this program* for good," *see* Pltfs. Br. at 14 (citation omitted), Defendants contend that EPA did not terminate the Solar for All Program, and that "there is no [] SFA program" following H.R. 1. EPA Br. at 43. This fictional construct simply cannot be reconciled with Defendants' admissions that Solar for All program funds were obligated to Solar for All awardees months prior to the passage of H.R. 1, *id.* at 5, 27, that only "unobligated" funds were rescinded by H.R. 1, *id.* at 1, 8, 23, 44, and that H.R. 1 "is silent" on the awarded grants that comprise the program. *Id.* at 53. Defendants, in effect, ask the Court to help them make $7 billion in Congressional appropriations disappear, when Congress itself left them in place. The Constitution forbids this sleight of hand.

### 1. *Because H.R. 1 is silent on the obligated Solar for All funding,* Dalton v. Specter *does not apply.*

On the undisputed administrative and legislative record, Plaintiffs' freestanding constitutional claims are not precluded by *Dalton v. Specter*, 511 U.S. 462 (1994). The record establishes that Congress funded the Solar for All program and all grant funds were appropriated

48

and obligated prior to H.R. 1. Given the congressional mandate, it would violate the Separation of Powers for EPA to refuse to continue the program. As a *defense* to the constitutional claim, Defendants argue that H.R. 1 gave them statutory authority to terminate the Solar for All grants.

By its terms, however, *Dalton* applies only when a claim challenges executive action as exceeding statutory authority: *Dalton* holds that judicial "review is not available when the *statute in question* commits the decision to the discretion of the President." 511 U.S. at 474 (emphasis added). Here, Defendants acknowledge that "OBBBA is silent on what EPA should do with existing SFA grants." EPA Br. at 53. By Defendants' own admission, then, H.R. 1 did *not* commit any discretion to the President or EPA Administrator to terminate Solar for All, and *Dalton* is inapposite.

Moreover, *Dalton* itself recognizes that there is a distinction between "claims of constitutional violations and claims that an official has acted in excess of his statutory authority," 511 U.S. at 472, and the holding in *Dalton* expressly sanctioned constitutional claims where the executive acts in the "absence of any statutory authority" whatsoever. *Id.* at 473 (emphasis removed). It would be a drastic expansion of *Dalton* for this Court to find that judicial review of Defendants' actions is unavailable where they themselves concede the statute they cited to justify their actions is "silent" on whether there is authority to act. *See Am. Fed'n of Gov't Emps. v. Trump*, 784 F. Supp. 3d 1316, 1347 (N.D. Cal. 2025) ("Plaintiffs' [ultra vires] claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed."), *vacated & remanded on other grounds*, 155 F.4th 1082 (9th Cir. 2025); *Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1331743, at *4-5 (N.D. Ill. May 7, 2025) ("*Dalton* did not involve the Spending Clause[.]"); *Does 1-26 v. Musk*, 771 F. Supp. 3d 637, 678 (D. Md. 2025) (unlike in *Dalton*, "Plaintiffs' Separation of Powers claim is not based only on alleged statutory

49

violations but instead further asserts that the [challenged action] exceeds the President's Article II powers.").

Moreover, Defendants cite the D.C. Circuit's opinion in *Global Health Council v. Trump* as supporting their *Dalton* argument here, EPA Br. at 52, 54 (citing *Glob. Health Council*, 153 F.4th 1 (D.C. Cir. 2025)), but that case did not address a decision to terminate an entire congressionally mandated grant program. And notably, the D.C. Circuit's application of *Dalton* in *Global Health Council* hardly represents that court's settled view. Last month, the D.C. Circuit reheard argument en banc in two cases—*Climate United Fund v. Citibank N.A.*, No. 25-5122 (D.C. Cir.), and *National Treasury Employees Union v. Vought*, No. 25-5091 (D.C. Cir.)— in which the proper understanding of *Dalton* is hotly contested. *See, e.g.*, Order, *Climate United Fund v. Citibank N.A.*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) (granting rehearing en banc); *see also* Order, *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *3 (D.C. Cir. Aug. 28, 2025) (denying rehearing en banc) (Pan, J., dissenting) (noting the *Dalton* issue will likely be addressed on rehearing in other pending cases). Regardless, in this case, the lack of any authorization in H.R. 1 for Defendants' action makes *Dalton* inapplicable here.

