**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND AFL-CIO, *et al.*, <br><br>        *Plaintiffs*, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br>        *Defendants*. | No. 1:25-cv-00510-MSM-PAS |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    As Non-Grantees, Plaintiffs Cannot Meet the Elements of Article III Standing. ............... 2

    II.    Plaintiffs Are Not Within the Zone of Interests of the Statutes that EPA Purportedly Violated. ........................................................................................................... 7

    III.    This Court Lacks Jurisdiction Over Plaintiffs' Claims. ...................................................... 8

        A.    *NIH*, *California*, and First Circuit Precedent Foreclose Plaintiffs' Claims in District Court. ........................................................................................................... 9

        B.    EPA's Discretionary Decision Not to Use Lump-Sum Appropriations to Administer SFA Grants is Not Reviewable. ....................................................................... 15

        C.    Plaintiffs Fail to Identify Any Waiver of Sovereign Immunity for Non-APA "Freestanding" Constitutional Claims. ............................................................... 16

    IV.    Plaintiffs' Claims Fail as a Matter of Law. ....................................................................... 17

        A.    Plaintiffs' Statutory Claim Fails Because EPA Cannot Violate a Repealed Statute...... 17

        B.    The Constitutional Claims Fail under *Dalton* and for the Same Reasons as the Statutory Claim. ........................................................................................... 23

        C.    EPA's Termination of the SFA Grants Following Congress's Repeal of Section 134 and Rescission of Administrative Funding Was Not Arbitrary or Capricious. ................... 24

    V.    Plaintiffs Have Not Shown Any Need for Any Remedy Other Than Remand. ................ 28

CONCLUSION................................................................................................................. 32

## TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Advocate Health Care Network v. Stapleton,*
581 U.S. 468 (2017)...................................................................................................... 21

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) ......................................................................................... 18

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019)...................................................................................................... 21

*Bennett v. Spear,*
520 U.S. 154 (1997)...................................................................................................... 12

*Bos. Redevelopment Auth. v. Nat'l Park Serv.,*
838 F.3d 42 (1st Cir. 2016) .......................................................................................... 27

*Brock v. Pierce Cnty.,*
476 U.S. 253 (1986)...................................................................................................... 31

*California v. U.S. Dep't of Educ.,*
769 F. Supp. 3d 72 (D. Mass. 2025) .............................................................................. 9

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)........................................................................................................ 5

*Colorado v. U.S. Department of Health and Human Services,*
783 F. Supp. 3d 641 (D.R.I. 2025)............................................................................... 25

*Nuclear Regul. Comm'n v. Texas,*
605 U.S. 665 (2025).............................................................................................. 16, 17

*Dalton v. Specter,*
511 U.S. 462 (1994)............................................................................................... 16, 22

*De La Rama S.S. Co. v. United States,*
344 U.S. 386 (1953)...................................................................................................... 22

*Dep't of Educ. v. California,*
604 U.S. 650 (2025)................................................................................................. passim

*Diamond Alt. Energy, LLC v. EPA,*
606 U.S. 100 (2025)........................................................................................................ 6

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006)...................................................................................... 16

*Dorsey v. United States*,
  567 U.S. 260 (2012)...................................................................................... 20

*DraftKings Inc. v. Hermalyn*,
  118 F.4th 416 (1st Cir. 2024) ...................................................................... 29

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009)...................................................................................... 28

*Foxboro Co. v. Arabian Am. Oil Co.*,
  805 F.2d 34 (1st Cir. 1986) .......................................................................... 30

*Garcia v. United States*,
  469 U.S. 70 (1984)........................................................................................ 21

*Great N. Ry. Co. v. United States*,
  208 U.S. 452 (1908)...................................................................................... 22

*Greene v. Ablon*,
  794 F.3d 133 (1st Cir. 2015) ........................................................................ 29

*Harper v. Werfel*,
  118 F.4th 100 (1st Cir. 2024) ...................................................................... 11

*Hikvision USA, Inc. v. FCC*,
  97 F.4th 938 (D.C. Cir. 2024) ..................................................................... 18

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949)...................................................................................... 16

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)...................................................................................... 15

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020)...................................................................................... 23

*Lopez v. Garriga*,
  917 F.2d 63 (1st Cir. 1990) .......................................................................... 30

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................. passim

iii

*Maryland v. King*,
   567 U.S. 1301 (2012)...................................................................................................... 31

*Massachusetts v. Kennedy*,
   No. 1:25-CV-10814, 2025 WL 1747213 (D. Mass. June 23, 2025) ........................................ 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012)..................................................................................................... 7, 8

*Matthews v. Eldridge*,
   424 U.S. 319 (1976)........................................................................................................ 31

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)........................................................................................................ 29

*Narragansett Indian Tribe v. Guilbert*,
   934 F.2d 4 (1st Cir. 1991) .............................................................................................. 30

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025)............................................................................................... passim

*New York v. Trump*,
   No. 25-1236, 2026 WL 734941 (1st Cir. Mar. 16, 2026)................................................. passim

*New York v. Trump*,
   No. 25-CV-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) .............................................. 8

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015)........................................................................................... 30

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
   835 F.2d 380 (1st Cir. 1987) .......................................................................................... 30

*Rochester Pure Waters Dist. v. EPA*,
   960 F.2d 180 (D.C. Cir. 1992) .................................................................................. 20, 21

*Salazar v. Ramah Navajo Chapter*,
   567 U.S. 182 (2012)........................................................................................................ 23

*Sardarian v. Federal Emergency Management Agency*,
   No. 3:19-CV-00910, 2022 WL 4080325 (D. Conn. Apr. 1, 2022)............................................ 3

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   123 F.4th 1 (1st Cir. 2024) ............................................................................................... 8

iv

*Shell Co. (Puerto Rico) v. Los Frailes Serv. Station, Inc.*,
   605 F.3d 10 (1st Cir. 2010) ................................................................................ 29, 30

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ...................................................................................................... 6

*Steir v. Girl Scouts of the USA*,
   383 F.3d 7 (1st Cir. 2004) ......................................................................................... 30

*Train v. City of New York*,
   420 U.S. 35 (1975) .......................................................................................... 18, 23, 24

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) ...................................................................................................... 25

*United States ex rel. Sargent v. Collins*,
   165 F.4th 102 (1st Cir. 2026) ................................................................................... 16

*United States v. Larionoff*,
   431 U.S. 864 (1977) .................................................................................................. 25

*United States v. W. T. Grant Co.*,
   345 U.S. 629 (1953) .................................................................................................. 30

*Van Buren v. United States*,
   593 U.S. 374 (2021) .................................................................................................. 20

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) .................................................................................................. 27

*Washington v. Fed. Emergency Mgmt. Agency*,
   No. 25-cv-12006, 2025 WL 3551751 (D. Mass. Dec. 11, 2025) ............................... 18

**Statutes**

1 U.S.C. § 109 ............................................................................................................. 7

5 U.S.C. § 701(a)(2) .................................................................................................. 15

16 U.S.C. § 2105 ....................................................................................................... 16

42 U.S.C. § 7434(a) ..................................................................................................... 6

42 U.S.C. § 7434(a)(1) .............................................................................................. 14

42 U.S.C. § 7437 ....................................................................................................... 16

Pub. L. No. 119-4 .............................................................................................................. 26

**<u>Regulations</u>**

2 C.F.R. § 200.300 ............................................................................................................. 25

2 C.F.R. § 200.331 ............................................................................................................... 3

2 C.F.R. § 200.340 ............................................................................................................. 23

2 C.F.R. § 200.344 ............................................................................................................... 5

**INTRODUCTION**

Plaintiffs' response to Defendants' cross motion for summary judgment, like this litigation as a whole, is built on two pillars: (1) grants that were terminated on August 7, 2025, and (2) a statute that was repealed by Congress on July 4, 2025. Because neither can support relief in this Court, the lawsuit collapses.

Defendants' position in this case is simple. EPA's only action was terminating the Solar for All ("SFA") grants. Plaintiffs lack standing to challenge the grant terminations, and this Court lacks jurisdiction to adjudicate Plaintiffs' claims, as the Supreme Court and First Circuit have made clear. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam) ("*California*"); *New York v. Trump*, No. 25-1236, 2026 WL 734941 (1st Cir. Mar. 16, 2026). Plaintiffs do not (and cannot) distinguish this case from *NIH*, *California*, and now *New York*. No matter how many ways they describe their claims and requested relief, the only agency action was a decision to terminate grants, and the only relief Plaintiffs could hope to secure from the Court is an order undoing grant terminations. That relief would require EPA's "specific performance" of the grants, contravening "the Supreme Court's recent pronouncements regarding the interaction between the APA and the Tucker Act." *New York*, 2026 WL 734941, at *17.

