UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | C.A. No. 1:25-cv-00510-MSM-PAS |

**MEMORANDUM AND ORDER**

Mary S. McElroy, United States District Judge.

Before the Court is the Motion for Summary Judgment (ECF No. 32) of the plaintiffs: Rhode Island AFL-CIO, Rhode Island Center for Justice, Anh Nguyen, Solar United Neighbors ("SUN"), Sunpath Consulting LLC d/b/a Sunpath Solar, 2KB Energy Services, LLC ("2KB"), Energy Independent Solutions ("EIS"), and Black Sun Light Sustainability ("BSLS") (collectively, "Plaintiffs"). Plaintiffs sued the United States Environmental Protection Agency ("EPA") and its Administrator, Lee Zeldin (together, "Defendants"), for their decision to terminate a solar grant program, Solar for All ("SFA"). *See* ECF No. 1. Defendants cross-move for summary judgment, arguing that the Court lacks jurisdiction over Plaintiffs' claims and that those claims are meritless. *See* ECF No. 35. For the following reasons, the Court GRANTS

Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Cross-Motion for Summary Judgment.

## I. BACKGROUND

The legal and factual background of this case is largely undisputed. In 2022, Congress passed the Inflation Reduction Act ("IRA"). Pub. L. No. 117-169, § 60103, 136 Stat. 1818. The IRA amended the Clean Air Act by adding Section 134, which appropriated $26.97 billion to the EPA Administrator for a "Greenhouse Gas Reduction Fund" for grants aimed at reducing greenhouse gas emissions and other forms of air pollution. 136 Stat. 2065–67; *see* 42 U.S.C. § 7434 (repealed 2025). Of that total, Congress appropriated $7 billion "to make grants, on a competitive basis" to States, municipalities, Tribes, and eligible nonprofits "to enable low-income and disadvantaged communities to deploy or benefit from zero emission technologies . . . and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section." 42 U.S.C. § 7434(a)(1). The $7 billion appropriation would "remain available until September 30, 2024." *Id.* Congress also appropriated an additional $30 million to EPA "for administrative costs necessary to carry out activities under this section," which would remain available until September 30, 2031. *Id.* § 7434(a)(4).

On June 28, 2023, EPA announced a Notice of Funding Opportunity ("NOFO") that described a competitive grant process, SFA, through which recipients could apply for funds from the $7 billion appropriation. *See* ECF No. 30-34. Based on criteria described in the NOFO, which expressly contemplated applicants' "multi-

sectoral partnerships with key stakeholders in the workforce development ecosystem needed to execute on th[e] vision for a robust and inclusive clean energy workforce," *id.* at 45, EPA announced awards that obligated the entire $7 billion before the September 30, 2024, deadline. The obligated funds were to be available for five years.

On July 4, 2025, Congress enacted the One Big Beautiful Bill Act ("OBBBA"). *See* Pub. L. No. 119-21, § 60002, 139 Stat. 72 (2025). As relevant here, the OBBBA provided the following:

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. 154. As made clear through Section 60002 and as supported by its accompanying legislative history, existing grants were not to be rescinded. *See* H. Comm. on Energy and Com., *Markup of Budget Reconciliation Text* (Part 1) (May 13, 2025), at 13 (Representative Morgan Griffith explaining that "these provisions . . . only apply, as far as this bill is concerned, to the unobligated balances."); *id.* at 244:5962–5964, 5968–5970 (further declaring that, "if a grant was already given, as far as this bill is concerned, then that would still be going forward," and "[i]f the grant has already been granted and the money is obligated, then this – then our language does not affect that."); *id.* at 245:5998–6000 (Representative Brett Guthrie affirming that "this legislation . . . does not close the grants on any obligated funds"). And while the OBBBA rescinded the remaining $19 million unobligated administrative funds appropriated for the Greenhouse Gas Reduction Fund, EPA retained over $3 billion

in funding for "necessary expenses not otherwise provided for," including the "personnel and related costs" necessary to administer grant programs. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 252 (2024).

Notwithstanding the above, in a memorandum dated August 7, 2025, EPA Associate Deputy Administrator Travis Voyles recommended the termination of SFA. *See* ECF No. 30-15. That memorandum justified this recommendation by proposing that, following the OBBBA, "there is no longer a statutory foundation for the EPA to administer and evaluate awards or to ensure and monitor the compliance of award recipients with grant terms, conditions, or applicable laws—or the ability of EPA to enforce grant contracts against programs previously constituted under that section." *Id.* at 2. It proposed that "the continuation of the SFA program would exceed the Agency's authority, risk flouting congressional intent, and potentially violate the terms and conditions of the grant awards themselves." *Id.* at 2–3.