### 2. *Defendants violated the Separation of Powers.*

In light of the H.R. 1's "silence" on the awarded Solar for All grant program, Congress's 2022 appropriation remains controlling. Article II requires the executive branch to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and the executive branch does not have the ability to disobey duly enacted laws for policy reasons—reasons that here include EPA's policy position that continuing to administer the program would be "improper," *see* D.R.I. EPA 000091, and its policy choice not to use available funds to do so. *See In re Aiken Cnty.*, 725

50

F.3d at 266-67 & 261 n.1 (stating that the executive "does not have unilateral authority to refuse to spend [congressionally appropriated] funds"); *Matthews v. Zane's Lessee*, 9 U.S. 92, 98 (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."); *Kendall v. United States* ex rel. *Stokes*, 37 U.S. 524, 613 (1838) (explaining that dispensing power "has no . . . support in any part of the constitution").

Defendants' argument, by contrast, would allow them to overturn Congress's spending choices—including Congress's choice to rescind only unobligated amounts and leave the entire obligated grant program in place, where it remains subject to the express purpose and limitations Congress imposed in appropriating that funding. That would allow the executive branch to control these important spending decisions and would be an impermissible violation of the separation of powers. "[I]t is for the Congress in the responsible exercise of its legislative power to make provisions for termination" of a program, and "[u]ntil those provisions are made, the function of the Executive is to administer the program in accord with the legislated purposes." *Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 79 (D.D.C. 1973). Here, as in the many Nixon-era impoundment cases, "[t]he defendants have no residual constitutional authority to refuse to spend the money." *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 903 (D.D.C. 1973), *supplemented*, 387 F. Supp. 991 (D.D.C. 1974), *rev'd on other grounds*, *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Mathews*, 546 F.2d 1003 (D.C. Cir. 1976). Their argument is "a violation of the spirit, intent and letter of the Act and a flagrant abuse of executive discretion." *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 700 (E.D. Va. 1973) (entering declaratory judgment holding the challenged policy null and void).

### 3. *Defendants violated the Presentment Clause.*

Defendants argue that "the Presentment Clause is not implicated because EPA neither enacted a different law than what Congress passed nor vetoed the law." EPA Br. at 55.

Defendants admit that H.R. 1 is silent on all obligated grant funding but assert elsewhere in their brief that H.R. 1 "repealed EPA's statutory authority to run the SFA program." *Id.* at 44. Based on the retroactivity they would graft onto the plainly prospective language of H.R. 1, Defendants then extrapolate that "Section 134 no longer governs," *id.* at 46, and therefore "the SFA grants served no statutory purpose," *id.* at 37 n.14, leaving Defendants free to eliminate the supposedly "orphaned" grants across the board. *Id.* at 46. All these assertions are impermissible attempts to rewrite the statute and retroactively erase the congressional appropriations language that—because H.R. 1 did nothing to affect all $7 billion in obligated grant funding—continues to govern Solar for All. Defendants' unilateral decision to terminate the program in reliance on H.R. 1 grafts onto the legislation language that was neither passed by Congress nor presented to the President.

It is undisputed that Defendants terminated all awards that constitute the $7 billion mandated by Congress for this program, and that EPA is unwilling to spend any of those funds. It is further undisputed that Defendants' claimed authority for this refusal is H.R. 1, and that this legislation does not include any language relieving EPA of its obligation to spend the program funds for their congressional purpose. As a result, Defendants' reliance on H.R. 1 to claim authority to terminate the entirety of Solar for All imports language into the legislation that simply is not there, in violation of the Presentment Clause.

IV.     **Restoring the Program Is the Proper Remedy**

A.  **Vacatur Is Appropriate.**

In keeping with the statutory instruction that the reviewing court "shall . . . hold unlawful and set aside agency action" that violates the APA, 5 U.S.C. § 706(2), the "normal remedy" for a "successful APA challenge is vacatur." *Woonasquatucket*, 778 F. Supp. 3d at 478. *Accord Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 139 (D. Mass. 2025) (holding that "remand is insufficient" and vacatur of agency's policy was the appropriate remedy where the court found it to be unlawful). The Supreme Court has explained that Section 706(2)(A) "*requires* federal courts to set aside federal agency action that is not in accordance with . . . *any* law.'" *Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (first emphasis added) (cleaned up). This relief is consistent with the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025).