Recognizing that they cannot sue in district court to challenge the grant terminations, Plaintiffs improperly resort to artful pleading to avoid the jurisdictional bar, which only leads to additional problems. Attempting to mask their challenge to grant terminations and their relief seeking disbursement of grant funds, Plaintiffs claim to challenge EPA's termination of an SFA "program" as violating Section 134 of the Clean Air Act. But Plaintiffs' "program" is a straw man. Section 134 authorized EPA to make grants using a one-time appropriation, which EPA did. But Congress then repealed Section 134. After the repeal, all that remained were orphaned

SFA grants, whose termination cannot be adjudicated here.  Though Plaintiffs ask the Court to enforce an alleged "congressional mandate," any such mandate ended when Congress repealed the statute.  Plaintiffs' claims for relief, in other words, rely entirely on a statute that no longer exists.  At any rate, Plaintiffs' request to vacate and enjoin the "program" termination would not provide them any relief.  Without jurisdiction to redress grant termination, Plaintiffs' request to restore the "program" could only prop up a meaningless shell, with no grants, no dedicated administrative funding, and no statutory mandate to govern it.  The Court should reject this nonsensical request for what it is: a plain effort to avoid justiciability requirements prohibiting Plaintiffs' challenges to grant termination.

Defendants therefore reiterate their request for summary judgment on all Plaintiffs' claims.

## ARGUMENT

### I.    As Non-Grantees, Plaintiffs Cannot Meet the Elements of Article III Standing.

Plaintiffs cannot contest the fundamental legal error of their lawsuit: they lack privity of contract with the government.  Plaintiffs cannot sue the government based on a third party's grant with an agency in an effort to restore that grant funding.  Because Plaintiffs cannot overcome this lack of privity, they seek to evade it with a fictive pleading challenging EPA's termination of a "program" that only further divorces their claims from any redressable injury.

As demonstrated in Defendants' opening brief, Plaintiffs have not established Article III standing, as they failed to present the "specific facts" showing (1) an "injury in fact," (2) that the injury is "fairly traceable to the challenged conduct of the defendant," and (3) that it is "likely, as opposed to merely speculative," that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  Importantly, "when the plaintiff is not … the object of the government action or inaction he challenges"—like here—

2

standing "is ordinarily 'substantially more difficult' to establish." *Id.* at 562 (citations omitted). Plaintiffs' opposition brief adds nothing to meet this "substantially more difficult" standard.

*First,* Plaintiffs fail to provide the "specific facts" necessary to meet the injury-in-fact element. They fail both to identify any "legally protected interest" and to provide "specific facts" needed to show an "invasion" of their purported interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotations omitted). Defendants' opening brief cited regulations and case law showing Plaintiffs do not have a "legally protected interest" in the six SFA grants under which they claim a benefit because they are not grantees and thus have no "direct legal relationship" with EPA. Defs.' Cross Mot. for Summ. J. & Opp. to Pls.' Mot. for Summ. J. 14–16, ECF No. 35 ("Def. Mot.") (quoting 2 C.F.R. § 200.331). Ignoring this federal law, Plaintiffs argue that EPA's position rests on a "fundamental mischaracterization" of their claims as challenging EPA's grant terminations. Pls.' Reply in Supp. of Mot. for Summ. J. & Opp. to Defs.' Cross-Mot. for Summ. J. 4, ECF No. 36 ("Pl. Opp."). But Plaintiffs do not explain how, as non-grantees, they have a "legally protected interest" in a grant "program" *absent the grants* that purportedly conferred a benefit to them in the first place. *See, e.g.*, *id.* at 7 (asserting injuries based on Rhode Island's status as "a coalition partner on Rhode Island's grant"); *id.* at 11 (describing their requested relief as "reviv[ing]" EPA's "obligated grant funding"). Instead, recognizing Plaintiffs' claims for what they are—*i.e.*, challenges to EPA's termination of six federal grants—privity with the government *does matter*: without it, Plaintiffs lack the "legally cognizable interest" necessary to establish standing. 2 C.F.R. § 200.331; *see* Def. Mot. 15–16.[1]

---

[1] Contrary to Plaintiffs' argument, *see* Pl. Opp. 4–5, the holding in *Sardarian* did not turn on the plaintiff's status as a non-citizen but rather his failure to show that he was a "recipient" of the federal grant or qualified as an "applicant" of the grant. *See Sardarian v. Fed. Emergency Mgmt.*

Nor do Plaintiffs point to any "specific facts" establishing "concrete and particularized" injuries.  Instead, Plaintiffs repeat the generalized vague injury statements made in their opening brief, like "Plaintiffs are left with lost income, stranded investments, and time they will not be able to recoup," and argue in conclusory fashion that these injuries are "quantified" and "actual"—without quantifying any of these purported actual injuries.  Pl. Opp. 6.  Plaintiffs likewise provide no details related to losses or expected losses under various grants, subgrants, and other contracts or explain why (and if) Plaintiffs have not been compensated under these agreements.  *See* Def. Mot. 16–17 (citing, *inter alia*, ECF No. 32-6, Wood Decl. ¶ 9 (no details regarding Rhode Island Center's "Memorandum of Agreement" with Rhode Island); ECF No. 32-3, Gunning Decl. ¶¶ 5, 7 (no details regarding Sunpath's not-yet-final contract with Georgia)).

Plaintiffs do no more to explain how their organizational injuries are "concrete" and "particularized."  *See* Def. Mot. 18–20.  Instead, they describe their roles under the SFA grants, subgrants, and contracts, and then ask the Court to assume *ergo* they have suffered concrete and particularized organizational injuries.  *See* Pl. Opp. 7 ("SUN and Black Sun Light Sustainability held subgrants"; "2KB was designated as a Program Administrator"; and "Sunpath was selected as an approved installer").  That is not enough.  They must show that "one or more of [their] members would … be directly affected apart from their special interest in the subject" of solar energy.  *Lujan*, 504 U.S. at 563 (quotations and citation omitted).  Plaintiffs have not done this.

Nor do Plaintiffs refute that the future injuries in their declarations fail to qualify as "imminent" and not merely "possible."  *See* Def. Mot. 17–18 & n.5 (citing ECF No. 32-1,

---

*Agency*, No. 3:19-CV-00910, 2022 WL 4080325, at *2 (D. Conn. Apr. 1, 2022) ("[T]he court finds that, for purposes of establishing jurisdiction, the plaintiff cannot show that he was a recipient of a HMGP award.").  So too here.  Like the plaintiff in *Sardarian*, Plaintiffs cannot show the "invasion of a legally cognizable interest" because they are not SFA grant recipients (or applicants, for that matter).

Crowley Decl. ¶ 12 (claiming RI AFL-CIO suffers from workers' loss of "*[p]rospects of future employment*" that "*may* not be recoverable") (emphasis added); ECF No. 32-7, Abdul-Rahman Decl. ¶ 23 (asserting that "staff [at BSLS] *may* be terminated or moved to contracted or part-time positions") (emphasis added); ECF No. 32-6, Wood Decl. ¶¶ 12–13 (describing only "the *risk* of [utility] shutoff" for RI Center's clients) (emphasis added)).  As the Supreme Court recognized, imminence is no less important than concreteness, because it ensures the claimed "injury is not too speculative for Article III purposes," and without establishing it, Plaintiffs here lack a legally cognizable injury-in-fact.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

*Second,* Plaintiffs do not establish that EPA caused the injuries set forth in their declarations.  To establish Article III standing, the plaintiff must "show a sufficiently direct causal connection between the challenged action and the identified harm," *Katz*, 672 F.3d at 71, and such connection cannot be "the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (cleaned up).  Plaintiffs argue that EPA's termination decision "forced the grantees to cease work," which "in turn" caused Plaintiffs, as "subgrantees, contractors, and beneficiaries" to lose "work, revenue, and opportunities."  Pl. Opp. 8–9.  But Plaintiffs fail to provide "specific facts" necessary to understand how EPA—rather than the SFA grantees or other third parties—caused them to suffer injuries related to the time and money spent preparing for the state-led SFA programs, or the work performed on behalf of the SFA grantees.  *See* Def. Mot. 21 & n.8.  Have Plaintiffs not been compensated for that time and work?  If not, Plaintiffs' complaint lies with the six SFA grantees or subrecipients for their failure to compensate them.  *See* ECF No. 30-23, DRI_EPA_000111 ("Termination Notice") (describing SFA grantees' opportunity to submit all pre-termination allowable costs under 2 C.F.R. §

5

200.344).  If so, then many of Plaintiffs' purported injuries do not exist.  Either way, Plaintiffs do not provide the Court with the specificity required to show "causation" under Article III.