Mr. Voyles attached this memorandum to an email to EPA Deputy Administrator David Fotouhi, which explained that the memorandum "detail[ed] the recommendation that the Agency terminate the Solar for All (SFA) program and all existing grants." (ECF No. 30-14.) Three hours later, Mr. Fotouhi replied that, having reviewed the memorandum, he "agree[d] with the recommendation to terminate the SFA program and existing grants" and directed Mr. Voyles to "[p]lease proceed accordingly." *Id.* In response, Mr. Voyles stated that he would "work to immediately implement the termination of the SFA program and existing grants." *Id.*

That same day, EPA terminated the SFA program in its entirety and transmitted termination notification letters to grant recipients. *See* ECF No. 30-24. Those notification letters stated that EPA had "made the decision to terminate the SFA program and existing grants." (ECF No. 30-23.) In a social media post later that day, EPA's Administrator, Mr. Zeldin, declared that "EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive" and that EPA was "ending Solar for All for good." Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025 at 14:07 ET), https://perma.cc/8MWC-6Z42.

Plaintiffs are not themselves grant recipients. Instead, they are downstream beneficiaries of SFA who expended substantial time and resources in reliance on the grant funding made available through the program. *See* ECF Nos. 32-1 through 32-8 (declarations describing Plaintiffs' efforts). Sunpath Solar, 2KB, and EIS are solar energy companies that invested in increased personnel, equipment, infrastructure, and software based on grant funding awarded to Pennsylvania and Georgia under SFA. *See* ECF Nos. 32-3, 32-4, 32-2. Ms. Nguyen is an individual who applied to receive roofing and solar paneling services under Georgia's SFA program. (ECF No. 32-5.) Rhode Island AFL-CIO is a labor union that helped to develop an implementation plan for Rhode Island's SFA program. (ECF No. 32-1.) Rhode Island Center for Justice is a nonprofit that advocates for low-income households in Rhode Island that were to benefit from SFA. (ECF No. 32-6.) BSLS is a nonprofit that applied for and won a sub-award of nearly $30 million from Indiana's primary grant

recipient. (ECF No. 32-7.) SUN is a national nonprofit that was awarded nearly $14 million in subgrants. (ECF No. 32-9.)

Plaintiffs filed this action on October 6, 2025. (ECF No. 1.) Subsequently, SFA grant recipients filed two lawsuits against EPA. *See Harris Cnty., Texas v. EPA*, No. 1:25-cv-3646 (D.D.C. Oct. 13, 2025); *Arizona v. EPA*, No. 2:25-cv-02015-TMC (W.D. Wash. Oct. 16, 2025). The state grant recipients also filed challenges to the termination of their individual Solar for All grants in the Court of Federal Claims. *Maryland Clean Energy Ctr. v. United States*, No. 1:25-cv-01738-LAS (Fed. Cl. Oct. 15, 2025).

## II. STANDARD OF REVIEW

A motion for summary judgment requires the moving party to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, "[a]ll reasonable inferences are to be drawn in favor of the party opposing summary judgment," and "all disputed facts are viewed in the light most favorable" to that party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). "Where the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn." *Vazquez-Velazquez v. Puerto Rico Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (cleaned up).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Boston Redevelopment Auth. v. Nat'l. Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.* In making that determination, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## III. DISCUSSION

Plaintiffs' Complaint alleges that Defendants' termination of SFA violated the Administrative Procedure Act ("APA") because it was contrary to law and arbitrary and capricious. (ECF No. 1 ¶¶ 168–221.) They also allege that Defendants violated the Constitution's Presentment Clauses and its Spending Clause. *Id.* ¶¶ 222–249. Based on their claims, Plaintiffs ask the Court to issue declaratory and injunctive relief, including by vacating the EPA's termination of SFA and directing the agency to reinstate the program. *Id.* ¶ 250.

Plaintiffs now seek summary judgment on their claims. *See* ECF No. 32. In response, Defendants argue that they are entitled to judgment as a matter of law against Plaintiffs' claims on both jurisdictional and merits grounds. *See* ECF No. 35. Defendants also contend that any relief granted should be limited to remand to the EPA. *Id.* at 74–76.