Defendants merely assert that the Court "should limit any remedy to remand," EPA Br. at 61, without attempting to justify why such a remedy would be appropriate here, let alone satisfy the factors for remand without vacatur set out in *Allied-Signal, Inc. v. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993). *See id.* at 150-51 (identifying seriousness of deficiencies and disruptive consequences as relevant factors). Here, the seriousness of the deficiencies in Defendants' decision means there is no possibility of rehabilitating their decision on remand. *See Abramowitz*, 2026 WL 746989, at *15 ("[T]he Court can hardly imagine the defendants have a non-arbitrary justification for these actions on remand after they have failed to muster one in litigation."). And "the potential for disruption *favors* vacatur, not an exception," *id.*, because vacatur here would restart an already-underway grant program so communities

53

around the country could receive low-cost solar energy at a time of skyrocketing electricity bills, as Congress mandated.

Rather than argue for their position, Defendants try to imply that remand alone should be the default remedy. *See* EPA Br. at 61-62 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)). Not so. In Defendants' cited case, the Supreme Court did not rewrite the APA to limit the availability of vacatur as the proper remedy for an unlawful agency action. Instead, it noted that remand can be appropriate in situations where, *inter alia*, "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it." *Id.* at 744. This direction from the Supreme Court is aimed at preventing a court from stepping into the role of an agency in developing an administrative record. *Id.* at 743-44. It does not limit the appropriateness of vacatur where, as here, the record establishes an agency action violated the APA.

## B. An Injunction Is Also Appropriate.

Plaintiffs also have provided the Court all it needs to order injunctive relief.

> A district court will grant a permanent injunction if the plaintiff can show: (1) actual success on the merits of its claims; (2) that they would be irreparably injured in the absence of injunctive relief; (3) that the harm suffered from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction; and (4) that the public interest would not be adversely affected by an injunction.

*Rhode Island v. Trump*, No. 1:25-cv-128-JJM-AEM, 2025 WL 3251113, at *17 (D.R.I. Nov. 21, 2025) (internal quotation marks omitted) (quoting *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025)), *appeal filed*, No. 26-1070 (1st Cir. Jan. 21, 2026). "[T]he last two factors merge because the Government is the opposing party." *Woonasquatucket*, 778 F. Supp. 3d at 456 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, such relief is an equitable remedy that is available for Plaintiffs' claims under the APA, *see* 5 U.S.C. § 703 (APA encompasses "actions

54

for . . . writs of prohibitory or mandatory injunction"), and would provide an operative remedy for Plaintiffs' freestanding constitutional claims, by prohibiting continued implementation of the unlawful termination and requiring restoration of the program. Because Plaintiffs, some of whom work nationwide, seek the opportunity to compete for opportunities within the program, it should be fully restored in order to provide "complete relief" to Plaintiffs, notwithstanding any "incidental[]" benefits to nonparties. *CASA*, 606 U.S. at 851-52.

In addition to demonstrating success on the merits, Plaintiffs' opening brief provided all the information required under the remaining injunction factors.

District courts "have broad discretion to evaluate the irreparability of harm and to make determinations regarding the propriety of injunctive relief." *Ross-Simons of Warwick, Inc. v. Baccarat*, 217 F.3d 8, 13 (1st Cir. 2000) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989)). Irreparable harm can consist of "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 19 (1st Cir. 1996). For example, this Court recently found that "reducing hiring, . . . furloughing and laying off staff, . . . shuttering planned projects, . . . curtailing or ending current projects, and . . . damage to the relationship between nonprofits and communities they serve . . . more than adequately demonstrated irreparable harm." *Woonasquatucket*, 776 F. Supp. 3d at 474; *see also Rhode Island v. Trump*, 155 F.4th 35, 49 (1st Cir. 2025) (recognizing "irreparable harm stemming from the loss of grant funding").

Plaintiffs' opening brief and accompanying declarations establish irreparable harm, and there is no need to repeat that evidentiary showing at length here. *See* Pltfs. Br. at 53-62. That record shows ongoing injuries that are not adequately compensable by money damages, including stranded investments, actual and threatened layoffs, diversion of staff and

55

organizational resources, frustrated missions, reputational injury with communities and partner organizations, lost business and implementation opportunities, and the loss of access to the energy-bill savings and related benefits Solar for All was designed to provide. Those harms are already occurring and will continue absent restoration of the program.