*Finally,* Plaintiffs fail to show how this Court can redress their injuries by restoring the SFA program without also reinstating the six SFA grants at issue, which the Court lacks jurisdiction to do.  *Infra* at 9–14.  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998).  Plaintiffs' stated injuries are their loss of "work, revenue, and opportunities" purportedly caused by the SFA grantees' inability to continue work under the SFA "program."  Pl. Opp. 8.  To remedy these purported injuries, Plaintiffs seek vacatur of EPA's "termination of the program," so that the "downstream work it funds, may resume."  *Id.* at 9–10.  The redressability problem with this relief is twofold. First, Congress created the SFA program through Section 134, *see* 42 U.S.C. § 7434(a)–(c), and three years later, Congress repealed that program through OBBBA § 60002.  The Court cannot restore a program that Congress ended.  *See infra* at 14 & n.8.  And even if the Court could order EPA's resurrection of the program, such an order would not redress Plaintiff's purported injuries without requiring both EPA's *and* the SFA grantees' continued contractual performance to provide Plaintiffs with downstream work and opportunities.  Without any ability to order EPA or the SFA grantees to perform, *infra* at 12–13; Def. Mot. 35, it is "entirely conjectural" whether the "nonagency activity that affects [Plaintiffs]"—*i.e.*, contractual performance by six SFA grantees—"will be altered or affected by the agency activity they seek to achieve"—*i.e.*, the restoration of a (now-repealed) program.  *Lujan*, 504 U.S. at 571.[2]

---

[2] It is also unclear how the restoration of the SFA program, absent the restoration of the six SFA grants, would "remove the 'impediment to [Plaintiffs'] ability to fully compete in the market' and participate in the program."  Pl. Opp. 10 (citing *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100,

That leads to the second problem: what Plaintiffs really want to redress their claimed injuries is an order requiring EPA's continued performance under the terminated SFA grants. Plaintiffs even say this:

> [I]f the Court vacates the termination decision, *EPA's obligated grant funding would be revived [and]grantees—regardless of their identity—would be authorized to resume projects*, and downstream participants, including Plaintiffs would be able to resume their work and continue competing for the opportunities the program provides.

Pl. Opp. 11 (emphasis added).  In other words—and in Plaintiffs' words—the only way to redress Plaintiffs' downstream injuries is for the Court to order the reinstatement of the SFA grants and EPA's continued disbursement of SFA funds under those grants.  As set forth below, the Court cannot do that.  *See infra* at 9–14; *New York*, 2026 WL 734941, at *17.  This does not "conflate the redressability inquiry" with "jurisdiction[]," as Plaintiffs argue.  Pl. Opp. 10.  It only underscores that Plaintiffs lack standing because the Court cannot redress their injuries.

## II.    Plaintiffs Are Not Within the Zone of Interests of the Statutes that EPA Purportedly Violated.

In attempting to establish a claim under the APA, Plaintiffs assert that Defendants acted contrary to OBBBA § 60002 and the general savings statute, 1 U.S.C. § 109.  ECF No. 1, ¶¶ 168-80 (Count I).  But Plaintiffs lack prudential standing to sue under those statutes because they are not within the "zone of interests" of either statute.  *See* Def. Mot. 26–27; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).  Nor do Plaintiffs argue

---

104–05 (2025)).  Indeed, that lack of clarity is what distinguishes this case from *Diamond Alternative Energy*: there, the oil manufacturers provided sufficient evidence showing that setting aside regulations requiring more electric cars would redress their monetary injuries and return their ability to compete in the energy market.  Here, Plaintiffs provide no evidence showing that setting aside EPA's "termination of the program"—without an order reinstating the grants— would do anything for them, much less remove a barrier to their ability to compete in some unidentified "market."

otherwise.  *See* Pl. Opp. 12–13.  Plaintiffs instead assert they only need to be in the zone-of-interests of the "broader statutory scheme governing the Solar for All program."  *Id.* at 13 (citing cases).[3]  Not true.  The Supreme Court in *Patchak* held that a court must consider the zone-of-interests of the statute that was purportedly "violated"—not a generalized statutory scheme.  567 U.S. at 224.  The cases Plaintiffs cite only support this conclusion.  *See Seafreeze*, 123 F.4th at 20–21 (considering the zone-of-interests of two environmental statutes, "MMPA" and "NEPA," because plaintiffs alleged claims under those statutes); *New York v. Trump*, 2025 WL 3514301, at *6 (considering the zone-of-interests of the "statutes and regulations that collectively govern the permitting process for wind energy projects" because plaintiffs claimed that the government acted "contrary to" those statutes and regulations under the APA).  Because Plaintiffs are not within the zone of OBBBA § 60002 or the general savings statute, they lack prudential standing to assert APA claims premised on those statutes.

### III.    This Court Lacks Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' claims are based on the termination of grants, and Plaintiffs seek relief to require EPA to disburse funds under those grants.  Under Supreme Court and First Circuit authority, this Court lacks jurisdiction under the APA to adjudicate Plaintiffs' claims or provide the relief sought.  *NIH*, 145 S. Ct. at 2658; *California*, 604 U.S. at 651; *New York*, 2026 WL 734941, at *17.  The APA further bars Plaintiffs' claims because they are based on EPA's discretionary decision to terminate the grants instead of using general appropriations to continue to administer the SFA grants.  And Plaintiffs' statutory-based constitutional claims fail because

---

[3] Plaintiffs cite two cases: *New York v. Trump*, No. 25-CV-11221, 2025 WL 3514301, at *6-7 (D. Mass. Dec. 8, 2025) and *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024).

Plaintiffs cannot satisfy the "Hail Mary" exception to sovereign immunity's bar on claims against the government.

### A. *NIH*, *California*, and First Circuit Precedent Foreclose Plaintiffs' Claims in District Court.

This Court lacks jurisdiction. Plaintiffs' claims, though asserted under the APA, the Constitution, and two other federal statutes, are all based on SFA grants. The relief they seek is designed to enforce EPA's payment of funds under those grants. Under *NIH*, *California*, and recent First Circuit precedent, the APA "does not provide" district courts with jurisdiction to (1) "adjudicate claims 'based on' ... grants," or (2) "to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH*, 145 S. Ct. at 2660 (quoting *California*, 604 U.S. at 651); *see New York*, 2026 WL 734941, at *17 (same). Plaintiffs' attempt to distinguish, downplay, and ultimately evade this authority fails.

This case is no different than *California*. There, the Department of Education—like EPA here—terminated all grants under two congressionally-mandated grant programs. *See California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 (D. Mass. 2025) ("The record reflects that there was no individualized analysis of any of the programs; rather, it appears that <u>all</u> TQP and SEED grants were simply terminated.") (emphasis in original); *see* States' Stay Opposition at 4–5, 8–9, *California*, 604 U.S. 650 (24A910) ("*California* Opp.") (describing agency's termination of teacher-training grant programs under 20 U.S.C. §§ 1022 and 6672(a)).[4] Eight plaintiff states there—like Plaintiffs here—purported to challenge the agency's "programmatic decision" under the APA based on "statutes and regulations, not contracts" and sought "equitable relief," not money damages. *California* Opp. at 22, 25. In issuing a temporary restraining order, the district

---

[4] The parties' Supreme Court briefs in *California* are available at https://www.supremecourt.gov/docket/docketfiles/html/public/24a910.html.

court ordered the agency to, *inter alia*, "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States." *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d at 80. The Supreme Court stayed this order, holding that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *California*, 604 U.S. at 651 (citation omitted). The same conclusion applies here. Plaintiffs—like the state-plaintiffs in *California*—purport to challenge a "program" decision and repeatedly disclaim the contractual nature of their case and any interest in an order resulting in the government's obligation to pay money under federal grants. Pl. Opp. 14–16, 19, 20. But Plaintiffs also describe the vacatur they seek as "restoring the status quo before [EPA's termination] took place." *Id.* at 14. The Supreme Court in *California* stayed a *nearly identical order* because such an order ultimately "enforce[s] a contractual obligation to pay money." *California*, 604 U.S. at 651 (citation omitted). So too here.