### A. Plaintiffs Have Standing to Assert Their Claims

At the outset, the Court must determine whether it has jurisdiction over Plaintiffs' claims. *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006). This requires deciding whether Plaintiffs have standing to assert those claims. *Id.* To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). While this is a threshold requirement to suit, the Supreme Court has advised that courts should avoid making standing law "more complicated than it needs to be." *Diamond Alt. Energy, LLC v. Env't Protec. Agency*, 606 U.S. 100, 125 (2025) (quoting *Thole v. U.S. Bank N. A.*, 590 U.S. 538, 547 (2020)).

An injury in fact is an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A particularized injury affects the plaintiff "in a personal and individual way." *Id.* A concrete injury is one that actually exists. *Id.* at 340 (italics in original).

To be traceable, an injury must be one that "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). This requirement can be satisfied, however, when the defendant pressured or otherwise caused a third party to act in a way that injured

the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Thus, an injury is traceable to the defendant when that injury was the predictable, rather than merely possible, result of the defendant's conduct with respect to a third party. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024).

To be redressable, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43). But a favorable decision need not be able to redress the entirety of the alleged injury; instead, it is enough that "at least some" of the injury—even only "one dollar"—will be remedied by judicial intervention. *Diamond Alt. Energy*, 606 U.S. at 114 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)).

A plaintiff must demonstrate standing for each asserted claim and each form of requested relief. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis*, 554 U.S. at 734). That said, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006). As long as one plaintiff has standing to assert a claim and seek related relief, the Court need not address the standing of every other plaintiff that asserts that claim and seeks that same relief. *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) (en banc), *abrogated on other grounds by*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Town of Chester*, 581 U.S. at 439.

Defendants' first jurisdictional defense is that Plaintiffs lack standing to assert their claims against EPA. (ECF No. 35 at 26–40.) According to Defendants, Plaintiffs lack any legally protected interest in the SFA grants because they are not grantees, and their alleged injuries are too unspecific to be concrete or particularized. *Id.* at 27–33. Defendants also contend that, to the extent Plaintiffs' injuries are cognizable, they are neither traceable to Defendants' conduct (given Plaintiffs' third-party status with respect to individual SFA grants) nor redressable by this Court. *Id.* at 33–40.

A threshold issue presented by Defendants' standing and other jurisdictional arguments is the way in which Plaintiffs' claims should be construed: do Plaintiffs challenge Defendants' terminations of individual SFA grants, or do they challenge the high-level decision by Defendants to terminate SFA as a whole? Defendants press the Court to adopt the former view, which would heavily favor their jurisdictional arguments. *See id.* at 35, 41, 50. According to them, notwithstanding the OBBBA's plainly prospective-only rescission of Greenhouse Gas Reduction Fund grants, the result of the OBBBA is, effectively, the repeal of SFA. *See id.* at 36–37. They contend that the consequence of this effective repeal was that the appropriated SFA funds were converted into "lump-sum amounts without statutory restrictions." *Id.* at 54 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 183 (1993)). As such, "[p]laintiffs cannot dress up their challenge to grant terminations as a challenge to the termination of a program that Congress, rather than EPA, repealed." *Id.* at 41.

Defendants' preferred approach runs contrary to Congress's clear intent that already obligated Greenhouse Gas Reduction Fund monies, including SFA grants, not

be disturbed by the repeal of Section 134. They provide no legal authority for their proposition that the obligated SFA funds were somehow converted into lump-sum amounts untethered to the program for which they were originally appropriated. The more obvious reading of Congress's intent is that, while grant funding from the Greenhouse Gas Reduction Fund was to no longer be available following the OBBBA, already existing grant awards were to remain in place, subject to the residual statutory authority under which they were originally obligated.[1]

The administrative record also undercuts Defendants' position. The internal memorandum justifying termination of SFA grants recommends that EPA "terminate the SFA program and existing grants." (ECF No. 30-15 at 1.) Defendants' own contemporaneous communications likewise repeatedly referred to their "termination

---

[1] The parties argue at length as to the applicability of the General Savings Statute, 1 U.S.C. § 109, to this case. That statute provides, in relevant part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

*Id. See also De La Rama S. S. Co. v. United States*, 344 U.S. 386, 389 (1953) ("By the General Savings Statute Congress did not merely save from extinction a liability incurred under the repealed statute; it saved the statute itself . . . [w]e see no reason why a careful provision of Congress, keeping a repealed statute alive for a precise purpose, should not be respected when doing so will attain exactly that purpose.").