Defendants have no cognizable interest in continuing to implement an unlawful program termination, and "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025) (cleaned up). Indeed, that is precisely the remedy they recently told the D.C. Circuit would be proper in this circumstance. *See* Ex. 1, *Climate United Fund* Tr. at 63:2-3 ("the remedy would be restore the program"). By contrast, Plaintiffs and the communities Congress sought to benefit will continue to lose jobs, projects, community partnerships, and access to lower-cost electricity absent relief. The public interest strongly favors both faithful execution of Congress's spending decision and compliance with the Constitution.

Finally, Plaintiffs have not waived their request for injunctive relief, as Defendants argue. *See* EPA Br. at 62. As long as Plaintiffs have "presented all the procedural and substantive issues" to demonstrate that they meet the requirements for an injunction, the "court [may] issue a ruling with respect to such relief." *Allstate Ins. Co. v. Fougere*, 581 F. Supp. 3d 307, 313 (D. Mass. 2022), *aff'd*, 79 F.4th 172 (1st Cir. 2023). Plaintiffs sought injunctive relief in their Complaint—Complaint, Jurisdiction and Venue ¶ 15, Prayer for Relief ¶¶ 250 (C)-(D) (Doc. 1)—and preserved that request in their summary judgment papers. As explained above, Plaintiffs' Motion for Summary Judgment and Memorandum in Support sufficiently presented all the support needed to address the injunction factors and justify this relief. *See Allstate*, 581 F. Supp. 3d at 313 ("In the absence of any clear statement by [the plaintiff] of an intent to abandon

56

its right to pursue a permanent injunction, the court declines to find that the request for a permanent injunction has been waived."). Plaintiffs have presented the substantive issues and factual record needed to support that remedy; the fact that the opening brief did not include a longer standalone discussion of each injunction factor does not amount to abandonment. The waiver cases Defendants cite concern issues raised for the first time on reply, not a remedy expressly requested from the outset and supported by the same record already before the Court.

## CONCLUSION

In a single, program-level agency action, Defendants terminated Congress's spending decision to help struggling communities around the country via Solar for All. The Court should reverse Defendants' unlawful termination of this important program.

Respectfully submitted, this 20th day of March, 2026,

/s/ *James Crowley*
James Crowley (R.I. Bar No. 9405)
Alexandra St. Pierre* (MA Bar No. 706739)
Conservation Law Foundation
235 Promenade St.
Suite 560, Mailbox 28
Providence, RI 02908
Telephone: (401) 228-1905
Facsimile: (401) 351-1130
jcrowley@clf.org
aestpierre@clf.org


/s/ *Gary DiBianco*
Gary DiBianco* (D.C. Bar No. 458669)
Jillian Blanchard* (CA Bar No. 203593)
Amy Powell* (N.C. Bar No. 50300)
Larissa Koehler* (CA Bar No. 289581)
Lawyers for Good Government
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011

/s/  *Nicholas S. Torrey*
Nicholas S. Torrey* (N.C. Bar No. 43382)
Banumathi Rangarajan* (N.C. Bar No. 27311)
David Neal* (N.C. Bar No. 27992)
Kimberley Hunter* (N.C. Bar No. 41333)
Jennifer Whitfield* (D.C. Bar No. 983212)
Ben Grillot* (D.C. Bar No. 982114)
Southern Environmental Law Center
136 E. Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
ntorrey@selc.org
brangarajan@selc.org
dneal@selc.org
kmeyer@selc.org
jwhitfield@selc.org
bgrillot@selc.org

/s/ *Amy R. Romero*
Amy R. Romero (RI Bar # 8262)

57

Telephone: (202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
amy@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

Kevin Love Hubbard* (MA Bar #704772)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
Telephone: (401) 453-1500
Amy@dwbrlaw.com
Kevin@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, the foregoing Plaintiffs' Reply in Support of

Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary

Judgment was filed through the Court's electronic filing system ("ECF"), by which means the

document is available for viewing and downloading from the ECF system, and that all

participants in the case are registered CM/ECF users and service will be accomplished by the

CM/ECF system.

/s/ Nicholas S. Torrey
Nicholas S. Torrey (N.C. Bar No. 43382)
Southern Environmental Law Center
136 E. Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421