*NIH* likewise supports judgment for Defendants. There, NIH terminated over 1,000 grants, many of which were issued pursuant to congressional mandates. *See* States' Stay Opposition at 6–10, *NIH*, 145 S. Ct. 2658 (25A103) (describing grants awarded consistent with Congress's commands under 42 U.S.C. §§ 285t(c), 285a-6, 285b-7a, 283p).[5] Multiples states and non-profits filed suit against NIH, bringing APA, constitutional, and *ultra vires* claims against the agency—all claims challenging (1) NIH guidance directing the review of grants for "DEI"; and (2) NIH's termination of grants based on that review. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). The district court, after a bench trial, vacated the guidance and the

---

[5] The parties' Supreme Court briefs in *NIH* are available at https://www.supremecourt.gov/ docket/docketfiles/html/public/25a103.html.

terminations. *Massachusetts v. Kennedy*, No. 1:25-CV-10814, 2025 WL 1747213, at *2 (D. Mass. June 23, 2025). The Supreme Court stayed the judgment vacating the grant terminations. *NIH*, 145 S. Ct. at 2659. Relying on its reasoning in *California*, the Court explained (again) that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* at 2660 (citation and quotations omitted). The same conclusion should be reached here. Plaintiffs seek to "revive" EPA's "obligated grant funding" so that SFA grantees are "authorized to resume projects," and "downstream participants, including Plaintiffs would be able to resume their work …." Pl. Opp. 11. The only way to achieve this relief is through the vacatur of the SFA grant terminations. But such relief would be no different than the district court's order in *NIH*, as both orders are "designed to enforce [an agency's] obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2659. The district court in *NIH* lacked jurisdiction for the same reasons the Court lacks jurisdiction here.

The vacatur of "[g]oing forward" guidance in *NIH*, 145 S. Ct. at 2661 (Barrett, J. concurring), only underscores why there is no jurisdiction in this case. Unlike NIH, EPA did not issue any guidance that it could apply in any future decision-making about the SFA grants. First, the Termination Notice provided no guidance to any agency employees or SFA grantee at all; rather, it informed each grantee that EPA had terminated its grant. *See* Termination Notice at DRI_EPA_000111–12. The Recommendation plaintiffs want to challenge likewise provided no guidance or instructions; it only recommended EPA's termination of SFA grants following an analysis of OBBBA, various reliance interests, and other alternatives. ECF No. 30-15,

11

DRI_EPA_000088–96 ("Recommendation").[6]  Second, EPA did not issue any guidance to be applied moving forward; indeed, there is no *possibility* of any forward-looking policy because EPA cannot award new SFA grants after OBBBA § 60002 repealed EPA's authorization to "make grants" under any GGRF program.  The only final agency action to review here is EPA's decision to terminate orphaned grants previously awarded under a now-repealed law.  As to that decision, Justice Barrett made clear that "plaintiffs cannot end-run [CFC's exclusive jurisdiction over grant terminations] simply by packaging them with a challenge to agency guidance."  *NIH*, 145 S. Ct. at 2661–62 (Barrett, J. concurring) (quoting *California*, 604 U.S. at 651).  And while the Supreme Court allowed claims challenging the guidance as applied to future grant decisions, it recognized that "[v]acating the guidance does not reinstate [the] terminated grants."  *Id.* at 2661.  Here, EPA's termination decision has no forwarding looking effect, it only terminated grants, and vacating that guidance could only aid Plaintiffs by reinstating the terminated grants.  *See* Pl. Opp. 11 (seeking to "revive" EPA's "obligated grant funding") (citing declarations).  The Supreme Court concluded that district courts could not provide that relief.

The First Circuit's recent decision in *New York v. Trump* puts to rest any doubt about the meaning and import of *NIH* and *California*.  There, certain states filed APA and constitutional claims against federal agencies, challenging an OMB directive, various Executive Orders, and the resulting "'broad, categorical freezes on obligated funds' without review of applicable

---

[6] The Recommendation also would not qualify as a "final agency action," as it only recommended termination and did not effectuate any grant termination.  *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024), *cert. denied sub nom. Harper v. Faulkender*, 145 S. Ct. 2867, 222 L. Ed. 2d 1147 (2025) ("To be considered 'final,' the agency action must satisfy two conditions": (1) "it must mark the 'consummation' of the agency's decisionmaking process"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'") (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  Only the terminations themselves constituted final agency actions.

statutory, regulatory, or grant terms." *New York*, 2026 WL 734941, at \*17. The district court entered an injunction, ordering the agencies to "release and transmit any disbursements to the States on awarded grants" "that were paused on the grounds of the OMB Directive and Executive Orders." *Id.* The government appealed. On appeal, the state-plaintiffs—like Plaintiffs here—argued that *NIH* and *California* did not apply, because their claims "do not turn on 'the terms of any particular award.'" *Id.*; *see* Pl. Opp. 22 (arguing that Plaintiffs "are not seeking to enforce … grant agreements and do not challenge individual grant terminations"). The First Circuit rejected this argument and vacated the injunction. In doing so, it held that the court's order amounted to "specific performance" under federal grants and was therefore contrary to "the Supreme Court's recent pronouncements regarding the interaction between the APA and the Tucker Act." *Id.* (quoting *NIH*, 145 S.Ct. at 2659). The same conclusion should be reached here.

Plaintiffs' status as non-grantees does not aid their claims. They still seek "relief designed to enforce an[] 'obligation to pay money' pursuant to [SFA] grants." *NIH*, 145 S. Ct. at 2660 (quoting *California*, 604 U.S. at 651); *see New York*, 2026 WL 734941, at \*17 (same). Plaintiffs' requested relief is no different than the vacated relief in *California*, *NIH*, and *New York*. Once again, as Plaintiffs put it:

> [I]f the Court vacates the termination decision, *EPA's obligated grant funding would be revived, grantees—regardless of their identity—would be authorized to resume projects*, and downstream participants, including Plaintiffs, would be able to resume their work and continue competing for the opportunities the program provides.

Pl. Opp. 11 (citing declarations) (emphasis added). The restoration of "EPA's obligated grant funding" could only happen if the Court ordered EPA to reinstate the SFA grants and continue disbursements under them. Such relief is "specific performance" and forbidden under "the

13

Supreme Court's recent pronouncements regarding the interaction between the APA and the Tucker Act." *New York*, 2026 WL 734941, at *17 (quoting *NIH*, 145 S.Ct. at 2659).[7]

EPA's use of the word "program" in the Termination Notice and Recommendation, *see* Pl. Opp. 14, 24, does not make EPA's action anything more than what it was—the termination of an existing group of grants. Congress created the SFA grant program. 42 U.S.C. § 7434(a)(1) (repealed); *see* ECF No. 30-34, DRI_EPA_000313 ("NOFO") (describing Section 134 and GGRF as a "program" that EPA would be implementing). Three years later, Congress ended the SFA program. OBBBA § 60002. After that, EPA continued to administer the 60 orphaned grants and continued to refer to them collectively as a "program." *See, e.g.*, Recommendation at DRI_EPA_000089. But the agency's use of the word "program" cannot transform a congressional action into an agency one. And no document in the record indicates that EPA made any separate "program" decision apart from its decision to terminate the 60 SFA grants. *See* Termination Notice at DRI_EPA_000111 (explaining termination of "SFA program and existing grants"). As the Supreme Court held in *California*, the plaintiffs' programmatic challenge "based on grants" seeking to enforce an "obligation to pay money" cannot be brought in district court under the APA. 604 U.S. at 651 (citation omitted).[8]

---

[7] Plaintiffs describe their relief in a myriad of other ways, but no matter how creatively Plaintiffs frame what they want, they ultimately seek EPA's reinstatement of the SFA grants and EPA's continued disbursement of grant funding. *See* Pl. Opp. 16 (describing "injunctive relief" that would "direct[] EPA to reinstate the Solar for All grant program and not interfere with the availability of funds"); *id.* ("vacating Defendants' decision to terminate the program should restore the status quo before that action took place"). Any such order would be contrary to *NIH*, *California*, and *New York*.