Under the General Savings Statute, Section 134 must be considered as remaining in force for the purposes of any claims by SFA grantees against the federal government. It is unclear, however, whether that extends to Plaintiffs' claims here, given that Plaintiffs are not themselves grantees.

of the SFA program *and* existing grants," *see* ECF No. 30-14 (emphasis added), as does, at least in one instance, their own briefing. *See* ECF No. 35 at 60 ("EPA terminated the SFA program *and* grants as of August 7, 2025, after OBBBA had already repealed Section 134.") (emphasis added). Defendants seem to have acknowledged that they were implementing a program-wide termination of SFA that was distinct from the repeal of Section 134 accomplished by the OBBBA. It is that programmatic decision (hereinafter, the "Termination Decision") that Plaintiffs' Complaint, properly construed, challenges.

With that established, the Court is satisfied that Plaintiffs have standing to assert their claims. *Lujan v. Defenders of Wildlife* is instructive here. *See* 504 U.S. at 563–71. The plaintiffs there challenged an agency rule that limited the geographic scope of the agency's application of a statute aimed at protecting endangered species by requiring consultations to ensure that funded projects would not jeopardize critical habitats. *Id.* at 558. The Supreme Court held that the plaintiffs lacked any actual or imminent injury because they had only alleged that they intended to observe impacted endangered wildlife at some unspecified time in the future and had not made any "concrete plans" to do so. *Id.* at 564. The Supreme Court also found that the plaintiffs' alleged injury could not be redressed because it was a challenge to "a more generalized level of Government action (rules regarding consultation)," and a favorable decision would not automatically result in a termination of funding to projects jeopardizing endangered species' habitats. *Id.* at 568 – 71.

Unlike *Lujan*, Plaintiffs here allege concrete, specific reliance on the availability of SFA funds, and clear injuries stemming from the termination of those funds. This is most clearly the case with 2KB, which has been injured by (1) the loss of a $1.64 million subgrant contract; (2) other economic losses stemming from its time, equipment, and personnel investments made in anticipation of grant funding that is no longer available; (3) deprivation of the opportunity to otherwise compete for those funds; and (4) reputational harm stemming from the abrupt cancelation of the program. *See* ECF No. 32-4. These injuries are logically traceable to Defendants' conduct, given that the Termination Decision was the "determinative" action from which 2KB's injuries necessarily flowed. *See Bennett*, 520 U.S. at 169. And while a favorable decision would not result in a damages award to 2KB, it would remedy the extent to which it has been deprived of the opportunity to access SFA funding by the Termination Decision. 2KB's status as a subgrantee does not render its injuries any less concrete, traceable, or redressable. *See Woonasquatucket River Watershed Council v. U.S. Dept. of Agric.*, No. 25-1428, 2026 WL 2279789, at *5 (1st Cir. Aug. 7, 2026) (affirming standing where subgrantees "did not receive their subgrant payments from the direct grantees because of the challenged funding freezes"); *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 104–07 (D.D.C. 2025) (finding subgrantee plaintiffs had standing based on their inability to access grant funds); *Elev8 Baltimore, Inc. v. Corp. for Nat'l and Comty. Serv.*, 804 F. Supp. 3d 524, 544–45 (D. Md. 2025) (same).

Because the plaintiffs here all seek the same relief, and because at least one of them has standing to challenge the Termination Decision, the Court need not make its analysis any "more complicated than it needs to be" by puzzling over the extent to which the other seven plaintiffs have standing here. *See Diamond Alt. Energy*, 606 U.S. at 125. Instead, the Court next turns to Defendants' other two jurisdictional defenses

**B. Defendants' Other Jurisdictional Defenses Are Without Merit**

The other jurisdictional issue implicated by Plaintiffs' claims is sovereign immunity. This is because, unless it has been waived, sovereign immunity shields federal agencies from suit. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *Davallou v. United States*, 998 F.3d 502, 504 (1st Cir. 2021). While the APA waives sovereign immunity for certain suits against the federal government, that waiver does not apply if another statute that waives sovereign immunity forbids the relief that is sought. *Dept. of Educ. v. California*, 604 U.S. 650, 651 (2025). Further, the APA only waives sovereign immunity against claims that challenge agency decisions that (1) constitute "final agency action"; and (2) are not "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(2), 704.