[8] Plaintiffs' cherry-picked (and interrupted) line of questioning from the oral argument in *Climate United*, *see* Pl. Opp. 16, is misleading. Counsel there addressed EPA's intent to issue replacement grants to avoid any impoundment concern when EPA terminated grants under two GGRF programs, months before OBBBA was passed. *See* ECF No. 36-1, Tr. at 62:12–16. But, with OBBBA's subsequent repeal of the GGRF statute, the government's position in *Climate*

**B.      EPA's Discretionary Decision Not to Use Lump-Sum Appropriations to Administer SFA Grants is Not Reviewable.**

After Congress repealed Section 134 and rescinded all designated funding for EPA to administer SFA, EPA chose to terminate the grants rather than attempt to use lump-sum appropriations to administer them, which would have required shifting funds from other programs and priorities of the agency.  Under *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993), this discretionary decision is unreviewable.  As held by the Supreme Court, "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," the decision is "committed to agency discretion by law."  *Id.* (citing 5 U.S.C. § 701(a)(2) (APA jurisdiction unavailable "to the extent that ... agency action is committed to agency discretion by law")).  That is what happened here.

In response, Plaintiffs make no argument that EPA allocated lump-sum appropriations for impermissible statutory objectives.  *See* Pl. Opp. 27–29.  Rather, Plaintiffs argue that—OBBBA aside—the now-repealed Section 134 still required EPA to administer a $7 billion grant program.  *Id.*  But with what money?  Plaintiffs suggest that EPA pull from the lump-sum appropriation that Congress provided for EPA's Environmental Programs and Management.  *Id.* at 35.  But EPA considered this option and rejected it, because the agency did not want to shift funds from programs with continued congressional authorization to a program with no authorization or designated administrative funding.  *See* Recommendation at DRI_EPA_000091 (concluding that "[g]eneral appropriations by Congress, including, for example, [EPM] funds, are needed and

---

*United* is as in this case, that the court cannot restore GGRF programs because Congress repealed those programs. *See id.* at 58:6–25 (Court: "So even if that [program] dismantling finding is credited, it only goes to the so-called separation of powers statutory argument. And then that argument has now changed because Congress has, in fact, dismantled this program. Am I matching up the claims correctly with the facts? …."  Government Counsel: "Yes, Your Honor, I think you are correctly aligning them.").

15

already set aside for the administration of other programs for which Congress did *not* specifically appropriate administrative funding") (emphasis in original).  In this way, Plaintiffs fail to appreciate that when Congress rescinded the designated funding to administer the SFA grants, EPA was left with a choice, *not a mandate*, to use lump-sum appropriations for their administration.  *See infra* at 26–27.[9]  As all Plaintiffs' claims are based on this the discretionary decision to terminate the SFA grants, judgment should be entered for Defendants on all claims.

C.     **Plaintiffs Fail to Identify Any Waiver of Sovereign Immunity for Non-APA "Freestanding" Constitutional Claims.**

Plaintiffs cannot evade sovereign immunity by asserting "freestanding" constitutional *ultra vires* claims.  Pl. Opp. 29–31.  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *United States ex rel. Sargent v. Collins*, 165 F.4th 102, 110 (1st Cir. 2026) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 484 (2006)).  A plaintiff must identify a statutory waiver of sovereign immunity to bring any claim—including constitutional claims—against a federal agency.  *Id.*  The Supreme Court has recognized an exception to this general rule for claims based on acts beyond a federal officer's statutory or constitutional authority because such actions "are considered individual and not sovereign actions."  *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).  Contrary to Plaintiffs' cursory argument, *see* Pl. Opp. 29–30, Plaintiffs' constitutional claims, all of which repackage their APA statutory claim, do not meet this exception.

_____

[9] That is why Plaintiffs' reliance on *New York*, Pl. Opp. 29, is misplaced.  Although the First Circuit held that the agencies lacked discretion to disburse obligated grant funds, the funding to administer those grant programs had not been rescinded.  2026 WL 734941, at *10 (citing 16 U.S.C. § 2105 (establishing "urban and community forestry challenge cost-sharing program"); 42 U.S.C. § 7437 (authorizing EPA to "competitively award grants" for "developing a plan for the reduction of greenhouse gas air pollution")).  The agencies in *New York* therefore did not have the same discretionary choice that EPA had here.  Plaintiffs' argument to the contrary should be rejected.

16

Where a plaintiff's constitutional claims are premised on an officer exceeding statutory authority, *see Dalton v. Specter*, 511 U.S. 462, 472 (1994), this exception to sovereign immunity is "a narrow one, and it does not apply simply because an agency has arguably reached a conclusion which does not comport with the law." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). "Rather, it applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* (citation omitted) (emphasis in original). It "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 681–82. Plaintiffs' latest attempt to get around sovereign immunity does not succeed. In both their opening brief and opposition, Plaintiffs do not identify any specific statutory provision that prohibits EPA's termination of the SFA grants. *See* Pl. Opp. 29–30; Pls.' Mot. for Summ. J. 48, ECF No. 32 ("Pl. Mot."). Nor could they. Section 134 authorized EPA to "make grants," which it did. And OBBBA § 60002 repealed that authorization. No specific language in either statute prohibited EPA from terminating those grants. And Congress—not EPA—terminated any SFA "program" independent from the grants. *Infra* at 17–22. Thus, without a specific statutory prohibition and without a waiver of sovereign immunity, the Court cannot hear Plaintiffs' constitutional *ultra vires* claims.

## IV.    Plaintiffs' Claims Fail as a Matter of Law.

### A.    Plaintiffs' Statutory Claim Fails Because EPA Cannot Violate a Repealed Statute.

As described in Defendants' opening brief, Section 60002 of OBBBA straightforwardly "repealed" Section 134—the statute that authorized the GGRF, including SFA—in its entirety, without any savings language, and "rescinded" the "unobligated balances of amounts made available to carry out" that statute. Def. Mot. 27–28 (quoting OBBBA § 60002). OBBBA thus took away both EPA's authorization to run any SFA program and the dedicated funding to do so,

17

thereby unambiguously terminating any SFA program separable from the pre-existing grants moving forward.[10]

In response, Plaintiffs simply assert, repeatedly, and without authority, that because OBBBA did not also rescind appropriated funds that had been obligated before the repeal (*i.e.*, the SFA grants), it "left in place EPA's obligation" to administer a congressionally mandated SFA program, Pl. Opp. 31, and that "some new authority" therefore is needed "to terminate the existing Solar for All program," *id.* at 34–35.[11]  That is simply not correct.  By asserting that EPA requires some separate affirmative authority to terminate apart from the repeal, Plaintiffs suggest a new default rule: even if Congress repeals the statutory authority for a program, the agency *must* continue to carry out the statutory program so long as obligated funds remain outstanding.  The very notion turns bedrock administrative law on its head.  *See* Def. Mot. 43–44.  Plaintiffs' attempt to turn OBBBA's silence on the SFA grants into a congressional mandate cannot be

---

[10] Contrary to Plaintiff's characterization, this is not a "*post hoc* justification."  Pl. Opp. 34.  EPA cited OBBBA's repeal of statutory authority and rescission of dedicated SFA funding in the Recommendation and Termination Notice and determined it had discretion to terminate the grants.  *See* Def. Mot. 8, 10.  Regardless, EPA's analysis of OBBBA is irrelevant to the statutory inquiry.  Because OBBBA stripped EPA of authority to continue running any SFA program separable from the grants, the Court cannot order EPA to resume an SFA program, regardless of EPA's contemporaneous reasoning.  *See, e.g.*, *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024) (unauthorized agency action "is plainly contrary to law and cannot stand") (quoting *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002)).

[11] *See also* Pl. Opp. 33 (quoting Section 134's "authorization to use 'amounts otherwise available'" to run the GGRF programs); *id.* at 34 ("H.R. 1 left in place all $7 billion in obligated funding, and thus did not retroactively repeal the statutory requirements governing its use."); *id.* at 35 ("Section 134 specifically contemplated EPA's use of other available appropriations…"); *id.* at 38 ("H.R. 1's prospective effect means Congress's appropriations mandate continues to govern, as does its authorization of 'amounts otherwise available' to fulfill that mandate by administering the program."); *id.* ("The statutory appropriation remains in effect.").