Defendants argue that the APA's waiver of sovereign immunity does not apply to Plaintiffs' claims for two reasons. (ECF No. 35 at 40–55.) First, they contend that Plaintiffs' claims are challenges to grant terminations that must, under the Tucker Act, only be brought in the Court of Federal Claims. *Id.* at 40–50; *see* 28 U.S.C. § 1491. Second, Defendants contend that the only final agency action Plaintiffs

challenge are the individual grant terminations, and that administration (and, consequently, termination) of SFA was committed to EPA's discretion by the OBBBA. (ECF No. 35 at 50-55.)

Of these two defenses, the first carries more weight. As the Supreme Court has explained, the APA's waiver of sovereign immunity does not apply to lawsuits that seek "to enforce a contractual obligation to pay money." *California*, 604 U.S. at 651. Under the Tucker Act, those lawsuits must instead be brought before the Court of Federal Claims. *Id.*; *see also* 5 U.S.C. § 702 (limiting APA actions to those "seeking relief other than money damages"). This exclusive jurisdiction holds true for claims brought under the APA when those claims seek relief that "takes the form of an injunction to pay the funds obligated under existing grants." *Woonasquatucket*, 2026 WL 2279789, at *17. This is so even when the plaintiff is not themself able to bring those claims before the Court of Federal Claims. *See id.*.

Defendants find support for their position that the Tucker Act bars Plaintiffs' claims here from the dismissal of the state grantees' challenges to the Termination Decision in *Arizona v. EPA*, No. 2:25-cv-02015-TMC (W.D. Wash. Oct. 16, 2025), 2026 WL 1533001 (W.D. Wash. June 1, 2026). There, while acknowledging that the states expressly argued that they were challenging the Termination Decision, and not individual grant terminations, the court nevertheless found that the states' claims were essentially contractual and thus subject to the exclusive jurisdiction of the Court of Federal Claims. *Id.* at *9. In reaching that conclusion, the court applied a two-part test established by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959

(D.C. Cir. 1982), for determining whether an APA claim is a "disguised contract action." That test looks to (1) "the source of the rights upon which the plaintiff bases its claims"; and (2) "the type of relief sought." *Id.* at 968. As the court found, both considerations weighed in favor of the state grantees' claims being contractual in nature because the source of the states' rights were their rescinded SFA grants, and because the type of relief they sought was "retroactive relief akin to specific performance of a contract." *See Arizona*, 2026 WL 1533001, at *6–9.

Here, however, Plaintiffs lack any contractual relationship with Defendants. The sources of the rights upon which they base their claims are the APA and the Constitution, rather than the terms of any grant issued to them by the federal government. *See Cmty. Leg. Servs. in E. Palo Alto v. U.S. Dept. Health & Human Servs.*, 155 F.4th 1099, 1100 (9th Cir. 2025) (concluding that "[t]he bottom line is that Plaintiffs have no contract with the Government," and that therefore "Plaintiffs' claims have no business before the Court of Federal Claims.") (cleaned up). Further, unlike the state grantees, Plaintiffs' requested relief would not directly result in the disbursement of funds from the federal government to them. That some degree of monetary relief might flow to them as a result of a favorable ruling does not automatically mean that their claims are barred. *See Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988) (explaining how the APA's legislative history "demonstrate[s] conclusively that the exception for an action seeking 'money damages' should not be broadened beyond the meaning of its plain language"). Thus, even were the Court to follow the test outlined in *Megapulse*—which has not yet been expressly adopted

by the First Circuit—the critical distinctions between Plaintiffs' claims and those brought by the state grantees weigh against dismissal here.