18

squared with OBBBA's explicit repeal of any congressional mandate.[12]  That OBBBA did not also give EPA directions on how to handle the SFA grants does not undo what OBBBA did.  And because it no longer exists, Section 134 cannot buttress Plaintiffs' statutory claims or an injunction prohibiting EPA from terminating the SFA program moving forward.

Plaintiffs' efforts to sustain their radical theory by chipping away at the repeal's plain meaning all fail.  First, Plaintiffs' attempt to portray the SFA program's termination as retroactive is a red herring.  Contrary to Plaintiffs' assertion, Defendants have never argued that the repeal "reached back and wiped out EPA's statutory authority" to have *ever* administered an SFA program.  Pl. Opp. 32.  But that does not mean that the statutory repeal does no work right now.  The repeal took Section 134 off the books the moment the repeal was enacted.  Even a purely "prospective" repeal means that Plaintiffs cannot rely on Section 134 to support programmatic claims based on agency actions taken after its repeal.

Plaintiffs' portrayal of Defendants as urging the Court to hold that OBBBA's rescission of administrative funding effected "an *implicit* repeal of [EPA's] responsibility to continue administering Solar for All," *id.* at 33 (emphasis added), is more sleight of hand.  OBBBA explicitly repealed Section 134; implicit repeal standards are irrelevant.

Next, Plaintiffs' two attempts to argue Congress intended the repeal to have less than its full meaning fall flat.  Plaintiffs first suggest that OBBBA's repeal of Section 134 was simply intended to "prevent a later Congress from appropriating more funding to the program in the future, absent further legislative action."  *Id.* at 32.  This interpretation fails to give the repeal its

---

[12] Neither *Train v. City of New York*, 420 U.S. 35, 40, 47 (1975), nor *Washington v. Fed. Emergency Mgmt. Agency*, No. 25-cv-12006, 2025 WL 3551751, at *5 (D. Mass. Dec. 11, 2025), indicates otherwise, as those cases applied statutes that were still in effect.

plain meaning: removing the law from the books entirely.  *See* Repeal, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/repeal (last visited March 30, 2026) (defining "repeal" as "to rescind or annul by authoritative act," "to revoke or abrogate by legislative enactment," to "abandon," or to "renounce"); *see also* Def. Mot. 44.  Plaintiffs' interpretation also fails to give the repeal any meaningful impact.  "[S]tatutes enacted by one Congress cannot bind a later Congress."  *Dorsey v. United States*, 567 U.S. 260, 274 (2012). Thus, ascribing the intent of the statute as limiting Congress gives the repeal no tangible consequence.  *See Van Buren v. United States*, 593 U.S. 374, 393 (2021) ("When Congress amends legislation, courts must presume it intends the change to have real and substantial effect.") (quotations omitted).  New legislation would always have been needed to appropriate more funds for the SFA program.  Section 134 authorized grants and appropriated funds in a single legislative act, setting the expiration of the grant funds for September 2024; any additional funding of grants after that date would have required an additional legislative act.  Congress did not need to repeal Section 134 just to require future legislation that was already required. Finally, Plaintiffs' interpretation fails to give meaning to the rescission of unobligated funds that accompanied Section 134's repeal.  *See* OBBBA § 60002.  That rescission undisputedly took away the remaining money EPA had been given to run the then-existing GGRF programs, including SFA.  *See* Pl. Mot. 12–13.  If Congress intended the repeal to leave the existing SFA program in place, rescinding the funds appropriated to EPA to run that program makes no sense. The better interpretation is that Congress intended Section 134's repeal and the remaining administrative funds' rescission to terminate the program.  *See* U.S. Gov't Accountability Off., GAO-16-464SP, Principles of Federal Appropriations Law 2-54–55 (2016); *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (rescission of appropriated grant funds

20

"could not be clearer" that Congress "did not want any part of the remaining funds to be expended for the ... grant program").

Plaintiffs' second interpretation that OBBBA's repeal of Section 134 was only intended to prevent EPA from replacing grants that had previously been terminated under the other two GGRF programs, Pl. Opp. 32–33, is belied by the statute itself. OBBBA's plain text repealed Section 134 in full, without differentiating between GGRF programs, and rescinded the remaining designated funding to administer all GGRF grants. *See* OBBBA § 60002. Any attempts to use legislative history to give OBBBA a meaning that is less than a full repeal of the GGRF programs, or to give OBBBA different meanings as applied to different GGRF programs, are contrary to OBBBA's text and cannot be countenanced.[13] *See, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) ("[E]ven those of us who believe that clear legislative history can illuminate ambiguous text won't allow ambiguous legislative history to muddy clear statutory language.") (quotations omitted).

Finally, contrary to Plaintiffs' derision that Defendants "narrow the scope of" the general savings statute "beyond recognition," Pl. Opp. 36, that statute is the nail in their litigation's coffin. The whole point of the general savings statute is to preserve a party's ability to enforce liabilities incurred under statutes before they are repealed. *See* Def. Mot. 48–49. But here Plaintiffs do not seek to enforce any pre-repeal liability; Plaintiffs ask the Court to carry the

---

[13] Moreover, the position is based one Senator's floor statements five days after OBBBA was enacted, *see id.*, which is "among the least illuminating forms of legislative history," *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017) (quotations omitted). And Plaintiffs' attempt to minimize the Committee report cited by Defendants by directing the Court to the report's "minority views" and a committee hearing, Pl. Opp. 33–34, is similarly unpersuasive. *See Garcia v. United States*, 469 U.S. 70, 76 (1984) (committee reports are "more authoritative" than other legislative history).

repealed Section 134 forward to invalidate and enjoin EPA's post-repeal "program" termination, which the general savings statute does not countenance.[14]  *See id.*

Plaintiffs' remaining arguments about the general savings statute fare no better.  Plaintiffs first incorrectly attempt to frame *De La Rama S.S. Co. v. United States*, 344 U.S. 386 (1953), as "reject[ing]" the notion that the savings statute is focused on preserving "liabilities and actions to enforce liabilities."  Pl. Mot. 37 (quoting Def. Mot. 49).  However, in doing so, Plaintiffs rely on a quote from *De La Rama* that disproves Plaintiffs' point, recognizing that the savings statute saves repealed statutes only "for the purpose of sustaining any proper action ... for the enforcement of" pre-repeal liabilities.  *Id.*  Plaintiffs then make cursory efforts to frame this litigation as one to enforce a pre-repeal liability arising from a "breach of a statutory duty."  Pl. Mot. 37.  Those efforts fail because, as Plaintiffs point out, a "liability ... incurred after" a statutory repeal is "not saved by the" general savings statute.  *Id.*  Plaintiffs admit that EPA complied with Section 134 while it was in effect.  *See, e.g.*, Compl. ¶¶ 46–54.  They only claim EPA violated Section 134 (via OBBBA and the general savings statute) after it was repealed.  *See, e.g.*, Compl. ¶¶ 170, 179.  Plaintiffs' attempt to squeeze that result from the general savings statute fails on its face.[15]

---

[14] Although grantees continue to maintain the ability to enforce pre-repeal liabilities against EPA through actions on their contracts brought in the Court of Federal Claims, non-grantee Plaintiffs here want to instead use the general saving statute to carry Congress's purported congressional mandate with respect to the SFA program forward such that the grants could not be terminated. That is not the function of the general savings statue.  *See* Def. Mot. 48–50.

[15] Moreover, regardless of what happened pre-repeal, Plaintiffs' proposition that the general savings statute could support an action seeking vacatur and an injunction to require an agency to continue administering an agency program for four or more years after Congress repealed it is contrary to that statute's plain text.  The general savings statute does not purport to—and in any event cannot—defeat an explicit congressional repeal of an agency program.  *See* Def. Mot. 48–49; *Great N. Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (The general savings statute "cannot justify a disregard of the will of Congress as manifested, either expressly or by necessary implication, in a subsequent enactment.").