Defendants' other jurisdictional argument—that Plaintiffs challenge a decision that is not final agency action and that is committed to agency discretion by law—fares no better. Agency action is considered final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature"; and (2) it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116–17 (1st Cir. 2024) (internal quotation marks omitted) (quoting *Bennett*, 520 U.S. at 178). The Termination Decision explicitly marked the consummation of EPA's decision-making process, was neither tentative nor interlocutory, and legal consequences (i.e., grant terminations) flowed from it. And as explained above, the OBBBA did not convert the obligated SFA grants into lump-sum appropriations that EPA had unilateral discretion to administer. *See Illinois v. Fed. Emerg. Mgt. Agency*, 801 F. Supp. 3d 75, 91 (D.R.I. 2025) (finding no commitment to agency discretion where "the grants at issue [] are governed by statutory and regulatory frameworks that provide judicially manageable standards for review"). Plaintiffs' claims consequently do not fall within the exceptions to the APA's waiver of sovereign immunity outlined in 5 U.S.C. §§ 701(a)(2), 704.

**C. EPA's Termination of SFA Was Contrary to Law**

Having concluded that it has jurisdiction over Plaintiffs' claims, the Court next turns to the merits. The APA empowers district courts to "hold unlawful and set

aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). When administering federal statutes, an agency's power to act is limited to whatever authority Congress delegated to it. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). When an agency acts outside the bounds of its statutory authority, it violates the APA. *Id.*

As described above, the OBBBA did not convert SFA funding into a lump-sum amount subject to EPA's discretion. Instead, Congress's clear intent was that EPA continue to administer the already obligated SFA grants. Defendants acted contrary to this intent, and with no other statutory authority, when they terminated the SFA program. The Termination Decision was therefore contrary to law and in excess of its statutory authority, in violation of the APA.[2]

**D. Plaintiffs are Entitled to Vacatur**

Having concluded that Defendants violated the APA, the Court now turns to the proper remedy. In their Complaint, Plaintiffs request that the Court (1) issue a declaratory judgment finding that the Termination Decision was unlawful; (2) vacate the Termination Decision; (3) direct EPA to reinstate the SFA program; (4) "Enjoin EPA from de-obligating or otherwise interfering with the availability of the funds";

[2] Having concluded that Defendants acted contrary to law and in excess of their statutory authority, the Court need not resolve the merits of Plaintiffs' other claims against Defendants: that the Termination Decision was arbitrary and capricious and that it violated the Presentment Clauses and the Spending Clause.

(5) retain jurisdiction over this matter to ensure Defendants' compliance; (6) award Plaintiffs fees and costs; and (7) grant any other relief the Court deems just and proper. (ECF No. 1 ¶ 250.) Defendants, on the other hand, contend that any granted remedy should be limited to remand of the Termination Decision to the EPA, that Plaintiffs have waived any request for an injunction by failing to directly address it in their Motion for Summary Judgment, and have otherwise failed to satisfy the requirements for permanent injunctive relief. (ECF No. 35 at 74–76.) Defendants also argue that an injunction would lack any independent effect should the Court order vacatur, and that it should be denied on that ground as well. *Id.* at 75.

To the extent that Defendants challenge the availability of vacatur here, they are wrong. *See Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025) (explaining that "existing Supreme Court and First Circuit precedent affirms vacatur to be appropriate" for APA challenges). The First Circuit recently affirmed the availability of vacatur in *Woonasquatucket River Watershed Council*, where it explained that "a district court may vacate unlawful agency action, 'preventing the agency from using it going forward.'" *See* 2026 WL 2279789, at *18 (quoting *New York v. Trump*, 171 F.4th 1, 30 (1st Cir. 2026)). As the Court has determined that the Termination Decision violated the APA, vacatur is the appropriate remedy here.

With that established, it is unclear why permanent injunctive relief would also be necessary here. Defendants acknowledge that, while Plaintiffs' requested injunction would "prohibit[] continued implementation of the unlawful termination," that "is exactly what vacatur would do." (ECF No. 37 at 36.) As the Supreme Court

has explained, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also Greene v. Ablon*, 794 F.3d 133, 157 (1st Cir. 2015) ("An injunction should not be granted where 'a less drastic remedy' will suffice.") (quoting *Monsanto*, 561 U.S. at 165–66). Given Defendants' representation that vacatur is sufficient to prohibit continued implementation of the Termination Decision, and because Plaintiffs have not demonstrated why injunctive relief beyond vacatur is necessary here, the Court concludes that a permanent injunction is not warranted.

## IV. CONCLUSION

For these reasons, the Court GRANTS Plaintiffs' Motion for Summary Judgment (ECF No. 32) and DENIES Defendants' Cross-Motion for Summary Judgment (ECF No. 35). Defendants' termination of the Solar for All program is declared unlawful under the APA and is ordered vacated.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

September 18, 2026