**B.    The Constitutional Claims Fail under *Dalton* and for the Same Reasons as the Statutory Claim.**

As Defendants explained, Plaintiffs' separation of powers and Presentment Clause claims fail, first, because they are not cognizable under *Dalton v. Specter*, 511 U.S. 462 (1994), and, second, because they lack merit for the same reason as their statutory claims. Def. Mot. 51–55. With respect to *Dalton*, Plaintiffs reiterate that their constitutional claims are based on EPA's violation of the "congressional mandate" established by Congress's Section 134 appropriations for the SFA program. Pl. Opp. 48–49. They therefore mirror Plaintiffs' statutory claims and fall squarely within *Dalton*. To muddy the water, Plaintiffs mischaracterize Defendants' position to try to turn this litigation into something it is not—a litigation about EPA's "statutory authority," or lack thereof, "to terminate the [SFA] grants." *Id.* at 49. That is not the issue here, and Defendants have never tried to make that the issue.

Instead, Plaintiffs brought this litigation to enforce Section 134's "congressional mandate," arguing EPA's actions contravened repealed Section 134 by way of OBBBA and the general savings statute. Defendants have responded that OBBBA repealed Section 134 and rescinded the remaining program appropriations, so EPA did not act contrary to any congressional mandate. And contrary to Plaintiffs' assertion, Defendants' argument that OBBBA did not provide any instructions concerning the SFA grants is not an "admission" that OBBBA "did not commit any discretion to" EPA to terminate the grants. Pl. Opp. 49. Statutes routinely afford agencies discretion through silence. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020). Because the litigation centers on whether

23

EPA's termination of the purported SFA program did or did not comply with statutes (OBBBA and repealed Section 134), it is on all fours with *Dalton*.[16]

On the merits, Plaintiffs' constitutional claims simply reassert their statutory claim. *See* Pl. Opp. 50 ("In light of [OBBBA's] 'silence' on the awarded [SFA] grant program," Section 134 "remains controlling."); *id.* at 52 ("[B]ecause [OBBBA] did nothing to affect all $7 billion in obligated grant funding," the prior Congress's Section 134 appropriation of that funding "continues to govern Solar for All."). They thus fail for the same reasons. *See supra* at 17–22.

### C. EPA's Termination of the SFA Grants Following Congress's Repeal of Section 134 and Rescission of Administrative Funding Was Not Arbitrary or Capricious.

Because a repealed statute cannot support reinstatement of any SFA "program," this litigation fails as a matter of law, regardless of EPA's rationale for terminating the SFA grants. Nonetheless, as explained in Defendants' opening brief, EPA's termination of the SFA grants was both reasonable and reasonably explained. *See* Def. Mot. 55–61. Plaintiffs' counterarguments mostly just reiterate their statutory argument, offering variations on the theme that EPA acted unreasonably because it violated repealed Section 134's purported congressional mandate. *See* Pl. Opp. 40 (terminating the SFA program was unreasonable because OBBBA "left in place all [SFA] grant funding and with it, EPA's obligation to use the money for its congressionally mandated purpose"); *id.* at 41 (terminating the SFA program was unreasonable because EPA's "obligation remained in place to fulfill the mandate set out by Congress"); *id.* at 42 (not using lump-sum appropriations was unreasonable because OBBBA "left undisturbed Defendants'

---

[16] As explained in Defendants' opening brief, EPA retained the option to terminate the SFA grants when issuing them. *See* Def. Mot. 48; 2 C.F.R. § 200.340. Exercising that option in the aftermath of OBBBA's repeal of Section 134 and rescission of administrative funds was reasonable. *See id.* at 48, 55–56; *see also, e.g., Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) ("Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's valid obligations will remain enforceable in the courts.") (quotations omitted).

continuing obligation to administer Solar for All"); *id.* at 42 (using lump-sum appropriations was not committed to agency discretion because it was contrary to the "legislative mandate that [OBBBA] left in place"); *id.* at 43 (EPA inadequately considered alternative means of administering the program because EPA "canceled an entire grant program mandated by congressional appropriation"); *id.* at 47 (urging Court to disregard APA's harmless error doctrine because OBBBA's "forward-looking repeal ... and rescission ... did not require or authorize EPA to terminate this program"). These arguments all fail for the same reasons as the statutory claim. *See supra* at 17–22. In short, Section 134 no longer exists. There is no congressional mandate. Most of Plaintiffs' arguments in support of their arbitrary and capricious claims should be disregarded on that basis.[17]

Plaintiffs' ancillary arguments are also easily dismissed. First, Plaintiffs' characterization of Defendants as arguing "*post hoc*" in this litigation that "Congress gave them the discretion to decide for themselves to terminate the program," Pl. Opp. 40–41, is obviously incorrect. As described extensively in Defendants' opening brief, *see, e.g.*, Def. Mot. 43–45, 52–53, and as borne out in the very quotes Plaintiffs reference, *see* Pl. Opp. 40, Defendants' position is that there was no ongoing SFA program separable from the grants, but even assuming there was, Congress terminated it—EPA had and has no discretion in that matter. EPA did, however, have discretion to terminate the orphaned SFA grants, *see* Def. Mot. 45–46, and reasonably exercised that discretion, *see* Def. Mot. 56.[18] Plaintiffs' argument otherwise is simply an attempt to get the

---

[17] *Colorado v. U.S. Department of Health and Human Services*, 783 F. Supp. 3d 641, 648 (D.R.I. 2025), is of no help to Plaintiffs, *see* Pl. Opp. 40, for the reasons discussed in Defendants' opening brief, *see* Def. Mot. 57. And 2 C.F.R. § 200.300, Pl. Opp. 42, adds nothing to the legal analysis. That provision simply requires agencies to follow the law when administering grants, which EPA did.

[18] Plaintiffs' suggestion that the short window of time between the Recommendation and the decision to terminate shows a lack of reasoned decision-making, Pl. Opp. 39, is nonsense. As is

Court to ignore the legal distinctions between congressionally authorized "programs" and discrete pre-repeal vested rights, which should not be countenanced. *See United States v. Larionoff*, 431 U.S. 864, 879 (1977) (repeal of statute authorizing the Variable Re-enlistment Bonus "repeal[ed] the VRB program," even though it did not "divest ... rights ... already earned" under the program).

Next, Plaintiffs attempt to discredit EPA's consideration of alternative means of administering the grants by claiming the record "is devoid of any analysis of the effect of" using fiscal year 2025 Environmental Programs and Management ("EPM") funding to make up the rescinded administrative funding. Pl. Opp. 43. That is plainly incorrect. EPA specifically considered using EPM funding to continue administering the grants, concluding "reassigning funds for the ongoing administration of the SFA program would likely require stripping administration and oversight funding away from programs that Congress intended the Agency to support through other dedicated funding, including EPM appropriations." Recommendation at DRI_EPA_000095. Far from contradicting that conclusion, the fiscal year 2025 budget and appropriations materials cited by Plaintiffs support it. As a preliminary matter, the appropriations for fiscal year were enacted on March 15, 2025, and therefore preceded OBBBA's enactment on July 4, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ("FY25 Appropriations Act"). OBBBA is thus Congress's final word on administrative funding for the SFA grants. *See* Hon. Bill Green, B-207186 at 4 (Comp. Gen. Feb. 10, 1989), *available at* https://www.gao.gov/products/b-207186-1 (where

---

clear on its face, the Recommendation—an eight-page document with numerous factual and legal citations—represents one step in a deliberative process, not the whole of that process. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies.").

authorization and appropriations statutes "are in irreconcilable conflict," the later enacted statute "provides the most recent expression of congressional intent").  Moreover, though Plaintiffs emphasize the EPM appropriation was "over $3 billion" to imply EPA's consideration of budgetary constraints was unreasonable, the materials cited by Plaintiffs show that EPA had requested more than $4.4 billion in EPM funding.  *See* EPA, EPA-190R24002, Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on Appropriations: Tab 05: Environmental Programs and Management 5 (2024) ("FY25 Justification").[19]  Congress's almost $3.2 billion EPM appropriation, FY25 Appropriations Act § 1802, 139 Stat. 9, 30, was thus less than 73 percent of what EPA requested.  And EPA had assigned all its requested $4.4 billion funding to specific programs.  *See* FY25 Justification at 6–10.  Thus, the materials cited by Plaintiffs support EPA's reasoning that using EPM funding to administer the SFA grants would take funding away from other programs that had not been repealed.

Finally, in assailing EPA's consideration of reliance interests, Plaintiffs are simply asking the Court to substitute its judgment (or more accurately, Plaintiffs' judgment) for that of the agency, *see* Pl. Opp. 44–47, but that is not the function of the Court.  Plaintiffs' attacks on the record amount to (1) disagreement with EPA's analysis, *see, e.g.*, *id.* at 45 ("[T]he program was not 'nascent' in any meaningful sense."); *id.* ("Defendants' conclusion that the closeout process would 'lessen[]' the impact of termination was unreasonable.") (citations omitted), and (2) complaints that EPA did not consider every possible way not disbursing SFA grant funds could impact any non-grantee, *see, e.g.*, *id.* ("[L]ost business opportunities, damaged community relationships, frustrated organizational missions, workforce instability, and the inability to deliver

---

[19] This report is available at https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf.

27

promised services to low-income households are not allowable pre-termination costs."). But even where a court (or plaintiff) disagrees with an agency's conclusions, the court "cannot substitute its judgment for that of the agency." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). And an agency's assessment does not fail simply "because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). EPA reasonably acknowledged and addressed reliance interests while explaining its reasons for terminating the SFA grants. *See* Def. Mot. 59–61. That is all the APA requires. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

## V.    Plaintiffs Have Not Shown Any Need for Any Remedy Other Than Remand.

For the reasons already discussed, Plaintiffs' claims fail as a matter of law, precluding any relief in their favor. However, even if the Court determines that it has jurisdiction to redress Plaintiffs claims, and those claims have merit, Plaintiffs have not shown that anything other than remand of EPA's decision to terminate any SFA "program" is warranted.

Neither of Plaintiffs' arguments for vacatur hold water. Plaintiffs' mere declaration that EPA's reasons for terminating the "program" cannot possibly be rehabilitated, Pl. Opp. 53, is incorrect. EPA's decision to terminate the SFA grants was reasonable, in light of Congress's repeal of the SFA program and rescission of designated administrative funding. There is thus every reason to think that, on remand, EPA could rehabilitate any failure to, for example, fully develop its analysis of reasonable alternatives or reliance interests. And Plaintiffs' claim that vacatur would have no "disruptive consequences" because it "would restart an already-underway grant program," *id.*, is misleading, at best. Vacating any "program" termination, alone, would improperly require EPA to run an unauthorized grant program without any preexisting grants,

28

which have all been terminated, and without any authority to issue grants in the future.  And vacating the grant terminations is not within this Court's jurisdiction.  Vacatur therefore would be incredibly disruptive.[20]

Moreover, Plaintiffs' attempt to rehabilitate their failure to support injunctive relief, in addition to vacatur, falls short.[21]  First, Plaintiffs fail to muster any showing that a permanent injunction would "have any meaningful practical effect independent of vacatur," as is needed to support a permanent injunction in APA cases.  Def. Mot. 62 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)); *see* Pl. Opp. 54–56.  Instead, Plaintiffs admit the injunction would simply "prohibit[] continued implementation of the unlawful termination," Pl. Opp. 55, which is exactly what vacatur would do.  Their requested injunction should be denied on that basis.  *See Greene v. Ablon*, 794 F.3d 133, 157 (1st Cir. 2015) ("An injunction should not be granted where 'a less drastic remedy' will suffice.") (quoting *Monsanto*, 561 U.S. at 165–66).

Next, Plaintiffs still fail to identify irreparable injury supporting permanent injunctive relief for four reasons.  First, Plaintiffs' purported harm cannot support injunctive relief because it cannot be remedied by any injunction issued in this case.  *See, e.g.*, *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) ("Judges must closely tailor injunctive relief to the specific harm alleged."); *The Shell Co. (Puerto Rico) v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 23–24 (1st Cir. 2010) (overturning injunction that was not related to the demonstrated

---

[20] Even assuming the Court could vacate the grant terminations (and it clearly cannot under *NIH* and *California*), the grants are now at various stages of the post-termination process.  As of March 6, ten grantees had not challenged their grant terminations, had submitted closeout reports, and were nearing final closeout.  *See* Treml. Decl. ¶¶ 10–11, ECF No. 35-1.  Plaintiffs fail to explain how universal vacatur requiring all grantees' continued performance would even be possible in these circumstances.

[21] As noted in Defendants' opening brief, because Plaintiffs failed to support their request for injunctive relief in their motion, the request is waived.  *See* Def. Mot. 62.

harms).  Plaintiffs seek injunctions "directing EPA to reinstate the [SFA] grant program" and preventing EPA "from de-obligating or otherwise interfering with the availability of the funds." Compl. ¶ 250(C)–(D), ECF No. 1.  However, the purported harm Plaintiffs identify is the loss of "beneficial downstream effects" of six terminated SFA grants.  *See* Def. Mot. 16, 24 (quoting Pl. Mot. 54).  Indeed, Plaintiffs' only interests in the SFA program and money stem solely from the terminated SFA grant agreements.  *See id.* at 25–26.  Because this Court cannot adjudicate the grant terminations, it cannot order an injunction based on harm from the grant terminations.  *See, e.g.*, *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (district court cannot issue injunction if the injury is not related to the challenged conduct).

Second, Plaintiffs have shown no "likelihood of future unlawful conduct" by EPA.  *Lopez v. Garriga*, 917 F.2d 63, 67–68 (1st Cir. 1990); *see United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations.").  "It is not enough for a plaintiff to assert that she 'could be' subjected in the future to the effects of an unlawful policy or illegal conduct by a defendant—the prospect of harm must have an 'immediacy and reality.'"  *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004). According to Plaintiffs, their purported harm results from a discrete program termination that happened almost eight months ago.  Plaintiffs have failed to identify any likelihood of EPA issuing a repeat termination in the event the Court vacates the purported program termination.

Third, Plaintiffs have not shown that monetary damages available in actions on subcontracts and other third-party agreements offer an inadequate remedy.  *See* Def. Mot. 16–17 (describing Plaintiffs' purported financial harms flowing from the loss of sub-grants and thirdparty contracts); *supra* at 4–5.  Plaintiffs' claims of irreparable harm fail for this reason alone. *See Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find

30

irreparable injury where only money is at stake and where the plaintiff has a satisfactory remedy at law to recover the money at issue.").

Fourth, Plaintiffs have failed to prove their harm. "Speculative injury does not constitute a showing of irreparable harm." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)). "A presently existing, actual threat must be shown." *Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emerg. Prep. of Com. of Mass.*, 649 F.2d 71, 74 (1st Cir. 1981). Plaintiffs have not done that here, as they largely assert the possibility or general risk of lost business, workers, or opportunities—not a presently existing, actual threat of that loss. *See* Def. Mot. 17 & n.5; *supra* at 4–5.

Finally, Plaintiffs have not shown that the equities and public interest favor an injunction. Plaintiffs proffer a circular argument: if they prevail on the merits, the public interest supports enjoining the unlawful agency action. *See* Pl. Opp. 56. But that just repackages the merits arguments, which, if successful, will be redressed by remand. On the other hand, the injunction would harm the government. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). This is especially true here. Because the Court lacks jurisdiction to restore the SFA grants, any injunction against terminating an SFA "program" would simply force EPA to maintain a meaningless shell of a program. Requiring EPA to reinstate and fund an aimless, congressionally defunct program is contrary to "the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources." *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976); *see Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986) ("[T]he protection of the public fisc is a matter that is of

31

interest to every citizen.").  An injunction would interfere with the agency's ability to effectuate

OBBBA § 60002 in accordance with Congress's will and is therefore against public interest.

**CONCLUSION**

For these reasons and those set out in Defendants' opening brief, Defendants respectfully

request that judgment be entered in their favor.


Dated: April 3, 2026                    BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        KIRK T. MANHARDT
                                        Director

                                        KEVIN P. VANLANDINGHAM
                                        Assistant Director

                                        */s/ Bethany R. Theriot*
                                        BETHANY R. THERIOT
                                        TIFFINEY F. CARNEY
                                        I-HENG HSU
                                        Trial Attorneys
                                        U.S. Department of Justice, Civil Division
                                        Commercial Litigation Branch
                                        1100 L Street NW
                                        Washington, DC 20005
                                        (202) 307-0244
                                        bethany.theriot@usdoj.gov
                                        tiffiney.carney@usdoj.gov
                                        i-heng.hsu@usdoj.gov

                                        *Attorneys for Defendants*


32
